No. 22-1891

# United States Court of Appeals for the Federal Circuit

## APPLE INC.,

*Appellant,*

*v.*

## MASIMO CORPORATION,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. IPR2020-01524

## APPLE INC.'S OPENING BRIEF

Lauren A. Degnan
W. Karl Renner
Christopher Dryer
Michael J. Ballanco
Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

*Attorneys for Appellant Apple Inc.*

October 19, 2022

**Claim 1 of U.S. Patent No. 10,433,776 (Appx53-78).**

1.  A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Apple Inc. ("Apple") certifies the following:

1.   Provide the full names of all entities represented by undersigned counsel in this case.

   **Apple Inc.**

2.   Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

   **Apple Inc.**

3.   Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **None**

4.   List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

   **Fish & Richardson P.C.: Daniel D. Smith, and Kim H. Leung**

5.   Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

   *Masimo Corporation, et al. v. Apple Inc.,*
   **Case No. 8:20-cv-00048 (C.D. Cal.)**

   *Apple Inc. v. Masimo Corporation,*
   **Case No. 22-1890 (Fed. Cir.)**

6.   Provide any information required under Fed. R. App. P. 26.1(b)
     (organizational victims in criminal cases) and 26.1(c) (bankruptcy case
     debtors and trustees). Fed. Cir. R. 47.4(a)(6).

     **None/Not Applicable**

Dated:  October 19, 2022          */s/ Lauren A. Degnan*
                                  Lauren A. Degnan

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................. v

STATEMENT OF RELATED CASES ................................................. vii

JURISDICTIONAL STATEMENT .................................................... viii

STATEMENT OF ISSUES .................................................................. ix

INTRODUCTION ............................................................................... 1

STATEMENT OF THE CASE AND FACTS ....................................... 2

I.     THE '776 PATENT PURPORTS TO INVENT A LOW
       POWER OXIMETER .................................................................2

       A.     "Multiple Sampling Mechanisms" / "Power
              Consumption"....................................................................2

       B.     The '776 Patent Relies on Conventional and Known
              Technology .......................................................................5

II.    THE PATENT TRIAL AND APPEAL BOARD
       PROCEEDINGS........................................................................6

SUMMARY OF THE ARGUMENT .................................................... 8

ARGUMENT ................................................................................... 10

I.     STANDARD OF REVIEW .......................................................10

II.    THE BOARD ERRED IN PROHIBITING A ZERO-
       PERCENT DUTY CYCLE IN CONTRADICTION TO THE
       CLAIMS AND WITHOUT INTRINSIC SUPPORT FOR A
       NEGATIVE LIMITATION .......................................................10

       A.     Claim 1 Does Not Prohibit a Zero-Percent Duty Cycle.....11

              1.     The Remainder of Claim 1 Does Not Require the
                     Board's Negative Limitation.................................... 13

B.     The Specification's Disclosure of a Zero-Percent Duty Cycle Prevents the Board from Meeting the Exacting Standard To Impose the Negative Limitation ....................................17

        1.     The Specification Discloses a "Data Off" Period with a Zero-Percent Duty Cycle ............................................. 18

              a.     The Data Off Period Is an Explicitly Contemplated State ......................................... 18

              b.     The Board Erroneously Placed Undue Significance on the Specification's Use of "Data Off State" Rather than "Data Off Duty Cycle" ................................................. 22

        2.     There Is Inadequate Support for the Board's Negative Limitation ................................................. 24

C.     Dependent Claims 6 and 15 Recite Operating in the "Data Off" State, Supporting the Presence of a Zero-Percent Duty Cycle..............................................................28

D.     The Board's Reliance on Extrinsic Evidence To Contradict the Clear Intrinsic Record Was Misplaced.......................30

CONCLUSION .................................................... 32

ADDENDUM ..................................................... 33

CERTIFICATE OF SERVICE AND FILING ................................... 112

CERTIFICATE OF COMPLIANCE................................... 113

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ........................................................31

*Aqua Prods., Inc. v. Matal*,
  872 F.3d 1290 (Fed. Cir. 2017) ........................................................25

*CIAS, Inc. v. All. Gaming Corp.*,
  504 F.3d 1356 (Fed. Cir. 2007) ........................................................12

*Cont'l Circuits, LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ..........................................................26

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) ...................................................25, 26

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
  29 F.4th 1365 (Fed. Cir. 2022) .........................................................31

*Gillette Co. v. Energizer Holdings, Inc.*,
  405 F.3d 1367 (Fed. Cir. 2005) ........................................................30

*Homeland Housewares, LLC v. Whirlpool Corp.*,
  865 F.3d 1372 (Fed. Cir. 2017) ...................................................11, 17

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 801 (Fed. Cir. 2021) ...........................................................10

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) ........................................................31

*Kaufman v. Microsoft Corp.*,
  34 F.4th 1360 (Fed. Cir. 2022) .........................................................22

*Laitram Corp. v. NEC Corp.*,
  62 F.3d 1388 (Fed. Cir. 1995) ....................................................28, 29

*MTD Prod. Inc. v. Iancu*,
  933 F.3d 1336 (Fed. Cir. 2019) ........................................................27

v

*Nike, Inc. v. Adidas AG*,
  812 F.3d 1326 (Fed. Cir. 2016) ...........................................................24

*Omega Eng'g, Inc., v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ...........................................................25

*Profectus Tech. LLC v. Huawei Techs. Co.*,
  823 F.3d 1375 (Fed. Cir. 2016) ...........................................................10

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ...........................................................26

*In re Varma*,
  816 F.3d 1352 (Fed. Cir. 2016) ...........................................................30

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ...................................................15, 17

## Statutes

35 U.S.C. § 112(d) ...................................................................................29

## STATEMENT OF RELATED CASES

Per Federal Circuit Rule 47.5(a), Apple states that no other appeals from this proceeding have previously been before this or any other appellate court.

Per Federal Circuit Rule 47.5(b), Apple is aware of the following pending case that may directly affect or be directly affected by this Court's decision in the pending appeal as it also concerns the same patent:

- *Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020).

# **JURISDICTIONAL STATEMENT**

This Court has jurisdiction over the Board's final written decision in an *inter partes* review proceeding under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## <u>STATEMENT OF ISSUES</u>

1.    Whether the Board erred by injecting a negative limitation into the construction of "duty cycle."

# **INTRODUCTION**

This appeal arises from an IPR proceeding reviewing U.S. Patent No. 10,433,776.  The Board determined that Apple had not shown the challenged claims were unpatentable over the grounds in Apple's petition.  A critical basis for this determination was the Board's errant construction of the claim term "duty cycle," which this Court should reverse in part.

The Board erred in interpreting "duty cycle" by injecting a negative limitation into the construction.  This negative limitation—which is that the duty cycle must not have an activity ratio of 0%—is not supported by the plain claim language, which provides no restriction or guidance on specific ratios necessary for a duty cycle.  Dependent claims reinforce this conclusion as they recite a "data off" state that is correlated to the recited first duty cycle, consistent with the written description's teachings.  Although the Board relied on the specification to support its narrowing construction, it did not even attempt to find the independent lexicography or express disclaimer needed to support a negative limitation, and neither exists.  The Board's use of extrinsic evidence to overcome this strong intrinsic evidence was further error.

The Board's negative limitation excluding a 0% duty cycle should be set aside, and the Board's decision vacated and remanded so that the Board may proceed under the correct construction.

## STATEMENT OF THE CASE AND FACTS

I.    **THE '776 PATENT PURPORTS TO INVENT A LOW POWER OXIMETER**

A.    **"Multiple Sampling Mechanisms" / "Power Consumption"**

The '776 patent generally describes a "pulse oximeter." Appx72 (1:13-31). The '776 patent explains that "[p]ulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply." *Id.* (1:13-15). Based on these oxygen saturation measurements, pulse oximeters can derive metrics such as a patient's oxygen saturation and pulse rate. *Id.* (1:64-2:11).

The '776 patent describes a pulse oximeter that is "low power" in that it "utilizes multiple sampling mechanisms to alter power consumption" by "increasing or decreasing the number of input samples received and processed." Appx74 (5:63-64, 6:13-14). The '776 patent adopts a sampling mechanism that, for example, employs an "emitter duty cycle control" that "determines the duty cycle of the current supplied by the emitter drive outputs 482 to [multiple] sensor emitters." Appx74 (5:64-6:2). The sampling mechanism described by the patent first "acquir[es] an input signal sample and subsequently "processe[s]" the input signal sample to determine whether it should modify power consumption. Appx74 (6:14-18). Once the determination is made to modify the power consumption, the '776 patent explains that "multiple sampling mechanisms," Appx74 (5:63-65),

"modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed[,]" Appx74 (6:12-14).

Several exemplary sampling mechanisms, with different associated levels of power consumption, are provided by the '776 patent. These include a "high duty cycle," "low duty cycle," and "data off" states. Appx75 (8:14-26); Appx68-69 (Figs. 8-9). By modifying the power consumption according to states such as these, the '776 patent says that sampling can be reduced during high signal quality periods and increased when the signal quality period is low or when important measurements are deemed necessary. Appx74 (6:14-18).

Claims 1 and 6 are illustrative of the claims at issue, with emphasis added to show claim language particularly relevant to this appeal.

> 1. A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:
>
> > operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;
> >
> > when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

3

generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operating of the patient monitor *according to the first control protocol operates the first control protocol light source according to a first duty cycle* and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a *second duty cycle*, wherein power consumption of the first control protocol light source according to the *first duty cycle* is different than power consumption of the second control protocol light source according to the *second duty cycle*.

Appx77 (cl. 1 at 11:41-12:21).[1]

6.  The method of claim 1, wherein said operating the patient monitor in *accordance with the first control protocol* comprises *operating the first control protocol light source in a data off state*.

_____

[1] All emphasis added unless otherwise noted.

Appx77 (cl. 6 at 12:43-46).

  **B.  The '776 Patent Relies on Conventional and Known Technology**

   Pulse oximeters like those described in the '776 patent were not new at the time of the alleged invention.  Physiological monitoring for pulse oximetry, for example, was available in the late 1990s.  *See, e.g.*, Appx488; Appx492 (1:38-40).  The general concept of modifying the functioning of a pulse oximeter to reduce its power consumption was also not new at the time of the '776 patent's alleged invention.  Indeed, the '776 patent admits that, at the time of invention, pulse oximetry was "[i]ncreasingly . . . utilized in portable, battery-operated applications," and that "[a] conventional approach for reducing power consumption in portable electronics . . . is to have a 'sleep mode' where the circuitry is powered-down when the devices are idle."  Appx72 (1:51-63).

   During prosecution of the '776 patent, Masimo faced rejections based on prior art which discloses continuously operating at a lower power consumption level and reducing a duty cycle.  Appx215-216.  The '776 patent overcame this rejection by cancelling claims and adding new claims that were much more limited, focusing specifically on the use of different sampling mechanisms to reduce power consumption.  Appx163-164; Appx241-242.

## II.    THE PATENT TRIAL AND APPEAL BOARD PROCEEDINGS

Apple's petition for *inter partes* review of the '776 patent asserts six obviousness grounds of unpatentability, all using U.S. Patent No. 5,555,882 to Richardson ("Richardson") as the base reference.  Appx88.  Richardson teaches a method for detecting and reducing the effects of noise on oximeters.  Appx93 (citing Appx492 (1:11-15, 2:35-37); Appx411-412 (¶35)).  Richardson achieves this result through its use of three different operational states, which variously turn off and activate the device's light sources.  Appx94-95 (citing Appx492-496 (2:57-64, 5:17-24, 5:41-57, 6:2-4, 6:66-7:3, 7:58-63, 8:46-49, 9:40-43, 9:52-63)).  Apple also presented several other prior art references, not directly at issue in this appeal, in combination with Richardson.  Appx88.

The Board determined that Apple had not proven the challenged claims to be unpatentable over the prior art grounds in Apple's petition.  Appx51.  A critical factor, at issue in this appeal, driving the Board's decision was its construction of the claim term "duty cycle."

The Board's "duty cycle" construction is multi-faceted.  First, the Board determined the claimed "first duty cycle" and "second duty cycle" cannot be the same and must be different.  Appx9-11.  The parties had disputed this aspect of the construction earlier in the proceeding, but by the time of the oral hearing, all

parties agreed that the first and second duty cycles must be different. Appx9-10. That portion of the construction is not at issue on appeal.

Another aspect of the construction was whether "duty cycle" should be construed, as proposed by Masimo, to mean "the ratio of operating time (or on time) of a light source to the total time period during which the light source is intermittently operated, expressed as a percentage.'" Appx11. Apple had not proposed construing the term "duty cycle" in this way, yet did not oppose the construction. Appx15 (citing Appx1318-1320). The Board adopted this understanding of "duty cycle," which is also not at issue on appeal. Appx16-17.

The final aspect of the construction, and the one at issue in this appeal, is whether the claim term "duty cycle" carries with it a negative limitation that "neither the first nor the second duty cycles can be 0%"; the Board concluded it does. Appx13-21; Appx49. The Board's primary support for this construction was its belief that the claims recite an oximeter that would not be able to measure heart rate with a 0% duty cycle. Appx17-18. The Board reached this conclusion by misapprehending the written description's disclosure of a "data off" state, also captured in dependent claims, that Apple argued demonstrates the existence of a 0% duty cycle, and by erroneously assuming that each of the one or more of a plurality of light sources would be off in such a cycle. Appx18-20.

As a result of the Board's limiting construction of "duty cycle," the Board

determined that Richardson does not disclose the recited "duty cycles" and,

therefore, that Apple had not shown the challenged claims unpatentable under the

grounds that rely on (1) Richardson alone, and (2) Richardson combined with

Bindszus.  Appx28-31.

## SUMMARY OF THE ARGUMENT

The Board's "duty cycle" construction is flawed and requires this Court's

correction.  Although the parties are in partial agreement on the construction of

"duty cycle"—namely, the requirement that the claimed first duty cycle and second

duty cycle must be different—the Board's negative limitation that the duty cycle

may not be 0% is improper and should be stricken from the construction.

The claims themselves guide the meaning of claim terms, and the '776

patent's claims do not support the Board's prohibition of a 0% duty cycle.  The

Board's reasoning that some lights must remain active to measure metrics like

heart rate does not justify the negative limitation.  Under the correct interpretation

of the claim language as a whole, which recites one or more of a plurality of light

sources, some lights may remain active while a light source operates according to a

duty cycle of 0%, making the Board's concern misplaced.

Indeed, the specification describes an embodiment with a 0% duty cycle.

Specifically, a "data off" state contemplates turning off light emitters, and thus

having a 0% duty cycle. The specification explains that this "data off" state may operate "in conjunction with" a particular duty cycle. This disclosure plainly teaches that "data off" can be a duty cycle. The Board's contrary interpretation shows, at most, a potential ambiguity that does not rise to the level of a clear lexicography or disavowal prohibiting a 0% duty cycle. Lexicography or disavowal is the caliber of specification support the Board would have needed to bar the claims from encompassing a 0% duty cycle. The Board did not even purport to have this support, and it does not exist.

Additionally, dependent claims 6 and 15 explicitly recite the "data off" state described in the specification. This recitation expressly connects the "data off" state with the first duty cycle recited by the independent claim, thus providing additional strong support for the construction of "duty cycle" not to exclude a ratio of 0%.

To the extent the Board relied on extrinsic evidence from Masimo's expert, that evidence must take a secondary role to the clear and powerful intrinsic record of the '776 patent. Given the intrinsic evidence here, the Board's reliance on expert testimony does not justify the negative limitation. Although the Board's construction of duty cycle is correct in some respects, its unjustified exclusion of a 0% duty cycle must be set aside.

# ARGUMENT

## I.   STANDARD OF REVIEW

"Claim construction is ultimately a question of law, decided de novo on review, as are the intrinsic-evidence aspects of a claim-construction analysis." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021) (citing *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1380 (Fed. Cir. 2021)).  In appeals from the Board, "any underlying fact findings about extrinsic evidence" is reviewed for substantial evidence.  *Id.*  However, "[e]xtrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"  *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1380 (Fed. Cir. 2016) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc)).

## II.   THE BOARD ERRED IN PROHIBITING A ZERO-PERCENT DUTY CYCLE IN CONTRADICTION TO THE CLAIMS AND WITHOUT INTRINSIC SUPPORT FOR A NEGATIVE LIMITATION

A key aspect to the '776 patent is its notion of varying the device's power consumption by adjusting the amount of time the oximeter's pulse-sensing lights are active.  The claimed "duty cycle" represents that number as a percentage, which the parties agree is the ratio of time the light emitters are active to the overall time that the lights are intermittently operated.  Appx11; Appx15.  The challenged claims each require a "first duty cycle" and "second duty cycle."  The

parties also agree that the claimed "first duty cycle" must be different, i.e., have a different ratio, from the claimed "second duty cycle."  Appx10 (quoting Appx1517 6:1-7).

Where the parties disagree is whether a duty cycle of 0% is permitted as one of either the "first" or "second" claimed duty cycles.  The Board held that it is not, thereby placing a negative limitation on the claims.  Both the claims and the specification demonstrate that the Board's construction was in error, and it should be reversed.

## A.    Claim 1 Does Not Prohibit a Zero-Percent Duty Cycle

The claim construction analysis for a term must begin by examining the claim in which the term is found.  *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) ("The claim construction inquiry begins and ends in all cases with the actual words of the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)).  Examination of the '776 patent's independent claims demonstrates that they do not prohibit a 0% duty cycle.

Claim 1 is a representative method claim, with several relevant portions reproduced below.

> 1.  A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method ***comprising***:

operating the patient monitor according to a first control protocol, wherein said ***operating includes activating a first control protocol light source*** in accordance with the first control protocol, ***the first control protocol light source including one or more of a plurality of light sources***;

. . .

wherein said operating of the patient monitor according to the first control protocol ***operates the first control protocol light source according to a first duty cycle*** . . . .

Appx77 (11:41-12:21).

Several features of the claim are notable. First, the claim limitations are introduced with the word "comprising," making the claim open-ended. Appx77 (11:44); *see, e.g., CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean "including but not limited to."). Second, because the claimed "first control protocol light source" may include "one or more of a plurality of light sources," it could in actuality have multiple component light sources. Appx77 (11:48-50). Indeed, the '776 patent explains that using both a red and infrared light source together was common in oximetry. *See* Appx72 (1:18-22).

Third is the claim's introduction of the term "duty cycle," according to which the "first control protocol light source" operates. Appx77 (12:11-13). The specification describes several exemplary "duty cycles"—for instance, the "high duty cycle," the "low duty cycle," the "intermittently reduced duty cycle," and the "data off" period lasting "longer than one drive current cycle." Appx69 (Fig. 9);

12

Appx74 (6:61-64) (describing illustrations of drive currents having a high duty cycle or a low duty cycle); Appx75 (7:11-18) (describing an intermittently reduced duty cycle where "there may be a 'data off' time period longer than one drive current cycle where the emitter drivers 480 (FIG. 4) are turned off").[2]  Importantly, however, the claim is agnostic as to which, if any, of these exemplary duty cycles forms the claimed "first duty cycle."  Thus, the claim indicates that the term "duty cycle" does not require a particular activity ratio.[3]

### 1.   The Remainder of Claim 1 Does Not Require the Board's Negative Limitation

A driving force behind the Board's exclusion of a 0% duty cycle was its understanding that some light source must always remain on according to the claim.  This understanding came from another limitation in the claim that requires calculating measurements of metrics such as "heart rate" based on light.  Appx17-18; Appx72 (11:51-57).  Specifically, the Board noted that "the first and second

---

[2] The specification refers to the power consumption during these periods with reference to "various engine control states."  Appx75 (8:4-6); Appx75 (8:12-15) ("The profile 800 shows the three control engine states 810 and the associated power consumption level 820.  These three states are high duty cycle 812, low duty cycle 814 and data off 818."); *id.* at (8:16-26) (describing "high duty cycle state," "low duty cycle state," and "data off state").

[3] The claim also describes a second control protocol, second control protocol light source, and second duty cycle.  Appx77 (11:63-12:10, 12:14-21).  These limitations resemble the limitations for their "first control protocol" counterparts, although the parties and Board agree that the first duty cycle must be different from the second duty cycle.  Appx10 (quoting Appx1517 (6:1-7)).

control protocol light sources" recited in claim 1 must "generate light so that the patient monitor can calculate a pulse rate based on the light." Appx17. The Board then reasoned that the first and second duty cycles cannot be 0% because these light sources "would not generate light to enable [the] pulse rate calculation as required by the claims." *Id.*

However, the Board misunderstood the interplay of the "first control protocol light source" with the "first duty cycle." Because the "first control protocol light source" may have multiple light sources,[4] only one of those light sources needs to operate "according to the first duty cycle" under the claim. Appx77 (12:12-13). In other words, so long as one of the plurality of light sources in the first control protocol light source operates according to the first duty cycle, the "duty cycle" claim limitation can be satisfied. Appx1318-1319; Appx416-420 (¶¶44-45, 49-50).

By way of analogy, this is similar to controlling the lights in one's house. One would properly be considered to have dimmed the house's lights—and to operate them a dimmed level—even if only some of the lights were dimmed and others remained at full strength. The same is true according to the plain language of claim 1 as it relates to operating a plurality of light sources making up the

---

[4] Appx77 (11:48-50) ("the first protocol light source including one or more of a plurality of light sources").

control protocol light source according to a duty cycle. As long as one of the lights in the plurality is operated at a duty cycle greater than 0%, the device can take measurements from that light even if other lights in the plurality operate at a 0% duty cycle, and are off. Appx1318-1319; Appx416-420 (¶¶44-45, 49-50). Indeed, the "measurement" limitation requires only that the measurements be responsive to "light from the first control protocol light source," and not light from *each* of the plurality of lights comprising the light source. Appx77 (11:53-54).

The Board disagreed with this interpretation of the claim language. Importantly, the Board's conclusion was rooted in the specification's disclosure of an attribute of the preferred embodiments: "the Specification of the '776 patent consistently describes patient monitors having multiple LEDs, which operate as a unit at the same low or high duty cycle." Appx18-19. In addition to improperly reading in aspects of a preferred embodiment into its construction,[5] the Board failed to appreciate an admission by Masimo on this very point. During the oral hearing, Masimo acknowledged that there is "no express teaching against" operating the different lights at different duty cycles, and "no indication in the patent that would discourage that . . . ." Appx1536 (25:1-13). Masimo repeated this answer even more directly when asked a second time:

---

[5] *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015) ("A court may not import limitations from the written description into the claims."). *See also* Arg. Sec. II.B.2 *infra*.

[Q]: . . . So, [the '776 patent] doesn't exclude a duty cycle, say the red at being 3 percent and the infrared at being 25 percent?  Is that an accurate statement?

[A]: That's right. . . . ***[T]here's no express statement in the patent that says, you know, you could not mix and match your duty cycles***.

Appx1539 (28:5-10).[6]  Had the Board recognized this admission, it would have appreciated that, even with a 0% duty cycle applied to one or more of the lights in the plurality, measurements could still be taken by other light sources that were active and operated at a level above 0%.

The remainder of the Board's analysis on this point is not compelling.  First, the Board relies on the conclusory *ipse dixit* testimony of Masimo's expert that "a person of ordinary skill in the art would not have understood a 'first duty cycle' or a 'second duty cycle' to encompass two distinct percentages of on time for different LEDs."  Appx896-897 (¶68).  As discussed further below, extrinsic expert testimony cannot be used to override the plain language of the claims, and so the Board should not have relied on this unreliable evidence.  *See* Arg. Sec. II.D, *infra*.

---

[6] Masimo attempted to recover from this admission by alleging that the claims somehow require that all lights in a control protocol light source plurality operate in lockstep according the same duty cycle.  Appx1539 (28:10-23).  As already discussed, this argument led the Board to error because the plain claim language recites that the control protocol light source may contain one or more lights.  Operating the control protocol light source according to a duty cycle is effectuated if some of the lights in the plurality function at that duty cycle.

Second, the Board relies on attorney argument from Masimo that the claims do not recite "one or more of a plurality of light sources operate according to a first duty cycle," but rather "the first control protocol operates the first protocol light source according to a first duty cycle."  Appx19.  However, by the same token, the claims also do not recite that "every light within a plurality of light sources operate according to a first duty cycle."  What is clear is that the claims do not include a restricting statement that would lead to the Board and Masimo's interpretation.  Accordingly, the negative limitation should be excised from the Board's construction.

### B.    The Specification's Disclosure of a Zero-Percent Duty Cycle Prevents the Board from Meeting the Exacting Standard To Impose the Negative Limitation

Claims should "be read in view of the specification of which they are a part[,]" *Homeland Housewares*, 865 F.3d at 1376 (quoting *Phillips*, 415 F.3d at 1315), but "[a] court may not import limitations from the written description into the claims," *Williamson*, 792 F.3d at 1346 (internal quotations, citation, and emphasis omitted).

The specification of the '776 provides for a 0% duty cycle, which is reason alone to reject the Board's negative limitation.  Nonetheless, even accepting the Board's incorrect interpretation of the specification, that interpretation does not

carry the heavy burden needed to import a negative limitation from the

specification into the claims as the Board has done.

### 1. The Specification Discloses a "Data Off" Period with a Zero-Percent Duty Cycle

#### a. The Data Off Period Is an Explicitly Contemplated State

The '776 patent specification describes an oximeter having a "data off" state

that corresponds to a duty cycle.  The '776 patent explains that, in a preferred

embodiment, the oximeter will have three states it can operate in: "These three

states are high duty cycle 812, low duty cycle 814 and data off 818."  Appx75

(8:14-15).  The specification describes how they the oximeter transitions from one

of these states to another.  Appx75-76 (8:33-9:18).  Figure 9 provides a state

diagram depicting these various states and the state-transition paths interconnecting

them:



FIG. 9

Appx69 (annotations added).

In one of its embodiments, the '776 patent provides exemplary activity ratios of 25% for the high duty and 3.125% for the low duty cycle states, respectively. Appx72 (2:43-44); Appx75 (8:16-24). As for the data off state, the specification explains that light emitters are turned off and no sensor samples are processed from these inactive lights. *See id.* (8:24-26) ("[T]he control engine 440 (FIG. 4) turns off the emitter drivers 480 (FIG. 4) and powers down the detector front-end 490 (FIG. 4)."); *id.* (8:38-40) ("[T]he pulse oximeter is able to enter the data off state 818, during which time no sensor samples are processed."). Thus, with light emitters not active, the activity ratio for these emitters in this "data off state" is 0%,

a point Masimo agreed upon.  Appx1319; Appx806.  Figure 8, which shows power

consumption according to the various states, helps to illustrate this point, showing

that power consumption drops to a base level during the "data off" periods:



FIG. 8

Appx68 (annotations added).

Critically, the written description relates the "data off" period to a duty

cycle.  In one particular passage, the '776 patent first describes a duty cycle in

which the activity ratio "is intermittently reduced" from a higher level to a lower

level, and refers to it as the "intermittently reduced duty cycle."  Appx75 (7:9-12).

The '776 patent then continues that "*[i]n conjunction with an intermittently*

*reduced duty cycle* or as an independent sampling mechanism, *there may be a*

*'data off' time period* longer than one drive current cycle where the emitter drivers

480 (FIG. 4) are turned off." *Id.* (7:11-15); *see also* Appx75 (7:15-18) (identifying

another component that may be turned off "during such a data off period").

The meaning of this passage is clear: "data off" may form a duty cycle—

specifically, the exemplary intermittently reduced duty cycle. When the '776

patent states that the intermittently reduced duty cycle may occur "in conjunction"

with the data off state, it is referring to a data cycle where the emitter drivers are

turned off for "a time period longer than one drive current cycle"—i.e., a "data off

period" or "data off state." Appx75 (7:11-18); id. (8:14-26) (describing the states).

The passage also provides an alternative, in which "data off" is not necessarily the

intermittently reduced duty cycle but instead "an independent sampling

mechanism." *Id.* (7:12-13). Taken together, this portion of the patent reveals that

the "data off" state can function as either an intermittently reduced duty cycle, or it

may function as some other manner for sampling within the oximeter. Appx1320

("[T]he data off state and the reduced duty cycle can occur at the same time; *i.e.*,

the reduced duty cycle can correspond to the data off state."); Appx16.

The '776 patent therefore discloses an embodiment in which "data off," or

0% activity ratio, constitutes a duty cycle. By disallowing duty cycles having a 0%

activity ratio, the Board's construction reads this contemplated embodiment out of

the claims. Appx22. This construction should be viewed with skepticism because

"[a] claim construction that excludes a preferred embodiment is rarely, if ever

correct . . . ." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022)

(citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996))

(quotations omitted).  Indeed, the Board had to muster "highly persuasive

evidentiary support" to read a preferred embodiment out of the claims.  *Id.* at 1372.

That evidence does not exist, as punctuated in the following section, which

demonstrates that there is no lexicography or disavowal support for the Board's

limiting "duty cycle" construction.

> **b.    The Board Erroneously Placed Undue Significance on the Specification's Use of "Data Off State" Rather than "Data Off Duty Cycle"**

The Board disregarded the evidence Apple identified in the specification

showing that "data off" may constitute a duty cycle because the Board said that the

'776 patent does not use the term "duty cycle" to name the "data off" state.  *See*

Appx20-21.

This analysis, however, fundamentally overlooks the portion of the

specification indicating that the "data off" period may function "in conjunction

with" a duty cycle.  Appx75 (7:11-15).  To the extent the Board adopted Masimo's

argument that this passage means that the data off period may work "together

with" the reduced duty cycle, that is simply ***not*** the most natural interpretation of

the passage.  If it were, the passage would not continue that the data off period may

also function as an "independent sampling mechanism," which is more aligned with the notion of working together with another duty cycle. Appx75 (7:13).

In addition, to restrict "duty cycle" from constituting a 0% ratio, the Board relied on the "[s]pecification distinguish[ing] operating between the data off state and the low duty cycle," which it alleged shows "that these states were not contemplated to be one in the same." Appx20. This observation erroneously presumes that the intermittently reduced duty cycle is necessarily the same as the low duty cycle. The written description does not explicitly draw a link between the intermittently reduced duty cycle discussed in one portion of the written description and the low duty cycle discussed in another portion. *Compare* Appx75 (7:7-15), *with id.* (8:47-61). Thus, there is no reason to believe that, when the '776 patent describes the intermittently reduced duty cycle, it is necessarily referring exclusively to the low duty cycle.

Furthermore, the written description uses the term "period" rather than "cycle" when introducing the concept of the "data off" period during the explanation of the "intermittently reduced duty cycle" because the duration of this data off period may be longer than a single drive current cycle: "there may be a 'data off' time period longer than one drive current cycle where the emitter drivers 480 (FIG. 4) are turned off." Appx75 (7:11-15). In addition, the specification uses the word "state" in connection with "high duty cycle," "low duty cycle," and "data

off," explaining that the engine control states are, in the exemplary embodiments of Figures 8 and 9, the "high duty cycle state," "low duty cycle state," and "data off state." Appx75 (8:4-26, 8:47-51, 8:64-65, 67); Appx76 (9:3, 7).

Given this context, there is nothing unusual about the patent's discussing the interaction between two duty cycles like the low power cycle and the data off states. Indeed, the claims themselves require the presence of a "first" and "second" duty cycle that interact with one another. Appx77 (cl. 1). By using "first duty cycle" and "second duty cycle" rather than the "low duty cycle" and "high duty cycle" from the written description, the '776 patent illustrates an intent to capture a broader scope—one that covers all the power saving states including the data off state.

### 2. There Is Inadequate Support for the Board's Negative Limitation

Despite the clear disclosure in the '776 specification providing for a 0% duty cycle, the Board incorrectly relied on the specification to support excluding a 0% duty cycle from the claims' ambit. However, even assuming, *arguendo*, that the Board's interpretation of the "data off" state in the specification were correct, that is an insufficient basis by which to limit the claims.

The Board's prohibition of a 0% duty cycle serves to exclude matter from the claims' scope, and is thus a negative limitation. *See Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1347 (Fed. Cir. 2016) ("Negative limitations generally recite an

express exclusion of material."), *overruled on other grounds by Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1296 & n.1 (Fed. Cir. 2017). Courts cannot merely infer negative limitations from a patent's specification. Rather, construing a claim to have a negative limitation based on the specification requires an "***express intent** to confer on the claim language the novel meaning imparted by th[e] negative limitation.*" *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). There must be "***express disclaimer or independent lexicography*** in the written description that would justify adding that negative limitation." *Id.*[7]

The Board did not purport to satisfy this high standard when it relied on the specification for its construction, nor could it have. Even the Board's flawed interpretation that the patent teaches that the "data off" state differs from a duty cycle in some way is insufficient. *See, e.g.*, Appx21 (Board explaining under its interpretation "the data off state is consistently described as being different" from a duty cycle) (quotations omitted)).[8]

More than this inferential support is needed to support the negative limitation, as "[t]he standards for finding lexicography and disavowal are exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed.

---

[7] As neither party nor the Board focused on prosecution history, the analysis herein focuses on the specification component of the intrinsic record.

[8] As explained above, a difference that the written description advances is that the "data off" period lasts longer than one drive current cycle. Appx75 (7:11-15).

Cir. 2014). For lexicography to apply, the written description must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). The Board's analysis of the "data off" state does not cite or evince any clear statement of definition that excludes a 0% duty cycle from the plain and ordinary meaning of "duty cycle." The Board's analysis also does not establish the applicant's clear intent to define duty cycle as excluding an active ratio of 0%.

For disavowal, the specification "must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Cont'l Circuits, LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (quotations omitted); *Thorner*, 669 F.3d at 1366. The Board's analysis does not cite any such statements of "manifest exclusion or restriction," and none exist. *Id.*

Apart from the "data off" state, the Board's additional reliance on the specification is equally, if not more, inferential, and fails the lexicography and disavowal tests for negative limitations. For example, the Board asserts that the specification describes the duty cycle "as consistently being 'in the range of about 3.125% to about 25%.'" Appx17 (quoting Appx72 (2:43-44)). This assertion takes the specification out of context, as it reads: "*In a particular embodiment*, the duty cycle *may* be in the range of about 3.125% to about 25%." Appx72 (2:43-

44).  This facially exemplary statement does not constitute a clear intent to define a duty cycle necessarily falling within that range, and excluding 0%.  *See MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) ("As with all lexicography, it is not enough for a patentee to simply disclose a single embodiment.  Rather, the patentee must clearly express an intent to redefine the term." (quotations omitted)).

The Board also cites the embodiment in Figure 5 and its associated text as purported support for the notion that multiple lights comprising a control protocol light source cannot operate according to different duty cycles.  Appx19 (citing Appx65 (Fig. 5); Appx74-75 (6:59-7:18)).  Yet, the '776 patent provides this embodiment "by way of example[] only."  Appx77 (11:34-35).  Moreover, Masimo admitted that "***there's no express statement in the patent that says, you know, you could not mix and match your duty cycles***" between different light sources.  Appx1539 (28:5-10).

The specification plainly does not provide lexicography or disavowal needed to support the Board's negative limitation.  Apple's non-limiting construction of "duty cycle" is the only one that does not place artificial limitations on the claim language that is, at most, inferred from a potentially ambiguous description of a preferred embodiment.

### C.    Dependent Claims 6 and 15 Recite Operating in the "Data Off" State, Supporting the Presence of a Zero-Percent Duty Cycle

In addition to its presence in the specification, the "data off" state appears in the dependent claims, thus informing the "duty cycle" construction. *Laitram Corp. v. NEC Corp.*, 62 F.3d 1388, 1392 (Fed. Cir. 1995) ("[D]ependent claims can aid in interpreting the scope of claims from which they depend.").

Dependent claim 6 recites: "operating the patient monitor in accordance with the first control protocol comprises ***operating the first control protocol light source in a data off state***." Appx77 (cl. 6 at 12:43-46). Dependent claim 15 is substantively the same. Appx78 (cl. 15 at 14:27-31). Reading these dependent claims in harmony with claim 1 makes clear that the "data off" state—which has a 0% activity ratio—can form a duty cycle:

> Claim 1: ". . . operating of the patient monitor according to the first control protocol ***operates the first control protocol light source according to a first duty cycle*** . . . ."
>
> Claim 6: " The method of claim 1, wherein said operating the patient monitor in accordance with the first control protocol comprises ***operating the first control protocol light source in a data off state***."

Appx77 (cl. 1 at 11:41-12:21; cl. 6 at 12:43-46).

The only way to read these claims consistently with each other is for the "data off" state to be the claimed first duty cycle. Appx1319-1320. Specifically, claim 1 recites that "the first control protocol ***operates*** the first control protocol light source according to ***a first duty cycle***." Claim 6 further claims that "the first

28

control protocol comprises *operating* the first control protocol light source *in a data off state*."  Both of these claims describe how the first control protocol "operates" the light source.  The first duty cycle of claim 1 is still operating when the additional requirement of claim 6—operation in a data off state—occurs.  In order for both to operate concurrently, the "first duty cycle" cannot exclude a data off state.  Claim 6 would not a proper dependent of claim 1 if its operation on the light source according to the data off state did not also satisfy claim 1's "first duty cycle" limitation.

*Laitram* illustrates this point in a way directly applicable to this case.  The parties' disputed in *Laitram* whether the independent claim of a printing method covered a "strobing" process.  62 F.3d at 1392.  The Court recognized that a strobing step was recited by one of the claims depending from the independent claim.  *Id.* at 1392-93.  The Court held that the independent claim must therefore be construed broadly enough to encompass strobing.  *Id.* at 1394.  That logic, applied here, means that duty cycle must be construed to cover a 0% duty cycle, else the dependent claim could not cover the independent claim, which is not permitted.  *See* 35 U.S.C. § 112(d) ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

The Board improperly disregarded claims 6 and 15 in its claim construction analysis.  According to the Board, these claims describe a "data off" state in which

the method may operate that is separate from the first duty cycle, in part because claim 6 uses the word "comprising." Appx20. Although the word "comprising" can make a claim open-ended, meaning it is not restricted to what additional features may exist beyond those claimed, it is also true that "'comprising' is not a weasel word with which to abrogate claim limitations." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1376 (Fed. Cir. 2005); *see also In re Varma*, 816 F.3d 1352, 1362-63 (Fed. Cir. 2016). The Board's interpretation violates this latter maxim by avoiding claim 1's "operates . . . according to a first duty cycle" limitation.

Apple's interpretation is most natural and preserves the logic of the claim set as a whole by allowing the independent and dependent claims to mutually co-exist and make sense.

### D.    The Board's Reliance on Extrinsic Evidence To Contradict the Clear Intrinsic Record Was Misplaced

Throughout its duty cycle claim construction, the Board cites to a declaration submitted by Masimo's expert Dr. Madisetti. For example, the Board cites heavily to Dr. Madisetti to support its determinations that: (1) the claims require that the duty cycle operate on all lights in the plurality of lights forming the control protocol light source, Appx18-19; *see* Arg. Sec. II.A, *supra*; and (2) dependent claims 6 and 15 do not demonstrate a 0% duty cycle, Appx19-20; *see* Arg. Sec. II.C, *supra*.

"[E]xtrinsic sources like expert testimony cannot overcome more persuasive intrinsic evidence." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). For that reason, "[e]xtrinsic evidence may never be relied upon . . . to vary or contradict the clear meaning of terms in the claims," *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995) (en banc)), and is permissible only "where the testimony is consistent with the interpretation required by the intrinsic evidence," *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022) (quotation omitted). As explained above, the Board's construction restricting a 0% duty cycle is not supported by, and is contrary to, the intrinsic record, including the claim language itself, the specification, and dependent claims. The Board therefore was not permitted to use Dr. Madisetti's testimony to salvage Masimo's proposed construction. *See* Appx18-19 (citing Appx881 (¶42) (observing an inactive light source would not generate light and asserting such would prevent the monitor to calculate the measurement values of the pulse rate), Appx883 (¶¶45-46) (describing '776 patent's disclosure)).

Other extrinsic evidence the Board cited is plainly irrelevant. For example, the Board repeatedly cites paragraph 68 of Dr. Madisetti's declaration. *See* Appx19 (citing Appx896-897). In this paragraph, Dr. Madisetti explains application of the "duty cycle" limitation to the Richardson prior art reference, and

speculates without support about what a POSITA would have understood about the "duty cycle" limitation. *See* Appx896-897. With this discussion being targeted towards the prior art rather than analyzing the intrinsic evidence, it is of marginal relevance, at best, but certainly should not play a meaningful role in the "duty cycle" claim construction.

Therefore, Dr. Madisetti's testimony is insufficient to support the Board's negative limitation.

## **CONCLUSION**

For the foregoing reasons, the restriction of a 0% duty cycle should be stricken from the Board's construction, and the Board' decision should be vacated and remanded, instructing the Board to proceed under the proper construction for "duty cycle."

Dated:  October 19, 2022          Respectfully submitted,

  */s/ Lauren A. Degnan*
Lauren A. Degnan
W. Karl Renner
Christopher Dryer
Michael J. Ballanco
Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Telephone: (202) 783-5070

**Attorneys for Appellant Apple Inc.**

# ADDENDUM

Trials@uspto.gov                                        Paper 29
571-272-7822                              Entered: April 29, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————————

IPR2020-01524
Patent 10,433,776 B2

———————————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01524
Patent 10,433,776 B2

# I.    INTRODUCTION

## A.    Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–16 ("challenged claims") of U.S. Patent No. 10,433,776 B2 (Ex. 1001, "the '776 patent").  Paper 2 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response. Paper 6.  We instituted an *inter partes* review of all challenged claims on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 7 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 15, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 18, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 20, "Sur-reply").  An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record.  Paper 28 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  Based on the record before us and for the reasons set forth below, Petitioner has not met its burden of showing, by a preponderance of the evidence, that any challenged claim of the '776 patent is unpatentable.

## B.    Related Matters

The parties identify the following matters related to the '776 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

IPR2020-01524
Patent 10,433,776 B2

> *Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);
*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB
Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);
*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);
*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553);
*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553);
*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and
*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2–3.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '776 patent.  Pet. 68; Paper 3, 1.

## C.     The '776 Patent

The '776 patent is titled "Low Power Pulse Oximeter," and issued on October 8, 2019, from U.S. Patent Application No. 16/174,144, filed October 29, 2018.  Ex. 1001, codes (21), (22), (45), (54).  The '776 patent claims priority through a series of continuation applications to Provisional Application No. 60/302,564, filed July 2, 2001.  *Id.* at codes (60), (63).

The '776 patent relates to a pulse oximeter that may reduce power consumption in the absence of certain parameters that may be monitored to

trigger or override the reduced power consumption state. *Id*. at code (57). "In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations." *Id.*

As depicted below, the low power pulse oximeter has signal processor (340) that derives physiological measurements (342), including oxygen saturation, pulse rate, and plethysmograph, from input sensor signal (322). Ex.1001, 4:65–5:16, Figs. 3, 4.



FIG. 3

Figure 3 illustrates a top-level block diagram of a low power pulse oximeter. *Id.* at 4:41–42. Signal processor (340) may also derive signal statistics (344), such as signal strength, noise, and motion artifact. *Id.* at 5:16–17, Figs. 3, 4. Physiological measurements (342) and signal statistics (344) may be input into sampling controller (360), which outputs sampling controls (362) that in turn are used to regulate pulse oximeter power dissipation by causing sensor interface (320) to vary the sampling characteristics of sensor port (302) and by causing signal processor (340) to

IPR2020-01524
Patent 10,433,776 B2

vary its sample processing characteristics. *Id.* at 5:17–26, Figs. 3, 4. According to the '776 patent, power dissipation "is responsive not only to output parameters, such as the physiological measurements 342, but also to internal parameters, such as the signal statistics 344." *Id.* at 5:26–29.

The pulse oximeter uses the physiological measurements and signal statistics to determine "the occurrence of an event or low signal quality condition." Ex. 1001, 6:28–31. An event determination is based upon the physiological measurements and "may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform." *Id.* at 6:31–37. A low signal quality condition is based upon the signal statistics and "may be any signal-related indication that justifies the processing or more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact." *Id.* at 6:37– 42.

The pulse oximeter "utilizes multiple sampling mechanisms to alter power consumption." Ex. 1001, 5:62–64. One sampling mechanism is "an emitter duty cycle control" that "determines the duty cycle of the current supplied by the emitter drive outputs 482 to both red and IR sensor emitters." *Id.* at 5:64–6:2. The sampling mechanisms "modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed." *Id.* at 6:12–14. "Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary." *Id.* at 6:14–

18. "In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers . . . are turned off." *Id.* at 7:11–15. The occurrence of an event or low signal quality triggers a higher duty sensor sampling, allowing high fidelity monitoring of the event and providing a larger signal-to-noise ratio. *Id.* at 8:47–61.

*D.    Illustrative Claim*

Of the challenged claims, claims 1 and 11 are independent. Claim 1 is illustrative and is reproduced below.

1.[p] A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

[a] operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

[b] generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

[c] in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different

IPR2020-01524
Patent 10,433,776 B2

from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

[d] wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

Ex. 1001, 11:40–12:21 (bracketed identifiers p–d added). Independent claim 11 is an apparatus claim that includes limitations substantially similar to limitations [a]–[d] of claim 1. *Id.* at 12:60–14:9.

### E.    *Applied References*

Petitioner relies upon the following references:

Richardson et al., U.S. Patent No. 5,555,882, filed August 24, 1994, issued September 17, 1996 (Ex. 1004, "Richardson");

Bindszus et al., U.S. Patent No. 6,178,343 B1, filed May 20, 1999, issued January 23, 2001 (Ex. 1005, "Bindszus"); and

Turcott, U.S. Patent No. 6,527,729 B1, filed October 11, 2000, issued March 4, 2003 (Ex. 1006, "Turcott").

Pet. 3–4.

IPR2020-01524
Patent 10,433,776 B2

Petitioner also submits, *inter alia*, the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003). Patent Owner submits, *inter alia*, the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2002). The parties also provide deposition testimony from Dr. Anthony and Dr. Madisetti, including from this proceeding and others. Exs. 1038, 2005, 2006.

### F.    *Asserted Grounds of Unpatentability*

We instituted an *inter partes* review based on the following grounds. Inst. Dec. 9, 23.

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–8, 11–16 | 103 | Richardson (first mapping) |
| 1–9, 11–16 | 103 | Richardson (second mapping) |
| 9, 10 | 103 | Richardson (either mapping) and Bindszus |
| 1–9, 11–16 | 103 | Richardson and Turcott (first mapping) |
| 1–9, 11–16 | 103 | Richardson and Turcott (second mapping) |
| 9, 10 | 103 | Richardson and Turcott (either mapping) and Bindszus |

### II.    DISCUSSION

### A.    *Claim Construction*

For petitions filed on or after November 13, 2018, a claim "shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2019). Petitioner submits that no claim term requires express construction. Pet. 7. Nonetheless, we determine that the parties' briefing

identifies certain aspects of the claim language that implicate claim

construction, as discussed below.

1.    *Whether the "first duty cycle" must be different from the "second duty cycle."*

Each independent claim requires "a first duty cycle" and "a second

duty cycle."  For example, claim 1 requires in pertinent part:

> wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to *a first duty cycle* and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to *a second duty cycle*.

Ex. 1001, 12:11–16 (emphases added), 14:1–4 (claim 11).

Petitioner has based its patentability analysis on two alternative claim

interpretations (two distinct "mappings") of the claim limitations related to a

"first duty cycle" and "second duty cycle."  *See* Pet. 3, 16.  The first

mapping, which Petitioner classifies as the proper construction, requires that

the first and second duty cycles be different.  Pet. 16 ("Accordingly,

Richardson teaches operating the patient monitor according to different duty

cycles, *under the proper construction of 1[d]*." (emphasis added)), Pet. 50

("[u]nder the proper construction of 1[d] requiring a different duty cycle for

operating the infrared light source in State 2 than the duty cycle for

operating the infrared or red light source in State 1"), 56 (similar argument).

Petitioner argues that under a proper construction, the first and second duty

cycles cannot be identical, but the Petition does not provide any argument or

basis for this reasoning.

Petitioner, in an alternative mapping, then posits a second claim

interpretation theory for the "first duty cycle" and "second duty cycle"

IPR2020-01524
Patent 10,433,776 B2

limitations in which the first and second duty cycles need *not* be different.
Pet. 30. Specifically, Petitioner argues, "Richardson teaches this limitation
under an alternate construction of this limitation that does not require
different duty cycles for the first duty cycle and the second duty cycle." *Id.*

Patent Owner, relying on the testimony of Dr. Madisetti, contends that
the Board should construe the "first duty cycle" to be different from the
"second duty cycle," consistent with Petitioner's first mapping. PO Resp. 22
(citing Ex. 2002 ¶¶ 48–53). Patent Owner argues the Specification of the
'776 patent requires different first and second duty cycles whereas claims 1
and 11 use "first" and "second" to distinguish the duty cycles. *Id.* at 23
(citing *Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed.
Cir. 2005) ("A claim construction that gives meaning to all the terms of the
claim is preferred over one that does not do so."). Patent Owner contends
that "[c]laims 1 and 11 further clarify that one of the differences between the
first and second control protocols are the duty cycles." *Id.* (citing Ex. 1001,
12:11–21).

During the oral hearing, Petitioner conceded that it was now accepting
the position that the first and second duty cycle must be different. Tr. 6:1–7
(Petitioner's counsel stating that "the parties agree that the claims require the
first and second duty cycle to be different").

We determine that the surrounding claim language and the
Specification of the '776 patent support the now agreed upon interpretation
that the first and second duty cycle must be different. *See* Ex. 1001, 11:45–
46, 11:63–65, 12:11–21, 6:64–7:2 (distinguishing constant duty cycle pulse
oximeters), 7:2–4, 8:4–24, Fig. 8.

IPR2020-01524
Patent 10,433,776 B2

As discussed more below, Petitioner has conceded that the grounds of
unpatentability based upon its second mapping of Richardson are no longer
viable under the interpretation that the first and second duty cycle must be
different. *See* Tr. 6:8–9, 27:4–24; Pet. 16, 26. Based on Petitioner's
concession, our analysis below focuses on those arguments directed to the
first mapping of Richardson – "[t]he first mapping assumes that the claims
require the first and second duty cycles to be different." Tr. 6:2–3.

2.    *Construction of "duty cycle" and whether the "duty cycle" can be
0%.*

Patent Owner requests that we "construe 'duty cycle' to mean 'the
ratio of operating time (or on time) of a light source to the total time period
during which the light source is intermittently operated, expressed as a
percentage.'" PO Resp. 17 (citing Ex. 2002 ¶ 36). Further, according to
Patent Owner, "[t]he 'first duty cycle' and 'second duty cycle' cannot be 0%
based on the claims and '776 patent specification." *Id.* at 19 (citing
Ex. 2002 ¶¶ 40–47).

Patent Owner contends that the person of ordinary skill in the art
would have understood "duty cycle" to be "the ratio of operating time to
total elapsed time of a device that operates intermittently, expressed as a
percentage," because "[t]he '776 patent consistently describes the 'duty
cycle' as the ratio of the operating time (or on time) of the red and infrared
LEDs to the total time period during which the LEDs are intermittently
operated, expressed as a percentage." PO Resp. 17–18 (citing Ex. 2004,
225; Ex. 2002 ¶¶ 37, 39; Ex. 1001, 2:43–44). Patent Owner notes that the
'776 patent discloses a method of reducing the power consumption of a
patient monitor by "intermittently reducing the drive current duty cycle." *Id.*

11

IPR2020-01524
Patent 10,433,776 B2

(quoting Ex. 1001, 6:59–7:11).  Patent Owner notes that "[t]he 'drive current' is the current supplied by the red and infrared LED drivers (also called the 'emitter drivers')", and "[t]he LEDs operate (i.e., are turned on and emit light) when the LED drivers supply current."  *Id.* at 18 (citing Ex. 1001, 2:43–44, 8:16–20; Figs. 4, 8).

Patent Owner relies on Figure 5 of the '776 patent, seen below, which "illustrates an 'emitter driver output current' versus time profile for a pulse oximeter."  PO Resp. 18 (quoting Ex. 1001, 6:59–60).



Patent Owner's annotated Figure 5 depicts the LEDs operating in high duty cycle state 502 (red) and the LEDs operating in a low duty cycle state 504 (green).  *Id.*  According to Patent Owner, the illustration shows that when the LEDs are operating in a high duty cycle, they receive current from the emitter driver and are operating (i.e., are turned on and emit light) for 25% of the total time period during which the LEDs are intermittently operated, and conversely, when the LEDS are operating in a low duty cycle, the LEDs receive current and operate (i.e., are turned on and emit light) for 3.125% of the total time period during which the LEDs are intermittently operated.  *Id.* at 19 (citing Ex. 1001, 6:58–61, 7:4–8, 8:15–24, Fig. 8).  Patent Owner thus

IPR2020-01524
Patent 10,433,776 B2

contends that the '776 patent uses "duty cycle" to mean "the ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage." *Id.* (citing Ex. 2002 ¶¶ 37–39).

As to Patent Owner's contention that the first duty cycle and second duty cycle cannot be 0%, Patent Owner first looks to the surrounding language of claim 1, and notes it "requires 'operating the patient monitor according to a first control protocol,' where the first control protocol 'operates the first control protocol light source according to a first duty cycle.'" PO Resp. 20 (quoting Ex. 1001, 11:45–46, 12:11–13). Patent Owner next relies on the claim language "that 'when operating according to the first control protocol,' the patient monitor calculates 'measurement values of the pulse rate' that are 'responsive to light from the first control protocol light source.'" *Id.* (quoting Ex. 1001, 11:51–57). "Thus," according to Patent Owner, the claims "require the 'first control protocol light source' to generate light so that the patient monitor can calculate the pulse rate based on the light." *Id.* (citing Ex. 2002 ¶ 41). Patent Owner reasons that "if the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light." *Id.* (citing Ex. 2002 ¶ 42). Accordingly, if the first control protocol light source had a duty cycle of 0%, Patent Owner contends "the monitor could not calculate the 'measurement values of the pulse rate' as required by claims 1 and 11," and, therefore, "the 'first duty cycle' must be a percentage greater than zero so that the first control protocol light source generates light, thereby permitting the monitor to calculate 'measurement values of pulse rate' responsive to that light." *Id.*

IPR2020-01524
Patent 10,433,776 B2

Patent Owner notes that the claim language related to the second control protocol operating the second control protocol light source is similar to that above, such that the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the second control protocol light source." PO Resp. 20–21 (quoting Ex. 1001, 12:4–10). Patent Owner similarly argues that "the 'second duty cycle' must be a percentage greater than zero so that the second control protocol light source generates light, thereby permitting the monitor to calculate 'measurement values of pulse rate' responsive to that light." *Id.* at 21.

Next, Patent Owner notes that the Specification "never mentions a duty cycle of 0%," but instead the Specification "consistently describes a patient monitor having high and low duty cycles greater than 0%." *Id.* (citing Ex. 1001, 2:39–44, 7:4–11, 8:14–15; Ex. 2002 ¶¶ 45–46). Patent Owner points out that the duty cycle of the preferred embodiment "is varied within a range from about 25% to about 3.125%." *Id.* (quoting Ex. 1001, 7:4–9).

Next, Patent Owner distinguishes the "data off state" from the duty cycle. PO Resp. 21–22. According to Patent Owner, the "data off state" is the situation of having the LEDs inactive for longer than one cycle. *Id.* (citing Ex. 1001, 7:11–15; Ex. 2002 ¶ 46). Patent Owner argues that the Specification distinguishes the data off state from the first and second duty cycles and further relies on the language stating "[i]n conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers are turned off." *Id.* at 22 (quoting Ex. 1001, 7:11–15 (emphasis omitted)) (citing Ex. 1001, 8:14–15, 8:16–32, 8:47–61).

14

Patent Owner contends this language is "an example of first and second duty cycles in conjunction with a data off state," and "[a] data off state is a different state where the light sources are turned off for more than one period." Tr. 25:20–26:5. Further, Patent Owner contends that "in conjunction with" means that "it works together with." Tr. 32:2–3, 32:11–14 ("I think it has its plain meaning. It means together with. They operate together with each other. . . . It doesn't mean that they operate simultaneously and it doesn't mean that they are replacements for each other.").

Petitioner contends that the "first duty cycle" can be 0%. Pet. Reply 1. Petitioner does not expressly disagree with the proposed construction of duty cycle to require a ratio of operating time, but Petitioner is firm that the duty cycle may be calculated to be zero percent. *See id.* at 1–3; Tr. 42:3–20 ("[T]hey're adding on this requirement that that ratio can't be zero. It's not like you have a ratio of zero to some positive value is undefined. That actually you can compute that, it's zero. So, I don't see how the restriction that it can't be zero flows from an argument that it has to be a ratio."). Petitioner contends that nothing in the claim language or specification of the '776 patent supports a restriction that the "first duty cycle" cannot be 0%. Pet. Reply 1.

According to Petitioner, the claim requirements identified by Patent Owner are still satisfied when the "first duty cycle" is 0%. *Id.* More "[s]pecifically, claims 1 and 11 recite 'the first control protocol light source including ***one or more of a plurality of light sources***' and 'operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle.'" *Id.* (quoting

IPR2020-01524
Patent 10,433,776 B2

Ex. 1001, 11:48–50, 12:11–13, 13:5–7, 13:35–14:1).  Petitioner contends that "[a]s long as one of the plurality of light sources is operated at a duty cycle greater than 0%, the patient monitor can calculate measurement values of the pulse rate from that one light source even if another of the plurality of light sources is operated at a duty cycle of 0%."  *Id.* at 2.

Petitioner next points to the claim language of dependent claims 6 and 15 that requires a "data off state."  Pet. Reply 2.  Petitioner argues that the language, "operating the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state," allows for the "first duty cycle" to be 0%.  *Id.* (quoting Ex. 1001, 12:43–46, 14:23–26).  According to Petitioner, the "first duty cycle" corresponds to "a data off state" and a "light source operating with a duty cycle of 0% is operating in a data off state."  *Id.*

Petitioner reads the language from the Specification stating that operating in the data off state can be "[i]n conjunction with an intermittently reduced duty cycle," as allowing the data off state and the reduced duty cycle to occur at the same time; i.e., the reduced duty cycle can correspond to the data off state.  *Id.* at 3 (citing Ex. 1001, 7:11–15) (emphasis omitted).  Further, Petitioner contends that the Specification describes three control states: "high duty cycle," "low duty cycle," and "data off," but the Specification "does not indicate which control state corresponds to the claimed 'first duty cycle' and 'second duty cycle.'"  *Id.* (citing Ex. 1001, 8:14–32, 8:47–61).

Based on the final record, we find Patent Owner's proposed interpretation of "duty cycle" persuasive.  The evidence cited supports "duty cycle" to mean "the ratio of operating time (or on time) of a light source to

the total time period during which the light source is intermittently operated, expressed as a percentage." *See* Ex. 2002 ¶ 36 (relying on an electronics dictionary and testifying as to how the '776 patent uses "duty cycle" consistent with its plain and ordinary meaning to require a ratio of operating time to total elapsed time). We are persuaded by the Specification of the '776 patent describing the "duty cycle" as the ratio of the operating time (or on time) of the red and infrared LEDs to the total time period during which the LEDs are intermittently operated, expressed as a percentage. *See* Ex. 1001, 2:43–44; Ex. 2004, 225; Ex. 2002 ¶¶ 37, 39. The duty cycle is described as consistently being "in the range of about 3.125% to about 25%." Ex. 1001, 2:43–44, Figs. 5, 8.

The weight of the evidence, including the claim language and Specification, convinces us that neither the first nor the second duty cycles can be 0%. The claims require the first and second control protocol light sources to generate light so that the patient monitor can calculate a pulse rate based on the light. *See* Ex. 1001, 11:45–12:21 ("when operating according to the first control protocol, calculating . . . measurement values of the pulse rate, . . . responsive to light from the first control protocol light source" and "calculating the measurement values of the pulse rate, . . . responsive to light from the second control protocol light source"); Ex. 2002 ¶¶ 41, 42. The first and second duty cycles cannot be 0% because the light sources of the first and second control protocol light source would not generate light to enable pulse rate calculation as required by the claims. *See* Ex. 2002 ¶ 42 ("[I]f the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light. If the light source did not generate light the monitor could not calculate the 'measurement

IPR2020-01524
Patent 10,433,776 B2

values of the pulse rate" as required by claims 1 and 11.") ¶ 44 ("[A]s with
the first control protocol light source, if the second control protocol light
source had a duty cycle of 0%, the light source would be inactive and would
not generate light."); Ex. 1001, 12:12–13.

Based on the context of the claim language, and supporting
explanations in the Specification, we determine that a 0% duty cycle is not
within the scope of the invention.  As explained persuasively by
Dr. Madisetti:

> If the light source did not generate light, the monitor could not
> calculate the "measurement values of the pulse rate" as required
> by claims 1 and 11.  For this reason, the "first duty cycle" must
> be a percentage *greater* than zero (i.e., it cannot be 0%) so that
> the first control protocol light source generates light, thereby
> permitting the monitor to calculate "measurement values of pulse
> rate" responsive to that light.

Ex. 2002 ¶ 42.  *See also* Tr. 44:14–20 ("[T]he claims require that when
you're operating according to the first control protocol you must calculate
measurement values of the pulse rate and when you're operating according
to the second control protocol, . . .  you must calculate the measurement
values of the pulse rate and the problem is if the LEDs are turned off you
cannot calculate the measurement value.").

We find unpersuasive Petitioner's reliance on the claim language
requiring "the first control protocol light source including one or more of a
plurality of light sources," to argue that as long as one of the plurality of
light sources is operated at a duty cycle greater than 0%, the patient monitor
can calculate measurement values of the pulse rate from that one light
source.  *See* Pet. Reply 1–2 ("As long as one of the plurality of light sources
is operated at a duty cycle greater than 0%, the patient monitor can calculate

18
**Appx18**

IPR2020-01524
Patent 10,433,776 B2

measurement values of the pulse rate from that one light source even if
another of the plurality of light sources is operated at a duty cycle of 0%.").
As Patent Owner notes, "[t]he claims do not state that 'one or more of a
plurality of light sources' operate according to a first duty cycle," but
instead, "the claims state, 'the first control protocol operates the first control
protocol light source according to a first duty cycle.'"  Sur-reply 2 (emphasis
omitted).  Thus, we agree with Patent Owner that the claims presume that
the individual light source(s) that comprise the first protocol light source
operate as a unit according to the same, first duty cycle.  *See id.*
Dr. Madisetti testifies persuasively that a person of ordinary skill in the art
would not have understood a "first duty cycle" or a "second duty cycle" to
encompass two distinct percentages of on time for the different LEDs that
may make up the "protocol light source."  Ex. 2002 ¶ 68.  For example, the
Specification of the '776 patent consistently describes patient monitors
having multiple LEDs, which operate as a unit at the same low or high duty
cycle.  *See* Ex. 1001, 6:59–7:18, Fig. 5.  As noted by Patent Owner, the
'776 patent does not disclose monitors that simultaneously drive multiple
LEDs at different duty cycles.  *See* Sur-reply 3; Ex. 2002 ¶¶ 45–46.  We also
agree with Dr. Madisetti that a person of ordinary skill in the art "would not
have understood 'duty cycle' to refer to the additive percentages of 'on time'
of two drive signals that drive different LEDs."  Ex. 2002 ¶ 68.

The "data off" state claimed in claims 6 and 15 does not support
Petitioner's position that the first duty cycle can be 0%.  The '776 patent
distinguishes between high and low duty cycles and a "data off state" where
the LEDs are inactive for longer than one cycle. *See* Ex. 2002 ¶¶ 45–46.  We
do not agree with Petitioner that to satisfy claims 6 and 15, the first duty

19

cycle can be in a data off state. Pet. Reply 2. Notably, claims 6 and 15 do not state that the first duty cycle is a data off state, as Petitioner argues. Rather, claims 6 and 15 use the word "comprises," which requires operating according to the first control protocol to encompass operating the first control protocol light source both "according to a first duty cycle" (claims 1/11) and "a data off state" (claims 6/15). *See* Sur-reply 4. As noted above, the LEDs have to be on in claims 1/11 for the surrounding claim requirements to function. The argument that the system of claims 1/11 could operate in just a data off state is inconsistent with the claim language and the more logical reading of claims 6 and 15 is that the data off and reduced duty cycle states can operate "in conjunction with" each other, not simultaneously. *See* Ex. 1001, 8:33–46, Fig. 8 (duty cycles and data off states not simultaneous). *See* Tr. 46:1–4 ("[A] data off state is not a duty cycle. It's not a first duty cycle, it's not a second duty cycle, so the idea that there can be this zero percent duty cycle that's inconsistent with the specification and it's inconsistent with the claims.").

The Specification identifies two of the control states as "duty cycles," and a third distinct time interval as a "data off state"; thus, the claimed first and second duty cycles can be the low or high duty cycles, but not a data off state. *See* Ex. 1001, 8:33–46 (identifying "low duty cycle" and "high duty cycle" as two control states but noting that the pulse oximeter may "enter the data off state" during a distinct "third time interval"). Further, the Specification distinguishes operating between the data off state and the low duty cycle showing that these states were not contemplated to be one in the same. *See id.* ("alternates between the data off state 818 and the low duty cycle state 814"); *see also id.* at Fig. 8 (duty cycles and data off states not

IPR2020-01524
Patent 10,433,776 B2

simultaneous). Thus, we agree with Patent Owner that "[t]he data off state is consistently described as being different from the first and second duty cycles or the low duty cycle and the high duty cycle." Tr. 45:19–21.

Based on the above evidence and arguments, we determine that neither the first nor the second duty cycles can be 0%.

### 3.    Other Claim Terms

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### B.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-

IPR2020-01524
Patent 10,433,776 B2

obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies." Pet. 6 (citing Ex. 1003 ¶ 32 ("someone with a working knowledge of physiological monitoring technologies")). "Alternatively, the person could have also had a

---

[1] Neither party has introduced objective evidence of non-obviousness. *See* Tr. 23:25–24:3.

IPR2020-01524
Patent 10,433,776 B2

Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "for this proceeding, [Patent Owner] applies the asserted level of skill identified in the Petition." PO Resp. 11–12.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D.    *Obviousness over the Teachings of Richardson (First Mapping)*

Petitioner contends that claims 1–8 and 11–16 of the '776 patent would have been obvious over the teachings of Richardson. Pet. 8–26. Patent Owner disagrees. PO Resp. 25–45; Sur-reply 2–5, 7–11.

Based on our review of the parties' arguments and the final record, we determine that Petitioner has not met its burden of showing by a preponderance of the evidence that claims 1–8 and 11–16 are unpatentable.

### 1.    *Overview of Richardson (Ex. 1004)*

Richardson is titled "Method and Apparatus for Reducing Ambient Noise Effects in Electronic Monitoring Instruments." Ex. 1004, code (54). Richardson "relates to a method and apparatus for detecting and reducing the effects of ambient electromagnetic noise . . . on electronic instruments." *Id.* at 1:11–15, 2:35–37. Richardson discloses "a method and apparatus for adapting to noise sources affecting a pulse oximeter." *Id.* at code (57). Richardson describes evaluating various frequencies to determine their respective noise levels and selecting one to act as the operating

IPR2020-01524
Patent 10,433,776 B2

demultiplexer frequency. *Id.* "During normal operation of the pulse oximeter, the various available demultiplexer frequencies are periodically scanned to determine which has the lowest associated noise," and "[t]he noise level associated with the operating frequency is used to determine the signal-to-noise ratio of the pulse oximeter signals" in order to "qualify certain signals from the pulse oximeter." *Id.* Richardson may rely upon noise levels to conserve power by reducing LED drive current while maintaining a safe signal-to-noise ratio. *Id.* at 3:3–7.

In Richardson, the pulse oximeter includes light sources that emit red and infrared light alternately into a patient's tissue and a photodetector that senses the light transmitted through the tissue. Ex. 1004, 1:37–45, 2:61–62, 4:2–5. Based on the changes in red and infrared light transmission, the pulse oximeter measures a physiological parameter. *Id.* at 1:46–61. Richardson addresses background noise by determining the noise level at each available operating frequency, and then selecting the frequency with the least noise to serve as the operating frequency for the instrument. *Id.* at 2:37–47. Richardson also periodically rescans the available frequencies to reevaluate the noise level and switches to a less noisy frequency, if available. *Id.* Richardson claims that these "techniques allow the invention to adapt to the total noise found in a given environment, such as a hospital." *Id.* at 2:49–51.

The oximeter operates in one of three states: State 0, State 1, or State 2. *Id.* at 5:41–43. In State 0, the oximeter turns off the light sources and monitors the photodetector signal at a given frequency to monitor noise in the oximeter signal. *Id.* at 2:57–64, 5:17–24, 5:43–53. The measured noise level is used to select a frequency at which the contribution of noise to the signal is relatively low. *Id.* at 3:1–17, 5:53–54, 7:58–63. After selecting a

IPR2020-01524
Patent 10,433,776 B2

frequency, the oximeter operates in a normal operating state, State 1, where both light sources are activated alternately at a frequency and the physiological parameter is monitored. *Id.* at 5:55–57, 6:66–7:3, 7:58–63, 8:46–49. When the oximeter is operating in State 1, the oximeter displays blood saturation values, a pulse waveform, and heart rate estimates and provides an audible pulse tone. *Id.* at 9:33–38, 9:43–47. If the oximeter determines that the signal-to-noise ratio decreases below an acceptable level, it reverts from State 1 to State 0 to search for a new frequency. *Id.* at 5:64–67, 7:3–18, 8:41–43, 8:50–64.

The oximeter may transition from State 1 to State 2 to reassess the noise at the current operating frequency. Ex. 1004, 6:1–2, 8:46, 9:39–43. In State 2, the red light source is turned off, and a new noise level is calculated by measuring the ambient noise in the red channel only. *Id.* at 6:2–4, 9:40–43, 9:52–63. In State 2, the infrared channel is operating, and the oximeter monitors the pulse rate, displays a pulse waveform and heart rate estimates, and provides an audible pulse tone. *Id.* at 6:4–7, 9:43–47. After calculating the new noise level, the oximeter returns to State 1 and operates normally using the new noise level. *Id.* at 6:7–10, 9:63–65.

## 2.     *Independent Claims 1 and 11*

Petitioner contends that claims 1 and 11 would have been obvious over Richardson. Pet. 10–17, 23–24. Because we determine that Richardson does not disclose all the limitations of claims 1 and 11, we focus our analysis below on those limitations. Specifically, limitations 1[d] and 11[d] of independent claims 1 and 11 require:

> [operating/operation] of the patient monitor according to the first control protocol operates the first control protocol light source

IPR2020-01524
Patent 10,433,776 B2

> according to a first duty cycle and said (operating/operation) of
> the patient monitor according to the second control protocol
> operates the second control protocol light source according to a
> second duty cycle.

*See* Pet. 15, 24. Based on our claim interpretations as set forth above, Petitioner's "first mapping" of Richardson does not disclose these limitations.

Petitioner's Contentions

Petitioner contends that it has established that Richardson discloses that the first control protocol (State 2) operates the first control protocol light source (the red LED) according to a first duty cycle of 0%, and the second control protocol (State 1) operates the second control protocol light source (the infrared LED) according to a second duty cycle of at least 25%. Pet. 17; Pet. Reply 7. "Relying on Dr. Anthony's testimony," Petitioner contends "that Richardson renders obvious that the power consumption of the first control protocol light source operating according to a duty cycle of 0% is different than the power consumption of the second control protocol light source operating according to a duty cycle of at least 25%." Pet. Reply 7 (citing Ex. 1003 ¶ 50); Pet. 17.

Petitioner contends that "in State 2, the red light source is turned off and has a duty cycle of 0%, and the infrared light source is operated with a duty cycle of at least 25%." Pet. 16 (citing Ex. 1003 ¶ 50; Ex. 1004, 9:40–43, 6:2–4, 9:52–63, 4:6–10). Petitioner notes that "[i]n State 1, both the red and infrared light sources are activated with a duty cycle of at least 25%," and as such, "Richardson discloses that the first control protocol, e.g., State 2, operates the first control protocol light source according to a first duty cycle, e.g., red LED at 0% duty cycle and infrared LED at 25% duty

IPR2020-01524
Patent 10,433,776 B2

cycle, and the second control protocol, e.g., State 1, operates the second control protocol light source according to a second duty cycle, e.g., red and infrared LEDs at 25% duty cycle." Pet. 16 (citing Ex. 1003 ¶ 50). Petitioner argues that Richardson teaches operating "the first control protocol light source according to a first duty cycle" because the red LED of the "first control protocol light source" is operated according to the "first duty cycle" of 0%. Pet. Reply 7.

Patent Owner Contentions

Patent Owner first contends that "Petitioner never identifies the first control protocol light source," and "is unclear whether it relies on the duty cycle of (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs." PO Resp. 35. Further, Patent Owner argues that regardless of the light source selected, a person of ordinary skill in the art "would not have understood (1) the red, (2) the infrared LED, or (3) the red and infrared LEDs in States 1 and 2 to operate according to a 'first duty cycle' and a 'second duty cycle' under the proper construction of those terms." *Id.* at 35–36.

Patent Owner contends that neither the red LED nor the infrared LED operate according to a "first duty cycle." PO Resp. 36–37. First, Patent Owner argues that the red LED does not operate according to a "first duty cycle," because the red LED has a duty cycle of 0% in State 2 and a duty cycle of at least 25% in State 1. *Id.* at 36 (citing Pet. 16). Patent Owner notes that "Petitioner identifies Richardson's State 2 as the 'first control protocol' and State 1 as the 'second control protocol.'" *Id.* (citing Pet. 10). Patent Owner relies on the claim construction that a "duty cycle" cannot be 0%, and argues that "Petitioner admits that in State 2 'the red light source is

27

IPR2020-01524
Patent 10,433,776 B2

turned off,'" "[t]hus, under the proper construction of 'first duty cycle,' turning off the red LED in State 2 (Petitioner's 'first control protocol') is not operating according to a 'first duty cycle' as required by claims 1 and 11." *Id.* (citing Ex. 2002 ¶ 66).

Next, Patent Owner contends that "[t]he infrared LED does not operate according to a 'first duty cycle' and 'second duty cycle' under the proper construction of the terms." *Id.* (citing Ex. 2002 ¶ 67). This is so because the parties agree "that the infrared LED operates at the same duty cycle, 'at least 25%,' in States 1 and 2," and the first and second duty cycles must be different under the "proper" claim construction. *Id.* at 36–37 (citing Pet. 16, 24, 50, 54; Ex. 1004, 4:6–7) (emphasis omitted).

Analysis

As we determined above, the claimed first and second duty cycles cannot be 0%. This determination precludes Petitioner's first mapping of Richardson from reading on claims 1 and 11.

Petitioner identifies the first mapping of Richardson as the transition of Richardson's oximeter from State 2 to State 1. Pet. 10 ("For this first mapping of Richardson . . . the claim elements . . . are mapped to disclosure in Richardson describing the oximeter transitioning from State 2 (as the first control protocol) to State 1 (as the second control protocol)."). Petitioner argues that State 2 (blue below) is the "first control protocol" and State 1 (orange below) is the "second control protocol" required by claims 1 and 11.

28

IPR2020-01524
Patent 10,433,776 B2



FIG. 2.

Patent Owner's annotated Figure 2 of Richardson (Ex. 1004) describes implementing the noise reduction methods in a pulse oximeter having three states, including State 1 (highlighted in orange) and State 2 (highlighted in blue). PO Resp. 33. Richardson's pulse oximeter transitions from State 1 to State 2 "[e]very 30 seconds," and "[t]he purpose of State 2 is to detect new noise sources that may have appeared since the last State 0 measurements." Ex. 1004, 9:39–42. In State 2, the oximeter reassesses the noise "by turning off one LED; typically the red LED," for about 1.4 seconds. *Id.* at 6:2–3, 9:52–53. When the 1.4 seconds (i.e., idle time) expires, the oximeter automatically returns to State 1 where it uses the newly estimated noise values. *Id.* at 9:63–65; *see also id.* at 9:66–10:5 (discussing idle time). When operating in State 1, the oximeter has both LEDs turned on. *Id.* at 5:55–67.

Petitioner argues that the red LED "has a duty cycle of 0%" in State 2 and a duty cycle of "at least 25%" in State 1. Pet. 16. Petitioner admits that in State 2 "the red light source is turned off." *Id.* As we determined in the claim construction analysis, a person of ordinary skill in the art would have

29

understood that the "first duty cycle" cannot be 0% based on the claims and Specification.  Thus, under the proper construction of "first duty cycle," turning off the red LED in State 2 (Petitioner's "first control protocol") is not operating according to a "first duty cycle" as required by claims 1 and 11.  Ex. 2002 ¶ 66.

Although not relied upon by Petitioner for this ground, the infrared LED also does not operate according to a "first duty cycle" and "second duty cycle" under the proper construction of the terms.  *See* Ex. 2002 ¶ 67.  This is so because the infrared LED operates at the same duty cycle, "at least 25%," in States 1 and 2.  Pet. 16; PO Resp. 36; *see also* Ex. 1004, 4:6–7 ("a duty cycle of at least 1 in 4").  Further, as we determined above, and as agreed by the parties, the first and second duty cycles must be different under the proper claim construction.  *See* Pet. 16, 24; PO Resp. 36–37.  Consequently, operation of the infrared LED at the same duty cycle in State 2 and State 1 is not operating according to a "first duty cycle" and a "second duty cycle" as required by claims 1 and 11.  Ex. 2002 ¶ 67.

Petitioner has not persuasively argued a combination of the red and infrared LEDs could be relied upon to show that Richardson operates according to a "first duty cycle" and a "second duty cycle."  In Reply, Petitioner maintains that "Richardson teaches operating 'the first control protocol light source according to a first duty cycle' because the red LED of the 'first control protocol light source' is operated according to the 'first duty cycle' of 0%."  Pet. Reply 9.  Thus, Petitioner relies on just the red LED and not a combination of the red and infrared LEDs for operating the first control protocol light source according to a first duty cycle.

IPR2020-01524
Patent 10,433,776 B2

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has not demonstrated by a preponderance of the evidence that claims 1 and 11 would have been obvious over Richardson for the reasons set forth above.

### 3.     *Dependent Claims 2–8 and 12–16*

Because each of dependent claims 2–8 and 12–16 depend from claims 1 or 11, we likewise determine that Petitioner has failed to demonstrate by a preponderance of the evidence that Richardson would have rendered obvious any of these dependent claims for the reasons set forth above for claims 1 and 11.

### E.     *Obviousness over Richardson and Bindszus*

Petitioner contends that claims 9 and 10 would have been obviousness over Richardson and Bindszus. Pet. 3. Based on the final record, and for the reasons set forth below, Petitioner has not cured the deficiencies set forth above related to Richardson and its failure to teach the claim limitations related to the claimed first and second duty cycle. For these reasons, this ground fails to show by a preponderance of the evidence that claims 9 and 10 of the '776 patent would have been unpatentable.

### 1.     *Bindszus (Exhibit 1005)*

Bindszus is titled "Pulse Rate and Heart Rate Coincidence Detection for Pulse Oximetry." Ex. 1005, code (54). Bindszus relates to a coincidence recognition unit that receives a first signal indicative of a pulse rate and a second signal indicative of a heart rate, then uses those signals to generate a

31

IPR2020-01524
Patent 10,433,776 B2

third signal indicative of the coincidence between the first signal and the second signal. *Id.* at code (57). Bindszus discloses methods of "validating the accuracy of measured oxygen saturation values." *Id.* at 1:5–7. Bindszus explains that a shortcoming of pulse oximetry is that it "relies on the fact that the arterial blood is the only pulsating component that causes a pulsatile change of the light absorption used to determine the oxygen saturation." *Id.* at 2:12–15.

##### 2.     *Analysis*

Petitioner relies on the combination of Richardson and Bindszus to achieve a system that provides the benefit of further improving the accuracy of oxygen saturation values derived by pulse oximetry. *See* Pet. 40–45; Ex. 1005, 2:24–28. Specifically, claims 9 and 10 depend from claim 1 and further require that "the physiological event includes at least one of oxygen desaturation, an abnormal pulse rate, or an abnormal plethysmograph waveform." Ex. 1001, 12:54–56. Petitioner alleges that a person of ordinary skill in the art would have recognized that the combination of "Richardson's pulse oximeter as suggested by Bindszus would include implementing a system that provides an output indicating whether the detected pulse rate is either abnormally higher or abnormally lower than the detected heart rate," which would cause a pulse oximeter to transition and select a new frequency at which to active the LEDs. Pet. 44–45.

Petitioner argues that Bindszus satisfies the additional limitations in dependent claims 9 and 10. *Id.* Petitioner does not argue that Bindszus satisfies any limitations in independent claims 1 and 11, and more specifically, the limitations examined above related to "first duty cycle" and "second duty cycle" that we determined Richardson failed to teach. For

IPR2020-01524
Patent 10,433,776 B2

these reasons, Petitioner has not persuasively shown that claims 9 and 10, which depend from claim 1, would have been obvious over the combination of Richardson and Bindszus.

### F.    Obviousness over Richardson and Turcott

Petitioner contends that claims 1–9 and 11–16 would have been obvious over Richardson and Turcott.  Pet. 3, 45–54; Pet. Reply 17–23. Patent Owner opposes for several reasons.  PO Resp. 52–63; Sur-reply 14–22.  Based on the final record, and for the reasons set forth below, Petitioner has not shown by a preponderance of the evidence that these claims of the '776 patent would have been unpatentable over Richardson and Turcott.

### 1.    Turcott (Exhibit 1006)

Turcott is titled "Method for Monitoring Patient Using Acoustic Sensor."  Ex. 1006, code (54).  Turcott relates to a "method for monitoring the progression of the disease of a heart failure patient" such that an implantable monitor "senses acoustic signals including heart and lung sounds within the patient."  *Id.* at code (57).  Turcott discloses an "implantable monitoring device[]" for "monitoring the status of a patient[] with a chronic disease such as heart failure using heart and lung sounds."  *Id.* at 1:13–16.  Turcott proposes implanting a device in the patient's chest that can detect the sounds made by the patient's heart and lungs and relay that information to the physician several times a day.  *Id.* at 6:58–7:30.  Turcott asserts that changes in the sounds made by the heart and lungs can signal a medical problem.  *Id.*

Turcott's device is sized and shaped to be implanted within a tissue pocket in the patient.  *Id.* at 8:65–9:4, 14:11–12 ("implantable hemodynamic

33

IPR2020-01524
Patent 10,433,776 B2

monitor is configured for subcutaneous or submuscular implantation"). The device includes a diaphragm, or other component, that can sense acoustic signals (i.e., sounds of the heart or lungs) at different time intervals. *Id.* at 6:58–17, 9:49–52. The device calculates the energy of the acoustic signal at each time and compares the energies to determine whether the condition of the patient has deteriorated. *Id.*

In one embodiment, the implantable device also includes a "light source 26 and detector 28, preferably LEDs and photodiode, respectively." *Id.* at 9:28–29. "The source and detector are preferably placed on the side of the device that, following implantation, faces the chest wall." *Id.* at 9:35–37. The source and detector are "used for both vascular plethysmography and for measuring the oxygen saturation of arterial hemoglobin." *Id.* at 9:30–32. Turcott discloses that "[t]he optical power generated by the [light] source is adjusted to optimize the signal to noise ratio and to minimize power consumption" by adjusting "the drive current" or "the duty cycle of the pulse train," and "[t]o conserve energy, the [light] source is preferably driven with a low duty cycle pulse train." *Id.* at 11:51–59

### 2.    *Independent Claims 1 and 11*

Petitioner contends that claims 1 and 11 would have been obvious over the combination of Richardson and Turcott. Because we determine that Richardson and Turcott do not disclose certain limitations of claims 1 and 11 (*see* limitation 1[d] above), and because Petitioner has not provided a rational basis for combining Richardson and Turcott to arrive at these same limitations, Petitioner has not proven by a preponderance of the evidence that claims 1 and 11 are unpatentable. We examine these limitations below.

34

IPR2020-01524
Patent 10,433,776 B2

Petitioner's Contentions

Petitioner argues that "Richardson discloses that in State 2, the red light source 2 is turned off and has a duty cycle of 0%, and the infrared light source is operated with a duty cycle of at least 25%." Pet. 49 (citing e.g., Ex. 1003 ¶¶ 49–50, 86). According to Petitioner, in State 1, both the red and infrared light sources are activated with a duty cycle of at least 25%. Pet. 50. Petitioner argues that "Turcott describes a pulse oximeter where '[t]he optical power generated by the [light] source is adjusted to optimize the signal to noise ratio and to minimize power consumption' by adjusting 'the duty cycle of the pulse train,' and '[t]o conserve energy, the [light] source is preferably driven with a low duty cycle pulse train.'" *Id.* (quoting Ex. 1006, 11:51–59).

Based on these factors, Petitioner argues that a person of ordinary skill in the art

> would have recognized that the predictable modification of Richardson's oximeter as suggested by Turcott would include implementing the oximeter to reduce the duty cycle of the pulse train for operating the infrared light source in State 2, as compared to the duty cycle of the pulse train for operating the infrared or red light source in State 1, to minimize power consumption, as suggested by Turcott.

Pet. 50 (citing Ex. 1003 ¶ 87; Ex. 1006, 11:51–59).

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott "to achieve a pulse oximeter that optimizes the signal-to-noise ratio and minimizes power consumption." Pet. 46. According to Petitioner, Richardson contemplates adjusting the duty cycles because it discloses a "duty cycle of at least 1 in 4," and "Turcott confirms that reducing the duty cycle of the light source

IPR2020-01524
Patent 10,433,776 B2

optimizes the signal-to-noise ratio and minimizes power consumption."
Pet. 46–47 (quoting Ex. 1004, 4:6–10) (citing Ex. 1006, 11:54–59); Pet.
Reply 19 ("Richardson contemplates adjusting the duty cycles . . . and
describes shifting the frequency of the pulse train . . .  and that Turcott
confirms that adjusting the duty cycle and/or shifting the frequency of the
light source optimizes the signal-to-noise ratio and/or minimizes power
consumption.").  Petitioner relies on Richardson's description of shifting the
frequency of the pulse train, which Turcott mentions is also performed in
addition to adjusting the duty cycle.  Pet. 47 (citing Ex. 1004, 3:1–17, 5:53–
54, 7:58–63; Ex. 1006, 11:59–61).

Petitioner argues that a person of ordinary skill in the art would have
been motivated to implement Turcott's teaching of reducing the duty cycle
to lower power consumption in a pulse oximeter in combination with
Richardson's pulse oximeter to further minimize power consumption.  *Id.*
According to Petitioner, the objectives of implementing Turcott's teaching
of reducing the duty cycle to minimize power consumption and operating a
pulse oximeter according to a first and second control protocol as taught by
Richardson, would have been routine and straightforward to a person of
ordinary skill in the art.  *Id.*; Pet. Reply 20–21.  Petitioner also argues that a
person of ordinary skill in the art "would have also been motivated to adjust,
e.g., by increasing, the duty cycle to optimize signal to noise ratio when the
signal to noise ratio is low."  Pet. Reply 21.

Patent Owner's Contentions

Patent Owner contends that "Turcott, like Richardson, does not
disclose low power patient monitors that reduce power consumption by
intermittently alternating between first and second duty cycles."  PO

36

Resp. 56 (citing Ex. 2002 ¶ 100). Patent Owner argues that Turcott does not teach operating a light source according to two different duty cycles as required by the claims. *Id.* (citing Ex. 2002 ¶¶ 101–105). Instead, according to Patent Owner, "Turcott suggests operating a light source according to a **single**, low duty cycle," whereas "Turcott states, '[t]o conserve energy, the source is preferably driven with a low duty cycle pulse train.'" *Id.* (quoting Ex. 1006, 11:51–52). Further, "Turcott never suggests a corresponding high duty cycle pulse train, much less intermittently changing from a low duty to a high duty cycle." *Id.* at 56–57 (citing Ex. 2002 ¶ 102).

Patent Owner notes that although Turcott discloses adjusting the duty cycle of the pulse train as one way of adjusting the optical power generated by the source to optimize the signal to noise ratio and to minimize power consumption, the adjustments are not in real-time and a person of ordinary skill in the art would have understood Turcott to suggest selecting such a configuration during product design or setup. *Id.* at 57 (citing Ex. 1006, 11:54–59; Ex. 2002 ¶¶ 103–104). As support for this position, Patent Owner points out that Turcott does not identify any conditions that would trigger a transition from a first duty cycle to a second duty cycle and Turcott does not disclose hardware and software necessary to make such real-time transitions. *Id.* Patent Owner argues that a person of ordinary skill in the art would have understood that Turcott does not disclose or enable "adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train" in real-time during patient monitoring. *Id.*

Thus, according to Patent Owner, Turcott would not have motivated a person of ordinary skill in the art to "modify Richardson's operating states to have first and second duty cycles." *Id.* Instead, Dr. Madisetti testifies that

Turcott would have motivated a person or ordinary skill in the art to reduce all duty cycles in Richardson's oximeter uniformly during product design or setup. Ex. 2002 ¶ 104. Patent Owner concludes that a person of ordinary skill in the art would not have understood Turcott to disclose or suggest operating a monitor according to a "first duty cycle" and "second duty cycle," and would not have been motivated by Turcott to modify Richardson to operate according to the "first duty cycle" and "second duty cycle." PO Resp. 58 (citing Ex. 2002 ¶¶ 101–105).

Patent Owner next argues that "Petitioner does not explain why Turcott would have motivated a person of ordinary skill in the art to adjust the duty cycle in Richardson's State 2 ('first mapping')." PO Resp. 58 (emphasis omitted). Patent Owner contends that using Turcott's teaching of reducing the duty cycle to lower power consumption in a pulse oximeter does not provide a motivation to adjust the duty cycle between two states. *Id.* (citing Ex. 2002 ¶¶ 106–112).

Patent Owner, relying on the testimony of Dr. Madisetti, contends that if a person of ordinary skill in the art wanted to "'minimize power consumption' of a patient monitor, the person would have set the activation of the sensor at a single level associated with a low power consumption." *Id.* Dr. Madisetti testifies that:

> The person of ordinary skill in the art would have had no motivation to use a different "duty cycle" where one of the duty cycles would have resulted in a higher power consumption level. Operating Richardson's oximeter at a constant power consumption level would have been consistent with Richardson's disclosure, which describes operating Richardson's light sources at a constant duty cycle of at least 25%. Ex. 1004 (Richardson) at 4:6–7.

IPR2020-01524
Patent 10,433,776 B2

Ex. 2002 ¶ 107. Patent Owner further contends that "Petitioner never identifies any motivation for a POSITA to intermittently change between a 'first duty cycle' and a 'second duty cycle' during patient monitoring." PO Resp. 59.

Next, Patent Owner argues that a person of ordinary skill in the art "would have been discouraged from changing the duty cycle, as argued by Petitioner, without proper patient and signal protections in place." *Id.* (citing Ex. 2002 ¶ 108). Patent Owner points out that at certain critical times during low signal quality periods or when critical measurements are necessary, it would be necessary to trigger the monitor to increase the duty cycle. *Id.* Yet, neither Richardson nor Turcott teach a feedback loop whereby physiological measurements or internal parameters are used to adjust the duty cycle. *Id.* (citing Ex. 2002 ¶ 108). Patent Owner argues that Petitioner likewise does not propose modifying Richardson or Turcott to include such a feedback loop. *Id.*

Patent Owner contends that because Turcott is an implantable device, a person of ordinary skill in the art would have desired a constant low duty cycle for such a device. PO Resp. 60. Patent Owner argues that Turcott does not disclose adjusting the activation level of its sensors in real-time, but prefers a constant low duty cycle in order to prolong the life of the device. *Id.* (citing Ex. 2002 ¶ 109). Running the implantable device at a different, higher power consumption level, as required by the challenged claims, would reduce the life of the device, according to Patent Owner. *Id.*

Patent Owner next argues that a person of ordinary skill in the art would not have been motivated to use Richardson as the starting point for a low power patient monitor. PO Resp. 60. This is so because "Richardson's

IPR2020-01524
Patent 10,433,776 B2

device 'requires a computational overhead to constantly monitor which frequency of operation provides the least noise.'" *Id.* (quoting Ex. 2008, 4:30–42). Thus, according to Patent Owner, a person of ordinary skill in the art would not have envisioned Richardson as the starting point for a low power patient monitor. *See* Ex. 2002 ¶ 110.

Patent Owner further argues that "Petitioner does not explain how the combination of Richardson and Turcott would operate to adjust Richardson's duty cycle." PO Resp. 60 (citing Ex. 2002 ¶¶ 111–112). Patent Owner notes that "in order for Richardson's oximeter to adjust the duty cycle of Richardson's LEDs, the oximeter must send a signal to the emitter drivers and the emitter drivers must be capable of changing the duty cycle of supplied current between different non-zero duty cycles." *Id.* at 61 (citing Ex. 2002 ¶ 112). "Yet, Richardson does not send a signal to the emitter drivers to change the duty cycle," but instead, "only turns the LEDs off or operates the LEDs at a 25% duty cycle." *Id.* at 61 (citing Ex. 2002 ¶ 112). Dr. Madisetti testifies that "Richardson would need, at a minimum, additional hardware and/or software to change the duty cycles and some sort of trigger to change the duty cycles," yet, "Richardson discloses neither." Ex. 2002 ¶ 112.

Patent Owner contends that a person of ordinary skill in the art would not have been motivated to reduce Richardson's duty cycle of the pulse train for operating the infrared light source in State 2 and instead would have been discouraged from making such a reduction. PO Resp. 62 (citing Ex. 2002 ¶ 113). Patent Owner notes that "[i]n State 2, Richardson's oximeter reassesses the noise 'by turning off one LED; typically the red LED.'" *Id.* (quoting Ex. 1004, 6:2–3). Patent Owner relies on Richardson's disclosure

"that '[t]he red LED is turned off for approximately 1.4 seconds,'" and "[w]hen the one LED is turned off, 'the pulse oximeter cannot calculate blood oxygen saturation, but it can monitor pulse rate and otherwise give the appearance of operating normally.'" *Id.* (quoting Ex. 1004, 9:52–53, 6:4–7). "Thus," according to Patent Owner, when Richardson is "in State 2, the functionality of the oximeter is compromised," and "'the pulse oximeter may continue to display the last computed oxygen saturation number throughout State 2 even though no new saturations numbers can be computed.'" *Id.* at 63 (quoting Ex. 1004, 9:47–51) (citing Ex. 2002 ¶ 115). Dr. Madisetti testifies that because the information generated by the active LED becomes critical in State 2 and the only source of real-time information about the patient's condition for the oximeter, a person of ordinary skill in the art "would not have been motivated to reduce the duty cycle of the only active LED because that reduction in the duty cycle could result in erroneous or unreliable readings." Ex. 2002 ¶ 115.

Patent Owner further notes that any power savings from reducing the duty cycle in State 2 of the active LED would be negligible because Richardson's oximeter remains in State 2 for only about 1.4 seconds, or less than about 4.7% of its operating time (i.e., approximately 1.4 seconds / 30 seconds). PO Resp. 63. Because the power savings would be minimal, a person of ordinary skill in the art would not have been motivated to risk the health and safety of a patient for such a minimal power savings. Ex. 2002 ¶ 116.

Analysis

Based on the final record before us, the combination of Richardson and Turcott does not teach operating according to first and second duty

41

cycles as claimed. Petitioner has also not persuasively demonstrated that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott to adjust the duty cycle of Richardson's oximeter as alleged by Petitioner.

Petitioner argues that the references render the limitations of claims 1(d) and 11(d) obvious because "Richardson contemplates adjusting the duty cycles" and "Turcott confirms that adjusting the duty cycle . . . of the light source optimizes the signal-to-noise ratio and/or minimizes power consumption." Pet. Reply 19; Pet. 46–51. We disagree for several reasons.

First, Petitioner has not persuasively established that Richardson's disclosure of operating at a duty cycle of at least 25% contemplates using multiple duty cycles as set forth in the claims. *See* Pet. Reply 19 ("Richardson contemplates adjusting the duty cycles" because it discloses a "duty cycle of at least 1 in 4."). Further, the claims do not require merely "adjusting" a duty cycle. Rather, the claims require a transition from the patient monitor operating according to a first control protocol to a second control protocol, in which a second control protocol light source is operated according to a second duty cycle different from the first. *See, e.g.*, Ex. 1001, claim 1. Petitioner has not shown that any reference or combination of references meets these limitations. We find Dr. Madisetti's testimony persuasive that Richardson does not mention or suggest operating according to different non-zero duty cycles during patient monitoring. Ex. 2002 ¶ 119. Richardson merely states, "[a] clock controls the sequential output of light from the light emitting diodes and to a duty cycle of at least 1 in 4." Ex. 1004, 4:6–7. Thus, while Richardson recognizes the light emitting diodes could operate at a single duty cycle of at least 25%, Richardson contains no

disclosure suggesting that its light source could operate at a first duty cycle and then transition to a second duty cycle as the claims require.  Ex. 2002 ¶ 119.

Next, Turcott, like Richardson, does not disclose low power patient monitors that reduce power consumption by transitioning between first and second duty cycles.  *See* Ex. 2002 ¶ 100.  Likewise, Turcott does not teach operating a light source of a patient monitor according to first duty cycle and then transitioning to a second duty cycle as required by the claims.  *Id.* ¶¶ 100–105.  Turcott states, "[t]o conserve energy, the source is preferably driven with a low duty cycle pulse train."  Ex. 1006, 11:51–52.  We find persuasive Dr. Madisetti's testimony that "Turcott encourages using a single low duty cycle, but it does not disclose intermittently changing between two different duty cycles."  Ex. 2002 ¶ 100.

Petitioner relies on portions of Turcott that state "[t]he optical power generated by the source is adjusted to optimize the signal to noise ratio and to minimize power consumption."  Ex. 1006, 11:54–57; Pet. 46, 49, 50.  Turcott conveys that this "can be done by adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train."  Ex. 1006, 11:57–59.  Dr. Anthony contends that Turcott describes shifting the frequency of the pulse train and adjusting the duty cycle from one duty cycle to another, and infers that these things could be done during normal operation of the device to reduce power consumption.  *See, e.g.*, Ex. 1003 ¶¶ 81, 82, 87.  We do not agree that Turcott teaches shifting the frequency of the pulse train or adjusting the duty cycle during normal operation of the device as alleged by Petitioner.  We have considered Dr. Anthony's testimony as to these points, but we determine that the scope

43

IPR2020-01524
Patent 10,433,776 B2

of Turcott's teachings are better explained by Dr. Madisetti. We find more persuasive Dr. Madisetti's testimony and reasoning that a person of ordinary skill in the art would have understood that Turcott's adjustments would happen during device design or setup, and not during operation of the device. Ex. 2002 ¶¶ 101–105. This is so because Turcott discloses operating at a single, low duty cycle that minimizes power consumption. *See* Ex. 2002 ¶ 104; Ex. 1006, 11:51–52 ("To conserve energy, the source is preferably driven with a low duty cycle pulse train."). We also find persuasive Dr. Madisetti's cross-examination testimony that the use of the terminology "optical power generated by the source is adjusted" in Turcott, "refers and describes to a POSA that it's adjusted, past tense, at design time or manufacturing or setup," and that "Turcott refers to this adjusted in past tense through the term 'adjusting' referring to that time at manufacturing or setup." Ex. 1038, 22:16–24:15.

We further base our determinations as to Turcott's teachings on the following evidence and argument set forth by Patent Owner (Sur-reply 15–16) and Dr. Madisetti (Ex. 2002 ¶¶ 100, 104, 109): (1) Turcott never discloses or suggests transitioning the duty cycle during operation and Turcott also does not disclose or enable making duty cycle adjustments in real-time during continuous monitoring as Petitioner alleges, (2) Turcott does not identify any conditions during patient monitoring that would trigger

IPR2020-01524
Patent 10,433,776 B2

any duty cycle adjustments,[2] (3) Turcott does not disclose the hardware and software necessary to make such duty cycle adjustments in real-time, and (4) Turcott describes an implantable device[3] where a constant low duty cycle would have been important to prolong the device's life.  Petitioner attempts to backfill the lack of disclosure examined above by simply alleging that the significant changes that would be required to incorporate Turcott's teachings into Richardson are within the skill level of the person of ordinary skill in the art.  *See* Pet. Reply 22.  Based on the final record before us, Petitioner's contentions lack evidentiary support.

Petitioner also has not persuasively demonstrated that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott to adjust the duty cycle of Richardson's oximeter.  *See* Ex. 2002 ¶ 112.  We find persuasive Dr. Madisetti's testimony that the teachings

---

[2]  The claims require operating the patient monitor according to second control protocol based on a "response to receiving [a] trigger signal." Ex. 1001, 11:63.  Petitioner does not identify any such trigger signal in Turcott that would cause the optical power generated by the light source to be adjusted.  *See* Pet. 49; Ex. 1003 ¶ 85.  Petitioner also does not explain how any alleged trigger signal in Richardson could be integrated with the teachings of Turcott.  *See id.*

[3] Patent Owner alleges that Turcott's device is "an implantable, invasive device."  *See, e.g.*, Sur-reply 16.  As Petitioner points out, Turcott at least suggests that some of its sensors "can be used in noninvasive, external embodiments, in contrast to incorporation in an implantantable monitor." Pet. Reply 21–22 (quoting 1006, 11:66–12:15).  However, Turcott describes the "Field of the Invention" as "implantable monitoring devices" and discourages the use of noninvasive sensors.  Ex. 1006, 1:14–17, 11:66–12:28 ("the preferred embodiment for these sensors is in an implanted, extravascular configuration").  Petitioner also did not rely on any alleged "noninvasive" embodiments for its obviousness arguments.  *See* Pet. 45–48 (citing Ex. 1006, 11:15–61).  Regardless, this single factor is not dispositive.

IPR2020-01524
Patent 10,433,776 B2

found in Turcott would not have motivated a person of ordinary skill in the art to modify Richardson's operating states to transition between first and second duty cycles as claimed. Ex. 2002 ¶ 104. To the contrary, we agree with Patent Owner that Turcott would have motivated a person of ordinary skill in the art to reduce all duty cycles in Richardson's oximeter uniformly during product design or setup. *Id.*

Petitioner maintains that a person of ordinary skill in the art "would have been motivated to modify Richardson based on Turcott's teachings to achieve a pulse oximeter that optimizes the signal-to-noise ratio and minimizes power consumption." Pet. Reply 20. In light of the final record before us, we do not find Petitioner's contentions sufficient to meet its burden.

Patent Owner has shown persuasively that a person of ordinary skill in the art that was intent on minimizing power consumption would have run the system at a single, low duty cycle to consume the least amount of power. *See* PO Resp. 58–59. Both Richardson and Turcott operate in this manner and neither reference suggests deviating from this approach. *Id.* at 56–59; Ex. 1006, 11:51–52; Ex. 1007, 36:6–15. Expanding Turcott's teaching of reducing a single duty cycle to minimize power consumption to capture a pulse oximeter transitioning between a first and second control protocol as claimed is not supported by the evidence before us.

In light of this evidence, Petitioner shifts its argument to assert, "a POSITA would not have merely wanted to minimize power consumption of the patient monitor, but would have also wanted to optimize signal to noise ratio." Pet. Reply 21 ("POSITA would have also been motivated to adjust, e.g., *by increasing*, the duty cycle to optimize signal to noise ratio when the

IPR2020-01524
Patent 10,433,776 B2

signal to noise ratio is low.") (emphasis added).  This argument is not persuasive for the reasons set forth below.  The argument is also contradictory because Dr. Anthony conversely stated that "Turcott confirms that *reducing* the duty cycle of the light source optimizes the signal-to-noise ratio."  Ex. 1003 ¶ 81 (emphasis added).

Regardless, Petitioner does not persuasively show why a person of ordinary skill in the art would have been motivated to "optimize" Richardson's signal-to-noise ratio.  *See* Pet. 46–48; Ex. 1003 ¶¶ 81–83 (providing no explanation).  Richardson already teaches a distinct method for its oximeter to achieve a low signal-to-noise ratio.  Richardson discloses a method of "identifying a pulse oximeter demultiplexing frequency at which the contribution of noise to the signal is relatively low."  Ex. 1004, 3:7–10; *see also* PO Resp. 31–32 ("selecting the frequency with the least noise to serve as the operating frequency" and "also periodically rescans the available frequencies to reevaluate the noise level and switches to a less noisy frequency") (citing Ex. 1004, 2:37–51).  Because Richardson already purports to solve the problem Petitioner identified as the motivation to combine, and because Petitioner never adequately explains why Richardson's existing method for handling the signal-to-noise ratio is insufficient and would have required supplementation with Turcott, we determine that Petitioner's basis for modifying Richardson in light of Turcott is not supported by a preponderance of the evidence before us.  *See* Sur-reply 18.

We have considered Petitioner's additional reasons for combining Richardson and Turcott, but find that these explanations are not tied to any particular claim limitation and are also unsupported by the final record.  *See*

IPR2020-01524
Patent 10,433,776 B2

Pet. 47–48 ("obvious to modify Richardson with Turcott because doing so entails the use of known solutions" and arguing, in general, that "Turcott's teachings" could be applied to "Richard's pulse oximeter" because the results were predictable).  Further, to the extent that the "technique of reducing [a] duty cycle to lower power consumption" was indeed "well-known," (Pet. 48) this technique is not what is claimed and does not support Petitioner's conclusion that actively operating a patient monitor according to two distinct control protocols with first and second duty cycles as claimed was also well-known.

Patent Owner identifies other reasons why a person of ordinary skill in the art would not have been motivated to combine Richardson and Turcott.  *See* PO Resp. 58–62; Sur-reply 19.  In light of our analysis above, and Petitioner's burden to show a reasonable basis for combining the references, which we determine they have not met, we need not address Patent Owner's additional reasons.

### 3.    *Dependent Claims 2–9 and 12–16*

Because of each of dependent claims 2–8 and 12–16 depend from claims 1 or 11, we likewise determine that Petitioner has failed to demonstrate by a preponderance of the evidence that Richardson and Turcott would have rendered obvious any of these dependent claims for the reasons set forth above for claims 1 and 11.

### G.    *Obviousness over Richardson, Turcott, and Bindszus*

Petitioner contends that claims 9 and 10 would have been obviousness over Richardson, Turcott, and Bindszus.  Pet. 62–63.  Based on the final record, and for the reasons set forth above and below, Petitioner has not

48

IPR2020-01524
Patent 10,433,776 B2

shown by a preponderance of the evidence that these claims of the '776 patent would have been unpatentable over Richardson, Turcott, and Bindszus.

In the ground based on Richardson, Turcott, and Bindszus, Petitioner argues that Bindszus satisfies the additional limitations in dependent claims 9 and 10. Pet. 62–63. Petitioner does not argue that Bindszus satisfies any limitations in claim 1 that we found lacking above. *Id.* For these reasons, Petitioner has not persuasively shown that claims 9 and 10 would have been obvious over the combination of Richardson, Turcott, and Bindszus.

### H.    *Obviousness over the "Second Mapping" of Richardson Alone or in Combination with Turcott or in Combination with Bindzus and Turcott*

As noted above in the "Asserted Grounds," Petitioner asserts three distinct grounds of unpatentability based on the "second mapping" of Richardson. *See also* Pet. 3 (asserting (i) Richardson, (ii) Richardson and Turcott, and (iii) Richardson, Turcott, and Bindszus).

As we explained above in the claim construction analysis, Petitioner's "second mapping" of Richardson is based on a claim construction position that Petitioner has abandoned. *See* Pet. 26, 30 ("Richardson teaches this limitation under an alternate construction of this limitation that does not require different duty cycles"). During the oral hearing, Petitioner conceded that it was now accepting the position that that the first and second duty cycle must be different. Tr. 6:1–7 (Petitioner's counsel stating that "the parties agree that the claims require the first and second duty cycle to be different."). For the reasons set forth above, we agree that the first and second duty cycle must be different. Accordingly, each of the grounds

IPR2020-01524
Patent 10,433,776 B2

based on the "second mapping" of Richardson has been conceded by Petitioner.  Petitioner has not shown by a preponderance of the evidence that any claim of the '776 patent is invalid based upon the "second mapping" of Richardson.

### III.    CONCLUSION

In summary:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8, 11–16 | 103 | Richardson (first mapping) | | 1–8, 11–16 |
| 1–9, 11–16 | 103 | Richardson (second mapping) | | 1–9, 11–16 |
| 9, 10 | 103 | Richardson (either mapping) and Bindszus | | 9, 10 |
| 1–9, 11–16 | 103 | Richardson and Turcott (first mapping) | | 1–9, 11–16 |
| 1–9, 11–16 | 103 | Richardson and Turcott (second mapping) | | 1–9, 11–16 |
| 9, 10 | 103 | Richardson and Turcott (either mapping) and Bindszus | | 9, 10 |
| **Overall Outcome** | | | | 1–16 |

50

IPR2020-01524
Patent 10,433,776 B2

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–16 of the '776 patent are not determined to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01524
Patent 10,433,776 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Kim Leung
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
leung@fr.com


FOR PATENT OWNER:

Joshua Stowell
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jys@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com



US010433776B2

(12) **United States Patent**

Al-Ali

(10) Patent No.: **US 10,433,776 B2**

(45) Date of Patent: ***Oct. 8, 2019**

(54) **LOW POWER PULSE OXIMETER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, Tustin, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/174,144**

(22) Filed: **Oct. 29, 2018**

(65) **Prior Publication Data**

US 2019/0069814 A1    Mar. 7, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/820,082, filed on Nov. 21, 2017, which is a continuation of application No. 13/908,957, filed on Jun. 3, 2013, now Pat. No. 9,848,806, which is a continuation of application No. 11/939,519, filed on Nov. 13, 2007, now Pat. No. 8,457,703, which is a continuation of application No. 10/785,573, filed on Feb. 24, 2004, now Pat. No. 7,295,866, which is a continuation of application No.

(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14551* (2013.01); *A61B 2560/0209* (2013.01)

(58) **Field of Classification Search**
CPC .. A61B 5/00; A61B 5/02; A61B 5/021; A61B

5/0205; A61B 5/03; A61B 5/04; A61B 5/0059; A61B 5/08; A61B 5/103; A61B 5/0093; A61B 5/68; A61B 5/145; A61B 5/1455; A61B 5/14551

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,907,183 A * | 3/1990 | Tanaka ............... G06F 1/30 365/229 |
| 4,960,128 A | 10/1990 | Gordon et al. |
| 4,964,408 A | 10/1990 | Hink et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 872 210 A1 | 10/1998 |
| WO | WO 99/63883 | 12/1999 |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)

(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

A pulse oximeter may reduce power consumption in the absence of overriding conditions. Various sampling mechanisms may be used individually or in combination. Various parameters may be monitored to trigger or override a reduced power consumption state. In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations.

**16 Claims, 11 Drawing Sheets**



APPLE 1001

**Appx53**

**US 10,433,776 B2**

Page 2

**Related U.S. Application Data**

10/184,028, filed on Jun. 26, 2002, now Pat. No. 6,697,658.

(60) Provisional application No. 60/302,564, filed on Jul. 2, 2001.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,187 A | | 8/1991 | Hink et al. |
| 5,069,213 A | | 12/1991 | Polczynski |
| 5,069,214 A | * | 12/1991 | Samaras ............ A61B 5/14551 |
| | | | 600/323 |
| 5,163,438 A | | 11/1992 | Gordon et al. |
| 5,238,001 A | * | 8/1993 | Gallant ................ A61B 5/0205 |
| | | | 600/513 |
| 5,279,298 A | * | 1/1994 | Flower ................. A61B 3/1241 |
| | | | 351/206 |
| 5,319,355 A | | 6/1994 | Russek |
| 5,337,744 A | | 8/1994 | Branigan |
| 5,341,805 A | | 8/1994 | Stavridi et al. |
| D353,195 S | | 12/1994 | Savage et al. |
| D353,196 S | | 12/1994 | Savage et al. |
| 5,377,676 A | | 1/1995 | Vari et al. |
| D359,546 S | | 6/1995 | Savage et al. |
| 5,431,170 A | | 7/1995 | Mathews |
| D361,840 S | | 8/1995 | Savage et al. |
| D362,063 S | | 9/1995 | Savage et al. |
| 5,452,717 A | | 9/1995 | Branigan et al. |
| D363,120 S | | 10/1995 | Savage et al. |
| 5,456,252 A | | 10/1995 | Vari et al. |
| 5,479,934 A | | 1/1996 | Imran |
| 5,482,036 A | | 1/1996 | Diab et al. |
| 5,490,505 A | | 2/1996 | Diab et al. |
| 5,490,523 A | | 2/1996 | Isaacson et al. |
| 5,494,043 A | | 2/1996 | O'Sullivan et al. |
| 5,533,511 A | | 7/1996 | Kaspari et al. |
| 5,534,851 A | | 7/1996 | Russek |
| 5,561,275 A | | 10/1996 | Savage et al. |
| 5,562,002 A | | 10/1996 | Lalin |
| 5,590,649 A | | 1/1997 | Caro et al. |
| 5,602,924 A | | 2/1997 | Durand et al. |
| 5,619,992 A | | 4/1997 | Guthrie et al. |
| 5,632,272 A | | 5/1997 | Diab et al. |
| 5,638,816 A | | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 A | | 6/1997 | Diab et al. |
| 5,645,440 A | | 7/1997 | Tobler et al. |
| 5,685,299 A | | 11/1997 | Diab et al. |
| D393,830 S | | 4/1998 | Tobler et al. |
| 5,743,262 A | | 4/1998 | Lepper, Jr. et al. |
| 5,746,694 A | | 5/1998 | Wilk et al. |
| 5,758,644 A | | 6/1998 | Diab et al. |
| 5,760,910 A | | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 A | | 6/1998 | Diab et al. |
| 5,782,757 A | | 7/1998 | Diab et al. |
| 5,785,659 A | | 7/1998 | Caro et al. |
| 5,791,347 A | | 8/1998 | Flaherty et al. |
| 5,797,841 A | | 8/1998 | Delonzor et al. |
| 5,810,734 A | | 9/1998 | Caro et al. |
| 5,823,950 A | | 10/1998 | Diab et al. |
| 5,827,969 A | | 10/1998 | Lee et al. |
| 5,830,131 A | | 11/1998 | Caro et al. |
| 5,833,618 A | | 11/1998 | Caro et al. |
| 5,860,919 A | | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 A | | 4/1999 | Mills et al. |
| 5,904,654 A | | 5/1999 | Wohltmann et al. |
| 5,919,134 A | | 7/1999 | Diab |
| 5,924,979 A | | 7/1999 | Swedlow et al. |
| 5,934,925 A | | 8/1999 | Tobler et al. |
| 5,940,182 A | | 8/1999 | Lepper, Jr. et al. |
| 5,987,343 A | | 11/1999 | Kinast |
| 5,995,855 A | | 11/1999 | Kiani et al. |
| 5,997,343 A | | 12/1999 | Mills et al. |
| 6,002,952 A | | 12/1999 | Diab et al. |
| 6,011,986 A | | 1/2000 | Diab et al. |
| 6,027,452 A | | 2/2000 | Flaherty et al. |
| 6,036,642 A | | 3/2000 | Diab et al. |
| 6,045,509 A | | 4/2000 | Caro et al. |
| 6,067,462 A | | 5/2000 | Diab et al. |
| 6,081,735 A | | 6/2000 | Diab et al. |
| 6,088,607 A | | 7/2000 | Diab et al. |
| 6,110,522 A | | 8/2000 | Lepper, Jr. et al. |
| 6,115,622 A | | 9/2000 | Minoz |
| 6,124,597 A | | 9/2000 | Shehada |
| 6,128,521 A | | 10/2000 | Marro et al. |
| 6,129,675 A | | 10/2000 | Jay |
| 6,144,868 A | | 11/2000 | Parker |
| 6,151,516 A | | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 A | | 11/2000 | Gerhardt et al. |
| 6,157,850 A | | 12/2000 | Diab et al. |
| 6,165,005 A | | 12/2000 | Mills et al. |
| 6,184,521 B1 | | 2/2001 | Coffin, IV et al. |
| 6,206,830 B1 | | 3/2001 | Diab et al. |
| 6,229,856 B1 | | 5/2001 | Diab et al. |
| 6,232,609 B1 | | 5/2001 | Snyder et al. |
| 6,236,872 B1 | | 5/2001 | Diab et al. |
| 6,241,683 B1 | | 6/2001 | Macklem et al. |
| 6,253,097 B1 | | 6/2001 | Aronow et al. |
| 6,256,523 B1 | | 7/2001 | Diab et al. |
| 6,263,222 B1 | | 7/2001 | Diab et al. |
| 6,270,460 B1 | | 8/2001 | McCartan et al. |
| 6,278,522 B1 | | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 B1 | | 8/2001 | Tobler et al. |
| 6,285,896 B1 | | 9/2001 | Tobler et al. |
| 6,301,493 B1 | | 10/2001 | Marro et al. |
| 6,308,089 B1 | | 10/2001 | von der Ruhr et al. |
| 6,317,627 B1 | | 11/2001 | Ennen et al. |
| 6,321,100 B1 | | 11/2001 | Parker |
| 6,325,761 B1 | | 12/2001 | Jay |
| 6,334,065 B1 | | 12/2001 | Al-Ali et al. |
| 6,343,224 B1 | | 1/2002 | Parker |
| 6,349,228 B1 | | 2/2002 | Kiani et al. |
| 6,360,114 B1 | | 3/2002 | Diab et al. |
| 6,368,283 B1 | | 4/2002 | Xu et al. |
| 6,371,921 B1 | | 4/2002 | Caro et al. |
| 6,377,829 B1 | | 4/2002 | Al-Ali |
| 6,388,240 B2 | | 5/2002 | Schulz et al. |
| 6,396,137 B1 | | 5/2002 | Klughart |
| 6,397,091 B2 | | 5/2002 | Diab et al. |
| 6,402,690 B1 | * | 6/2002 | Rhee ..................... A61B 5/0002 |
| | | | 600/300 |
| 6,430,437 B1 | | 8/2002 | Marro |
| 6,430,525 B1 | | 8/2002 | Weber et al. |
| 6,463,311 B1 | | 10/2002 | Diab |
| 6,470,199 B1 | | 10/2002 | Kopotic et al. |
| 6,501,975 B2 | | 12/2002 | Diab et al. |
| 6,505,059 B1 | | 1/2003 | Kollias et al. |
| 6,515,273 B2 | | 2/2003 | Al-Ali |
| 6,519,487 B1 | | 2/2003 | Parker |
| 6,525,386 B1 | | 2/2003 | Mills et al. |
| 6,526,300 B1 | | 2/2003 | Kiani et al. |
| 6,527,729 B1 | | 3/2003 | Turcott |
| 6,541,756 B2 | | 4/2003 | Schulz et al. |
| 6,542,764 B1 | | 4/2003 | Al-Ali et al. |
| 6,580,086 B1 | | 6/2003 | Schulz et al. |
| 6,584,336 B1 | | 6/2003 | Ali et al. |
| 6,595,316 B2 | | 7/2003 | Cybulski et al. |
| 6,597,932 B2 | | 7/2003 | Tian et al. |
| 6,597,933 B2 | | 7/2003 | Kiani et al. |
| 6,606,511 B1 | | 8/2003 | Ali et al. |
| 6,632,181 B2 | | 10/2003 | Flaherty et al. |
| 6,639,668 B1 | | 10/2003 | Trepagnier |
| 6,640,116 B2 | | 10/2003 | Diab |
| 6,643,530 B2 | | 11/2003 | Diab et al. |
| 6,650,917 B2 | | 11/2003 | Diab et al. |
| 6,654,624 B2 | | 11/2003 | Diab et al. |
| 6,658,276 B2 | | 12/2003 | Kiani et al. |
| 6,661,161 B1 | | 12/2003 | Lanzo et al. |
| 6,671,531 B2 | | 12/2003 | Al-Ali et al. |
| 6,678,543 B2 | | 1/2004 | Diab et al. |
| 6,684,090 B2 | | 1/2004 | Ali et al. |
| 6,684,091 B2 | | 1/2004 | Parker |
| 6,697,656 B1 | | 2/2004 | Al-Ali |
| 6,697,657 B1 | | 2/2004 | Shehada et al. |

2

**US 10,433,776 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,697,658 B2 | 2/2004 | Al-Ali |
| RE38,476 E | 3/2004 | Diab et al. |
| 6,699,194 B1 | 3/2004 | Diab et al. |
| 6,714,804 B2 | 3/2004 | Al-Ali et al. |
| RE38,492 E | 4/2004 | Diab et al. |
| 6,721,582 B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 B1 | 4/2004 | Parker |
| 6,725,075 B2 | 4/2004 | Al-Ali |
| 6,728,560 B2 | 4/2004 | Kollias et al. |
| 6,735,459 B2 | 5/2004 | Parker |
| 6,745,060 B2 | 6/2004 | Diab et al. |
| 6,760,607 B2 | 7/2004 | Al-Ali |
| 6,770,028 B1 | 8/2004 | Ali et al. |
| 6,771,994 B2 | 8/2004 | Kiani et al. |
| 6,792,300 B1 | 9/2004 | Diab et al. |
| 6,813,511 B2 | 11/2004 | Diab et al. |
| 6,816,741 B2 | 11/2004 | Diab |
| 6,822,564 B2 | 11/2004 | Al-Ali |
| 6,826,419 B2 | 11/2004 | Diab et al. |
| 6,830,711 B2 | 12/2004 | Mills et al. |
| 6,850,787 B2 | 2/2005 | Weber et al. |
| 6,850,788 B2 | 2/2005 | Al-Ali |
| 6,852,083 B2 | 2/2005 | Caro et al. |
| 6,861,639 B2 | 3/2005 | Al-Ali |
| 6,898,452 B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 B2 | 8/2005 | Kiani et al. |
| 6,939,305 B2 | 9/2005 | Flaherty et al. |
| 6,943,348 B1 | 9/2005 | Coffin, IV |
| 6,950,687 B2 | 9/2005 | Al-Ali |
| 6,961,598 B2 | 11/2005 | Diab |
| 6,970,792 B1 | 11/2005 | Diab |
| 6,979,812 B2 | 12/2005 | Al-Ali |
| 6,985,764 B2 | 1/2006 | Mason et al. |
| 6,993,371 B2 | 1/2006 | Kiani et al. |
| 6,996,427 B2 | 2/2006 | Ali et al. |
| 6,999,904 B2 | 2/2006 | Weber et al. |
| 7,003,338 B2 | 2/2006 | Weber et al. |
| 7,003,339 B2 | 2/2006 | Diab et al. |
| 7,015,451 B2 | 3/2006 | Dalke et al. |
| 7,024,233 B2 | 4/2006 | Ali et al. |
| 7,027,849 B2 | 4/2006 | Al-Ali |
| 7,030,749 B2 | 4/2006 | Al-Ali |
| 7,039,449 B2 | 5/2006 | Al-Ali |
| 7,041,060 B2 | 5/2006 | Flaherty et al. |
| 7,044,918 B2 | 5/2006 | Diab |
| 7,048,687 B1 | 5/2006 | Reuss et al. |
| 7,067,893 B2 | 6/2006 | Mills et al. |
| 7,096,052 B2 | 8/2006 | Mason et al. |
| 7,096,054 B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 B2 | 11/2006 | Schulz et al. |
| 7,142,901 B2 | 11/2006 | Kiani et al. |
| 7,149,561 B2 | 12/2006 | Diab |
| 7,186,966 B2 | 3/2007 | Al-Ali |
| 7,190,261 B2 | 3/2007 | Al-Ali |
| 7,190,986 B1 | 3/2007 | Hannula et al. |
| 7,215,984 B2 | 5/2007 | Diab |
| 7,215,986 B2 | 5/2007 | Diab |
| 7,221,971 B2 | 5/2007 | Diab |
| 7,225,006 B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 B2 | 5/2007 | Al-Ali |
| RE39,672 E | 6/2007 | Shehada et al. |
| 7,239,905 B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 B1 | 7/2007 | Parker |
| 7,254,429 B2 | 8/2007 | Schurman et al. |
| 7,254,431 B2 | 8/2007 | Al-Ali |
| 7,254,433 B2 | 8/2007 | Diab et al. |
| 7,254,434 B2 | 8/2007 | Schulz et al. |
| 7,272,425 B2 | 9/2007 | Al-Ali |
| 7,274,955 B2 | 9/2007 | Kiani et al. |
| D554,263 S | 10/2007 | Al-Ali |
| 7,280,858 B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 B2 | 10/2007 | Mansfield et al. |
| 7,292,883 B2 | 11/2007 | De Felice et al. |
| 7,295,866 B2 | 11/2007 | Al-Ali |
| 7,328,053 B1 | 2/2008 | Diab et al. |
| 7,332,784 B2 | 2/2008 | Mills et al. |
| 7,340,287 B2 | 3/2008 | Mason et al. |
| 7,341,559 B2 | 3/2008 | Schulz et al. |
| 7,343,186 B2 | 3/2008 | Lamego et al. |
| D566,282 S | 4/2008 | Al-Ali et al. |
| 7,355,512 B1 | 4/2008 | Al-Ali |
| 7,356,365 B2 | 4/2008 | Schurman |
| 7,371,981 B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 B2 | 5/2008 | Weber et al. |
| 7,376,453 B1 | 5/2008 | Diab et al. |
| 7,377,794 B2 | 5/2008 | Al Ali et al. |
| 7,377,899 B2 | 5/2008 | Weber et al. |
| 7,383,070 B2 | 6/2008 | Diab et al. |
| 7,415,297 B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 B2 | 9/2008 | Ali et al. |
| 7,438,683 B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 B2 | 10/2008 | Diab |
| 7,454,240 B2 | 11/2008 | Diab et al. |
| 7,467,002 B2 | 12/2008 | Weber et al. |
| 7,469,157 B2 | 12/2008 | Diab et al. |
| 7,471,969 B2 | 12/2008 | Diab et al. |
| 7,471,971 B2 | 12/2008 | Diab et al. |
| 7,483,729 B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 B2 | 1/2009 | Diab et al. |
| 7,489,958 B2 | 2/2009 | Diab et al. |
| 7,496,391 B2 | 2/2009 | Diab et al. |
| 7,496,393 B2 | 2/2009 | Diab et al. |
| D587,657 S | 3/2009 | Al-Ali et al. |
| 7,499,741 B2 | 3/2009 | Diab et al. |
| 7,499,835 B2 | 3/2009 | Weber et al. |
| 7,500,950 B2 | 3/2009 | Al-Ali et al. |
| 7,509,154 B2 | 3/2009 | Diab et al. |
| 7,509,494 B2 | 3/2009 | Al-Ali |
| 7,510,849 B2 | 3/2009 | Schurman et al. |
| 7,526,328 B2 | 4/2009 | Diab et al. |
| 7,530,942 B1 | 5/2009 | Diab |
| 7,530,949 B2 | 5/2009 | Al Ali et al. |
| 7,530,955 B2 | 5/2009 | Diab et al. |
| 7,563,110 B2 | 7/2009 | Al-Ali et al. |
| 7,596,398 B2 | 9/2009 | Al-Ali et al. |
| 7,618,375 B2 | 11/2009 | Flaherty |
| D606,659 S | 12/2009 | Kiani et al. |
| 7,647,083 B2 | 1/2010 | Al-Ali et al. |
| D609,193 S | 2/2010 | Al-Ali et al. |
| D614,305 S | 4/2010 | Al-Ali et al. |
| RE41,317 E | 5/2010 | Parker |
| 7,729,733 B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 B2 | 6/2010 | Al-Ali |
| 7,761,127 B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 B2 | 7/2010 | Dalke et al. |
| D621,516 S | 8/2010 | Kiani et al. |
| 7,791,155 B2 | 9/2010 | Diab |
| 7,801,581 B2 | 9/2010 | Diab |
| 7,822,452 B2 | 10/2010 | Schurman et al. |
| RE41,912 E | 11/2010 | Parker |
| 7,844,313 B2 | 11/2010 | Kiani et al. |
| 7,844,314 B2 | 11/2010 | Al-Ali |
| 7,844,315 B2 | 11/2010 | Al-Ali |
| 7,865,222 B2 | 1/2011 | Weber et al. |
| 7,873,497 B2 | 1/2011 | Weber et al. |
| 7,880,606 B2 | 2/2011 | Al-Ali |
| 7,880,626 B2 | 2/2011 | Al-Ali et al. |
| 7,891,355 B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 B2 | 2/2011 | Al-Ali et al. |
| 7,899,507 B2 | 3/2011 | Al-Ali et al. |
| 7,899,518 B2 | 3/2011 | Trepagnier et al. |
| 7,904,132 B2 | 3/2011 | Weber et al. |
| 7,909,772 B2 | 3/2011 | Popov et al. |
| 7,910,875 B2 | 3/2011 | Al-Ali |
| 7,919,713 B2 | 4/2011 | Al-Ali et al. |
| 7,937,128 B2 | 5/2011 | Al-Ali |
| 7,937,129 B2 | 5/2011 | Mason et al. |
| 7,937,130 B2 | 5/2011 | Diab et al. |
| 7,941,199 B2 | 5/2011 | Kiani |
| 7,951,086 B2 | 5/2011 | Flaherty et al. |

**US 10,433,776 B2**

Page 4

## (56) References Cited

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,957,780 B2 | 6/2011 | Lamego et al. |
| 7,962,188 B2 | 6/2011 | Kiani et al. |
| 7,962,190 B1 | 6/2011 | Diab et al. |
| 7,976,472 B2 | 7/2011 | Kiani |
| 7,988,637 B2 | 8/2011 | Diab |
| 7,990,382 B2 | 8/2011 | Kiani |
| 7,991,446 B2 | 8/2011 | Ali et al. |
| 8,000,761 B2 | 8/2011 | Al-Ali |
| 8,008,088 B2 | 8/2011 | Bellott et al. |
| RE42,753 E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 B2 | 9/2011 | Diab et al. |
| 8,028,701 B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 B2 | 10/2011 | Bellott et al. |
| 8,036,727 B2 | 10/2011 | Schurman et al. |
| 8,036,728 B2 | 10/2011 | Diab et al. |
| 8,046,040 B2 | 10/2011 | Ali et al. |
| 8,046,041 B2 | 10/2011 | Diab et al. |
| 8,046,042 B2 | 10/2011 | Diab et al. |
| 8,048,040 B2 | 11/2011 | Kiani |
| 8,050,728 B2 | 11/2011 | Al-Ali et al. |
| RE43,169 E | 2/2012 | Parker |
| 8,118,620 B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 B2 | 2/2012 | Diab et al. |
| 8,128,572 B2 | 3/2012 | Diab et al. |
| 8,130,105 B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 B2 | 3/2012 | Diab et al. |
| 8,150,487 B2 | 4/2012 | Diab et al. |
| 8,175,672 B2 | 5/2012 | Parker |
| 8,180,420 B2 | 5/2012 | Diab et al. |
| 8,182,443 B1 | 5/2012 | Kiani |
| 8,185,180 B2 | 5/2012 | Diab et al. |
| 8,190,223 B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 B2 | 5/2012 | Diab et al. |
| 8,203,438 B2 | 6/2012 | Kiani et al. |
| 8,203,704 B2 | 6/2012 | Merritt et al. |
| 8,204,566 B2 | 6/2012 | Schurman et al. |
| 8,219,172 B2 | 7/2012 | Schurman et al. |
| 8,224,411 B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 B2 | 7/2012 | Al-Ali |
| 8,229,533 B2 | 7/2012 | Diab et al. |
| 8,233,955 B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 B2 | 8/2012 | Al-Ali et al. |
| 8,255,026 B1 | 8/2012 | Al-Ali |
| 8,255,027 B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 B2 | 9/2012 | Weber et al. |
| 8,265,723 B1 | 9/2012 | McHale et al. |
| 8,274,360 B2 | 9/2012 | Sampath et al. |
| 8,280,473 B2 | 10/2012 | Al-Ali |
| 8,301,217 B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 B2 | 11/2012 | Schurman et al. |
| 8,310,336 B2 | 11/2012 | Muhsin et al. |
| 8,315,683 B2 | 11/2012 | Al-Ali et al. |
| RE43,860 E | 12/2012 | Parker |
| 8,337,403 B2 | 12/2012 | Al-Ali et al. |
| 8,346,330 B2 | 1/2013 | Lamego |
| 8,353,842 B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 B2 | 1/2013 | Diab et al. |
| 8,364,223 B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 B2 | 1/2013 | Diab et al. |
| 8,374,665 B2 | 2/2013 | Lamego |
| 8,385,995 B2 | 2/2013 | Al-ali et al. |
| 8,385,996 B2 | 2/2013 | Smith et al. |
| 8,388,353 B2 | 3/2013 | Kiani |
| 8,399,822 B2 | 3/2013 | Al-Ali |
| 8,401,602 B2 | 3/2013 | Kiani |
| 8,405,608 B2 | 3/2013 | Al-Ali et al. |
| 8,414,499 B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 B2 | 4/2013 | Al-Ali |
| 8,423,106 B2 | 4/2013 | Lamego et al. |
| 8,428,967 B2 | 4/2013 | Olsen et al. |
| 8,430,817 B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 B2 | 5/2013 | Dalvi et al. |
| 8,455,290 B2 | 6/2013 | Siskavich |
| 8,457,703 B2 | 6/2013 | Al-Ali |
| 8,457,707 B2 | 6/2013 | Kiani |
| 8,463,349 B2 | 6/2013 | Diab et al. |
| 8,466,286 B2 | 6/2013 | Bellot et al. |
| 8,471,713 B2 | 6/2013 | Poeze et al. |
| 8,473,020 B2 | 6/2013 | Kiani et al. |
| 8,483,787 B2 | 7/2013 | Al-Ali et al. |
| 8,489,364 B2 | 7/2013 | Weber et al. |
| 8,498,684 B2 | 7/2013 | Weber et al. |
| 8,504,128 B2 | 8/2013 | Blank et al. |
| 8,509,867 B2 | 8/2013 | Workman et al. |
| 8,515,509 B2 | 8/2013 | Bruinsma et al. |
| 8,523,781 B2 | 9/2013 | Al-Ali |
| 8,529,301 B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 B2 | 9/2013 | Ali et al. |
| 8,532,728 B2 | 9/2013 | Diab et al. |
| D692,145 S | 10/2013 | Al-Ali et al. |
| 8,547,209 B2 | 10/2013 | Kiani et al. |
| 8,548,548 B2 | 10/2013 | Al-Ali |
| 8,548,549 B2 | 10/2013 | Schurman et al. |
| 8,548,550 B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 B1 | 10/2013 | Diab et al. |
| 8,570,167 B2 | 10/2013 | Al-Ali |
| 8,570,503 B2 | 10/2013 | Vo et al. |
| 8,571,617 B2 | 10/2013 | Reichgott et al. |
| 8,571,618 B1 | 10/2013 | Lamego et al. |
| 8,571,619 B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 B2 | 11/2013 | Lamego et al. |
| 8,581,732 B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,600,467 B2 | 12/2013 | Al-Ali et al. |
| 8,606,342 B2 | 12/2013 | Diab |
| 8,626,255 B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 B2 | 1/2014 | Lamego et al. |
| 8,634,889 B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 B2 | 2/2014 | Sierra et al. |
| 8,652,060 B2 | 2/2014 | Al-Ali |
| 8,663,107 B2 | 3/2014 | Kiani |
| 8,666,468 B1 | 3/2014 | Al-Ali |
| 8,667,967 B2 | 3/2014 | Al-Ali et al. |
| 8,670,811 B2 | 3/2014 | O'Reilly |
| 8,670,814 B2 | 3/2014 | Diab et al. |
| 8,676,286 B2 | 3/2014 | Weber et al. |
| 8,682,407 B2 | 3/2014 | Al-Ali |
| RE44,823 E | 4/2014 | Parker |
| RE44,875 E | 4/2014 | Kiani et al. |
| 8,690,799 B2 | 4/2014 | Telfort et al. |
| 8,700,112 B2 | 4/2014 | Kiani |
| 8,702,627 B2 | 4/2014 | Telfort et al. |
| 8,706,179 B2 | 4/2014 | Parker |
| 8,712,494 B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 B2 | 5/2014 | Telfort et al. |
| 8,718,735 B2 | 5/2014 | Lamego et al. |
| 8,718,737 B2 | 5/2014 | Diab et al. |
| 8,718,738 B2 | 5/2014 | Blank et al. |
| 8,720,249 B2 | 5/2014 | Al-Ali |
| 8,721,541 B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 B1 | 5/2014 | Kiani |
| 8,740,792 B1 | 6/2014 | Kiani et al. |
| 8,754,776 B2 | 6/2014 | Poeze et al. |
| 8,755,535 B2 | 6/2014 | Telfort et al. |
| 8,755,856 B2 | 6/2014 | Diab et al. |
| 8,755,872 B1 | 6/2014 | Marinow |
| 8,761,850 B2 | 6/2014 | Lamego |
| 8,764,671 B2 | 7/2014 | Kiani |
| 8,768,423 B2 | 7/2014 | Shakespeare et al. |
| 8,771,204 B2 | 7/2014 | Telfort et al. |
| 8,777,634 B2 | 7/2014 | Kiani et al. |
| 8,781,543 B2 | 7/2014 | Diab et al. |
| 8,781,544 B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 B2 | 7/2014 | Schurman et al. |
| 8,790,268 B2 | 7/2014 | Al-Ali |
| 8,801,613 B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 B2 | 9/2014 | Al-Ali et al. |

4

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,830,449 B1 | 9/2014 | Lamego et al. |
| 8,831,700 B2 | 9/2014 | Schurman et al. |
| 8,840,549 B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 B2 | 9/2014 | Kiani et al. |
| 8,849,365 B2 | 9/2014 | Smith et al. |
| 8,852,094 B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 B2 | 10/2014 | Stippick et al. |
| 8,868,150 B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 B2 | 11/2014 | Kiani et al. |
| 8,888,539 B2 | 11/2014 | Al-Ali et al. |
| 8,888,708 B2 | 11/2014 | Diab et al. |
| 8,892,180 B2 | 11/2014 | Weber et al. |
| 8,897,847 B2 | 11/2014 | Al-Ali |
| 8,909,310 B2 | 12/2014 | Lamego et al. |
| 8,911,377 B2 | 12/2014 | Al-Ali |
| 8,912,909 B2 | 12/2014 | Al-Ali et al. |
| 8,920,317 B2 | 12/2014 | Al-Ali et al. |
| 8,921,699 B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 B2 | 1/2015 | Al-Ali et al. |
| 8,942,777 B2 | 1/2015 | Diab et al. |
| 8,948,834 B2 | 2/2015 | Diab et al. |
| 8,948,835 B2 | 2/2015 | Diab |
| 8,965,471 B2 | 2/2015 | Lamego |
| 8,983,564 B2 | 3/2015 | Al-Ali |
| 8,989,831 B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 B2 | 3/2015 | Kiani et al. |
| 8,998,809 B2 | 4/2015 | Kiani |
| 9,028,429 B2 | 5/2015 | Telfort et al. |
| 9,037,207 B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 B2 | 6/2015 | Reichgott et al. |
| 9,066,666 B2 | 6/2015 | Kiani |
| 9,066,680 B1 | 6/2015 | Al-Ali et al. |
| 9,072,474 B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 B2 | 7/2015 | Schurman et al. |
| 9,084,569 B2 | 7/2015 | Weber et al. |
| 9,095,316 B2 | 8/2015 | Welch et al. |
| 9,106,038 B2 | 8/2015 | Telfort et al. |
| 9,107,625 B2 | 8/2015 | Telfort et al. |
| 9,107,626 B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 B2 | 8/2015 | Al-Ali |
| 9,113,832 B2 | 8/2015 | Al-Ali |
| 9,119,595 B2 | 9/2015 | Lamego |
| 9,131,881 B2 | 9/2015 | Diab et al. |
| 9,131,882 B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 B2 | 9/2015 | Al-Ali |
| 9,131,917 B2 | 9/2015 | Telfort et al. |
| 9,138,180 B1 | 9/2015 | Coverston et al. |
| 9,138,182 B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 B2 | 9/2015 | Weber et al. |
| 9,142,117 B2 | 9/2015 | Muhsin et al. |
| 9,153,112 B1 | 10/2015 | Kiani et al. |
| 9,153,121 B2 | 10/2015 | Kiani et al. |
| 9,161,696 B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 B2 | 10/2015 | Lamego et al. |
| 9,176,141 B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 B2 | 11/2015 | Al-Ali |
| 9,192,329 B2 | 11/2015 | Al-Ali |
| 9,192,351 B1 | 11/2015 | Telfort et al. |
| 9,195,385 B2 | 11/2015 | Al-Ali et al. |
| 9,211,072 B2 | 12/2015 | Kiani |
| 9,211,095 B2 | 12/2015 | Al-Ali |
| 9,218,454 B2 | 12/2015 | Kiani et al. |
| 9,226,696 B2 | 1/2016 | Kiani |
| 9,241,662 B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 B1 | 1/2016 | Vo et al. |
| 9,259,185 B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 B2 | 2/2016 | Barker et al. |
| 9,277,880 B2 | 3/2016 | Poeze et al. |
| 9,289,167 B2 | 3/2016 | Diab et al. |
| 9,295,421 B2 | 3/2016 | Kiani et al. |

| | | | |
|---|---|---|---|
| 9,307,928 B1 | 4/2016 | Al-Ali et al. |
| 9,323,894 B2 | 4/2016 | Kiani |
| D755,392 S | 5/2016 | Hwang et al. |
| 9,326,712 B1 | 5/2016 | Kiani |
| 9,333,316 B2 | 5/2016 | Kiani |
| 9,339,220 B2 | 5/2016 | Lamego et al. |
| 9,341,565 B2 | 5/2016 | Lamego et al. |
| 9,351,673 B2 | 5/2016 | Diab et al. |
| 9,351,675 B2 | 5/2016 | Al-Ali et al. |
| 9,364,181 B2 | 6/2016 | Kiani et al. |
| 9,368,671 B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 B2 | 6/2016 | McHale et al. |
| 9,370,335 B2 | 6/2016 | Al-ali et al. |
| 9,375,185 B2 | 6/2016 | Ali et al. |
| 9,386,953 B2 | 7/2016 | Al-Ali |
| 9,386,961 B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 B1 | 8/2016 | Kinast et al. |
| 9,436,645 B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 B1 | 9/2016 | Lamego et al. |
| 9,466,919 B2 | 10/2016 | Kiani et al. |
| 9,474,474 B2 | 10/2016 | Lamego et al. |
| 9,480,422 B2 | 11/2016 | Al-Ali |
| 9,480,435 B2 | 11/2016 | Olsen |
| 9,492,110 B2 | 11/2016 | Al-Ali et al. |
| 9,510,779 B2 | 12/2016 | Poeze et al. |
| 9,517,024 B2 | 12/2016 | Kiani et al. |
| 9,532,722 B2 | 1/2017 | Lamego et al. |
| 9,538,949 B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 B2 | 1/2017 | Telfort et al. |
| 9,549,696 B2 | 1/2017 | Lamego et al. |
| 9,554,737 B2 | 1/2017 | Schurman et al. |
| 9,560,996 B2 | 2/2017 | Kiani |
| 9,560,998 B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 B2 | 2/2017 | Jansen et al. |
| 9,591,975 B2 | 3/2017 | Dalvi et al. |
| 9,622,692 B2 | 4/2017 | Lamego et al. |
| 9,622,693 B2 | 4/2017 | Diab |
| D788,312 S | 5/2017 | Al-Ali et al. |
| 9,636,055 B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 B2 | 5/2017 | Al-Ali |
| 9,649,054 B2 | 5/2017 | Lamego et al. |
| 9,662,052 B2 | 5/2017 | Al-Ali et al. |
| 9,668,679 B2 | 6/2017 | Schurman et al. |
| 9,668,680 B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 B2 | 6/2017 | Al-Ali |
| 9,675,286 B2 | 6/2017 | Diab |
| 9,687,160 B2 | 6/2017 | Kiani |
| 9,693,719 B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 B2 | 7/2017 | Al-Ali |
| 9,697,928 B2 | 7/2017 | Al-Ali et al. |
| 9,717,425 B2 | 8/2017 | Kiani et al. |
| 9,717,458 B2 | 8/2017 | Lamego et al. |
| 9,724,016 B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 B2 | 8/2017 | Al-Ali |
| 9,724,025 B2 | 8/2017 | Kiani et al. |
| 9,730,640 B2 | 8/2017 | Diab et al. |
| 9,743,887 B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 B2 | 8/2017 | Sampath et al. |
| 9,750,442 B2 | 9/2017 | Olsen |
| 9,750,443 B2 | 9/2017 | Smith et al. |
| 9,750,461 B1 | 9/2017 | Telfort |
| 9,775,545 B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 B2 | 10/2017 | Diab et al. |
| 9,775,570 B2 | 10/2017 | Al-Ali |
| 9,778,079 B1 | 10/2017 | Al-Ali et al. |
| 9,782,077 B2 | 10/2017 | Lamego et al. |
| 9,782,110 B2 | 10/2017 | Kiani |
| 9,787,568 B2 | 10/2017 | Lamego et al. |
| 9,788,735 B2 | 10/2017 | Al-Ali |
| 9,788,768 B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 B2 | 10/2017 | Al-Ali |
| 9,795,310 B2 | 10/2017 | Al-Ali |
| 9,795,358 B2 | 10/2017 | Telfort et al. |
| 9,795,739 B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 B2 | 10/2017 | Kiani |

**US 10,433,776 B2**

Page 6

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,801,588 B2 | 10/2017 | Weber et al. |
| 9,808,188 B1 | 11/2017 | Perea et al. |
| 9,814,418 B2 | 11/2017 | Weber et al. |
| 9,820,691 B2 | 11/2017 | Kiani |
| 9,833,152 B2 | 12/2017 | Kiani et al. |
| 9,833,180 B2 | 12/2017 | Shakespeare et al. |
| 9,839,379 B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 B1 | 12/2017 | Weber et al. |
| 9,847,002 B2 | 12/2017 | Kiani et al. |
| 9,847,749 B2 | 12/2017 | Kiani et al. |
| 9,848,800 B1 | 12/2017 | Lee et al. |
| 9,848,806 B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 B2 | 12/2017 | Lamego |
| 9,861,298 B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 B1 | 1/2018 | Weber et al. |
| 9,867,578 B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 B2 | 1/2018 | Al-Ali |
| 9,876,320 B2 | 1/2018 | Coverston et al. |
| 9,877,650 B2 | 1/2018 | Muhsin et al. |
| 9,877,686 B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 B2 | 2/2018 | Dalvi |
| 9,895,107 B2 | 2/2018 | Al-Ali et al. |
| 9,913,617 B2 | 3/2018 | Al-Ali et al. |
| 9,924,893 B2 | 3/2018 | Schurman et al. |
| 9,924,897 B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 B2 | 4/2018 | Poeze et al. |
| 9,943,269 B2 | 4/2018 | Muhsin et al. |
| 9,949,676 B2 | 4/2018 | Al-Ali |
| 9,955,937 B2 | 5/2018 | Telfort |
| 9,965,946 B2 | 5/2018 | Al-Ali |
| 9,980,667 B2 | 5/2018 | Kiani et al. |
| D820,865 S | 6/2018 | Muhsin et al. |
| 9,986,919 B2 | 6/2018 | Lamego et al. |
| 9,986,952 B2 | 6/2018 | Dalvi et al. |
| 9,989,560 B2 | 6/2018 | Poeze et al. |
| 9,993,207 B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 B2 | 6/2018 | Al-Ali et al. |
| D822,215 S | 7/2018 | Al-Ali et al. |
| D822,216 S | 7/2018 | Barker et al. |
| 10,010,276 B2 | 7/2018 | Al-Ali et al. |
| 10,032,002 B2 | 7/2018 | Kiani et al. |
| 10,039,482 B2 | 8/2018 | Al-Ali et al. |
| 10,052,037 B2 | 8/2018 | Kinast et al. |
| 10,058,275 B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 B2 | 9/2018 | Al-Ali |
| 10,086,138 B1 | 10/2018 | Novak, Jr. |
| 10,092,200 B2 | 10/2018 | Al-Ali et al. |
| 10,092,249 B2 | 10/2018 | Kiani et al. |
| 10,098,550 B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 B2 | 10/2018 | Al-Ali et al. |
| D833,624 S | 11/2018 | DeJong et al. |
| 10,123,726 B2 | 11/2018 | Al-Ali et al. |
| 10,130,289 B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 B2 | 11/2018 | Schurman et al. |
| D835,282 S | 12/2018 | Barker et al. |
| D835,283 S | 12/2018 | Barker et al. |
| D835,284 S | 12/2018 | Barker et al. |
| D835,285 S | 12/2018 | Barker et al. |
| 10,149,616 B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 B2 | 12/2018 | Lamego et al. |
| 10,188,296 B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 B1 | 1/2019 | Kiani et al. |
| 10,188,348 B2 | 1/2019 | Al-Ali et al. |
| RE47,218 E | 2/2019 | Ali-Ali |
| RE47,244 E | 2/2019 | Kiani et al. |
| RE47,249 E | 2/2019 | Kiani et al. |
| 10,194,847 B2 | 2/2019 | Al-Ali |
| 10,194,848 B1 | 2/2019 | Kiani et al. |
| 10,201,298 B2 | 2/2019 | Al-Ali et al. |
| 10,205,272 B2 | 2/2019 | Kiani et al. |
| 10,205,291 B2 | 2/2019 | Scruggs et al. |
| 10,213,108 B2 | 2/2019 | Al-Ali |

| | | | |
|---|---|---|---|
| 10,219,706 B2 | 3/2019 | Al-Ali |
| 10,219,746 B2 | 3/2019 | McHale et al. |
| 10,226,187 B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 B2 | 3/2019 | Kiani |
| 10,231,657 B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 B2 | 3/2019 | Blank et al. |
| 10,231,676 B2 | 3/2019 | Al-Ali et al. |
| RE47,353 E | 4/2019 | Kiani et al. |
| 10,251,585 B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 B2 | 4/2019 | Lamego |
| 10,255,994 B2 | 4/2019 | Sampath et al. |
| 10,258,265 B1 | 4/2019 | Poeze et al. |
| 10,258,266 B1 | 4/2019 | Poeze et al. |
| 2003/0218386 A1 | 11/2003 | Dalke et al. |
| 2005/0234317 A1 | 10/2005 | Kiani |
| 2006/0094943 A1 | 5/2006 | Van Slyke |
| 2006/0161054 A1 | 7/2006 | Reuss et al. |
| 2007/0073121 A1 | 3/2007 | Hoarau et al. |
| 2007/0282478 A1 | 12/2007 | Al-Ali et al. |
| 2009/0247984 A1 | 10/2009 | Lamego et al. |
| 2009/0275813 A1 | 11/2009 | Davis |
| 2009/0275844 A1 | 11/2009 | Al-Ali |
| 2010/0004518 A1 | 1/2010 | Vo et al. |
| 2010/0030040 A1 | 2/2010 | Poeze et al. |
| 2011/0001605 A1 | 1/2011 | Kiani et al. |
| 2011/0082711 A1 | 4/2011 | Poeze et al. |
| 2011/0087083 A1 | 4/2011 | Poeze et al. |
| 2011/0105854 A1 | 5/2011 | Kiani et al. |
| 2011/0125060 A1 | 5/2011 | Telfort et al. |
| 2011/0208015 A1 | 8/2011 | Welch et al. |
| 2011/0213212 A1 | 9/2011 | Al-Ali |
| 2011/0230733 A1 | 9/2011 | Al-Ali |
| 2011/0237911 A1 | 9/2011 | Lamego et al. |
| 2011/0237969 A1 | 9/2011 | Eckerbom et al. |
| 2011/0288383 A1 | 11/2011 | Diab |
| 2012/0041316 A1 | 2/2012 | Al-Ali et al. |
| 2012/0046557 A1 | 2/2012 | Kiani |
| 2012/0059267 A1 | 3/2012 | Lamego et al. |
| 2012/0088984 A1 | 4/2012 | Al-Ali et al. |
| 2012/0165629 A1 | 6/2012 | Merritt et al. |
| 2012/0179006 A1 | 7/2012 | Jansen et al. |
| 2012/0209082 A1 | 8/2012 | Al-Ali |
| 2012/0209084 A1 | 8/2012 | Olsen et al. |
| 2012/0227739 A1 | 9/2012 | Kiani |
| 2012/0283524 A1 | 11/2012 | Kiani et al. |
| 2012/0296178 A1 | 11/2012 | Lamego et al. |
| 2012/0319016 A1 | 12/2012 | Al-Ali |
| 2012/0330112 A1 | 12/2012 | Lamego et al. |
| 2013/0023775 A1 | 1/2013 | Lamego et al. |
| 2013/0041591 A1 | 2/2013 | Lamego |
| 2013/0045685 A1 | 2/2013 | Kiani |
| 2013/0046204 A1 | 2/2013 | Lamego et al. |
| 2013/0060147 A1 | 3/2013 | Welch et al. |
| 2013/0096405 A1 | 4/2013 | Garfio |
| 2013/0096936 A1 | 4/2013 | Sampath et al. |
| 2013/0190581 A1 | 7/2013 | Al-Ali et al. |
| 2013/0197328 A1 | 8/2013 | Diab et al. |
| 2013/0211214 A1 | 8/2013 | Olsen |
| 2013/0243021 A1 | 9/2013 | Siskavich |
| 2013/0253334 A1 | 9/2013 | Al-Ali et al. |
| 2013/0262730 A1 | 10/2013 | Al-Ali et al. |
| 2013/0274572 A1 | 10/2013 | Al-Ali et al. |
| 2013/0296672 A1 | 11/2013 | O'Neil et al. |
| 2013/0296713 A1 | 11/2013 | Al-Ali et al. |
| 2013/0317370 A1 | 11/2013 | Dalvi et al. |
| 2013/0324808 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331660 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 A1 | 12/2013 | Kiani |
| 2013/0338461 A1 | 12/2013 | Lamego et al. |
| 2014/0012100 A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 A1 | 2/2014 | Lamego et al. |
| 2014/0058230 A1 | 2/2014 | Abdul-Hafiz et al. |
| 2014/0066783 A1 | 3/2014 | Kiani et al. |
| 2014/0077956 A1 | 3/2014 | Sampath et al. |
| 2014/0081100 A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 A1 | 3/2014 | Telfort |
| 2014/0094667 A1 | 4/2014 | Schurman et al. |
| 2014/0100434 A1 | 4/2014 | Diab et al. |

6

**US 10,433,776 B2**

Page 7

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2014/0114199 A1 | 4/2014 | Lamego et al. |
| 2014/0120564 A1 | 5/2014 | Workman et al. |
| 2014/0121482 A1 | 5/2014 | Merritt et al. |
| 2014/0121483 A1 | 5/2014 | Kiani |
| 2014/0127137 A1 | 5/2014 | Bellott et al. |
| 2014/0129702 A1 | 5/2014 | Lamego et al. |
| 2014/0135588 A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 A1 | 6/2014 | Al-Ali |
| 2014/0163402 A1 | 6/2014 | Lamego et al. |
| 2014/0166076 A1 | 6/2014 | Kiani et al. |
| 2014/0171763 A1 | 6/2014 | Diab |
| 2014/0180038 A1 | 6/2014 | Kiani |
| 2014/0180154 A1 | 6/2014 | Sierra et al. |
| 2014/0180160 A1 | 6/2014 | Brown et al. |
| 2014/0187973 A1 | 7/2014 | Brown et al. |
| 2014/0194709 A1 | 7/2014 | Al-Ali et al. |
| 2014/0194711 A1 | 7/2014 | Al-Ali |
| 2014/0194766 A1 | 7/2014 | Al-Ali et al. |
| 2014/0206963 A1 | 7/2014 | Al-Ali |
| 2014/0213864 A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0243627 A1 | 8/2014 | Diab et al. |
| 2014/0266790 A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 A1 | 9/2014 | Poeze et al. |
| 2014/0275835 A1 | 9/2014 | Lamego et al. |
| 2014/0275871 A1 | 9/2014 | Lamego et al. |
| 2014/0275872 A1 | 9/2014 | Merritt et al. |
| 2014/0275881 A1 | 9/2014 | Lamego et al. |
| 2014/0276115 A1 | 9/2014 | Dalvi et al. |
| 2014/0288400 A1 | 9/2014 | Diab et al. |
| 2014/0303520 A1 | 10/2014 | Telfort et al. |
| 2014/0316217 A1 | 10/2014 | Purdon et al. |
| 2014/0316218 A1 | 10/2014 | Purdon et al. |
| 2014/0316228 A1 | 10/2014 | Blank et al. |
| 2014/0323825 A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 A1 | 10/2014 | Brown et al. |
| 2014/0323898 A1 | 10/2014 | Purdon et al. |
| 2014/0330092 A1 | 11/2014 | Al-Ali et al. |
| 2014/0330098 A1 | 11/2014 | Merritt et al. |
| 2014/0330099 A1 | 11/2014 | Al-Ali et al. |
| 2014/0333440 A1 | 11/2014 | Kiani |
| 2014/0336481 A1 | 11/2014 | Shakespeare et al. |
| 2014/0343436 A1 | 11/2014 | Kiani |
| 2014/0357966 A1 | 12/2014 | Al-Ali et al. |
| 2014/0371548 A1 | 12/2014 | Al-Ali et al. |
| 2014/0378784 A1 | 12/2014 | Kiani et al. |
| 2015/0005600 A1 | 1/2015 | Blank et al. |
| 2015/0011907 A1 | 1/2015 | Purdon et al. |
| 2015/0012231 A1 | 1/2015 | Poeze et al. |
| 2015/0018650 A1 | 1/2015 | Al-Ali et al. |
| 2015/0025406 A1 | 1/2015 | Al-Ali |
| 2015/0032029 A1 | 1/2015 | Al-Ali et al. |
| 2015/0038859 A1 | 2/2015 | Dalvi et al. |
| 2015/0045637 A1 | 2/2015 | Dalvi |
| 2015/0051462 A1 | 2/2015 | Olsen |
| 2015/0080754 A1 | 3/2015 | Purdon et al. |
| 2015/0087936 A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 A1 | 4/2015 | Al-Ali |
| 2015/0097701 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099950 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099951 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099955 A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 A1 | 4/2015 | Muhsin et al. |
| 2015/0112151 A1 | 4/2015 | Muhsin et al. |
| 2015/0116076 A1 | 4/2015 | Al-Ali et al. |
| 2015/0126830 A1 | 5/2015 | Schurman et al. |
| 2015/0133782 A1 | 5/2015 | Smith et al. |
| 2015/0141781 A1 | 5/2015 | Weber et al. |
| 2015/0165312 A1 | 6/2015 | Kiani |
| 2015/0196237 A1 | 7/2015 | Lamego |
| 2015/0196249 A1 | 7/2015 | Brown et al. |
| 2015/0201874 A1 | 7/2015 | Diab |
| 2015/0208966 A1 | 7/2015 | Al-Ali |
| 2015/0216459 A1 | 8/2015 | Al-Ali et al. |

| | | |
|---|---|---|
| 2015/0230755 A1 | 8/2015 | Al-Ali et al. |
| 2015/0238722 A1 | 8/2015 | Al-Ali |
| 2015/0245773 A1 | 9/2015 | Lamego et al. |
| 2015/0245794 A1 | 9/2015 | Al-Ali |
| 2015/0257689 A1 | 9/2015 | Al-Ali et al. |
| 2015/0272514 A1 | 10/2015 | Kiani et al. |
| 2015/0351697 A1 | 12/2015 | Weber et al. |
| 2015/0351704 A1 | 12/2015 | Kiani et al. |
| 2015/0359429 A1 | 12/2015 | Al-Ali et al. |
| 2015/0366472 A1 | 12/2015 | Kiani |
| 2015/0366507 A1 | 12/2015 | Blank |
| 2015/0374298 A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 A1 | 12/2015 | Coverston et al. |
| 2016/0000362 A1 | 1/2016 | Diab et al. |
| 2016/0007930 A1 | 1/2016 | Weber et al. |
| 2016/0029932 A1 | 2/2016 | Al-Ali |
| 2016/0029933 A1 | 2/2016 | Al-Ali et al. |
| 2016/0045118 A1 | 2/2016 | Kiani |
| 2016/0051205 A1 | 2/2016 | Al-Ali et al. |
| 2016/0058338 A1 | 3/2016 | Schurman et al. |
| 2016/0058347 A1 | 3/2016 | Reichgott et al. |
| 2016/0066823 A1 | 3/2016 | Kind et al. |
| 2016/0066824 A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 A1 | 3/2016 | Telfort et al. |
| 2016/0072429 A1 | 3/2016 | Kiani et al. |
| 2016/0073967 A1 | 3/2016 | Lamego et al. |
| 2016/0081552 A1 | 3/2016 | Wojtczuk et al. |
| 2016/0095543 A1 | 4/2016 | Telfort et al. |
| 2016/0095548 A1 | 4/2016 | Al-Ali et al. |
| 2016/0103598 A1 | 4/2016 | Al-Ali et al. |
| 2016/0113527 A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 A1 | 5/2016 | Al-Ali |
| 2016/0166182 A1 | 6/2016 | Al-Ali et al. |
| 2016/0166183 A1 | 6/2016 | Poeze et al. |
| 2016/0166188 A1 | 6/2016 | Bruinsma et al. |
| 2016/0166210 A1 | 6/2016 | Al-Ali |
| 2016/0192869 A1 | 7/2016 | Kiani et al. |
| 2016/0196388 A1 | 7/2016 | Lamego |
| 2016/0197436 A1 | 7/2016 | Barker et al. |
| 2016/0213281 A1 | 7/2016 | Eckerbom et al. |
| 2016/0228043 A1 | 8/2016 | O'Neil et al. |
| 2016/0233632 A1 | 8/2016 | Scruggs et al. |
| 2016/0234944 A1 | 8/2016 | Schmidt et al. |
| 2016/0270735 A1 | 9/2016 | Diab et al. |
| 2016/0283665 A1 | 9/2016 | Sampath et al. |
| 2016/0287090 A1 | 10/2016 | Al-Ali et al. |
| 2016/0287786 A1 | 10/2016 | Kiani |
| 2016/0296169 A1 | 10/2016 | McHale et al. |
| 2016/0310052 A1 | 10/2016 | Al-Ali et al. |
| 2016/0314260 A1 | 10/2016 | Kiani |
| 2016/0324486 A1 | 11/2016 | Al-Ali et al. |
| 2016/0324488 A1 | 11/2016 | Olsen |
| 2016/0327984 A1 | 11/2016 | Al-Ali et al. |
| 2016/0328528 A1 | 11/2016 | Al-Ali et al. |
| 2016/0331332 A1 | 11/2016 | Al-Ali |
| 2016/0367173 A1 | 12/2016 | Dalvi et al. |
| 2017/0000394 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007134 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007190 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007198 A1 | 1/2017 | Al-Ali et al. |
| 2017/0014083 A1 | 1/2017 | Diab et al. |
| 2017/0014084 A1 | 1/2017 | Al-Ali et al. |
| 2017/0021099 A1 | 1/2017 | Al-Ali et al. |
| 2017/0024748 A1 | 1/2017 | Haider |
| 2017/0027456 A1 | 2/2017 | Kinast et al. |
| 2017/0042488 A1 | 2/2017 | Muhsin |
| 2017/0055847 A1 | 3/2017 | Kiani et al. |
| 2017/0055851 A1 | 3/2017 | Al-Ali |
| 2017/0055882 A1 | 3/2017 | Al-Ali |
| 2017/0055887 A1 | 3/2017 | Al-Ali |
| 2017/0055896 A1 | 3/2017 | Al-Ali |
| 2017/0079594 A1 | 3/2017 | Telfort et al. |
| 2017/0086723 A1 | 3/2017 | Al-Ali |
| 2017/0143281 A1 | 5/2017 | Olsen |
| 2017/0147774 A1 | 5/2017 | Kiani |
| 2017/0156620 A1 | 6/2017 | Al-Ali et al. |
| 2017/0173632 A1 | 6/2017 | Al-Ali |
| 2017/0187146 A1 | 6/2017 | Kiani et al. |
| 2017/0188919 A1 | 7/2017 | Al-Ali et al. |

7

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2017/0196464 A1 | 7/2017 | Jansen et al. |
| 2017/0196470 A1 | 7/2017 | Lamego et al. |
| 2017/0202490 A1 | 7/2017 | Al-Ali et al. |
| 2017/0224262 A1 | 8/2017 | Al-Ali |
| 2017/0228516 A1 | 8/2017 | Sampath et al. |
| 2017/0245790 A1 | 8/2017 | Al-Ali et al. |
| 2017/0251974 A1 | 9/2017 | Shreim et al. |
| 2017/0251975 A1 | 9/2017 | Shreim et al. |
| 2017/0258403 A1 | 9/2017 | Abdul-Hafiz et al. |
| 2017/0311851 A1 | 11/2017 | Schurman et al. |
| 2017/0311891 A1 | 11/2017 | Kiani et al. |
| 2017/0325728 A1 | 11/2017 | Al-Ali et al. |
| 2017/0332976 A1 | 11/2017 | Al-Ali et al. |
| 2017/0340293 A1 | 11/2017 | Al-Ali et al. |
| 2017/0360310 A1 | 12/2017 | Kiani et al. |
| 2017/0367632 A1 | 12/2017 | Al-Ali et al. |
| 2018/0008146 A1 | 1/2018 | Al-Ali et al. |
| 2018/0013562 A1 | 1/2018 | Haider et al. |
| 2018/0014752 A1 | 1/2018 | Al-Ali et al. |
| 2018/0028124 A1 | 2/2018 | Al-Ali et al. |
| 2018/0055385 A1 | 3/2018 | Al-Ali |
| 2018/0055390 A1 | 3/2018 | Kiani et al. |
| 2018/0055430 A1 | 3/2018 | Diab et al. |
| 2018/0064381 A1 | 3/2018 | Shakespeare et al. |
| 2018/0069776 A1 | 3/2018 | Lamego et al. |
| 2018/0070867 A1 | 3/2018 | Smith et al. |
| 2018/0082767 A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 A1 | 3/2018 | Telfort |
| 2018/0087937 A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 A1 | 4/2018 | Lee et al. |
| 2018/0103905 A1 | 4/2018 | Kiani |
| 2018/0110478 A1 | 4/2018 | Al-Ali |
| 2018/0116575 A1 | 5/2018 | Perea et al. |
| 2018/0125368 A1 | 5/2018 | Lamego et al. |
| 2018/0125430 A1 | 5/2018 | Al-Ali et al. |
| 2018/0125445 A1 | 5/2018 | Telfort et al. |
| 2018/0130325 A1 | 5/2018 | Kiani et al. |
| 2018/0132769 A1 | 5/2018 | Weber et al. |
| 2018/0132770 A1 | 5/2018 | Lamego |
| 2018/0146901 A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 A1 | 5/2018 | Kiani et al. |
| 2018/0153442 A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 A1 | 6/2018 | Kiani |
| 2018/0153447 A1 | 6/2018 | Al-Ali et al. |
| 2018/0153448 A1 | 6/2018 | Weber et al. |
| 2018/0161499 A1 | 6/2018 | Al-Ali et al. |
| 2018/0168491 A1 | 6/2018 | Al-Ali et al. |
| 2018/0174679 A1 | 6/2018 | Sampath et al. |
| 2018/0174680 A1 | 6/2018 | Sampath et al. |
| 2018/0182484 A1 | 6/2018 | Sampath et al. |
| 2018/0184917 A1 | 7/2018 | Kiani |
| 2018/0192924 A1 | 7/2018 | Al-Ali |
| 2018/0192953 A1 | 7/2018 | Shreim et al. |
| 2018/0192955 A1 | 7/2018 | Al-Ali et al. |
| 2018/0199871 A1 | 7/2018 | Pauley et al. |
| 2018/0206795 A1 | 7/2018 | Al-Ali |
| 2018/0206815 A1 | 7/2018 | Telfort |
| 2018/0213583 A1 | 7/2018 | Al-Ali |
| 2018/0214031 A1 | 8/2018 | Kiani et al. |
| 2018/0214090 A1 | 8/2018 | Al-Ali et al. |
| 2018/0218792 A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 A1 | 8/2018 | Al-Ali et al. |
| 2018/0238718 A1 | 8/2018 | Dalvi |

| | | |
|---|---|---|
| 2018/0242853 A1 | 8/2018 | Al-Ali |
| 2018/0242921 A1 | 8/2018 | Muhsin et al. |
| 2018/0242923 A1 | 8/2018 | Al-Ali et al. |
| 2018/0242924 A1 | 8/2018 | Barker et al. |
| 2018/0242926 A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 A1 | 8/2018 | Muhsin et al. |
| 2018/0249933 A1 | 9/2018 | Schurman et al. |
| 2018/0253947 A1 | 9/2018 | Muhsin et al. |
| 2018/0256087 A1 | 9/2018 | Al-Ali et al. |
| 2018/0256113 A1 | 9/2018 | Weber et al. |
| 2018/0285094 A1 | 10/2018 | Housel et al. |
| 2018/0289325 A1 | 10/2018 | Poeze et al. |
| 2018/0289337 A1 | 10/2018 | Al-Ali et al. |
| 2018/0296161 A1 | 10/2018 | Shreim et al. |
| 2018/0300919 A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 A1 | 11/2018 | Indorf et al. |
| 2018/0310823 A1 | 11/2018 | Al-Ali et al. |
| 2018/0317826 A1 | 11/2018 | Muhsin |
| 2018/0317841 A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 A1 | 11/2018 | Lamego et al. |
| 2018/0333087 A1 | 11/2018 | Al-Ali |
| 2019/0000317 A1 | 1/2019 | Muhsin et al. |
| 2019/0000362 A1 | 1/2019 | Kiani et al. |
| 2019/0015023 A1 | 1/2019 | Monfre |
| 2019/0021638 A1 | 1/2019 | Al-Ali et al. |
| 2019/0029574 A1 | 1/2019 | Schurman et al. |
| 2019/0029578 A1 | 1/2019 | Al-Ali et al. |
| 2019/0058280 A1 | 2/2019 | Al-Ali et al. |
| 2019/0058281 A1 | 2/2019 | Al-Ali et al. |
| 2019/0069813 A1 | 3/2019 | Al-Ali |
| 2019/0076028 A1 | 3/2019 | Al-Ali et al. |
| 2019/0082979 A1 | 3/2019 | Al-Ali et al. |
| 2019/0090748 A1 | 3/2019 | Al-Ali |
| 2019/0090760 A1 | 3/2019 | Kinast et al. |
| 2019/0090764 A1 | 3/2019 | Al-Ali |
| 2019/0117070 A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117140 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117930 A1 | 4/2019 | Al-Ali |

OTHER PUBLICATIONS

US 9,579,050 B2, 02/2017, Al-Ali (withdrawn)
International Search Report dated Jul. 11, 2002, International Application No. PCT/US02/20675 filed Jun. 28, 2002.
U.S. Appl. No. 15/820,082, Low Power Pulse Oximeter, filed Nov. 21, 2017.
U.S. Appl. No. 16/174,130, Low Power Pulse Oximeter, filed Oct. 29, 2018.
Nov. 8, 2018 Complaint for (1) Breach of Contract (2) Trade Secret Misappropriation (3) Breach of Fiduciary Duty and (4) Patent Infringement and Demand for Jury Trial, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *True Wearables, Inc. and Marcelo Lamego*, Case No. 8:18-cv-2001.
May 15, 2019 Defendants True Wearables, Inc.'s and Marcelo Lamego's Preliminary Invalidity Contentions, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *True Wearables, Inc. and Marcelo Lamego*, Case No. 8:18-cv-2001-JVS-JDE.
New, William, Jr., "Continuous Non-Invasive Measurement of Arterial Oxygen", Journal of Japan Society for Clinical Anesthesia, vol. 6, No. 6, pp. 460-468 (Dec. 15, 1986).

* cited by examiner



FIG. 1 (Prior Art)

9



FIG. 2 (Prior Art)

Case: 22-1891    Document: 12    Page: 107    Filed: 10/19/2022



FIG. 3

11



FIG. 4



FIG. 5



FIG. 6





FIG. 8



FIG. 9

E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
PARTICULAR TIME PERIOD
T = TIMEOUT

17



FIG. 10

18



FIG. 11

US 10,433,776 B2

1

**LOW POWER PULSE OXIMETER**

REFERENCE TO RELATED APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are incorporated by reference under 37 CFR 1.57 and made a part of this specification.

BACKGROUND OF THE INVENTION

Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply. Oxygen saturation monitoring is crucial in critical care and surgical applications, where an insufficient blood supply can quickly lead to injury or death. FIG. **1** illustrates a conventional pulse oximetry system **100**, which has a sensor **110** and a monitor **150**. The sensor **110**, which can be attached to an adult's finger or an infant's foot, has both red and infrared LEDs **112** and a photodiode detector **114**. For a finger, the sensor is configured so that the LEDs **112** project light through the fingernail and into the blood vessels and capillaries underneath. The photodiode **114** is positioned at the finger tip opposite the fingernail so as to detect the LED emitted light as it emerges from the finger tissues. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled "Low Noise Optical Probe," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. **1**, the monitor **150** has LED drivers **152**, a signal conditioning and digitization front-end **154**, a signal processor **156**, a display driver **158** and a display **159**. The LED drivers **152** alternately activate the red and IR LEDs **112** and the front-end **154** conditions and digitizes the resulting current generated by the photodiode **114**, which is proportional to the intensity of the detected light. The signal processor **156** inputs the conditioned photodiode signal and determines oxygen saturation based on the differential absorption by arterial blood of the two wavelengths emitted by the LEDs **112**. Specifically, a ratio of detected red and infrared intensities is calculated by the signal processor **156**, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The display driver **158** and associated display **159** indicate a patient's oxygen saturation, heart rate and plethysmographic waveform.

SUMMARY OF THE INVENTION

Increasingly, pulse oximeters are being utilized in portable, battery-operated applications. For example, a pulse oximeter may be attached to a patient during emergency transport and remain with the patient as they are moved between hospital wards. Further, pulse oximeters are often implemented as plug-in modules for multiparameter patient monitors having a restricted power budget. These applications and others create an increasing demand for lower power and higher performance pulse oximeters. A conventional approach for reducing power consumption in portable electronics, typically utilized by devices such as calculators and notebook computers, is to have a "sleep mode" where the circuitry is powered-down when the devices are idle.

FIG. **2** illustrates a sleep-mode pulse oximeter **200** utilizing conventional sleep-mode power reduction. The pulse oximeter **200** has a pulse oximeter processor **210** and a power control **220**. The power control **220** monitors the pulse oximeter output parameters **212**, such as oxygen saturation and pulse rate, and controls the processor power **214** according to measured activity. For example, if there is no significant change in the oxygen saturation value over a certain time period, the power control **220** will power down the processor **210**, except perhaps for a portion of memory. The power control **220** may have a timer that triggers the processor **210** to periodically sample the oxygen saturation value, and the power control **220** determines if any changes in this parameter are occurring. If not, the power control **220** will leave the processor **210** in sleep mode.

There are a number of disadvantages to applying consumer electronic sleep mode techniques to pulse oximetry. By definition, the pulse oximeter is not functioning during sleep mode. Unlike consumer electronics, pulse oximetry cannot afford to miss events, such as patient oxygen desaturation. Further, there is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period. Also, sleep mode techniques rely only on the output parameters to determine whether the pulse oximeter should be active or in sleep mode. Finally, the caregiver is given no indication of when the pulse oximeter outputs were last updated.

One aspect of a low power pulse oximeter is a sensor interface adapted to drive a pulse oximetry sensor and receive a corresponding input signal. A processor derives a physiological measurement corresponding to the input signal, and a display driver communicates the measurement to a display. A controller generates a sampling control output to at least one of said sensor interface and said processor so as to reduce the average power consumption of the pulse oximeter consistent with a predetermined power target.

In one embodiment, a calculator derives a signal status output responsive to the input signal. The signal status output is communicated to the controller to override the sampling control output. The signal status output may indicate the occurrence of a low signal quality or the occurrence of a physiological event. In another embodiment, the sensor interface has an emitter driver adapted to provide a current output to an emitter portion of the sensor. Here, the sampling control output determines a duty cycle of the current output. In a particular embodiment, the duty cycle may be in the range of about 3.125% to about 25%.

In another embodiment, the sensor interface has a front-end adapted to receive the input signal from a detector portion of the sensor and to provide a corresponding digitized signal. Here, the sampling control output determines a powered-down period of the front-end. A confidence indicator responsive to a duration of the powered-down period may be provided and displayed.

In yet another embodiment, the pulse oximeter comprises a plurality of data blocks responsive to the input signal, wherein the sampling control output determines a time shift of successive ones of the data blocks. The time shift may vary in the range of about 1.2 seconds to about 4.8 seconds.

An aspect of a low power pulse oximetry method comprises the steps of setting a power target and receiving an input signal from a pulse oximetry sensor. Further steps include calculating signal status related to the input signal, calculating power status related to the power target, and sampling based upon the result of the calculating signal status and the calculating power status steps.

In one embodiment, the calculating signal status step comprises the substeps of receiving a signal statistic related to the input signal, receiving a physiological measurement related to the input signal, determining a low signal quality

20

US 10,433,776 B2

3

condition from the signal statistic, determining an event occurrence from the physiological measurement, and indicating an override based upon the low signal quality condition or the event occurrence. The calculating power status step may comprise the substeps of estimating an average power consumption for at least a portion of the pulse oximeter, and indicating an above power target condition when the average power consumption is above the power target. The sampling step may comprise the substep of increasing sampling as the result of the override. The sampling step may also comprise the substep of decreasing sampling as the result of the above power target condition, except during the override.

Another aspect of a low power pulse oximetry method comprises the steps of detecting an override related to a measure of signal quality or a physiological measurement event, increasing the pulse oximeter power to a higher power level when the override exists, and reducing the pulse oximeter power to a lower power level when the override does not exist. The method may comprise the further steps of predetermining a target power level for a pulse oximeter and cycling between the lower power level and the higher power level so that an average pulse oximeter power is consistent with the target power level.

In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor. In another embodiment, the reducing step comprises the substep of powering-down a detector front-end. A further step may comprise displaying a confidence indicator related to the duration of the powering-down substep. In yet another embodiment, the reducing step comprises the substep of increasing the time-shift of post-processor data blocks.

Another aspect of a low power pulse oximeter comprises a sensor interface adapted to receive an input signal from a sensor, a signal processor configured to communicate with the sensor interface and to generate an internal parameter responsive to the input signal, and a sampling controller responsive to the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The internal parameter may be indicative of the quality of the input signal. The output parameter may be indicative of oxygen saturation.

In another embodiment, the sampling controller is responsive to a predetermined power target in combination with the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters and the power target so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The sensor interface may comprise an emitter driver and the sampling control may modify a duty cycle of the emitter driver. The sensor interface may comprise a detector front-end and the sampling control may intermittently power-down the detector front-end. The processor may generate a plurality of data blocks corresponding to the input signal, where each of the data blocks have a time shift

4

from a preceding one of the data blocks, and where the sampling control may determine the amount of the time shift.

A further aspect of a low power pulse oximeter comprises an interface means for communicating with a sensor, a processor means for generating an internal parameter and an output parameter, and a controller means for selectively reducing the power consumption of at least one of the interface means and the processor means based upon the parameters. In one embodiment, the interface means comprises a driver means for determining the duty cycle of emitter current to the sensor, the driver means being responsive to the controller means. In another embodiment, the interface means comprises a detector front-end means for receiving an input signal from the sensor, the power for the detector front-end means being responsive to the controller means. In yet another embodiment, the processor means comprises a post-processor means for determining a time shift between data blocks, the post-processor means being responsive to the controller means. In a further embodiment, the controller means comprises a signal status calculator means for generating an indication of a low signal quality or a physiological event based upon at least one of an internal signal statistic and an output physiological measurement, and a control engine means in communications with the signal status calculator means for generating a sampling control responsive to the indication. In yet a further embodiment, the controller means comprises a power status calculator means for generating a power indication of power consumption relative to a power target, and a control engine means in communications with the power status calculator means for generating a sampling control responsive to the power indication.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a conventional pulse oximeter sensor and monitor;

FIG. **2** is a block diagram of a pulse oximeter having a conventional sleep mode;

FIG. **3** is a top-level block diagram of a low power pulse oximeter;

FIG. **4** is a detailed block diagram of a low power pulse oximeter illustrating a sensor interface, a signal processor and a sampling controller;

FIG. **5** is a graph of emitter drive current versus time illustrating variable duty cycle processing;

FIG. **6** is a graph of oxygen saturation versus time illustrating intermittent sample processing;

FIGS. 7A-B are graphs of data buffer content versus time illustrating variable data block overlap processing;

FIG. **8** is a graph of power versus time illustrating power dissipation conformance to an average power target using variable duty cycle and intermittent sample processing;

FIG. **9** is a state diagram of the sampling controller for variable duty cycle and intermittent sample processing;

FIG. **10** is a graph of power versus time illustrating power dissipation using variable data block overlap processing; and

FIG. **11** is a state diagram of the sampling controller for variable data block overlap processing.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **3** illustrates one embodiment of a low power pulse oximeter. The pulse oximeter **300** has a sensor interface **320**, a signal processor **340**, a sampling controller **360** and a

21

US 10,433,776 B2

5

display driver **380**. The pulse oximeter **300** also has a sensor port **302** and a display port **304**. The sensor port **302** connects to an external sensor, e.g. sensor **110** (FIG. **1**). The sensor interface **320** drives the sensor port **302**, receives a corresponding input signal from the sensor port **302**, and provides a conditioned and digitized sensor signal **322** accordingly. Physiological measurements **342** are input to a display driver **380** that outputs to the display port **304**. The display port **304** connects to a display device, such as a CRT or LCD, which a healthcare provider typically uses for monitoring a patient's oxygen saturation, pulse rate and plethysmograph.

As shown in FIG. **3**, the signal processor **340** derives the physiological measurements **342**, including oxygen saturation, pulse rate and plethysmograph, from the input signal **322**. The signal processor **340** also derives signal statistics **344**, such as signal strength, noise and motion artifact. The physiological measurements **342** and signal statistics **344** are input to the sampling controller **360**, which outputs sampling controls **362**, **364**, **366** accordingly. The sampling controls **362**, **364**, **366** regulate pulse oximeter power dissipation by causing the sensor interface **320** to vary the sampling characteristics of the sensor port **302** and by causing the signal processor **340** to vary its sample processing characteristics, as described in further detail with respect to FIG. **4**, below. Advantageously, power dissipation is responsive not only to output parameters, such as the physiological measurements **342**, but also to internal parameters, such as the signal statistics **344**.

FIG. **4** illustrates further detail regarding the sensor interface **320**, the signal processor **340** and the sampling controller **360**. The sensor interface **320** has emitter drivers **480** and a detector front-end **490**. The emitter drivers **480** are responsive to a sampling control **362**, described below, and provide emitter drive outputs **482**. The emitter drive outputs **482** activate the LEDs of a sensor attached to the sensor port **302** (FIG. **3**). The detector front-end **490** receives an input signal **492** from a sensor attached to the sensor port **302** (FIG. **3**) and provides a corresponding conditioned and digitized input signal **322** to the signal processor **340**. A sampling control **364** controls power to the detector front-end **490**, as described below.

As shown in FIG. **4**, the signal processor **340** has a pre-processor **410** and a post processor **430**. The pre-processor **410** demodulates red and IR signals from the digitized signal **322**, performs filtering, and reduces the sample rate. The pre-processor provides a demodulated output, having a red channel **412** and an IR channel **414**, which is input into the post-processor **430**. The post processor **430** calculates the physiological measurements **342** and the signal statistics **344**, which are output to a signal status calculator **450**. The physiological measurements **342** are also output to a display driver **380** (FIG. **3**) as described above. A pulse oximetry signal processor is described in U.S. Pat. No. 6,081,735 entitled "Signal Processing Apparatus," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. **4**, the sampling controller **360** has a control engine **440**, a signal status calculator **450** and a power status calculator **460**. The control engine **440** outputs sampling controls **362**, **364**, **366** to reduce the power consumption of the pulse oximeter **300**. In one embodiment, the control engine **440** advantageously utilizes multiple sampling mechanisms to alter power consumption. One sampling mechanism is an emitter duty cycle control **362** that is an input to the emitter drivers **480**. The emitter duty cycle control **362** determines the duty cycle of the current supplied

6

by the emitter drive outputs **482** to both red and IR sensor emitters, as described with respect to FIG. **5**, below. Another sampling mechanism is a front-end control **364** that intermittently removes power to the detector front-end **490**, as described with respected to FIG. **6**, below. Yet another sampling mechanism is a data block overlap control **366** that varies the number of data blocks processed by the post processor **430**. These various sampling mechanisms provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or oxygen desaturation events, as described below in further detail.

The sampling controls **362**, **364**, **366** modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed. Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary. In this manner, the control engine **440** regulates power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption, as described with respect to FIGS. **8** and **10**, below. The current state of the control engine is provided as a control state output **442** to the power status calculator **460**. The control engine **440** utilizes the power status output **462** and the signal status output **452** to determine its next control state, as described with respect to FIGS. **9** and **11**, below.

Further shown in FIG. **4**, the signal status calculator **450** receives physiological measurements and signal statistics from the post processor **430** and determines the occurrence of an event or a low signal quality condition. An event determination is based upon the physiological measurements output **342** and may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as an oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform to name a few. A low signal quality condition is based upon the signal statistics output **344** and may be any signal-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact to name a few. The signal status calculator **450** provides the signal status output **452** that is input to the control engine **440**.

In addition, FIG. **4** shows that the power status calculator **460** has a control state input **442** and a power status output **462**. The control state input **442** indicates the current state of the control engine **440**. The power status calculator **460** utilizes an internal time base, such as a counter, timer or real-time clock, in conjunction with the control engine state to estimate the average power consumption of at least a portion of the pulse oximeter **300**. The power status calculator **460** also stores a predetermined power target and compares its power consumption estimate to this target. The power status calculator **460** generates the power status output **462** as an indication that the current average power estimate is above or below the power target and provides this output **462** to the control engine **440**.

FIG. **5** illustrates emitter driver output current versus time. The graph **500** depicts the combination of a red LED drive current **510** and an IR drive current **560**. The solid line graph **502** illustrates drive currents having a high duty cycle. The dashed line graph **504** illustrates drive currents having a low duty cycle. In a typical pulse oximeter, the duty cycle of the drive signals is constant and provides sufficient dark bands **508** to demodulate the detector response into red and IR channels. The emitter drivers **480** (FIG. **4**), however,

22

US 10,433,776 B2

7 8

require a significant portion of the overall pulse oximeter power budget. Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity. As an example, a low power pulse oximeter implementation nominally consuming 500 mw may be able to reduce power consumption on the order of 70 mw by such drive current duty cycle reductions. In a preferred embodiment, the drive current duty cycle is varied within a range from about 25% to about 3.125%. In a more preferred embodiment, the drive current duty cycle is intermittently reduced from about 25% to about 3.125%. In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a "data off" time period longer than one drive current cycle where the emitter drivers **480** (FIG. 4) are turned off. The detector front-end **490** (FIG. 4) may also be powered down during such a data off period, as described with respect to FIGS. 8 and 9, below.

FIG. 6 is a graph **600** of a pre-processor output signal **610** over time depicting the result of intermittent sampling at the detector front-end **490** (FIG. 4). The output signal **610** is a red channel **412** (FIG. 4) or an IR channel **414** (FIG. 4) output from the pre-processor **410** (FIG. 4), which is input to the post processor **430** (FIG. 4), as described above. The output signal **610** has "on" periods **612**, during which time the detector front-end **490** (FIG. 4) is powered-up and "off" periods **614**, during which time the detector front-end **490** (FIG. 4) is powered-down. The location and duration of the on periods **612** and off periods **614** are determined by the front-end control **364** (FIG. 4).

Also shown in FIG. 6 is a corresponding timeline **601** of overlapping data blocks **700**, which are "snap-shots" of the pre-processor output signal **610** over specific time intervals. Specifically, the post processor **430** (FIG. 4) processes a sliding window of samples of the pre-processor output signal **610**, as described with respect to FIGS. 7A-B, below. Advantageously, the post processor **430** (FIG. 4) continues to function during off portions **614**, marking as invalid those data blocks **640** that incorporate off portions **614**. A freshness counter can be used to measure the time period **660** between valid data blocks **630**, which can be displayed on a pulse oximeter monitor as an indication of confidence in the current measurements.

FIGS. 7A-B illustrate data blocks **700**, which are processed by the post processor **430** (FIG. 4). Each data block **700** has n samples **702** of the pre-processor output and corresponds to a time interval **704** of n/$f_s$, where $f_s$ is the sample frequency. For example, in one embodiment n=600 and $f_s$=62.5 Hz. Hence, each data block time interval **704** is nominally 9.6 sec.

As shown in FIG. 7A, each data block **700** also has a relative time shift **706** from the preceding data block, where is an integral number of sample periods. That is, =m/$f_s$, where m is an integer representing the number of samples dropped from the preceding data block and added to the succeeding data block. In the embodiment described above, m=75 and =1.2 sec, nominally. The corresponding overlap **708** of two adjacent data blocks **710**, **720** is (n−m)/$f_s$. In the embodiment described above, the overlap **708** is nominally 9.6 sec−1.2 sec=8.4 sec. The greater the overlap **708**, i.e. the smaller the time shift **706**, the more data blocks there are to process in the post-processor **430** (FIG. 4), with a corresponding greater power consumption. The overlap **708** between successive data blocks **710**, **720** may vary from n−1 samples to no samples, i.e. no overlap. Also, as shown in FIG. 7B, there may be a sample gap **756** or negative overlap, i.e. samples between data blocks that are not processed by

the post-processor, allowing further post-processor power savings. Sample gaps **756** may correspond to detector front-end off periods **614** (FIG. 6).

FIG. 8 illustrates an exemplar power consumption versus time profile **800** for the pulse oximeter **300** (FIG. 3) during various control engine states. In one embodiment, the control engine **440** (FIG. 4) has three states related to the sampling control outputs **362**, **364** that affect pulse oximeter power consumption accordingly. One of ordinary skill in the art will recognize that the control engine **440** (FIG. 4) may have greater or fewer states and associated power consumption levels. The profile **800** shows the three control engine states **810** and the associated power consumption levels **820**. These three states are high duty cycle **812**, low duty cycle **814** and data off **818**.

In the high duty cycle state **812**, the control engine **440** (FIG. 4) causes the emitter drivers **480** (FIG. 4) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red **510** and IR **560** drive currents. In the low duty cycle state **814**, the control engine **440** (FIG. 4) causes the emitter drivers **480** (FIG. 4) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red **510** and IR **560** drive currents. In the data off state **818**, the control engine **440** (FIG. 4) turns off the emitter drivers **480** (FIG. 4) and powers down the detector front-end **490** (FIG. 4). Also shown is a predetermined target power consumption level **830**. The control engine **440** (FIG. 4) alters the sensor sampling of the pulse oximeter **300** (FIG. 3) so that the average power consumption matches the target level **830**, as indicated by the power status output **462** (FIG. 4), except when overridden by the signal status output **452** (FIG. 4).

As shown in FIG. 8, power consumption changes according to the control states **810** during each of the time intervals **850**. In a first time interval **851**, the pulse oximeter is in a low duty cycle state **814** and transitions to a high duty cycle state **812** during a second time interval **852** due to an event or low quality signal. During a third time interval **853**, the pulse oximeter is able to enter the data off state **818**, during which time no sensor samples are processed. In a forth time interval **854**, sensor samples are again taken, but at a low duty cycle **814**. During the fifth and sixth time intervals **855**, **856**, sensor samples are shut off and turned on again as the pulse oximeter **300** (FIG. 3) alternates between the data off state **818** and the low duty cycle state **814** so as to maintain an average power consumption at the target level **830**.

FIG. 9 illustrates a state diagram **900** for one embodiment of the control engine **440** (FIG. 4). In this embodiment, there are three control states, high duty cycle **910**, low duty cycle **940** and data off **970**, as described with respect to FIG. 8, above. If the control state is data off **970**, an event triggers a data-off to high-duty-cycle transition **972**. If the control state is low duty cycle **940**, an event similarly triggers a low-duty-cycle to high-duty-cycle transition **942**. In this manner, the occurrence of an event initiates high duty sensor sampling, allowing high fidelity monitoring of the event. Similarly, if the control state is low duty cycle **940**, low signal quality triggers a low-duty cycle to high-duty-cycle transition **942**. In this manner, low signal quality initiates higher duty sensor sampling, providing, for example, a larger signal-to-noise ratio.

Also shown in FIG. 9, if the control state is high duty cycle **910** and either an event is occurring or signal quality is low, then a null transition **918** maintains the high duty cycle state **910**. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition **948** maintains the low duty cycle state **940**, so that

23

US 10,433,776 B2

9

10

sampling is turned-off only when necessary to track the power target. Further, if the control state is data off **970** and no time-out has occurred, a null transition **978** maintains the data off state **970**, providing a minimum power consumption.

In addition, FIG. **9** shows that when the control state is in a high duty cycle state **910**, if neither an event nor low signal quality are occurring, then a high-duty-cycle to low-duty-cycle transition **912** occurs by default. Also, if the control state is low duty cycle **940**, if neither an event nor low signal quality are occurring and the power consumption is above the target level for longer than a particular time interval, a low-duty-cycle to data-off transition **944** occurs by default, allowing power consumption to come down to the target level. Further, if the control state is data off **970**, if no event occurs and a timeout does occur, a data-off to low-duty-cycle transition **974** occurs by default, preventing excessively long periods of no sensor sampling.

FIG. **10** illustrates an exemplar power consumption versus time profile **1000** for the post processor **430** (FIG. **4**) during various control engine states. In one embodiment, the control engine **440** (FIG. **4**) has three states related to the sampling control output **366** (FIG. **4**) that affect post processor power consumption accordingly. One of ordinary skill in the art will recognize that the control engine may have greater or fewer states and associated power consumption levels. The profile **1000** shows the three control engine states **1010** and the associated post processor power consumption levels **1020**. These three states are large overlap **1012**, medium overlap **1014** and small overlap **1018**.

As shown in FIG. **10**, in the large overlap state **1012**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively small time shift **706** (FIG. **7A**), and the post processor exhibits relatively high power consumption under these conditions, say 300 mw. In the medium overlap state **1014**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively larger time shift **706** (FIG. **7A**). For example, the data blocks may be time shifted twice as much as for the large overlap state **1012**, and, as such, the post processor performs only half as many computations and consumes half the nominal power, say 150 mw. In the small overlap state **1018**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively large time shift. For example, the data blocks may be time shifted twice as much as for the medium overlap state **1014**. As such, the post processor performs only a quarter as many computations and consumes a quarter of the nominal power, say 75 mw, as for the large overlap state **1012**. In one embodiment, the control engine **440** (FIG. **4**) alters the data block overlap of the post processor in conjunction with the duty cycle of the emitter drivers described with respect to FIG. **5**, above, and the front-end sampling described with respect to FIG. **6**, above, so that the power consumption of the pulse oximeter matches a target level indicated by the power status output **462** (FIG. **4**) or so that the power consumption is otherwise reduced or minimized.

In a preferred embodiment, data blocks are time shifted by either about 0.4 sec or about 1.2 sec, depending on the overlap state of the control engine **440** (FIG. **4**). In a more preferred embodiment, the data blocks are varied between about 1.2 sec and about 4.8 sec. In a most preferred embodiment, the data blocks are time shifted by either about 1.2 sec, about 2.4 sec or about 4.8 sec, depending on the overlap state of the control engine **440** (FIG. **4**). Although the post-processing of data blocks is described above with respect to only a few overlap states and a corresponding number of particular data block time shifts, there may be many overlap states and a corresponding range of data block time shifts.

Further shown in FIG. **10**, power consumption **1020** changes according to the control states **1010** during each of the time intervals **1050**. In a first time interval **1052**, the post processor is in a large overlap state **1012** and transitions to a medium overlap state **1014** during a second time interval **1054**, so as to meet a power target during a high signal quality period, for example. During a third time interval **1055**, the post processor enters a small overlap state **1018**, for example to meet a power target by further reducing power consumption. In a forth time interval **1056**, the post processor transitions back to a large overlap state **1012**, such as during an event or low signal quality conditions.

FIG. **11** illustrates a state diagram **1100** for one embodiment of the control engine **440** (FIG. **4**). These states may function in parallel with, or in combination with, the sampling states described with respect to FIG. **9**, above. In the illustrated embodiment, there are three control states, large overlap **1110**, medium overlap **1140** and small overlap **1170**, as described with respect to FIG. **10**, above. If the control state is small overlap **1170**, an event triggers a small overlap to large overlap transition **1172**. If the control state is medium overlap **1140**, an event similarly triggers a medium overlap to large-overlap transition **1142**. In this manner, the occurrence of an event initiates the processing of more data blocks, allowing more robust signal statistics and higher fidelity monitoring of the event. Similarly, if the control state is medium overlap **1140**, low signal quality triggers a medium overlap to large overlap transition **1142**. In this manner, low signal quality initiates the processing of more data blocks, providing more robust signal statistics during lower signal-to-noise ratio periods.

Also shown in FIG. **11**, if the control state is large overlap **1110** and either an event is occurring or signal quality is low, then a null transition **1118** maintains the large overlap state **1110**. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition **1148** maintains the medium overlap state **1140**, so that reduced data processing occurs only when necessary to track the power target. Further, if the control state is small overlap **1170**, a null transition **1178** maintains this power saving state until the power target is reached or an event or low signal quality condition occurs.

In addition, FIG. **11** shows that when the control state is in a large overlap state **1110**, if neither an event nor low signal quality are occurring, then a large overlap to medium overlap transition **1112** occurs by default. Also, if the control state is medium overlap **1140**, if the power consumption is above the target level for longer than a particular time interval and no low signal quality condition or event is occurring, a medium overlap to small overlap transition **1174** occurs, allowing power consumption to come down to the target level. Further, if the control state is small overlap **1170**, if no event occurs but the power target has been met, a small overlap to medium overlap transition **1174** occurs.

A low power pulse oximeter embodiment is described above as having a power status calculator **460** (FIG. **4**) and an associated power target. Another embodiment of a low power pulse oximeter, however, functions without either a power status calculator or a power target, utilizing the sampling controls **362**, **364**, **366** (FIG. **3**) in response to internal parameters and/or output parameters, such as signal statistics **344** (FIG. **3**) and/or physiological measurements

24

US 10,433,776 B2

11 12

342 (FIG. 3) to reduce power consumption except during, say, periods of low signal quality and physiological events.

One of ordinary skill in the art will recognize that various state diagrams are possible representing control of the emitter drivers, the detector front-end and the post-processor. Such state diagrams may have fewer or greater states with differing transitional characteristics and with differing relationships between sampling mechanisms than the particular embodiments described above. In relatively simple embodiments of the control engine **440** (FIG. **4**), only a single sampling mechanism is used, such as the sampling mechanism used to vary the duty cycle of the emitter drivers. The single sampling mechanism may be based only upon internal parameters, such as signal quality, only upon output parameters, such as those that indicate the occurrence of physiological events, or upon a combination of internal and output parameters, with or without a power target.

In relatively more complex embodiments of the control engine **440** (FIG. **4**), sampling mechanisms are used in combination. These sampling mechanisms may be based only upon internal parameters, only upon output parameters, or upon a combination of internal and output parameters, with or without a power target. In a particular embodiment, the emitter duty-cycle, front-end duty-cycle and data block overlap sampling mechanisms described above are combined. A "reduced overlap" state relating to the post-processing of data blocks is added to the diagram of FIG. **9** between the "low duty cycle" state and the "data off" state. That is, sampling is varied between a high duty cycle state, a low duty cycle state, a reduced overlap state and a data off state in response to signal quality and physiological events, with or without a power target.

The low power pulse oximeter has been disclosed in detail in connection with various embodiments. These embodiments are disclosed by way of examples only and are not to limit the scope of the claims that follow. One of ordinary skill in the art will appreciate many variations and modifications.

What is claimed is:

1. A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control

protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor;

wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

2. The method of claim 1, wherein the first control protocol light source operates on the first duty cycle having an active time and an inactive time according to the first control protocol, wherein the second control protocol light source operates on the second duty cycle having an active time and an inactive time according to the second control protocol, the active time of the first duty cycle having a first duration and the active time of the second duty cycle having a second duration, wherein the first duration and the second duration are different.

3. The method of claim 2, wherein the second duration is longer than the first duration.

4. The method of claim 1, wherein power consumption during said operating at the second control protocol is greater than power consumption during said operating at the first control protocol.

5. The method of claim 1, wherein said operating the patient monitor according to the first control protocol consumes a relatively small amount of power, and wherein said operating the patient monitor according to the second control protocol consumes a relatively large amount of power.

6. The method of claim 1, wherein said operating the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state.

7. The method of claim 1, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source.

8. The method of claim 7, wherein the signal quality characteristics includes at least one of signal strength, a presence of noise, or a presence of motion induced noise.

9. The method of claim 1, wherein the physiological event includes at least one of oxygen desaturation, an abnormal pulse rate, or an abnormal plethysmograph waveform.

10. The method of claim 9, wherein the physiological event includes the abnormal pulse rate and wherein the abnormal pulse rate includes an elevated pulse rate.

11. A patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the patient monitor comprising:

a plurality of light sources;

at least one detector of an optical sensor configured to receive light after attenuation by body tissue of the patient using the patient monitor; and

25

US 10,433,776 B2

13

one or more processors configured to:

operate the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of said plurality of light sources;

when operating according to the first control protocol, calculate, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by said at least one detector after attenuation by the body tissue of the patient using the patient monitor;

generate a trigger signal, wherein generation of said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operate the patient monitor according to a second control protocol different from the first control protocol, wherein said operation includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of said plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculate the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by said at least one detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operation of the patient monitor according to the second control protocol operates the first control

14

protocol light source according to a first duty cycle and said operation of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

**12**. The patient monitor of claim **11**, wherein said operation of the first control protocol light source on the first duty cycle has an active time and an inactive time according to the first control protocol, wherein said operation of the second control protocol light source on the second duty cycle has an active time and an inactive time according to the second control protocol, wherein the active time of the first duty cycle has a first duration and the active time of the second duty cycle has a second duration, wherein the first duration and the second duration are different.

**13**. The patient monitor of claim **12**, wherein the second duration is longer than the first duration.

**14**. The patient monitor of claim **11**, wherein power consumption during said operation at the second control protocol is greater than power consumption during said operation at the first control protocol.

**15**. The patient monitor of claim **11**, wherein said operation of the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state.

**16**. The patient monitor of claim **11**, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source.

* * * * *

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on October 19, 2022, I electronically filed the foregoing

**OPENING BRIEF** of appellant using the Court's CM/ECF filing system.

Counsel for appellee were electronically served by and through the Court's

CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).


*/s/ Lauren A. Degnan*
Lauren A. Degnan

## <u>CERTIFICATE OF COMPLIANCE</u>

The **OPENING BRIEF** of appellant is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b).  The brief contains 7,329 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).  This **OPENING BRIEF** has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.


Dated:  October 19, 2022                           */s/ Lauren A. Degnan*
                                                    Lauren A. Degnan