No. 22-1891

# United States Court of Appeals
# for the Federal Circuit

## APPLE INC.,

*Appellant,*

*v.*

## MASIMO CORPORATION,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NO. IPR2020-01524

## JOINT APPENDIX

Lauren A. Degnan
W. Karl Renner
Christopher Dryer
Michael J. Ballanco
Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

*Attorneys for Appellant Apple Inc.*

February 15, 2023

Joseph R. Re, Principal Counsel
Stephen C. Jensen
Joshua J. Stowell
Jarom D. Kesler
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Tel: (949) 760-0404

*Attorneys for AppelleeMasimo Corporation*

Apple Inc. v. Masimo Corp.

Docket No. 2022-1891

Joint Appendix Index

| **Date** | **Document Title** | **Beginning Page No.** |
|---|---|---|
| 04/29/2022 | Final Written Decision (Paper 29) | Appx1 |
| 10/08/2019 | U.S. Patent No. 10,433,776 B2 to Al-Ali (APPLE-1001) | Appx53 |
| 07/21/2022 | Certified List for *Inter Partes* Review 2020-01524 | Appx79 |
| | **Record Before Patent Trial and Appeal Board (PTAB) for IPR2020-01524** | |
| 08/31/2020 | Petition for *Inter Partes* Review of United States Patent No. 10,433,776 B2 Pursuant to 35 U.S.C. §§ 311-319, 37 C.F.R. § 42  (Paper 2) | Appx81 |
| | APPLE-1002 - Excerpts from the Prosecution History of the '776 Patent | Appx157 |
| | APPLE-1003 - Declaration of Brian W. Anthony, Ph.D. | Appx393 |
| | APPLE-1004 - U.S. Patent No. 5,555,882 to Richardson et al. ("Richardson") | Appx488 |
| 08/02/2021 | Patent Owner's Response (Paper 15) | Appx779 |
| | Exhibit 2001 - Certificate of Correction of U.S. Patent No. 10,433,776 B2 | Appx856 |
| | Exhibit 2002 - Expert Declaration of Vijay K. Madisetti Ph.D. | Appx857 |
| | Exhibit 2004 - Excerpts from Rudolf Graf, Modern Dictionary of Electronics, 7th ed. (1999) | Appx955 |
| 10/21/2021 | Petitioner's Reply to Patent Owner's Response (Paper 18) | Appx1313 |
| 12/02/2021 | Patent Owner's Sur-Reply to Reply (Paper 20) | Appx1384 |
| 02/16/2022 | Transcript of hearing held January 19, 2022 (Paper 28) | Appx1512 |

Trials@uspto.gov                                          Paper 29
571-272-7822                                    Entered: April 29, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

––––––––––––––––––––––––––

BEFORE THE PATENT TRIAL AND APPEAL BOARD

––––––––––––––––––––––––––

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

––––––––––––––––––––––––––

IPR2020-01524
Patent 10,433,776 B2

––––––––––––––––––––––––––

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01524
Patent 10,433,776 B2

# I.     INTRODUCTION

## A.     Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–16 ("challenged claims") of U.S. Patent No. 10,433,776 B2 (Ex. 1001, "the '776 patent"). Paper 2 ("Pet."). Masimo Corporation ("Patent Owner") waived filing a Preliminary Response. Paper 6. We instituted an *inter partes* review of all challenged claims on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314. Paper 7 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 15, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 18, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 20, "Sur-reply"). An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record. Paper 28 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Based on the record before us and for the reasons set forth below, Petitioner has not met its burden of showing, by a preponderance of the evidence, that any challenged claim of the '776 patent is unpatentable.

## B.     Related Matters

The parties identify the following matters related to the '776 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

IPR2020-01524
Patent 10,433,776 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2–3.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '776 patent. Pet. 68; Paper 3, 1.

## C.    *The '776 Patent*

The '776 patent is titled "Low Power Pulse Oximeter," and issued on October 8, 2019, from U.S. Patent Application No. 16/174,144, filed October 29, 2018. Ex. 1001, codes (21), (22), (45), (54). The '776 patent claims priority through a series of continuation applications to Provisional Application No. 60/302,564, filed July 2, 2001. *Id.* at codes (60), (63).

The '776 patent relates to a pulse oximeter that may reduce power consumption in the absence of certain parameters that may be monitored to

IPR2020-01524
Patent 10,433,776 B2

trigger or override the reduced power consumption state. *Id*. at code (57). "In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations." *Id.*

As depicted below, the low power pulse oximeter has signal processor (340) that derives physiological measurements (342), including oxygen saturation, pulse rate, and plethysmograph, from input sensor signal (322). Ex.1001, 4:65–5:16, Figs. 3, 4.



FIG. 3

Figure 3 illustrates a top-level block diagram of a low power pulse oximeter. *Id.* at 4:41–42. Signal processor (340) may also derive signal statistics (344), such as signal strength, noise, and motion artifact. *Id.* at 5:16–17, Figs. 3, 4. Physiological measurements (342) and signal statistics (344) may be input into sampling controller (360), which outputs sampling controls (362) that in turn are used to regulate pulse oximeter power dissipation by causing sensor interface (320) to vary the sampling characteristics of sensor port (302) and by causing signal processor (340) to

4

vary its sample processing characteristics. *Id.* at 5:17–26, Figs. 3, 4. According to the '776 patent, power dissipation "is responsive not only to output parameters, such as the physiological measurements 342, but also to internal parameters, such as the signal statistics 344." *Id.* at 5:26–29.

The pulse oximeter uses the physiological measurements and signal statistics to determine "the occurrence of an event or low signal quality condition." Ex. 1001, 6:28–31. An event determination is based upon the physiological measurements and "may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform." *Id.* at 6:31–37. A low signal quality condition is based upon the signal statistics and "may be any signal-related indication that justifies the processing or more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact." *Id.* at 6:37–42.

The pulse oximeter "utilizes multiple sampling mechanisms to alter power consumption." Ex. 1001, 5:62–64. One sampling mechanism is "an emitter duty cycle control" that "determines the duty cycle of the current supplied by the emitter drive outputs 482 to both red and IR sensor emitters." *Id.* at 5:64–6:2. The sampling mechanisms "modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed." *Id.* at 6:12–14. "Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary." *Id.* at 6:14–

18. "In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers . . . are turned off." *Id.* at 7:11–15. The occurrence of an event or low signal quality triggers a higher duty sensor sampling, allowing high fidelity monitoring of the event and providing a larger signal-to-noise ratio. *Id.* at 8:47–61.

### D.    Illustrative Claim

Of the challenged claims, claims 1 and 11 are independent. Claim 1 is illustrative and is reproduced below.

1.[p] A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

[a] operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

[b] generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

[c] in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different

IPR2020-01524
Patent 10,433,776 B2

from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

[d] wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

Ex. 1001, 11:40–12:21 (bracketed identifiers p–d added). Independent claim 11 is an apparatus claim that includes limitations substantially similar to limitations [a]–[d] of claim 1. *Id.* at 12:60–14:9.

### E.    *Applied References*

Petitioner relies upon the following references:

Richardson et al., U.S. Patent No. 5,555,882, filed August 24, 1994, issued September 17, 1996 (Ex. 1004, "Richardson");

Bindszus et al., U.S. Patent No. 6,178,343 B1, filed May 20, 1999, issued January 23, 2001 (Ex. 1005, "Bindszus"); and

Turcott, U.S. Patent No. 6,527,729 B1, filed October 11, 2000, issued March 4, 2003 (Ex. 1006, "Turcott").

Pet. 3–4.

IPR2020-01524
Patent 10,433,776 B2

Petitioner also submits, *inter alia*, the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003). Patent Owner submits, *inter alia*, the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2002). The parties also provide deposition testimony from Dr. Anthony and Dr. Madisetti, including from this proceeding and others. Exs. 1038, 2005, 2006.

### F. *Asserted Grounds of Unpatentability*

We instituted an *inter partes* review based on the following grounds. Inst. Dec. 9, 23.

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–8, 11–16 | 103 | Richardson (first mapping) |
| 1–9, 11–16 | 103 | Richardson (second mapping) |
| 9, 10 | 103 | Richardson (either mapping) and Bindszus |
| 1–9, 11–16 | 103 | Richardson and Turcott (first mapping) |
| 1–9, 11–16 | 103 | Richardson and Turcott (second mapping) |
| 9, 10 | 103 | Richardson and Turcott (either mapping) and Bindszus |

## II.    DISCUSSION

### A. *Claim Construction*

For petitions filed on or after November 13, 2018, a claim "shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2019). Petitioner submits that no claim term requires express construction. Pet. 7. Nonetheless, we determine that the parties' briefing

IPR2020-01524
Patent 10,433,776 B2

identifies certain aspects of the claim language that implicate claim

construction, as discussed below.

1.     *Whether the "first duty cycle" must be different from the "second duty*
*cycle."*

Each independent claim requires "a first duty cycle" and "a second

duty cycle."  For example, claim 1 requires in pertinent part:

> wherein said operating of the patient monitor according to the
> first control protocol operates the first control protocol light
> source according to *a first duty cycle* and said operating of the
> patient monitor according to the second control protocol operates
> the second control protocol light source according to *a second*
> *duty cycle*.

Ex. 1001, 12:11–16 (emphases added), 14:1–4 (claim 11).

Petitioner has based its patentability analysis on two alternative claim

interpretations (two distinct "mappings") of the claim limitations related to a

"first duty cycle" and "second duty cycle."  *See* Pet. 3, 16.  The first

mapping, which Petitioner classifies as the proper construction, requires that

the first and second duty cycles be different.  Pet. 16 ("Accordingly,

Richardson teaches operating the patient monitor according to different duty

cycles, *under the proper construction of 1[d]*." (emphasis added)), Pet. 50

("[u]nder the proper construction of 1[d] requiring a different duty cycle for

operating the infrared light source in State 2 than the duty cycle for

operating the infrared or red light source in State 1"), 56 (similar argument).

Petitioner argues that under a proper construction, the first and second duty

cycles cannot be identical, but the Petition does not provide any argument or

basis for this reasoning.

Petitioner, in an alternative mapping, then posits a second claim

interpretation theory for the "first duty cycle" and "second duty cycle"

IPR2020-01524
Patent 10,433,776 B2

limitations in which the first and second duty cycles need *not* be different.
Pet. 30. Specifically, Petitioner argues, "Richardson teaches this limitation
under an alternate construction of this limitation that does not require
different duty cycles for the first duty cycle and the second duty cycle." *Id.*

Patent Owner, relying on the testimony of Dr. Madisetti, contends that
the Board should construe the "first duty cycle" to be different from the
"second duty cycle," consistent with Petitioner's first mapping. PO Resp. 22
(citing Ex. 2002 ¶¶ 48–53). Patent Owner argues the Specification of the
'776 patent requires different first and second duty cycles whereas claims 1
and 11 use "first" and "second" to distinguish the duty cycles. *Id.* at 23
(citing *Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed.
Cir. 2005) ("A claim construction that gives meaning to all the terms of the
claim is preferred over one that does not do so."). Patent Owner contends
that "[c]laims 1 and 11 further clarify that one of the differences between the
first and second control protocols are the duty cycles." *Id.* (citing Ex. 1001,
12:11–21).

During the oral hearing, Petitioner conceded that it was now accepting
the position that the first and second duty cycle must be different. Tr. 6:1–7
(Petitioner's counsel stating that "the parties agree that the claims require the
first and second duty cycle to be different").

We determine that the surrounding claim language and the
Specification of the '776 patent support the now agreed upon interpretation
that the first and second duty cycle must be different. *See* Ex. 1001, 11:45–
46, 11:63–65, 12:11–21, 6:64–7:2 (distinguishing constant duty cycle pulse
oximeters), 7:2–4, 8:4–24, Fig. 8.

IPR2020-01524
Patent 10,433,776 B2

As discussed more below, Petitioner has conceded that the grounds of unpatentability based upon its second mapping of Richardson are no longer viable under the interpretation that the first and second duty cycle must be different. *See* Tr. 6:8–9, 27:4–24; Pet. 16, 26. Based on Petitioner's concession, our analysis below focuses on those arguments directed to the first mapping of Richardson – "[t]he first mapping assumes that the claims require the first and second duty cycles to be different." Tr. 6:2–3.

2.    *Construction of "duty cycle" and whether the "duty cycle" can be 0%.*

Patent Owner requests that we "construe 'duty cycle' to mean 'the ratio of operating time (or on time) of a light source to the total time period during which the light source is intermittently operated, expressed as a percentage.'" PO Resp. 17 (citing Ex. 2002 ¶ 36). Further, according to Patent Owner, "[t]he 'first duty cycle' and 'second duty cycle' cannot be 0% based on the claims and '776 patent specification." *Id.* at 19 (citing Ex. 2002 ¶¶ 40–47).

Patent Owner contends that the person of ordinary skill in the art would have understood "duty cycle" to be "the ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage," because "[t]he '776 patent consistently describes the 'duty cycle' as the ratio of the operating time (or on time) of the red and infrared LEDs to the total time period during which the LEDs are intermittently operated, expressed as a percentage." PO Resp. 17–18 (citing Ex. 2004, 225; Ex. 2002 ¶¶ 37, 39; Ex. 1001, 2:43–44). Patent Owner notes that the '776 patent discloses a method of reducing the power consumption of a patient monitor by "intermittently reducing the drive current duty cycle." *Id.*

11

IPR2020-01524
Patent 10,433,776 B2

(quoting Ex. 1001, 6:59–7:11).  Patent Owner notes that "[t]he 'drive current' is the current supplied by the red and infrared LED drivers (also called the 'emitter drivers')", and "[t]he LEDs operate (i.e., are turned on and emit light) when the LED drivers supply current."  *Id.* at 18 (citing Ex. 1001, 2:43–44, 8:16–20; Figs. 4, 8).

Patent Owner relies on Figure 5 of the '776 patent, seen below, which "illustrates an 'emitter driver output current' versus time profile for a pulse oximeter."  PO Resp. 18 (quoting Ex. 1001, 6:59–60).



Patent Owner's annotated Figure 5 depicts the LEDs operating in high duty cycle state 502 (red) and the LEDs operating in a low duty cycle state 504 (green).  *Id.*  According to Patent Owner, the illustration shows that when the LEDs are operating in a high duty cycle, they receive current from the emitter driver and are operating (i.e., are turned on and emit light) for 25% of the total time period during which the LEDs are intermittently operated, and conversely, when the LEDS are operating in a low duty cycle, the LEDs receive current and operate (i.e., are turned on and emit light) for 3.125% of the total time period during which the LEDs are intermittently operated.  *Id.* at 19 (citing Ex. 1001, 6:58–61, 7:4–8, 8:15–24, Fig. 8).  Patent Owner thus

12

**Appx12**

IPR2020-01524
Patent 10,433,776 B2

contends that the '776 patent uses "duty cycle" to mean "the ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage." *Id.* (citing Ex. 2002 ¶¶ 37–39).

As to Patent Owner's contention that the first duty cycle and second duty cycle cannot be 0%, Patent Owner first looks to the surrounding language of claim 1, and notes it "requires 'operating the patient monitor according to a first control protocol,' where the first control protocol 'operates the first control protocol light source according to a first duty cycle.'" PO Resp. 20 (quoting Ex. 1001, 11:45–46, 12:11–13). Patent Owner next relies on the claim language "that 'when operating according to the first control protocol,' the patient monitor calculates 'measurement values of the pulse rate' that are 'responsive to light from the first control protocol light source.'" *Id.* (quoting Ex. 1001, 11:51–57). "Thus," according to Patent Owner, the claims "require the 'first control protocol light source' to generate light so that the patient monitor can calculate the pulse rate based on the light." *Id.* (citing Ex. 2002 ¶ 41). Patent Owner reasons that "if the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light." *Id.* (citing Ex. 2002 ¶ 42). Accordingly, if the first control protocol light source had a duty cycle 0%, Patent Owner contends "the monitor could not calculate the 'measurement values of the pulse rate' as required by claims 1 and 11," and, therefore, "the 'first duty cycle' must be a percentage greater than zero so that the first control protocol light source generates light, thereby permitting the monitor to calculate 'measurement values of pulse rate' responsive to that light." *Id.*

IPR2020-01524
Patent 10,433,776 B2

Patent Owner notes that the claim language related to the second control protocol operating the second control protocol light source is similar to that above, such that the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the second control protocol light source." PO Resp. 20–21 (quoting Ex. 1001, 12:4–10). Patent Owner similarly argues that "the 'second duty cycle' must be a percentage greater than zero so that the second control protocol light source generates light, thereby permitting the monitor to calculate 'measurement values of pulse rate' responsive to that light." *Id.* at 21.

Next, Patent Owner notes that the Specification "never mentions a duty cycle of 0%," but instead the Specification "consistently describes a patient monitor having high and low duty cycles greater than 0%." *Id.* (citing Ex. 1001, 2:39–44, 7:4–11, 8:14–15; Ex. 2002 ¶¶ 45–46). Patent Owner points out that the duty cycle of the preferred embodiment "is varied within a range from about 25% to about 3.125%." *Id.* (quoting Ex. 1001, 7:4–9).

Next, Patent Owner distinguishes the "data off state" from the duty cycle. PO Resp. 21–22. According to Patent Owner, the "data off state" is the situation of having the LEDs inactive for longer than one cycle. *Id.* (citing Ex. 1001, 7:11–15; Ex. 2002 ¶ 46). Patent Owner argues that the Specification distinguishes the data off state from the first and second duty cycles and further relies on the language stating "[i]n conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers are turned off." *Id.* at 22 (quoting Ex. 1001, 7:11–15 (emphasis omitted)) (citing Ex. 1001, 8:14–15, 8:16–32, 8:47–61).

IPR2020-01524
Patent 10,433,776 B2

Patent Owner contends this language is "an example of first and second duty cycles in conjunction with a data off state," and "[a] data off state is a different state where the light sources are turned off for more than one period." Tr. 25:20–26:5.  Further, Patent Owner contends that "in conjunction with" means that "it works together with." Tr. 32:2–3, 32:11–14 ("I think it has its plain meaning.  It means together with.  They operate together with each other. . . .  It doesn't mean that they operate simultaneously and it doesn't mean that they are replacements for each other.").

Petitioner contends that the "first duty cycle" can be 0%.  Pet. Reply 1.  Petitioner does not expressly disagree with the proposed construction of duty cycle to require a ratio of operating time, but Petitioner is firm that the duty cycle may be calculated to be zero percent. *See id.* at 1–3; Tr. 42:3–20 ("[T]hey're adding on this requirement that that ratio can't be zero.  It's not like you have a ratio of zero to some positive value is undefined.  That actually you can compute that, it's zero.  So, I don't see how the restriction that it can't be zero flows from an argument that it has to be a ratio.").  Petitioner contends that nothing in the claim language or specification of the '776 patent supports a restriction that the "first duty cycle" cannot be 0%.  Pet. Reply 1.

According to Petitioner, the claim requirements identified by Patent Owner are still satisfied when the "first duty cycle" is 0%. *Id.*  More "[s]pecifically, claims 1 and 11 recite 'the first control protocol light source including ***one or more of a plurality of light sources***' and 'operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle.'" *Id.* (quoting

IPR2020-01524
Patent 10,433,776 B2

Ex. 1001, 11:48–50, 12:11–13, 13:5–7, 13:35–14:1).  Petitioner contends that "[a]s long as one of the plurality of light sources is operated at a duty cycle greater than 0%, the patient monitor can calculate measurement values of the pulse rate from that one light source even if another of the plurality of light sources is operated at a duty cycle of 0%."  *Id.* at 2.

Petitioner next points to the claim language of dependent claims 6 and 15 that requires a "data off state."  Pet. Reply 2.  Petitioner argues that the language, "operating the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state," allows for the "first duty cycle" to be 0%.  *Id.* (quoting Ex. 1001, 12:43–46, 14:23–26).  According to Petitioner, the "first duty cycle" corresponds to "a data off state" and a "light source operating with a duty cycle of 0% is operating in a data off state."  *Id.*

Petitioner reads the language from the Specification stating that operating in the data off state can be "[i]n conjunction with an intermittently reduced duty cycle," as allowing the data off state and the reduced duty cycle to occur at the same time; i.e., the reduced duty cycle can correspond to the data off state.  *Id.* at 3 (citing Ex. 1001, 7:11–15) (emphasis omitted).  Further, Petitioner contends that the Specification describes three control states: "high duty cycle," "low duty cycle," and "data off," but the Specification "does not indicate which control state corresponds to the claimed 'first duty cycle' and 'second duty cycle.'"  *Id.* (citing Ex. 1001, 8:14–32, 8:47–61).

Based on the final record, we find Patent Owner's proposed interpretation of "duty cycle" persuasive.  The evidence cited supports "duty cycle" to mean "the ratio of operating time (or on time) of a light source to

IPR2020-01524
Patent 10,433,776 B2

the total time period during which the light source is intermittently operated, expressed as a percentage." *See* Ex. 2002 ¶ 36 (relying on an electronics dictionary and testifying as to how the '776 patent uses "duty cycle" consistent with its plain and ordinary meaning to require a ratio of operating time to total elapsed time). We are persuaded by the Specification of the '776 patent describing the "duty cycle" as the ratio of the operating time (or on time) of the red and infrared LEDs to the total time period during which the LEDs are intermittently operated, expressed as a percentage. *See* Ex. 1001, 2:43–44; Ex. 2004, 225; Ex. 2002 ¶¶ 37, 39. The duty cycle is described as consistently being "in the range of about 3.125% to about 25%." Ex. 1001, 2:43–44, Figs. 5, 8.

The weight of the evidence, including the claim language and Specification, convinces us that neither the first nor the second duty cycles can be 0%. The claims require the first and second control protocol light sources to generate light so that the patient monitor can calculate a pulse rate based on the light. *See* Ex. 1001, 11:45–12:21 ("when operating according to the first control protocol, calculating . . . measurement values of the pulse rate, . . . responsive to light from the first control protocol light source" and "calculating the measurement values of the pulse rate, . . . responsive to light from the second control protocol light source"); Ex. 2002 ¶¶ 41, 42. The first and second duty cycles cannot be 0% because the light sources of the first and second control protocol light source would not generate light to enable pulse rate calculation as required by the claims. *See* Ex. 2002 ¶ 42 ("[I]f the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light. If the light source did not generate light the monitor could not calculate the 'measurement

IPR2020-01524
Patent 10,433,776 B2

values of the pulse rate" as required by claims 1 and 11.") ¶ 44 ("[A]s with the first control protocol light source, if the second control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light."); Ex. 1001, 12:12–13.

Based on the context of the claim language, and supporting explanations in the Specification, we determine that a 0% duty cycle is not within the scope of the invention. As explained persuasively by Dr. Madisetti:

> If the light source did not generate light, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11. For this reason, the "first duty cycle" must be a percentage *greater* than zero (i.e., it cannot be 0%) so that the first control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light.

Ex. 2002 ¶ 42. *See also* Tr. 44:14–20 ("[T]he claims require that when you're operating according to the first control protocol you must calculate measurement values of the pulse rate and when you're operating according to the second control protocol, . . . you must calculate the measurement values of the pulse rate and the problem is if the LEDs are turned off you cannot calculate the measurement value.").

We find unpersuasive Petitioner's reliance on the claim language requiring "the first control protocol light source including one or more of a plurality of light sources," to argue that as long as one of the plurality of light sources is operated at a duty cycle greater than 0%, the patient monitor can calculate measurement values of the pulse rate from that one light source. *See* Pet. Reply 1–2 ("As long as one of the plurality of light sources is operated at a duty cycle greater than 0%, the patient monitor can calculate

measurement values of the pulse rate from that one light source even if
another of the plurality of light sources is operated at a duty cycle of 0%.").
As Patent Owner notes, "[t]he claims do not state that 'one or more of a
plurality of light sources' operate according to a first duty cycle," but
instead, "the claims state, 'the first control protocol operates the first control
protocol light source according to a first duty cycle.'"  Sur-reply 2 (emphasis
omitted).  Thus, we agree with Patent Owner that the claims presume that
the individual light source(s) that comprise the first protocol light source
operate as a unit according to the same, first duty cycle.  *See id.*
Dr. Madisetti testifies persuasively that a person of ordinary skill in the art
would not have understood a "first duty cycle" or a "second duty cycle" to
encompass two distinct percentages of on time for the different LEDs that
may make up the "protocol light source."  Ex. 2002 ¶ 68.  For example, the
Specification of the '776 patent consistently describes patient monitors
having multiple LEDs, which operate as a unit at the same low or high duty
cycle.  *See* Ex. 1001, 6:59–7:18, Fig. 5.  As noted by Patent Owner, the
'776 patent does not disclose monitors that simultaneously drive multiple
LEDs at different duty cycles.  *See* Sur-reply 3; Ex. 2002 ¶¶ 45–46.  We also
agree with Dr. Madisetti that a person of ordinary skill in the art "would not
have understood 'duty cycle' to refer to the additive percentages of 'on time'
of two drive signals that drive different LEDs."  Ex. 2002 ¶ 68.

The "data off" state claimed in claims 6 and 15 does not support
Petitioner's position that the first duty cycle can be 0%.  The '776 patent
distinguishes between high and low duty cycles and a "data off state" where
the LEDs are inactive for longer than one cycle. *See* Ex. 2002 ¶¶ 45–46.  We
do not agree with Petitioner that to satisfy claims 6 and 15, the first duty

cycle can be in a data off state. Pet. Reply 2. Notably, claims 6 and 15 do not state that the first duty cycle is a data off state, as Petitioner argues. Rather, claims 6 and 15 use the word "comprises," which requires operating according to the first control protocol to encompass operating the first control protocol light source both "according to a first duty cycle" (claims 1/11) and "a data off state" (claims 6/15). *See* Sur-reply 4. As noted above, the LEDs have to be on in claims 1/11 for the surrounding claim requirements to function. The argument that the system of claims 1/11 could operate in just a data off state is inconsistent with the claim language and the more logical reading of claims 6 and 15 is that the data off and reduced duty cycle states can operate "in conjunction with" each other, not simultaneously. *See* Ex. 1001, 8:33–46, Fig. 8 (duty cycles and data off states not simultaneous). *See* Tr. 46:1–4 ("[A] data off state is not a duty cycle. It's not a first duty cycle, it's not a second duty cycle, so the idea that there can be this zero percent duty cycle that's inconsistent with the specification and it's inconsistent with the claims.").

The Specification identifies two of the control states as "duty cycles," and a third distinct time interval as a "data off state"; thus, the claimed first and second duty cycles can be the low or high duty cycles, but not a data off state. *See* Ex. 1001, 8:33–46 (identifying "low duty cycle" and "high duty cycle" as two control states but noting that the pulse oximeter may "enter the data off state" during a distinct "third time interval"). Further, the Specification distinguishes operating between the data off state and the low duty cycle showing that these states were not contemplated to be one in the same. *See id.* ("alternates between the data off state 818 and the low duty cycle state 814"); *see also id.* at Fig. 8 (duty cycles and data off states not

IPR2020-01524
Patent 10,433,776 B2

simultaneous). Thus, we agree with Patent Owner that "[t]he data off state is consistently described as being different from the first and second duty cycles or the low duty cycle and the high duty cycle." Tr. 45:19–21.

Based on the above evidence and arguments, we determine that neither the first nor the second duty cycles can be 0%.

### 3. Other Claim Terms

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-

IPR2020-01524
Patent 10,433,776 B2

obviousness.[1]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."  *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness.  *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable.  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b).  The burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.    *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies."  Pet. 6 (citing Ex. 1003 ¶ 32 ("someone with a working knowledge of physiological monitoring technologies")).  "Alternatively, the person could have also had a

---

[1]  Neither party has introduced objective evidence of non-obviousness.  *See* Tr. 23:25–24:3.

IPR2020-01524
Patent 10,433,776 B2

Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "for this proceeding, [Patent Owner] applies the asserted level of skill identified in the Petition." PO Resp. 11–12.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D.    *Obviousness over the Teachings of Richardson (First Mapping)*

Petitioner contends that claims 1–8 and 11–16 of the '776 patent would have been obvious over the teachings of Richardson. Pet. 8–26. Patent Owner disagrees. PO Resp. 25–45; Sur-reply 2–5, 7–11.

Based on our review of the parties' arguments and the final record, we determine that Petitioner has not met its burden of showing by a preponderance of the evidence that claims 1–8 and 11–16 are unpatentable.

### 1.    *Overview of Richardson (Ex. 1004)*

Richardson is titled "Method and Apparatus for Reducing Ambient Noise Effects in Electronic Monitoring Instruments." Ex. 1004, code (54). Richardson "relates to a method and apparatus for detecting and reducing the effects of ambient electromagnetic noise . . . on electronic instruments." *Id.* at 1:11–15, 2:35–37. Richardson discloses "a method and apparatus for adapting to noise sources affecting a pulse oximeter." *Id.* at code (57). Richardson describes evaluating various frequencies to determine their respective noise levels and selecting one to act as the operating

23

demultiplexer frequency. *Id.* "During normal operation of the pulse oximeter, the various available demultiplexer frequencies are periodically scanned to determine which has the lowest associated noise," and "[t]he noise level associated with the operating frequency is used to determine the signal-to-noise ratio of the pulse oximeter signals" in order to "qualify certain signals from the pulse oximeter." *Id.* Richardson may rely upon noise levels to conserve power by reducing LED drive current while maintaining a safe signal-to-noise ratio. *Id.* at 3:3–7.

In Richardson, the pulse oximeter includes light sources that emit red and infrared light alternately into a patient's tissue and a photodetector that senses the light transmitted through the tissue. Ex. 1004, 1:37–45, 2:61– 62, 4:2–5. Based on the changes in red and infrared light transmission, the pulse oximeter measures a physiological parameter. *Id.* at 1:46–61. Richardson addresses background noise by determining the noise level at each available operating frequency, and then selecting the frequency with the least noise to serve as the operating frequency for the instrument. *Id.* at 2:37–47. Richardson also periodically rescans the available frequencies to reevaluate the noise level and switches to a less noisy frequency, if available. *Id.* Richardson claims that these "techniques allow the invention to adapt to the total noise found in a given environment, such as a hospital." *Id.* at 2:49–51.

The oximeter operates in one of three states: State 0, State 1, or State 2. *Id.* at 5:41–43. In State 0, the oximeter turns off the light sources and monitors the photodetector signal at a given frequency to monitor noise in the oximeter signal. *Id.* at 2:57–64, 5:17–24, 5:43–53. The measured noise level is used to select a frequency at which the contribution of noise to the signal is relatively low. *Id.* at 3:1–17, 5:53–54, 7:58–63. After selecting a

IPR2020-01524
Patent 10,433,776 B2

frequency, the oximeter operates in a normal operating state, State 1, where both light sources are activated alternately at a frequency and the physiological parameter is monitored. *Id.* at 5:55–57, 6:66–7:3, 7:58–63, 8:46–49. When the oximeter is operating in State 1, the oximeter displays blood saturation values, a pulse waveform, and heart rate estimates and provides an audible pulse tone. *Id.* at 9:33–38, 9:43–47. If the oximeter determines that the signal-to-noise ratio decreases below an acceptable level, it reverts from State 1 to State 0 to search for a new frequency. *Id.* at 5:64–67, 7:3–18, 8:41–43, 8:50–64.

The oximeter may transition from State 1 to State 2 to reassess the noise at the current operating frequency. Ex. 1004, 6:1–2, 8:46, 9:39–43. In State 2, the red light source is turned off, and a new noise level is calculated by measuring the ambient noise in the red channel only. *Id.* at 6:2–4, 9:40–43, 9:52–63. In State 2, the infrared channel is operating, and the oximeter monitors the pulse rate, displays a pulse waveform and heart rate estimates, and provides an audible pulse tone. *Id.* at 6:4–7, 9:43–47. After calculating the new noise level, the oximeter returns to State 1 and operates normally using the new noise level. *Id.* at 6:7–10, 9:63–65.

### 2.     *Independent Claims 1 and 11*

Petitioner contends that claims 1 and 11 would have been obvious over Richardson. Pet. 10–17, 23–24. Because we determine that Richardson does not disclose all the limitations of claims 1 and 11, we focus our analysis below on those limitations. Specifically, limitations 1[d] and 11[d] of independent claims 1 and 11 require:

> [operating/operation] of the patient monitor according to the first control protocol operates the first control protocol light source

IPR2020-01524
Patent 10,433,776 B2

> according to a first duty cycle and said (operating/operation) of
> the patient monitor according to the second control protocol
> operates the second control protocol light source according to a
> second duty cycle.

*See* Pet. 15, 24. Based on our claim interpretations as set forth above, Petitioner's "first mapping" of Richardson does not disclose these limitations.

Petitioner's Contentions

Petitioner contends that it has established that Richardson discloses that the first control protocol (State 2) operates the first control protocol light source (the red LED) according to a first duty cycle of 0%, and the second control protocol (State 1) operates the second control protocol light source (the infrared LED) according to a second duty cycle of at least 25%. Pet. 17; Pet. Reply 7. "Relying on Dr. Anthony's testimony," Petitioner contends "that Richardson renders obvious that the power consumption of the first control protocol light source operating according to a duty cycle of 0% is different than the power consumption of the second control protocol light source operating according to a duty cycle of at least 25%." Pet. Reply 7 (citing Ex. 1003 ¶ 50); Pet. 17.

Petitioner contends that "in State 2, the red light source is turned off and has a duty cycle of 0%, and the infrared light source is operated with a duty cycle of at least 25%." Pet. 16 (citing Ex. 1003 ¶ 50; Ex. 1004, 9:40–43, 6:2–4, 9:52–63, 4:6–10). Petitioner notes that "[i]n State 1, both the red and infrared light sources are activated with a duty cycle of at least 25%," and as such, "Richardson discloses that the first control protocol, e.g., State 2, operates the first control protocol light source according to a first duty cycle, e.g., red LED at 0% duty cycle and infrared LED at 25% duty

26

IPR2020-01524
Patent 10,433,776 B2

cycle, and the second control protocol, e.g., State 1, operates the second control protocol light source according to a second duty cycle, e.g., red and infrared LEDs at 25% duty cycle." Pet. 16 (citing Ex. 1003 ¶ 50). Petitioner argues that Richardson teaches operating "the first control protocol light source according to a first duty cycle" because the red LED of the "first control protocol light source" is operated according to the "first duty cycle" of 0%. Pet. Reply 7.

<u>Patent Owner Contentions</u>

Patent Owner first contends that "Petitioner never identifies the first control protocol light source," and "is unclear whether it relies on the duty cycle of (1) the red LED, (2) the infrared LED, or (3) the red and infrared LEDs." PO Resp. 35. Further, Patent Owner argues that regardless of the light source selected, a person of ordinary skill in the art "would not have understood (1) the red, (2) the infrared LED, or (3) the red and infrared LEDs in States 1 and 2 to operate according to a 'first duty cycle' and a 'second duty cycle' under the proper construction of those terms." *Id.* at 35–36.

Patent Owner contends that neither the red LED nor the infrared LED operate according to a "first duty cycle." PO Resp. 36–37. First, Patent Owner argues that the red LED does not operate according to a "first duty cycle," because the red LED has a duty cycle of 0% in State 2 and a duty cycle of at least 25% in State 1. *Id.* at 36 (citing Pet. 16). Patent Owner notes that "Petitioner identifies Richardson's State 2 as the 'first control protocol' and State 1 as the 'second control protocol.'" *Id.* (citing Pet. 10). Patent Owner relies on the claim construction that a "duty cycle" cannot be 0%, and argues that "Petitioner admits that in State 2 'the red light source is

IPR2020-01524
Patent 10,433,776 B2

turned off,'" "[t]hus, under the proper construction of 'first duty cycle,' turning off the red LED in State 2 (Petitioner's 'first control protocol') is not operating according to a 'first duty cycle' as required by claims 1 and 11." *Id.* (citing Ex. 2002 ¶ 66).

Next, Patent Owner contends that "[t]he infrared LED does not operate according to a 'first duty cycle' and 'second duty cycle' under the proper construction of the terms." *Id.* (citing Ex. 2002 ¶ 67). This is so because the parties agree "that the infrared LED operates at the same duty cycle, 'at least 25%,' in States 1 and 2," and the first and second duty cycles must be different under the "proper" claim construction. *Id.* at 36–37 (citing Pet. 16, 24, 50, 54; Ex. 1004, 4:6–7) (emphasis omitted).

Analysis

As we determined above, the claimed first and second duty cycles cannot be 0%. This determination precludes Petitioner's first mapping of Richardson from reading on claims 1 and 11.

Petitioner identifies the first mapping of Richardson as the transition of Richardson's oximeter from State 2 to State 1. Pet. 10 ("For this first mapping of Richardson . . . the claim elements . . . are mapped to disclosure in Richardson describing the oximeter transitioning from State 2 (as the first control protocol) to State 1 (as the second control protocol)."). Petitioner argues that State 2 (blue below) is the "first control protocol" and State 1 (orange below) is the "second control protocol" required by claims 1 and 11.

IPR2020-01524
Patent 10,433,776 B2



*FIG. 2.*

Patent Owner's annotated Figure 2 of Richardson (Ex. 1004) describes
implementing the noise reduction methods in a pulse oximeter having three
states, including State 1 (highlighted in orange) and State 2 (highlighted in
blue). PO Resp. 33. Richardson's pulse oximeter transitions from State 1 to
State 2 "[e]very 30 seconds," and "[t]he purpose of State 2 is to detect new
noise sources that may have appeared since the last State 0 measurements."
Ex. 1004, 9:39–42. In State 2, the oximeter reassesses the noise "by turning
off one LED; typically the red LED," for about 1.4 seconds. *Id.* at 6:2–3,
9:52–53. When the 1.4 seconds (i.e., idle time) expires, the oximeter
automatically returns to State 1 where it uses the newly estimated noise
values. *Id.* at 9:63–65; *see also id.* at 9:66–10:5 (discussing idle time).
When operating in State 1, the oximeter has both LEDs turned on. *Id.* at
5:55–67.

 Petitioner argues that the red LED "has a duty cycle of 0%" in State 2
and a duty cycle of "at least 25%" in State 1. Pet. 16. Petitioner admits that
in State 2 "the red light source is turned off." *Id.* As we determined in the
claim construction analysis, a person of ordinary skill in the art would have

29

IPR2020-01524
Patent 10,433,776 B2

understood that the "first duty cycle" cannot be 0% based on the claims and Specification. Thus, under the proper construction of "first duty cycle," turning off the red LED in State 2 (Petitioner's "first control protocol") is not operating according to a "first duty cycle" as required by claims 1 and 11. Ex. 2002 ¶ 66.

Although not relied upon by Petitioner for this ground, the infrared LED also does not operate according to a "first duty cycle" and "second duty cycle" under the proper construction of the terms. *See* Ex. 2002 ¶ 67. This is so because the infrared LED operates at the same duty cycle, "at least 25%," in States 1 and 2. Pet. 16; PO Resp. 36; *see also* Ex. 1004, 4:6–7 ("a duty cycle of at least 1 in 4"). Further, as we determined above, and as agreed by the parties, the first and second duty cycles must be different under the proper claim construction. *See* Pet. 16, 24; PO Resp. 36–37. Consequently, operation of the infrared LED at the same duty cycle in State 2 and State 1 is not operating according to a "first duty cycle" and a "second duty cycle" as required by claims 1 and 11. Ex. 2002 ¶ 67.

Petitioner has not persuasively argued a combination of the red and infrared LEDs could be relied upon to show that Richardson operates according to a "first duty cycle" and a "second duty cycle." In Reply, Petitioner maintains that "Richardson teaches operating 'the first control protocol light source according to a first duty cycle' because the red LED of the 'first control protocol light source' is operated according to the 'first duty cycle' of 0%." Pet. Reply 9. Thus, Petitioner relies on just the red LED and not a combination of the red and infrared LEDs for operating the first control protocol light source according to a first duty cycle.

IPR2020-01524
Patent 10,433,776 B2

Having now considered the evidence in the complete record established during trial, we are persuaded that, based on this record, Petitioner has not demonstrated by a preponderance of the evidence that claims 1 and 11 would have been obvious over Richardson for the reasons set forth above.

### 3.    Dependent Claims 2–8 and 12–16

Because each of dependent claims 2–8 and 12–16 depend from claims 1 or 11, we likewise determine that Petitioner has failed to demonstrate by a preponderance of the evidence that Richardson would have rendered obvious any of these dependent claims for the reasons set forth above for claims 1 and 11.

### E.    Obviousness over Richardson and Bindszus

Petitioner contends that claims 9 and 10 would have been obviousness over Richardson and Bindszus.  Pet. 3.  Based on the final record, and for the reasons set forth below, Petitioner has not cured the deficiencies set forth above related to Richardson and its failure to teach the claim limitations related to the claimed first and second duty cycle.  For these reasons, this ground fails to show by a preponderance of the evidence that claims 9 and 10 of the '776 patent would have been unpatentable.

### 1.    Bindszus (Exhibit 1005)

Bindszus is titled "Pulse Rate and Heart Rate Coincidence Detection for Pulse Oximetry."  Ex. 1005, code (54).  Bindszus relates to a coincidence recognition unit that receives a first signal indicative of a pulse rate and a second signal indicative of a heart rate, then uses those signals to generate a

IPR2020-01524
Patent 10,433,776 B2

third signal indicative of the coincidence between the first signal and the second signal. *Id.* at code (57). Bindszus discloses methods of "validating the accuracy of measured oxygen saturation values." *Id.* at 1:5–7. Bindszus explains that a shortcoming of pulse oximetry is that it "relies on the fact that the arterial blood is the only pulsating component that causes a pulsatile change of the light absorption used to determine the oxygen saturation." *Id.* at 2:12–15.

### 2.   *Analysis*

Petitioner relies on the combination of Richardson and Bindszus to achieve a system that provides the benefit of further improving the accuracy of oxygen saturation values derived by pulse oximetry. *See* Pet. 40–45; Ex. 1005, 2:24–28. Specifically, claims 9 and 10 depend from claim 1 and further require that "the physiological event includes at least one of oxygen desaturation, an abnormal pulse rate, or an abnormal plethysmograph waveform." Ex. 1001, 12:54–56. Petitioner alleges that a person of ordinary skill in the art would have recognized that the combination of "Richardson's pulse oximeter as suggested by Bindszus would include implementing a system that provides an output indicating whether the detected pulse rate is either abnormally higher or abnormally lower than the detected heart rate," which would cause a pulse oximeter to transition and select a new frequency at which to active the LEDs. Pet. 44–45.

Petitioner argues that Bindszus satisfies the additional limitations in dependent claims 9 and 10. *Id.* Petitioner does not argue that Bindszus satisfies any limitations in independent claims 1 and 11, and more specifically, the limitations examined above related to "first duty cycle" and "second duty cycle" that we determined Richardson failed to teach. For

IPR2020-01524
Patent 10,433,776 B2

these reasons, Petitioner has not persuasively shown that claims 9 and 10, which depend from claim 1, would have been obvious over the combination of Richardson and Bindszus.

### F.    Obviousness over Richardson and Turcott

Petitioner contends that claims 1–9 and 11–16 would have been obvious over Richardson and Turcott.  Pet. 3, 45–54; Pet. Reply 17–23. Patent Owner opposes for several reasons.  PO Resp. 52–63; Sur-reply 14–22.  Based on the final record, and for the reasons set forth below, Petitioner has not shown by a preponderance of the evidence that these claims of the '776 patent would have been unpatentable over Richardson and Turcott.

### 1.    Turcott (Exhibit 1006)

Turcott is titled "Method for Monitoring Patient Using Acoustic Sensor."  Ex. 1006, code (54).  Turcott relates to a "method for monitoring the progression of the disease of a heart failure patient" such that an implantable monitor "senses acoustic signals including heart and lung sounds within the patient."  *Id.* at code (57).  Turcott discloses an "implantable monitoring device[]" for "monitoring the status of a patient[] with a chronic disease such as heart failure using heart and lung sounds."  *Id.* at 1:13–16.  Turcott proposes implanting a device in the patient's chest that can detect the sounds made by the patient's heart and lungs and relay that information to the physician several times a day.  *Id.* at 6:58–7:30.  Turcott asserts that changes in the sounds made by the heart and lungs can signal a medical problem.  *Id.*

Turcott's device is sized and shaped to be implanted within a tissue pocket in the patient.  *Id.* at 8:65–9:4, 14:11–12 ("implantable hemodynamic

monitor is configured for subcutaneous or submuscular implantation"). The device includes a diaphragm, or other component, that can sense acoustic signals (i.e., sounds of the heart or lungs) at different time intervals. *Id.* at 6:58–17, 9:49–52. The device calculates the energy of the acoustic signal at each time and compares the energies to determine whether the condition of the patient has deteriorated. *Id.*

In one embodiment, the implantable device also includes a "light source 26 and detector 28, preferably LEDs and photodiode, respectively." *Id.* at 9:28–29. "The source and detector are preferably placed on the side of the device that, following implantation, faces the chest wall." *Id.* at 9:35–37. The source and detector are "used for both vascular plethysmography and for measuring the oxygen saturation of arterial hemoglobin." *Id.* at 9:30–32. Turcott discloses that "[t]he optical power generated by the [light] source is adjusted to optimize the signal to noise ratio and to minimize power consumption" by adjusting "the drive current" or "the duty cycle of the pulse train," and "[t]o conserve energy, the [light] source is preferably driven with a low duty cycle pulse train." *Id.* at 11:51–59

### 2.    *Independent Claims 1 and 11*

Petitioner contends that claims 1 and 11 would have been obvious over the combination of Richardson and Turcott. Because we determine that Richardson and Turcott do not disclose certain limitations of claims 1 and 11 (*see* limitation 1[d] above), and because Petitioner has not provided a rational basis for combining Richardson and Turcott to arrive at these same limitations, Petitioner has not proven by a preponderance of the evidence that claims 1 and 11 are unpatentable. We examine these limitations below.

IPR2020-01524
Patent 10,433,776 B2

Petitioner's Contentions

Petitioner argues that "Richardson discloses that in State 2, the red light source 2 is turned off and has a duty cycle of 0%, and the infrared light source is operated with a duty cycle of at least 25%." Pet. 49 (citing e.g., Ex. 1003 ¶¶ 49–50, 86). According to Petitioner, in State 1, both the red and infrared light sources are activated with a duty cycle of at least 25%. Pet. 50. Petitioner argues that "Turcott describes a pulse oximeter where '[t]he optical power generated by the [light] source is adjusted to optimize the signal to noise ratio and to minimize power consumption' by adjusting 'the duty cycle of the pulse train,' and '[t]o conserve energy, the [light] source is preferably driven with a low duty cycle pulse train.'" *Id.* (quoting Ex. 1006, 11:51–59).

Based on these factors, Petitioner argues that a person of ordinary skill in the art

> would have recognized that the predictable modification of Richardson's oximeter as suggested by Turcott would include implementing the oximeter to reduce the duty cycle of the pulse train for operating the infrared light source in State 2, as compared to the duty cycle of the pulse train for operating the infrared or red light source in State 1, to minimize power consumption, as suggested by Turcott.

Pet. 50 (citing Ex. 1003 ¶ 87; Ex. 1006, 11:51–59).

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott "to achieve a pulse oximeter that optimizes the signal-to-noise ratio and minimizes power consumption." Pet. 46. According to Petitioner, Richardson contemplates adjusting the duty cycles because it discloses a "duty cycle of at least 1 in 4," and "Turcott confirms that reducing the duty cycle of the light source

IPR2020-01524
Patent 10,433,776 B2

optimizes the signal-to-noise ratio and minimizes power consumption."
Pet. 46–47 (quoting Ex. 1004, 4:6–10) (citing Ex. 1006, 11:54–59); Pet.
Reply 19 ("Richardson contemplates adjusting the duty cycles . . . and
describes shifting the frequency of the pulse train . . .  and that Turcott
confirms that adjusting the duty cycle and/or shifting the frequency of the
light source optimizes the signal-to-noise ratio and/or minimizes power
consumption.").  Petitioner relies on Richardson's description of shifting the
frequency of the pulse train, which Turcott mentions is also performed in
addition to adjusting the duty cycle.  Pet. 47 (citing Ex. 1004, 3:1–17, 5:53–
54, 7:58–63; Ex. 1006, 11:59–61).

Petitioner argues that a person of ordinary skill in the art would have
been motivated to implement Turcott's teaching of reducing the duty cycle
to lower power consumption in a pulse oximeter in combination with
Richardson's pulse oximeter to further minimize power consumption.  *Id.*
According to Petitioner, the objectives of implementing Turcott's teaching
of reducing the duty cycle to minimize power consumption and operating a
pulse oximeter according to a first and second control protocol as taught by
Richardson, would have been routine and straightforward to a person of
ordinary skill in the art.  *Id.*; Pet. Reply 20–21.  Petitioner also argues that a
person of ordinary skill in the art "would have also been motivated to adjust,
e.g., by increasing, the duty cycle to optimize signal to noise ratio when the
signal to noise ratio is low."  Pet. Reply 21.

Patent Owner's Contentions

Patent Owner contends that "Turcott, like Richardson, does not
disclose low power patient monitors that reduce power consumption by
intermittently alternating between first and second duty cycles."  PO

36

Resp. 56 (citing Ex. 2002 ¶ 100). Patent Owner argues that Turcott does not teach operating a light source according to two different duty cycles as required by the claims. *Id.* (citing Ex. 2002 ¶¶ 101–105). Instead, according to Patent Owner, "Turcott suggests operating a light source according to a **single**, low duty cycle," whereas "Turcott states, '[t]o conserve energy, the source is preferably driven with a low duty cycle pulse train.'" *Id.* (quoting Ex. 1006, 11:51–52). Further, "Turcott never suggests a corresponding high duty cycle pulse train, much less intermittently changing from a low duty to a high duty cycle." *Id.* at 56–57 (citing Ex. 2002 ¶ 102).

Patent Owner notes that although Turcott discloses adjusting the duty cycle of the pulse train as one way of adjusting the optical power generated by the source to optimize the signal to noise ratio and to minimize power consumption, the adjustments are not in real-time and a person of ordinary skill in the art would have understood Turcott to suggest selecting such a configuration during product design or setup. *Id.* at 57 (citing Ex. 1006, 11:54–59; Ex. 2002 ¶¶ 103–104). As support for this position, Patent Owner points out that Turcott does not identify any conditions that would trigger a transition from a first duty cycle to a second duty cycle and Turcott does not disclose hardware and software necessary to make such real-time transitions. *Id.* Patent Owner argues that a person of ordinary skill in the art would have understood that Turcott does not disclose or enable "adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train" in real-time during patient monitoring. *Id.*

Thus, according to Patent Owner, Turcott would not have motivated a person of ordinary skill in the art to "modify Richardson's operating states to have first and second duty cycles." *Id.* Instead, Dr. Madisetti testifies that

Turcott would have motivated a person or ordinary skill in the art to reduce all duty cycles in Richardson's oximeter uniformly during product design or setup. Ex. 2002 ¶ 104. Patent Owner concludes that a person of ordinary skill in the art would not have understood Turcott to disclose or suggest operating a monitor according to a "first duty cycle" and "second duty cycle," and would not have been motivated by Turcott to modify Richardson to operate according to the "first duty cycle" and "second duty cycle." PO Resp. 58 (citing Ex. 2002 ¶¶ 101–105).

Patent Owner next argues that "Petitioner does not explain why Turcott would have motivated a person of ordinary skill in the art to adjust the duty cycle in Richardson's State 2 ('first mapping')." PO Resp. 58 (emphasis omitted). Patent Owner contends that using Turcott's teaching of reducing the duty cycle to lower power consumption in a pulse oximeter does not provide a motivation to adjust the duty cycle between two states. *Id.* (citing Ex. 2002 ¶¶ 106–112).

Patent Owner, relying on the testimony of Dr. Madisetti, contends that if a person of ordinary skill in the art wanted to "'minimize power consumption' of a patient monitor, the person would have set the activation of the sensor at a single level associated with a low power consumption." *Id.* Dr. Madisetti testifies that:

> The person of ordinary skill in the art would have had no motivation to use a different "duty cycle" where one of the duty cycles would have resulted in a higher power consumption level. Operating Richardson's oximeter at a constant power consumption level would have been consistent with Richardson's disclosure, which describes operating Richardson's light sources at a constant duty cycle of at least 25%. Ex. 1004 (Richardson) at 4:6–7.

IPR2020-01524
Patent 10,433,776 B2

Ex. 2002 ¶ 107.  Patent Owner further contends that "Petitioner never identifies any motivation for a POSITA to intermittently change between a 'first duty cycle' and a 'second duty cycle' during patient monitoring."  PO Resp. 59.

Next, Patent Owner argues that a person of ordinary skill in the art "would have been discouraged from changing the duty cycle, as argued by Petitioner, without proper patient and signal protections in place."  *Id.* (citing Ex. 2002 ¶ 108).  Patent Owner points out that at certain critical times during low signal quality periods or when critical measurements are necessary, it would be necessary to trigger the monitor to increase the duty cycle.  *Id.* Yet, neither Richardson nor Turcott teach a feedback loop whereby physiological measurements or internal parameters are used to adjust the duty cycle.  *Id.* (citing Ex. 2002 ¶ 108).  Patent Owner argues that Petitioner likewise does not propose modifying Richardson or Turcott to include such a feedback loop.  *Id.*

Patent Owner contends that because Turcott is an implantable device, a person of ordinary skill in the art would have desired a constant low duty cycle for such a device.  PO Resp. 60.  Patent Owner argues that Turcott does not disclose adjusting the activation level of its sensors in real-time, but prefers a constant low duty cycle in order to prolong the life of the device. *Id.* (citing Ex. 2002 ¶ 109).  Running the implantable device at a different, higher power consumption level, as required by the challenged claims, would reduce the life of the device, according to Patent Owner.  *Id.*

Patent Owner next argues that a person of ordinary skill in the art would not have been motivated to use Richardson as the starting point for a low power patient monitor.  PO Resp. 60.  This is so because "Richardson's

IPR2020-01524
Patent 10,433,776 B2

device 'requires a computational overhead to constantly monitor which frequency of operation provides the least noise.'" *Id.* (quoting Ex. 2008, 4:30–42). Thus, according to Patent Owner, a person of ordinary skill in the art would not have envisioned Richardson as the starting point for a low power patient monitor. *See* Ex. 2002 ¶ 110.

Patent Owner further argues that "Petitioner does not explain how the combination of Richardson and Turcott would operate to adjust Richardson's duty cycle." PO Resp. 60 (citing Ex. 2002 ¶¶ 111–112). Patent Owner notes that "in order for Richardson's oximeter to adjust the duty cycle of Richardson's LEDs, the oximeter must send a signal to the emitter drivers and the emitter drivers must be capable of changing the duty cycle of supplied current between different non-zero duty cycles." *Id.* at 61 (citing Ex. 2002 ¶ 112). "Yet, Richardson does not send a signal to the emitter drivers to change the duty cycle," but instead, "only turns the LEDs off or operates the LEDs at a 25% duty cycle." *Id.* at 61 (citing Ex. 2002 ¶ 112). Dr. Madisetti testifies that "Richardson would need, at a minimum, additional hardware and/or software to change the duty cycles and some sort of trigger to change the duty cycles," yet, "Richardson discloses neither." Ex. 2002 ¶ 112.

Patent Owner contends that a person of ordinary skill in the art would not have been motivated to reduce Richardson's duty cycle of the pulse train for operating the infrared light source in State 2 and instead would have been discouraged from making such a reduction. PO Resp. 62 (citing Ex. 2002 ¶ 113). Patent Owner notes that "[i]n State 2, Richardson's oximeter reassesses the noise 'by turning off one LED; typically the red LED.'" *Id.* (quoting Ex. 1004, 6:2–3). Patent Owner relies on Richardson's disclosure

IPR2020-01524
Patent 10,433,776 B2

"that '[t]he red LED is turned off for approximately 1.4 seconds,'" and
"[w]hen the one LED is turned off, 'the pulse oximeter cannot calculate
blood oxygen saturation, but it can monitor pulse rate and otherwise give the
appearance of operating normally.'" *Id.* (quoting Ex. 1004, 9:52–53, 6:4–7).
"Thus," according to Patent Owner, when Richardson is "in State 2, the
functionality of the oximeter is compromised," and "'the pulse oximeter may
continue to display the last computed oxygen saturation number throughout
State 2 even though no new saturations numbers can be computed.'" *Id.* at
63 (quoting Ex. 1004, 9:47–51) (citing Ex. 2002 ¶ 115).  Dr. Madisetti
testifies that because the information generated by the active LED becomes
critical in State 2 and the only source of real-time information about the
patient's condition for the oximeter, a person of ordinary skill in the art
"would not have been motivated to reduce the duty cycle of the only active
LED because that reduction in the duty cycle could result in erroneous or
unreliable readings." Ex. 2002 ¶ 115.

   Patent Owner further notes that any power savings from reducing the
duty cycle in State 2 of the active LED would be negligible because
Richardson's oximeter remains in State 2 for only about 1.4 seconds, or less
than about 4.7% of its operating time (i.e., approximately 1.4 seconds / 30
seconds).  PO Resp. 63.  Because the power savings would be minimal, a
person of ordinary skill in the art would not have been motivated to risk the
health and safety of a patient for such a minimal power savings.  Ex. 2002
¶ 116.

Analysis

   Based on the final record before us, the combination of Richardson
and Turcott does not teach operating according to first and second duty

41

cycles as claimed.  Petitioner has also not persuasively demonstrated that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott to adjust the duty cycle of Richardson's oximeter as alleged by Petitioner.

Petitioner argues that the references render the limitations of claims 1(d) and 11(d) obvious because "Richardson contemplates adjusting the duty cycles" and "Turcott confirms that adjusting the duty cycle . . . of the light source optimizes the signal-to-noise ratio and/or minimizes power consumption."  Pet. Reply 19; Pet. 46–51.  We disagree for several reasons.

First, Petitioner has not persuasively established that Richardson's disclosure of operating at a duty cycle of at least 25% contemplates using multiple duty cycles as set forth in the claims.  *See* Pet. Reply 19 ("Richardson contemplates adjusting the duty cycles" because it discloses a "duty cycle of at least 1 in 4.").  Further, the claims do not require merely "adjusting" a duty cycle.  Rather, the claims require a transition from the patient monitor operating according to a first control protocol to a second control protocol, in which a second control protocol light source is operated according to a second duty cycle different from the first.  *See, e.g.*, Ex. 1001, claim 1.  Petitioner has not shown that any reference or combination of references meets these limitations.  We find Dr. Madisetti's testimony persuasive that Richardson does not mention or suggest operating according to different non-zero duty cycles during patient monitoring.  Ex. 2002 ¶ 119.  Richardson merely states, "[a] clock controls the sequential output of light from the light emitting diodes and to a duty cycle of at least 1 in 4."  Ex. 1004, 4:6–7.  Thus, while Richardson recognizes the light emitting diodes could operate at a single duty cycle of at least 25%, Richardson contains no

IPR2020-01524
Patent 10,433,776 B2

disclosure suggesting that its light source could operate at a first duty cycle and then transition to a second duty cycle as the claims require.  Ex. 2002 ¶ 119.

Next, Turcott, like Richardson, does not disclose low power patient monitors that reduce power consumption by transitioning between first and second duty cycles.  *See* Ex. 2002 ¶ 100.  Likewise, Turcott does not teach operating a light source of a patient monitor according to first duty cycle and then transitioning to a second duty cycle as required by the claims.  *Id.* ¶¶ 100–105.  Turcott states, "[t]o conserve energy, the source is preferably driven with a low duty cycle pulse train."  Ex. 1006, 11:51–52.  We find persuasive Dr. Madisetti's testimony that "Turcott encourages using a single low duty cycle, but it does not disclose intermittently changing between two different duty cycles."  Ex. 2002 ¶ 100.

Petitioner relies on portions of Turcott that state "[t]he optical power generated by the source is adjusted to optimize the signal to noise ratio and to minimize power consumption."  Ex. 1006, 11:54–57; Pet. 46, 49, 50.  Turcott conveys that this "can be done by adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train."  Ex. 1006, 11:57–59.  Dr. Anthony contends that Turcott describes shifting the frequency of the pulse train and adjusting the duty cycle from one duty cycle to another, and infers that these things could be done during normal operation of the device to reduce power consumption.  *See, e.g.*, Ex. 1003 ¶¶ 81, 82, 87.  We do not agree that Turcott teaches shifting the frequency of the pulse train or adjusting the duty cycle during normal operation of the device as alleged by Petitioner.  We have considered Dr. Anthony's testimony as to these points, but we determine that the scope

IPR2020-01524
Patent 10,433,776 B2

of Turcott's teachings are better explained by Dr. Madisetti. We find more persuasive Dr. Madisetti's testimony and reasoning that a person of ordinary skill in the art would have understood that Turcott's adjustments would happen during device design or setup, and not during operation of the device. Ex. 2002 ¶¶ 101–105. This is so because Turcott discloses operating at a single, low duty cycle that minimizes power consumption. *See* Ex. 2002 ¶ 104; Ex. 1006, 11:51–52 ("To conserve energy, the source is preferably driven with a low duty cycle pulse train."). We also find persuasive Dr. Madisetti's cross-examination testimony that the use of the terminology "optical power generated by the source is adjusted" in Turcott, "refers and describes to a POSA that it's adjusted, past tense, at design time or manufacturing or setup," and that "Turcott refers to this adjusted in past tense through the term 'adjusting' referring to that time at manufacturing or setup." Ex. 1038, 22:16–24:15.

We further base our determinations as to Turcott's teachings on the following evidence and argument set forth by Patent Owner (Sur-reply 15–16) and Dr. Madisetti (Ex. 2002 ¶¶ 100, 104, 109): (1) Turcott never discloses or suggests transitioning the duty cycle during operation and Turcott also does not disclose or enable making duty cycle adjustments in real-time during continuous monitoring as Petitioner alleges, (2) Turcott does not identify any conditions during patient monitoring that would trigger

any duty cycle adjustments,[2] (3) Turcott does not disclose the hardware and software necessary to make such duty cycle adjustments in real-time, and (4) Turcott describes an implantable device[3] where a constant low duty cycle would have been important to prolong the device's life. Petitioner attempts to backfill the lack of disclosure examined above by simply alleging that the significant changes that would be required to incorporate Turcott's teachings into Richardson are within the skill level of the person of ordinary skill in the art. *See* Pet. Reply 22. Based on the final record before us, Petitioner's contentions lack evidentiary support.

Petitioner also has not persuasively demonstrated that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott to adjust the duty cycle of Richardson's oximeter. *See* Ex. 2002 ¶ 112. We find persuasive Dr. Madisetti's testimony that the teachings

---

[2] The claims require operating the patient monitor according to second control protocol based on a "response to receiving [a] trigger signal." Ex. 1001, 11:63. Petitioner does not identify any such trigger signal in Turcott that would cause the optical power generated by the light source to be adjusted. *See* Pet. 49; Ex. 1003 ¶ 85. Petitioner also does not explain how any alleged trigger signal in Richardson could be integrated with the teachings of Turcott. *See id.*

[3] Patent Owner alleges that Turcott's device is "an implantable, invasive device." *See, e.g.*, Sur-reply 16. As Petitioner points out, Turcott at least suggests that some of its sensors "can be used in noninvasive, external embodiments, in contrast to incorporation in an implantantable monitor." Pet. Reply 21–22 (quoting 1006, 11:66–12:15). However, Turcott describes the "Field of the Invention" as "implantable monitoring devices" and discourages the use of noninvasive sensors. Ex. 1006, 1:14–17, 11:66–12:28 ("the preferred embodiment for these sensors is in an implanted, extravascular configuration"). Petitioner also did not rely on any alleged "noninvasive" embodiments for its obviousness arguments. *See* Pet. 45–48 (citing Ex. 1006, 11:15–61). Regardless, this single factor is not dispositive.

IPR2020-01524
Patent 10,433,776 B2

found in Turcott would not have motivated a person of ordinary skill in the art to modify Richardson's operating states to transition between first and second duty cycles as claimed. Ex. 2002 ¶ 104. To the contrary, we agree with Patent Owner that Turcott would have motivated a person of ordinary skill in the art to reduce all duty cycles in Richardson's oximeter uniformly during product design or setup. *Id.*

Petitioner maintains that a person of ordinary skill in the art "would have been motivated to modify Richardson based on Turcott's teachings to achieve a pulse oximeter that optimizes the signal-to-noise ratio and minimizes power consumption." Pet. Reply 20. In light of the final record before us, we do not find Petitioner's contentions sufficient to meet its burden.

Patent Owner has shown persuasively that a person of ordinary skill in the art that was intent on minimizing power consumption would have run the system at a single, low duty cycle to consume the least amount of power. *See* PO Resp. 58–59. Both Richardson and Turcott operate in this manner and neither reference suggests deviating from this approach. *Id.* at 56–59; Ex. 1006, 11:51–52; Ex. 1007, 36:6–15. Expanding Turcott's teaching of reducing a single duty cycle to minimize power consumption to capture a pulse oximeter transitioning between a first and second control protocol as claimed is not supported by the evidence before us.

In light of this evidence, Petitioner shifts its argument to assert, "a POSITA would not have merely wanted to minimize power consumption of the patient monitor, but would have also wanted to optimize signal to noise ratio." Pet. Reply 21 ("POSITA would have also been motivated to adjust, e.g., *by increasing*, the duty cycle to optimize signal to noise ratio when the

IPR2020-01524
Patent 10,433,776 B2

signal to noise ratio is low.") (emphasis added). This argument is not persuasive for the reasons set forth below. The argument is also contradictory because Dr. Anthony conversely stated that "Turcott confirms that *reducing* the duty cycle of the light source optimizes the signal-to-noise ratio." Ex. 1003 ¶ 81 (emphasis added).

Regardless, Petitioner does not persuasively show why a person of ordinary skill in the art would have been motivated to "optimize" Richardson's signal-to-noise ratio. *See* Pet. 46–48; Ex. 1003 ¶¶ 81–83 (providing no explanation). Richardson already teaches a distinct method for its oximeter to achieve a low signal-to-noise ratio. Richardson discloses a method of "identifying a pulse oximeter demultiplexing frequency at which the contribution of noise to the signal is relatively low." Ex. 1004, 3:7–10; *see also* PO Resp. 31–32 ("selecting the frequency with the least noise to serve as the operating frequency" and "also periodically rescans the available frequencies to reevaluate the noise level and switches to a less noisy frequency") (citing Ex. 1004, 2:37–51). Because Richardson already purports to solve the problem Petitioner identified as the motivation to combine, and because Petitioner never adequately explains why Richardson's existing method for handling the signal-to-noise ratio is insufficient and would have required supplementation with Turcott, we determine that Petitioner's basis for modifying Richardson in light of Turcott is not supported by a preponderance of the evidence before us. *See* Sur-reply 18.

We have considered Petitioner's additional reasons for combining Richardson and Turcott, but find that these explanations are not tied to any particular claim limitation and are also unsupported by the final record. *See*

47

IPR2020-01524
Patent 10,433,776 B2

Pet. 47–48 ("obvious to modify Richardson with Turcott because doing so entails the use of known solutions" and arguing, in general, that "Turcott's teachings" could be applied to "Richard's pulse oximeter" because the results were predictable). Further, to the extent that the "technique of reducing [a] duty cycle to lower power consumption" was indeed "well-known," (Pet. 48) this technique is not what is claimed and does not support Petitioner's conclusion that actively operating a patient monitor according to two distinct control protocols with first and second duty cycles as claimed was also well-known.

Patent Owner identifies other reasons why a person of ordinary skill in the art would not have been motivated to combine Richardson and Turcott. *See* PO Resp. 58–62; Sur-reply 19. In light of our analysis above, and Petitioner's burden to show a reasonable basis for combining the references, which we determine they have not met, we need not address Patent Owner's additional reasons.

### 3.    *Dependent Claims 2–9 and 12–16*

Because of each of dependent claims 2–8 and 12–16 depend from claims 1 or 11, we likewise determine that Petitioner has failed to demonstrate by a preponderance of the evidence that Richardson and Turcott would have rendered obvious any of these dependent claims for the reasons set forth above for claims 1 and 11.

### G.    *Obviousness over Richardson, Turcott, and Bindszus*

Petitioner contends that claims 9 and 10 would have been obviousness over Richardson, Turcott, and Bindszus. Pet. 62–63. Based on the final record, and for the reasons set forth above and below, Petitioner has not

IPR2020-01524
Patent 10,433,776 B2

shown by a preponderance of the evidence that these claims of the '776 patent would have been unpatentable over Richardson, Turcott, and Bindszus.

In the ground based on Richardson, Turcott, and Bindszus, Petitioner argues that Bindszus satisfies the additional limitations in dependent claims 9 and 10. Pet. 62–63. Petitioner does not argue that Bindszus satisfies any limitations in claim 1 that we found lacking above. *Id.* For these reasons, Petitioner has not persuasively shown that claims 9 and 10 would have been obvious over the combination of Richardson, Turcott, and Bindszus.

> ### H.   Obviousness over the "Second Mapping" of Richardson Alone or in Combination with Turcott or in Combination with Bindszus and Turcott

As noted above in the "Asserted Grounds," Petitioner asserts three distinct grounds of unpatentability based on the "second mapping" of Richardson. *See also* Pet. 3 (asserting (i) Richardson, (ii) Richardson and Turcott, and (iii) Richardson, Turcott, and Bindszus).

As we explained above in the claim construction analysis, Petitioner's "second mapping" of Richardson is based on a claim construction position that Petitioner has abandoned. *See* Pet. 26, 30 ("Richardson teaches this limitation under an alternate construction of this limitation that does not require different duty cycles"). During the oral hearing, Petitioner conceded that it was now accepting the position that that the first and second duty cycle must be different. Tr. 6:1–7 (Petitioner's counsel stating that "the parties agree that the claims require the first and second duty cycle to be different."). For the reasons set forth above, we agree that the first and second duty cycle must be different. Accordingly, each of the grounds

IPR2020-01524
Patent 10,433,776 B2

based on the "second mapping" of Richardson has been conceded by Petitioner.  Petitioner has not shown by a preponderance of the evidence that any claim of the '776 patent is invalid based upon the "second mapping" of Richardson.

## III.    CONCLUSION

In summary:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8, 11–16 | 103 | Richardson (first mapping) | | 1–8, 11–16 |
| 1–9, 11–16 | 103 | Richardson (second mapping) | | 1–9, 11–16 |
| 9, 10 | 103 | Richardson (either mapping) and Bindszus | | 9, 10 |
| 1–9, 11–16 | 103 | Richardson and Turcott (first mapping) | | 1–9, 11–16 |
| 1–9, 11–16 | 103 | Richardson and Turcott (second mapping) | | 1–9, 11–16 |
| 9, 10 | 103 | Richardson and Turcott (either mapping) and Bindszus | | 9, 10 |
| **Overall Outcome** | | | | 1–16 |

IPR2020-01524
Patent 10,433,776 B2

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–16 of the '776 patent are not determined to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01524
Patent 10,433,776 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Kim Leung
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
leung@fr.com

FOR PATENT OWNER:

Joshua Stowell
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jys@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com



US010433776B2

(12) **United States Patent**
Al-Ali

(10) Patent No.: **US 10,433,776 B2**
(45) Date of Patent: *Oct. 8, 2019

(54) **LOW POWER PULSE OXIMETER**

(71) Applicant: **Masimo Corporation**, Irvine, CA (US)

(72) Inventor: **Ammar Al-Ali**, Tustin, CA (US)

(73) Assignee: **MASIMO CORPORATION**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/174,144**

(22) Filed: **Oct. 29, 2018**

(65) **Prior Publication Data**

US 2019/0069814 A1    Mar. 7, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/820,082, filed on Nov. 21, 2017, which is a continuation of application No. 13/908,957, filed on Jun. 3, 2013, now Pat. No. 9,848,806, which is a continuation of application No. 11/939,519, filed on Nov. 13, 2007, now Pat. No. 8,457,703, which is a continuation of application No. 10/785,573, filed on Feb. 24, 2004, now Pat. No. 7,295,866, which is a continuation of application No.

(Continued)

(51) **Int. Cl.**
*A61B 5/1455* (2006.01)

(52) **U.S. Cl.**
CPC ........ *A61B 5/1455* (2013.01); *A61B 5/14551* (2013.01); *A61B 2560/0209* (2013.01)

(58) **Field of Classification Search**
CPC .. A61B 5/00; A61B 5/02; A61B 5/021; A61B

5/0205; A61B 5/03; A61B 5/04; A61B 5/0059; A61B 5/08; A61B 5/103; A61B 5/0093; A61B 5/68; A61B 5/145; A61B 5/1455; A61B 5/14551

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,907,183 A | * | 3/1990 | Tanaka ..................... G06F 1/30 365/229 |
| 4,960,128 A | | 10/1990 | Gordon et al. |
| 4,964,408 A | | 10/1990 | Hink et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 872 210 A1 | 10/1998 |
| WO | WO 99/63883 | 12/1999 |

OTHER PUBLICATIONS

US 8,845,543 B2, 09/2014, Diab et al. (withdrawn)

(Continued)

*Primary Examiner* — Eric F Winakur
*Assistant Examiner* — Chu Chuan Liu
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

A pulse oximeter may reduce power consumption in the absence of overriding conditions. Various sampling mechanisms may be used individually or in combination. Various parameters may be monitored to trigger or override a reduced power consumption state. In this manner, a pulse oximeter can lower power consumption without sacrificing performance during, for example, high noise conditions or oxygen desaturations.

**16 Claims, 11 Drawing Sheets**



APPLE 1001

**Appx53**

**US 10,433,776 B2**

Page 2

**Related U.S. Application Data**

10/184,028, filed on Jun. 26, 2002, now Pat. No. 6,697,658.

(60) Provisional application No. 60/302,564, filed on Jul. 2, 2001.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,041,187 | A | 8/1991 | Hink et al. |
| 5,069,213 | A | 12/1991 | Polczynski |
| 5,069,214 | A * | 12/1991 | Samaras ............. A61B 5/14551 |
| | | | 600/323 |
| 5,163,438 | A | 11/1992 | Gordon et al. |
| 5,238,001 | A * | 8/1993 | Gallant ................ A61B 5/0205 |
| | | | 600/513 |
| 5,279,298 | A * | 1/1994 | Flower ................ A61B 3/1241 |
| | | | 351/206 |
| 5,319,355 | A | 6/1994 | Russek |
| 5,337,744 | A | 8/1994 | Branigan |
| 5,341,805 | A | 8/1994 | Stavridi et al. |
| D353,195 | S | 12/1994 | Savage et al. |
| D353,196 | S | 12/1994 | Savage et al. |
| 5,377,676 | A | 1/1995 | Vari et al. |
| D359,546 | S | 6/1995 | Savage et al. |
| 5,431,170 | A | 7/1995 | Mathews |
| D361,840 | S | 8/1995 | Savage et al. |
| D362,063 | S | 9/1995 | Savage et al. |
| 5,452,717 | A | 9/1995 | Branigan et al. |
| D363,120 | S | 10/1995 | Savage et al. |
| 5,456,252 | A | 10/1995 | Vari et al. |
| 5,479,934 | A | 1/1996 | Imran |
| 5,482,036 | A | 1/1996 | Diab et al. |
| 5,490,505 | A | 2/1996 | Diab et al. |
| 5,490,523 | A | 2/1996 | Isaacson et al. |
| 5,494,043 | A | 2/1996 | O'Sullivan et al. |
| 5,533,511 | A | 7/1996 | Kaspari et al. |
| 5,534,851 | A | 7/1996 | Russek |
| 5,561,275 | A | 10/1996 | Savage et al. |
| 5,562,002 | A | 10/1996 | Lalin |
| 5,590,649 | A | 1/1997 | Caro et al. |
| 5,602,924 | A | 2/1997 | Durand et al. |
| 5,619,992 | A | 4/1997 | Guthrie et al. |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,638,816 | A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 | A | 6/1997 | Diab et al. |
| 5,645,440 | A | 7/1997 | Tobler et al. |
| 5,685,299 | A | 11/1997 | Diab et al. |
| D393,830 | S | 4/1998 | Tobler et al. |
| 5,743,262 | A | 4/1998 | Lepper, Jr. et al. |
| 5,746,694 | A | 5/1998 | Wilk et al. |
| 5,758,644 | A | 6/1998 | Diab et al. |
| 5,760,910 | A | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 | A | 6/1998 | Diab et al. |
| 5,782,757 | A | 7/1998 | Diab et al. |
| 5,785,659 | A | 7/1998 | Caro et al. |
| 5,791,347 | A | 8/1998 | Flaherty et al. |
| 5,797,841 | A | 8/1998 | Delonzor et al. |
| 5,810,734 | A | 9/1998 | Caro et al. |
| 5,823,950 | A | 10/1998 | Diab et al. |
| 5,827,969 | A | 10/1998 | Lee et al. |
| 5,830,131 | A | 11/1998 | Caro et al. |
| 5,833,618 | A | 11/1998 | Caro et al. |
| 5,860,919 | A | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 | A | 4/1999 | Mills et al. |
| 5,904,654 | A | 5/1999 | Wohltmann et al. |
| 5,919,134 | A | 7/1999 | Diab |
| 5,924,979 | A | 7/1999 | Swedlow et al. |
| 5,934,925 | A | 8/1999 | Tobler et al. |
| 5,940,182 | A | 8/1999 | Lepper, Jr. et al. |
| 5,987,343 | A | 11/1999 | Kinast |
| 5,995,855 | A | 11/1999 | Kiani et al. |
| 5,997,343 | A | 12/1999 | Mills et al. |
| 6,002,952 | A | 12/1999 | Diab et al. |
| 6,011,986 | A | 1/2000 | Diab et al. |
| 6,027,452 | A | 2/2000 | Flaherty et al. |
| 6,036,642 | A | 3/2000 | Diab et al. |
| 6,045,509 | A | 4/2000 | Caro et al. |
| 6,067,462 | A | 5/2000 | Diab et al. |
| 6,081,735 | A | 6/2000 | Diab et al. |
| 6,088,607 | A | 7/2000 | Diab et al. |
| 6,110,522 | A | 8/2000 | Lepper, Jr. et al. |
| 6,115,622 | A | 9/2000 | Minoz |
| 6,124,597 | A | 9/2000 | Shehada |
| 6,128,521 | A | 10/2000 | Marro et al. |
| 6,129,675 | A | 10/2000 | Jay |
| 6,144,868 | A | 11/2000 | Parker |
| 6,151,516 | A | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 | A | 11/2000 | Gerhardt et al. |
| 6,157,850 | A | 12/2000 | Diab et al. |
| 6,165,005 | A | 12/2000 | Mills et al. |
| 6,184,521 | B1 | 2/2001 | Coffin, IV et al. |
| 6,206,830 | B1 | 3/2001 | Diab et al. |
| 6,229,856 | B1 | 5/2001 | Diab et al. |
| 6,232,609 | B1 | 5/2001 | Snyder et al. |
| 6,236,872 | B1 | 5/2001 | Diab et al. |
| 6,241,683 | B1 | 6/2001 | Macklem et al. |
| 6,253,097 | B1 | 6/2001 | Aronow et al. |
| 6,256,523 | B1 | 7/2001 | Diab et al. |
| 6,263,222 | B1 | 7/2001 | Diab et al. |
| 6,270,460 | B1 | 8/2001 | McCartan et al. |
| 6,278,522 | B1 | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 | B1 | 8/2001 | Tobler et al. |
| 6,285,896 | B1 | 9/2001 | Tobler et al. |
| 6,301,493 | B1 | 10/2001 | Marro et al. |
| 6,308,089 | B1 | 10/2001 | von der Ruhr et al. |
| 6,317,627 | B1 | 11/2001 | Ennen et al. |
| 6,321,100 | B1 | 11/2001 | Parker |
| 6,325,761 | B1 | 12/2001 | Jay |
| 6,334,065 | B1 | 12/2001 | Al-Ali et al. |
| 6,343,224 | B1 | 1/2002 | Parker |
| 6,349,228 | B1 | 2/2002 | Kiani et al. |
| 6,360,114 | B1 | 3/2002 | Diab et al. |
| 6,368,283 | B1 | 4/2002 | Xu et al. |
| 6,371,921 | B1 | 4/2002 | Caro et al. |
| 6,377,829 | B1 | 4/2002 | Al-Ali |
| 6,388,240 | B2 | 5/2002 | Schulz et al. |
| 6,396,137 | B1 | 5/2002 | Klughart |
| 6,397,091 | B2 | 5/2002 | Diab et al. |
| 6,402,690 | B1 * | 6/2002 | Rhee ................... A61B 5/0002 |
| | | | 600/300 |
| 6,430,437 | B1 | 8/2002 | Marro |
| 6,430,525 | B1 | 8/2002 | Weber et al. |
| 6,463,311 | B1 | 10/2002 | Diab |
| 6,470,199 | B1 | 10/2002 | Kopotic et al. |
| 6,501,975 | B2 | 12/2002 | Diab et al. |
| 6,505,059 | B1 | 1/2003 | Kollias et al. |
| 6,515,273 | B2 | 2/2003 | Al-Ali |
| 6,519,487 | B1 | 2/2003 | Parker |
| 6,525,386 | B1 | 2/2003 | Mills et al. |
| 6,526,300 | B1 | 2/2003 | Kiani et al. |
| 6,527,729 | B1 | 3/2003 | Turcott |
| 6,541,756 | B2 | 4/2003 | Schulz et al. |
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. |
| 6,580,086 | B1 | 6/2003 | Schulz et al. |
| 6,584,336 | B1 | 6/2003 | Ali et al. |
| 6,595,316 | B2 | 7/2003 | Cybulski et al. |
| 6,597,932 | B2 | 7/2003 | Tian et al. |
| 6,597,933 | B2 | 7/2003 | Kiani et al. |
| 6,606,511 | B1 | 8/2003 | Ali et al. |
| 6,632,181 | B2 | 10/2003 | Flaherty et al. |
| 6,639,668 | B1 | 10/2003 | Trepagnier |
| 6,640,116 | B2 | 10/2003 | Diab |
| 6,643,530 | B2 | 11/2003 | Diab et al. |
| 6,650,917 | B2 | 11/2003 | Diab et al. |
| 6,654,624 | B2 | 11/2003 | Diab et al. |
| 6,658,276 | B2 | 12/2003 | Kiani et al. |
| 6,661,161 | B1 | 12/2003 | Lanzo et al. |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. |
| 6,678,543 | B2 | 1/2004 | Diab et al. |
| 6,684,090 | B2 | 1/2004 | Ali et al. |
| 6,684,091 | B2 | 1/2004 | Parker |
| 6,697,656 | B1 | 2/2004 | Al-Ali |
| 6,697,657 | B1 | 2/2004 | Shehada et al. |

2

**US 10,433,776 B2**

Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,697,658 B2 | 2/2004 | Al-Ali |
| RE38,476 E | 3/2004 | Diab et al. |
| 6,699,194 B1 | 3/2004 | Diab et al. |
| 6,714,804 B2 | 3/2004 | Al-Ali et al. |
| RE38,492 E | 4/2004 | Diab et al. |
| 6,721,582 B2 | 4/2004 | Trepagnier et al. |
| 6,721,585 B1 | 4/2004 | Parker |
| 6,725,075 B2 | 4/2004 | Al-Ali |
| 6,728,560 B2 | 4/2004 | Kollias et al. |
| 6,735,459 B2 | 5/2004 | Parker |
| 6,745,060 B2 | 6/2004 | Diab et al. |
| 6,760,607 B2 | 7/2004 | Al-Ali |
| 6,770,028 B1 | 8/2004 | Ali et al. |
| 6,771,994 B2 | 8/2004 | Kiani et al. |
| 6,792,300 B1 | 9/2004 | Diab et al. |
| 6,813,511 B2 | 11/2004 | Diab et al. |
| 6,816,741 B2 | 11/2004 | Diab |
| 6,822,564 B2 | 11/2004 | Al-Ali |
| 6,826,419 B2 | 11/2004 | Diab et al. |
| 6,830,711 B2 | 12/2004 | Mills et al. |
| 6,850,787 B2 | 2/2005 | Weber et al. |
| 6,850,788 B2 | 2/2005 | Al-Ali |
| 6,852,083 B2 | 2/2005 | Caro et al. |
| 6,861,639 B2 | 3/2005 | Al-Ali |
| 6,898,452 B2 | 5/2005 | Al-Ali et al. |
| 6,920,345 B2 | 7/2005 | Al-Ali et al. |
| 6,931,268 B1 | 8/2005 | Kiani-Azarbayjany et al. |
| 6,934,570 B2 | 8/2005 | Kiani et al. |
| 6,939,305 B2 | 9/2005 | Flaherty et al. |
| 6,943,348 B1 | 9/2005 | Coffin, IV |
| 6,950,687 B2 | 9/2005 | Al-Ali |
| 6,961,598 B2 | 11/2005 | Diab |
| 6,970,792 B1 | 11/2005 | Diab |
| 6,979,812 B2 | 12/2005 | Al-Ali |
| 6,985,764 B2 | 1/2006 | Mason et al. |
| 6,993,371 B2 | 1/2006 | Kiani et al. |
| 6,996,427 B2 | 2/2006 | Ali et al. |
| 6,999,904 B2 | 2/2006 | Weber et al. |
| 7,003,338 B2 | 2/2006 | Weber et al. |
| 7,003,339 B2 | 2/2006 | Diab et al. |
| 7,015,451 B2 | 3/2006 | Dalke et al. |
| 7,024,233 B2 | 4/2006 | Ali et al. |
| 7,027,849 B2 | 4/2006 | Al-Ali |
| 7,030,749 B2 | 4/2006 | Al-Ali |
| 7,039,449 B2 | 5/2006 | Al-Ali |
| 7,041,060 B2 | 5/2006 | Flaherty et al. |
| 7,044,918 B2 | 5/2006 | Diab |
| 7,048,687 B1 | 5/2006 | Reuss et al. |
| 7,067,893 B2 | 6/2006 | Mills et al. |
| 7,096,052 B2 | 8/2006 | Mason et al. |
| 7,096,054 B2 | 8/2006 | Abdul-Hafiz et al. |
| 7,132,641 B2 | 11/2006 | Schulz et al. |
| 7,142,901 B2 | 11/2006 | Kiani et al. |
| 7,149,561 B2 | 12/2006 | Diab |
| 7,186,966 B2 | 3/2007 | Al-Ali |
| 7,190,261 B2 | 3/2007 | Al-Ali |
| 7,190,986 B1 | 3/2007 | Hannula et al. |
| 7,215,984 B2 | 5/2007 | Diab |
| 7,215,986 B2 | 5/2007 | Diab |
| 7,221,971 B2 | 5/2007 | Diab |
| 7,225,006 B2 | 5/2007 | Al-Ali et al. |
| 7,225,007 B2 | 5/2007 | Al-Ali |
| RE39,672 E | 6/2007 | Shehada et al. |
| 7,239,905 B2 | 7/2007 | Kiani-Azarbayjany et al. |
| 7,245,953 B1 | 7/2007 | Parker |
| 7,254,429 B2 | 8/2007 | Schurman et al. |
| 7,254,431 B2 | 8/2007 | Al-Ali |
| 7,254,433 B2 | 8/2007 | Diab et al. |
| 7,254,434 B2 | 8/2007 | Schulz et al. |
| 7,272,425 B2 | 9/2007 | Al-Ali |
| 7,274,955 B2 | 9/2007 | Kiani et al. |
| D554,263 S | 10/2007 | Al-Ali |
| 7,280,858 B2 | 10/2007 | Al-Ali et al. |
| 7,289,835 B2 | 10/2007 | Mansfield et al. |
| 7,292,883 B2 | 11/2007 | De Felice et al. |
| 7,295,866 B2 | 11/2007 | Al-Ali |
| 7,328,053 B1 | 2/2008 | Diab et al. |
| 7,332,784 B2 | 2/2008 | Mills et al. |
| 7,340,287 B2 | 3/2008 | Mason et al. |
| 7,341,559 B2 | 3/2008 | Schulz et al. |
| 7,343,186 B2 | 3/2008 | Lamego et al. |
| D566,282 S | 4/2008 | Al-Ali et al. |
| 7,355,512 B1 | 4/2008 | Al-Ali |
| 7,356,365 B2 | 4/2008 | Schurman |
| 7,371,981 B2 | 5/2008 | Abdul-Hafiz |
| 7,373,193 B2 | 5/2008 | Al-Ali et al. |
| 7,373,194 B2 | 5/2008 | Weber et al. |
| 7,376,453 B1 | 5/2008 | Diab et al. |
| 7,377,794 B2 | 5/2008 | Al Ali et al. |
| 7,377,899 B2 | 5/2008 | Weber et al. |
| 7,383,070 B2 | 6/2008 | Diab et al. |
| 7,415,297 B2 | 8/2008 | Al-Ali et al. |
| 7,428,432 B2 | 9/2008 | Ali et al. |
| 7,438,683 B2 | 10/2008 | Al-Ali et al. |
| 7,440,787 B2 | 10/2008 | Diab |
| 7,454,240 B2 | 11/2008 | Diab et al. |
| 7,467,002 B2 | 12/2008 | Weber et al. |
| 7,469,157 B2 | 12/2008 | Diab et al. |
| 7,471,969 B2 | 12/2008 | Diab et al. |
| 7,471,971 B2 | 12/2008 | Diab et al. |
| 7,483,729 B2 | 1/2009 | Al-Ali et al. |
| 7,483,730 B2 | 1/2009 | Diab et al. |
| 7,489,958 B2 | 2/2009 | Diab et al. |
| 7,496,391 B2 | 2/2009 | Diab et al. |
| 7,496,393 B2 | 2/2009 | Diab et al. |
| D587,657 S | 3/2009 | Al-Ali et al. |
| 7,499,741 B2 | 3/2009 | Diab et al. |
| 7,499,835 B2 | 3/2009 | Weber et al. |
| 7,500,950 B2 | 3/2009 | Al-Ali et al. |
| 7,509,154 B2 | 3/2009 | Diab et al. |
| 7,509,494 B2 | 3/2009 | Al-Ali |
| 7,510,849 B2 | 3/2009 | Schurman et al. |
| 7,526,328 B2 | 4/2009 | Diab et al. |
| 7,530,942 B1 | 5/2009 | Diab |
| 7,530,949 B2 | 5/2009 | Al Ali et al. |
| 7,530,955 B2 | 5/2009 | Diab et al. |
| 7,563,110 B2 | 7/2009 | Al-Ali et al. |
| 7,596,398 B2 | 9/2009 | Al-Ali et al. |
| 7,618,375 B2 | 11/2009 | Flaherty |
| D606,659 S | 12/2009 | Kiani et al. |
| 7,647,083 B2 | 1/2010 | Al-Ali et al. |
| D609,193 S | 2/2010 | Al-Ali et al. |
| D614,305 S | 4/2010 | Al-Ali et al. |
| RE41,317 E | 5/2010 | Parker |
| 7,729,733 B2 | 6/2010 | Al-Ali et al. |
| 7,734,320 B2 | 6/2010 | Al-Ali |
| 7,761,127 B2 | 7/2010 | Al-Ali et al. |
| 7,761,128 B2 | 7/2010 | Al-Ali et al. |
| 7,764,982 B2 | 7/2010 | Dalke et al. |
| D621,516 S | 8/2010 | Kiani et al. |
| 7,791,155 B2 | 9/2010 | Diab |
| 7,801,581 B2 | 9/2010 | Diab |
| 7,822,452 B2 | 10/2010 | Schurman et al. |
| RE41,912 E | 11/2010 | Parker |
| 7,844,313 B2 | 11/2010 | Kiani et al. |
| 7,844,314 B2 | 11/2010 | Al-Ali |
| 7,844,315 B2 | 11/2010 | Al-Ali |
| 7,865,222 B2 | 1/2011 | Weber et al. |
| 7,873,497 B2 | 1/2011 | Weber et al. |
| 7,880,606 B2 | 2/2011 | Al-Ali |
| 7,880,626 B2 | 2/2011 | Al-Ali et al. |
| 7,891,355 B2 | 2/2011 | Al-Ali et al. |
| 7,894,868 B2 | 2/2011 | Al-Ali et al. |
| 7,899,507 B2 | 3/2011 | Al-Ali et al. |
| 7,899,518 B2 | 3/2011 | Trepagnier et al. |
| 7,904,132 B2 | 3/2011 | Weber et al. |
| 7,909,772 B2 | 3/2011 | Popov et al. |
| 7,910,875 B2 | 3/2011 | Al-Ali |
| 7,919,713 B2 | 4/2011 | Al-Ali et al. |
| 7,937,128 B2 | 5/2011 | Al-Ali |
| 7,937,129 B2 | 5/2011 | Mason et al. |
| 7,937,130 B2 | 5/2011 | Diab et al. |
| 7,941,199 B2 | 5/2011 | Kiani |
| 7,951,086 B2 | 5/2011 | Flaherty et al. |

3

US 10,433,776 B2

Page 4

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,957,780 B2 | 6/2011 | Lamego et al. |
| 7,962,188 B2 | 6/2011 | Kiani et al. |
| 7,962,190 B1 | 6/2011 | Diab et al. |
| 7,976,472 B2 | 7/2011 | Kiani |
| 7,988,637 B2 | 8/2011 | Diab |
| 7,990,382 B2 | 8/2011 | Kiani |
| 7,991,446 B2 | 8/2011 | Ali et al. |
| 8,000,761 B2 | 8/2011 | Al-Ali |
| 8,008,088 B2 | 8/2011 | Bellott et al. |
| RE42,753 E | 9/2011 | Kiani-Azarbayjany et al. |
| 8,019,400 B2 | 9/2011 | Diab et al. |
| 8,028,701 B2 | 10/2011 | Al-Ali et al. |
| 8,029,765 B2 | 10/2011 | Bellott et al. |
| 8,036,727 B2 | 10/2011 | Schurman et al. |
| 8,036,728 B2 | 10/2011 | Diab et al. |
| 8,046,040 B2 | 10/2011 | Ali et al. |
| 8,046,041 B2 | 10/2011 | Diab et al. |
| 8,046,042 B2 | 10/2011 | Diab et al. |
| 8,048,040 B2 | 11/2011 | Kiani |
| 8,050,728 B2 | 11/2011 | Al-Ali et al. |
| RE43,169 E | 2/2012 | Parker |
| 8,118,620 B2 | 2/2012 | Al-Ali et al. |
| 8,126,528 B2 | 2/2012 | Diab et al. |
| 8,128,572 B2 | 3/2012 | Diab et al. |
| 8,130,105 B2 | 3/2012 | Al-Ali et al. |
| 8,145,287 B2 | 3/2012 | Diab et al. |
| 8,150,487 B2 | 4/2012 | Diab et al. |
| 8,175,672 B2 | 5/2012 | Parker |
| 8,180,420 B2 | 5/2012 | Diab et al. |
| 8,182,443 B1 | 5/2012 | Kiani |
| 8,185,180 B2 | 5/2012 | Diab et al. |
| 8,190,223 B2 | 5/2012 | Al-Ali et al. |
| 8,190,227 B2 | 5/2012 | Diab et al. |
| 8,203,438 B2 | 6/2012 | Kiani et al. |
| 8,203,704 B2 | 6/2012 | Merritt et al. |
| 8,204,566 B2 | 6/2012 | Schurman et al. |
| 8,219,172 B2 | 7/2012 | Schurman et al. |
| 8,224,411 B2 | 7/2012 | Al-Ali et al. |
| 8,228,181 B2 | 7/2012 | Al-Ali |
| 8,229,533 B2 | 7/2012 | Diab et al. |
| 8,233,955 B2 | 7/2012 | Al-Ali et al. |
| 8,244,325 B2 | 8/2012 | Al-Ali et al. |
| 8,255,026 B1 | 8/2012 | Al-Ali |
| 8,255,027 B2 | 8/2012 | Al-Ali et al. |
| 8,255,028 B2 | 8/2012 | Al-Ali et al. |
| 8,260,577 B2 | 9/2012 | Weber et al. |
| 8,265,723 B1 | 9/2012 | McHale et al. |
| 8,274,360 B2 | 9/2012 | Sampath et al. |
| 8,280,473 B2 | 10/2012 | Al-Ali |
| 8,301,217 B2 | 10/2012 | Al-Ali et al. |
| 8,306,596 B2 | 11/2012 | Schurman et al. |
| 8,310,336 B2 | 11/2012 | Muhsin et al. |
| 8,315,683 B2 | 11/2012 | Al-Ali et al. |
| RE43,860 E | 12/2012 | Parker |
| 8,337,403 B2 | 12/2012 | Al-Ali et al. |
| 8,346,330 B2 | 1/2013 | Lamego |
| 8,353,842 B2 | 1/2013 | Al-Ali et al. |
| 8,355,766 B2 | 1/2013 | MacNeish, III et al. |
| 8,359,080 B2 | 1/2013 | Diab et al. |
| 8,364,223 B2 | 1/2013 | Al-Ali et al. |
| 8,364,226 B2 | 1/2013 | Diab et al. |
| 8,374,665 B2 | 2/2013 | Lamego |
| 8,385,995 B2 | 2/2013 | Al-ali et al. |
| 8,385,996 B2 | 2/2013 | Smith et al. |
| 8,388,353 B2 | 3/2013 | Kiani |
| 8,399,822 B2 | 3/2013 | Al-Ali |
| 8,401,602 B2 | 3/2013 | Kiani |
| 8,405,608 B2 | 3/2013 | Al-Ali et al. |
| 8,414,499 B2 | 4/2013 | Al-Ali et al. |
| 8,418,524 B2 | 4/2013 | Al-Ali |
| 8,423,106 B2 | 4/2013 | Lamego et al. |
| 8,428,967 B2 | 4/2013 | Olsen et al. |
| 8,430,817 B1 | 4/2013 | Al-Ali et al. |
| 8,437,825 B2 | 5/2013 | Dalvi et al. |
| 8,455,290 B2 | 6/2013 | Siskavich |
| 8,457,703 B2 | 6/2013 | Al-Ali |
| 8,457,707 B2 | 6/2013 | Kiani |
| 8,463,349 B2 | 6/2013 | Diab et al. |
| 8,466,286 B2 | 6/2013 | Bellot et al. |
| 8,471,713 B2 | 6/2013 | Poeze et al. |
| 8,473,020 B2 | 6/2013 | Kiani et al. |
| 8,483,787 B2 | 7/2013 | Al-Ali et al. |
| 8,489,364 B2 | 7/2013 | Weber et al. |
| 8,498,684 B2 | 7/2013 | Weber et al. |
| 8,504,128 B2 | 8/2013 | Blank et al. |
| 8,509,867 B2 | 8/2013 | Workman et al. |
| 8,515,509 B2 | 8/2013 | Bruinsma et al. |
| 8,523,781 B2 | 9/2013 | Al-Ali |
| 8,529,301 B2 | 9/2013 | Al-Ali et al. |
| 8,532,727 B2 | 9/2013 | Ali et al. |
| 8,532,728 B2 | 9/2013 | Diab et al. |
| D692,145 S | 10/2013 | Al-Ali et al. |
| 8,547,209 B2 | 10/2013 | Kiani et al. |
| 8,548,548 B2 | 10/2013 | Al-Ali |
| 8,548,549 B2 | 10/2013 | Schurman et al. |
| 8,548,550 B2 | 10/2013 | Al-Ali et al. |
| 8,560,032 B2 | 10/2013 | Al-Ali et al. |
| 8,560,034 B1 | 10/2013 | Diab et al. |
| 8,570,167 B2 | 10/2013 | Al-Ali |
| 8,570,503 B2 | 10/2013 | Vo et al. |
| 8,571,617 B2 | 10/2013 | Reichgott et al. |
| 8,571,618 B1 | 10/2013 | Lamego et al. |
| 8,571,619 B2 | 10/2013 | Al-Ali et al. |
| 8,577,431 B2 | 11/2013 | Lamego et al. |
| 8,581,732 B2 | 11/2013 | Al-Ali et al. |
| 8,584,345 B2 | 11/2013 | Al-Ali et al. |
| 8,588,880 B2 | 11/2013 | Abdul-Hafiz et al. |
| 8,600,467 B2 | 12/2013 | Al-Ali et al. |
| 8,606,342 B2 | 12/2013 | Diab |
| 8,626,255 B2 | 1/2014 | Al-Ali et al. |
| 8,630,691 B2 | 1/2014 | Lamego et al. |
| 8,634,889 B2 | 1/2014 | Al-Ali et al. |
| 8,641,631 B2 | 2/2014 | Sierra et al. |
| 8,652,060 B2 | 2/2014 | Al-Ali |
| 8,663,107 B2 | 3/2014 | Kiani |
| 8,666,468 B1 | 3/2014 | Al-Ali |
| 8,667,967 B2 | 3/2014 | Al-Ali et al. |
| 8,670,811 B2 | 3/2014 | O'Reilly |
| 8,670,814 B2 | 3/2014 | Diab et al. |
| 8,676,286 B2 | 3/2014 | Weber et al. |
| 8,682,407 B2 | 3/2014 | Al-Ali |
| RE44,823 E | 4/2014 | Parker |
| RE44,875 E | 4/2014 | Kiani et al. |
| 8,690,799 B2 | 4/2014 | Telfort et al. |
| 8,700,112 B2 | 4/2014 | Kiani |
| 8,702,627 B2 | 4/2014 | Telfort et al. |
| 8,706,179 B2 | 4/2014 | Parker |
| 8,712,494 B1 | 4/2014 | MacNeish, III et al. |
| 8,715,206 B2 | 5/2014 | Telfort et al. |
| 8,718,735 B2 | 5/2014 | Lamego et al. |
| 8,718,737 B2 | 5/2014 | Diab et al. |
| 8,718,738 B2 | 5/2014 | Blank et al. |
| 8,720,249 B2 | 5/2014 | Al-Ali |
| 8,721,541 B2 | 5/2014 | Al-Ali et al. |
| 8,721,542 B2 | 5/2014 | Al-Ali et al. |
| 8,723,677 B1 | 5/2014 | Kiani |
| 8,740,792 B1 | 6/2014 | Kiani et al. |
| 8,754,776 B2 | 6/2014 | Poeze et al. |
| 8,755,535 B2 | 6/2014 | Telfort et al. |
| 8,755,856 B2 | 6/2014 | Diab et al. |
| 8,755,872 B1 | 6/2014 | Marinow |
| 8,761,850 B2 | 6/2014 | Lamego |
| 8,764,671 B2 | 7/2014 | Kiani |
| 8,768,423 B2 | 7/2014 | Shakespeare et al. |
| 8,771,204 B2 | 7/2014 | Telfort et al. |
| 8,777,634 B2 | 7/2014 | Kiani et al. |
| 8,781,543 B2 | 7/2014 | Diab et al. |
| 8,781,544 B2 | 7/2014 | Al-Ali et al. |
| 8,781,549 B2 | 7/2014 | Al-Ali et al. |
| 8,788,003 B2 | 7/2014 | Schurman et al. |
| 8,790,268 B2 | 7/2014 | Al-Ali |
| 8,801,613 B2 | 8/2014 | Al-Ali et al. |
| 8,821,397 B2 | 9/2014 | Al-Ali et al. |
| 8,821,415 B2 | 9/2014 | Al-Ali et al. |

4

**Appx56**

**US 10,433,776 B2**

Page 5

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,830,449 B1 | 9/2014 | Lamego et al. |
| 8,831,700 B2 | 9/2014 | Schurman et al. |
| 8,840,549 B2 | 9/2014 | Al-Ali et al. |
| 8,847,740 B2 | 9/2014 | Kiani et al. |
| 8,849,365 B2 | 9/2014 | Smith et al. |
| 8,852,094 B2 | 10/2014 | Al-Ali et al. |
| 8,852,994 B2 | 10/2014 | Wojtczuk et al. |
| 8,868,147 B2 | 10/2014 | Stippick et al. |
| 8,868,150 B2 | 10/2014 | Al-Ali et al. |
| 8,870,792 B2 | 10/2014 | Al-Ali et al. |
| 8,886,271 B2 | 11/2014 | Kiani et al. |
| 8,888,539 B2 | 11/2014 | Al-Ali et al. |
| 8,888,708 B2 | 11/2014 | Diab et al. |
| 8,892,180 B2 | 11/2014 | Weber et al. |
| 8,897,847 B2 | 11/2014 | Al-Ali |
| 8,909,310 B2 | 12/2014 | Lamego et al. |
| 8,911,377 B2 | 12/2014 | Al-Ali |
| 8,912,909 B2 | 12/2014 | Al-Ali |
| 8,920,317 B2 | 12/2014 | Al-Ali et al. |
| 8,921,699 B2 | 12/2014 | Al-Ali et al. |
| 8,922,382 B2 | 12/2014 | Al-Ali et al. |
| 8,929,964 B2 | 1/2015 | Al-Ali et al. |
| 8,942,777 B2 | 1/2015 | Diab et al. |
| 8,948,834 B2 | 2/2015 | Diab et al. |
| 8,948,835 B2 | 2/2015 | Diab |
| 8,965,471 B2 | 2/2015 | Lamego |
| 8,983,564 B2 | 3/2015 | Al-Ali |
| 8,989,831 B2 | 3/2015 | Al-Ali et al. |
| 8,996,085 B2 | 3/2015 | Kiani et al. |
| 8,998,809 B2 | 4/2015 | Kiani |
| 9,028,429 B2 | 5/2015 | Telfort et al. |
| 9,037,207 B2 | 5/2015 | Al-Ali et al. |
| 9,060,721 B2 | 6/2015 | Reichgott et al. |
| 9,066,666 B2 | 6/2015 | Kiani |
| 9,066,680 B1 | 6/2015 | Al-Ali et al. |
| 9,072,474 B2 | 7/2015 | Al-Ali et al. |
| 9,078,560 B2 | 7/2015 | Schurman et al. |
| 9,084,569 B2 | 7/2015 | Weber et al. |
| 9,095,316 B2 | 8/2015 | Welch et al. |
| 9,106,038 B2 | 8/2015 | Telfort et al. |
| 9,107,625 B2 | 8/2015 | Telfort et al. |
| 9,107,626 B2 | 8/2015 | Al-Ali et al. |
| 9,113,831 B2 | 8/2015 | Al-Ali |
| 9,113,832 B2 | 8/2015 | Al-Ali |
| 9,119,595 B2 | 9/2015 | Lamego |
| 9,131,881 B2 | 9/2015 | Diab et al. |
| 9,131,882 B2 | 9/2015 | Al-Ali et al. |
| 9,131,883 B2 | 9/2015 | Al-Ali |
| 9,131,917 B2 | 9/2015 | Telfort et al. |
| 9,138,180 B1 | 9/2015 | Coverston et al. |
| 9,138,182 B2 | 9/2015 | Al-Ali et al. |
| 9,138,192 B2 | 9/2015 | Weber et al. |
| 9,142,117 B2 | 9/2015 | Muhsin et al. |
| 9,153,112 B1 | 10/2015 | Kiani et al. |
| 9,153,121 B2 | 10/2015 | Kiani et al. |
| 9,161,696 B2 | 10/2015 | Al-Ali et al. |
| 9,161,713 B2 | 10/2015 | Al-Ali et al. |
| 9,167,995 B2 | 10/2015 | Lamego et al. |
| 9,176,141 B2 | 11/2015 | Al-Ali et al. |
| 9,186,102 B2 | 11/2015 | Bruinsma et al. |
| 9,192,312 B2 | 11/2015 | Al-Ali |
| 9,192,329 B2 | 11/2015 | Al-Ali |
| 9,192,351 B1 | 11/2015 | Telfort et al. |
| 9,195,385 B2 | 11/2015 | Al-Ali et al. |
| 9,211,072 B2 | 12/2015 | Kiani |
| 9,211,095 B1 | 12/2015 | Al-Ali |
| 9,218,454 B2 | 12/2015 | Kiani et al. |
| 9,226,696 B2 | 1/2016 | Kiani |
| 9,241,662 B2 | 1/2016 | Al-Ali et al. |
| 9,245,668 B1 | 1/2016 | Vo et al. |
| 9,259,185 B2 | 2/2016 | Abdul-Hafiz et al. |
| 9,267,572 B2 | 2/2016 | Barker et al. |
| 9,277,880 B2 | 3/2016 | Poeze et al. |
| 9,289,167 B2 | 3/2016 | Diab et al. |
| 9,295,421 B2 | 3/2016 | Kiani et al. |
| 9,307,928 B1 | 4/2016 | Al-Ali et al. |
| 9,323,894 B2 | 4/2016 | Kiani |
| D755,392 S | 5/2016 | Hwang et al. |
| 9,326,712 B1 | 5/2016 | Kiani |
| 9,333,316 B2 | 5/2016 | Kiani |
| 9,339,220 B2 | 5/2016 | Lamego et al. |
| 9,341,565 B2 | 5/2016 | Lamego et al. |
| 9,351,673 B2 | 5/2016 | Diab et al. |
| 9,351,675 B2 | 5/2016 | Al-Ali et al. |
| 9,364,181 B2 | 6/2016 | Kiani et al. |
| 9,368,671 B2 | 6/2016 | Wojtczuk et al. |
| 9,370,325 B2 | 6/2016 | Al-Ali et al. |
| 9,370,326 B2 | 6/2016 | McHale et al. |
| 9,370,335 B2 | 6/2016 | Al-ali et al. |
| 9,375,185 B2 | 6/2016 | Ali et al. |
| 9,386,953 B2 | 7/2016 | Al-Ali |
| 9,386,961 B2 | 7/2016 | Al-Ali et al. |
| 9,392,945 B2 | 7/2016 | Al-Ali et al. |
| 9,397,448 B2 | 7/2016 | Al-Ali et al. |
| 9,408,542 B1 | 8/2016 | Kinast et al. |
| 9,436,645 B2 | 9/2016 | Al-Ali et al. |
| 9,445,759 B1 | 9/2016 | Lamego et al. |
| 9,466,919 B2 | 10/2016 | Kiani et al. |
| 9,474,474 B2 | 10/2016 | Lamego et al. |
| 9,480,422 B2 | 11/2016 | Al-Ali |
| 9,480,435 B2 | 11/2016 | Olsen |
| 9,492,110 B2 | 11/2016 | Al-Ali et al. |
| 9,510,779 B2 | 12/2016 | Poeze et al. |
| 9,517,024 B2 | 12/2016 | Kiani et al. |
| 9,532,722 B2 | 1/2017 | Lamego et al. |
| 9,538,949 B2 | 1/2017 | Al-Ali et al. |
| 9,538,980 B2 | 1/2017 | Telfort et al. |
| 9,549,696 B2 | 1/2017 | Lamego et al. |
| 9,554,737 B2 | 1/2017 | Schurman et al. |
| 9,560,996 B2 | 2/2017 | Kiani |
| 9,560,998 B2 | 2/2017 | Al-Ali et al. |
| 9,566,019 B2 | 2/2017 | Al-Ali et al. |
| 9,579,039 B2 | 2/2017 | Jansen et al. |
| 9,591,975 B2 | 3/2017 | Dalvi et al. |
| 9,622,692 B2 | 4/2017 | Lamego et al. |
| 9,622,693 B2 | 4/2017 | Diab |
| D788,312 S | 5/2017 | Al-Ali et al. |
| 9,636,055 B2 | 5/2017 | Al-Ali et al. |
| 9,636,056 B2 | 5/2017 | Al-Ali |
| 9,649,054 B2 | 5/2017 | Lamego et al. |
| 9,662,052 B2 | 5/2017 | Al-Ali et al. |
| 9,668,679 B2 | 6/2017 | Schurman et al. |
| 9,668,680 B2 | 6/2017 | Bruinsma et al. |
| 9,668,703 B2 | 6/2017 | Al-Ali |
| 9,675,286 B2 | 6/2017 | Diab |
| 9,687,160 B2 | 6/2017 | Kiani |
| 9,693,719 B2 | 7/2017 | Al-Ali et al. |
| 9,693,737 B2 | 7/2017 | Al-Ali |
| 9,697,928 B2 | 7/2017 | Al-Ali et al. |
| 9,717,425 B2 | 8/2017 | Kiani et al. |
| 9,717,458 B2 | 8/2017 | Lamego et al. |
| 9,724,016 B1 | 8/2017 | Al-Ali et al. |
| 9,724,024 B2 | 8/2017 | Al-Ali |
| 9,724,025 B2 | 8/2017 | Kiani et al. |
| 9,730,640 B2 | 8/2017 | Diab et al. |
| 9,743,887 B2 | 8/2017 | Al-Ali et al. |
| 9,749,232 B2 | 8/2017 | Sampath et al. |
| 9,750,442 B2 | 9/2017 | Olsen |
| 9,750,443 B2 | 9/2017 | Smith et al. |
| 9,750,461 B1 | 9/2017 | Telfort |
| 9,775,545 B2 | 10/2017 | Al-Ali et al. |
| 9,775,546 B2 | 10/2017 | Diab et al. |
| 9,775,570 B2 | 10/2017 | Al-Ali |
| 9,778,079 B1 | 10/2017 | Al-Ali et al. |
| 9,782,077 B2 | 10/2017 | Lamego et al. |
| 9,782,110 B2 | 10/2017 | Kiani |
| 9,787,568 B2 | 10/2017 | Lamego et al. |
| 9,788,735 B2 | 10/2017 | Al-Ali |
| 9,788,768 B2 | 10/2017 | Al-Ali et al. |
| 9,795,300 B2 | 10/2017 | Al-Ali |
| 9,795,310 B2 | 10/2017 | Al-Ali |
| 9,795,358 B2 | 10/2017 | Telfort et al. |
| 9,795,739 B2 | 10/2017 | Al-Ali et al. |
| 9,801,556 B2 | 10/2017 | Kiani |

US 10,433,776 B2
Page 6

(56)         References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,801,588 B2 | 10/2017 | Weber et al. |
| 9,808,188 B1 | 11/2017 | Perea et al. |
| 9,814,418 B2 | 11/2017 | Weber et al. |
| 9,820,691 B2 | 11/2017 | Kiani |
| 9,833,152 B2 | 12/2017 | Kiani et al. |
| 9,833,180 B2 | 12/2017 | Shakespeare et al. |
| 9,839,379 B2 | 12/2017 | Al-Ali et al. |
| 9,839,381 B1 | 12/2017 | Weber et al. |
| 9,847,002 B2 | 12/2017 | Kiani et al. |
| 9,847,749 B2 | 12/2017 | Kiani et al. |
| 9,848,800 B1 | 12/2017 | Lee et al. |
| 9,848,806 B2 | 12/2017 | Al-Ali et al. |
| 9,848,807 B2 | 12/2017 | Lamego |
| 9,861,298 B2 | 1/2018 | Eckerbom et al. |
| 9,861,304 B2 | 1/2018 | Al-Ali et al. |
| 9,861,305 B1 | 1/2018 | Weber et al. |
| 9,867,578 B2 | 1/2018 | Al-Ali et al. |
| 9,872,623 B2 | 1/2018 | Al-Ali |
| 9,876,320 B2 | 1/2018 | Coverston et al. |
| 9,877,650 B2 | 1/2018 | Muhsin et al. |
| 9,877,686 B2 | 1/2018 | Al-Ali et al. |
| 9,891,079 B2 | 2/2018 | Dalvi |
| 9,895,107 B2 | 2/2018 | Al-Ali et al. |
| 9,913,617 B2 | 3/2018 | Al-Ali et al. |
| 9,924,893 B2 | 3/2018 | Schurman et al. |
| 9,924,897 B1 | 3/2018 | Abdul-Hafiz |
| 9,936,917 B2 | 4/2018 | Poeze et al. |
| 9,943,269 B2 | 4/2018 | Muhsin et al. |
| 9,949,676 B2 | 4/2018 | Al-Ali |
| 9,955,937 B2 | 5/2018 | Telfort |
| 9,965,946 B2 | 5/2018 | Al-Ali |
| 9,980,667 B2 | 5/2018 | Kiani et al. |
| D820,865 S | 6/2018 | Muhsin et al. |
| 9,986,919 B2 | 6/2018 | Lamego et al. |
| 9,986,952 B2 | 6/2018 | Dalvi et al. |
| 9,989,560 B2 | 6/2018 | Poeze et al. |
| 9,993,207 B2 | 6/2018 | Al-Ali et al. |
| 10,007,758 B2 | 6/2018 | Al-Ali et al. |
| D822,215 S | 7/2018 | Al-Ali et al. |
| D822,216 S | 7/2018 | Barker et al. |
| 10,010,276 B2 | 7/2018 | Al-Ali et al. |
| 10,032,002 B2 | 7/2018 | Kiani et al. |
| 10,039,482 B2 | 8/2018 | Al-Ali et al. |
| 10,052,037 B2 | 8/2018 | Kinast et al. |
| 10,058,275 B2 | 8/2018 | Al-Ali et al. |
| 10,064,562 B2 | 9/2018 | Al-Ali |
| 10,086,138 B1 | 10/2018 | Novak, Jr. |
| 10,092,200 B2 | 10/2018 | Al-Ali et al. |
| 10,092,249 B2 | 10/2018 | Kiani et al. |
| 10,098,550 B2 | 10/2018 | Al-Ali et al. |
| 10,098,591 B2 | 10/2018 | Al-Ali et al. |
| 10,098,610 B2 | 10/2018 | Al-Ali et al. |
| D833,624 S | 11/2018 | DeJong et al. |
| 10,123,726 B2 | 11/2018 | Al-Ali et al. |
| 10,130,289 B2 | 11/2018 | Al-Ali et al. |
| 10,130,291 B2 | 11/2018 | Schurman et al. |
| D835,282 S | 12/2018 | Barker et al. |
| D835,283 S | 12/2018 | Barker et al. |
| D835,284 S | 12/2018 | Barker et al. |
| D835,285 S | 12/2018 | Barker et al. |
| 10,149,616 B2 | 12/2018 | Al-Ali et al. |
| 10,154,815 B2 | 12/2018 | Al-Ali et al. |
| 10,159,412 B2 | 12/2018 | Lamego et al. |
| 10,188,296 B2 | 1/2019 | Al-Ali et al. |
| 10,188,331 B1 | 1/2019 | Kiani et al. |
| 10,188,348 B2 | 1/2019 | Al-Ali et al. |
| RE47,218 E | 2/2019 | Ali-Ali |
| RE47,244 E | 2/2019 | Kiani et al. |
| RE47,249 E | 2/2019 | Kiani et al. |
| 10,194,847 B2 | 2/2019 | Al-Ali |
| 10,194,848 B1 | 2/2019 | Kiani et al. |
| 10,201,298 B2 | 2/2019 | Kiani et al. |
| 10,205,272 B2 | 2/2019 | Kiani et al. |
| 10,205,291 B2 | 2/2019 | Scruggs et al. |
| 10,213,108 B2 | 2/2019 | Al-Ali |
| 10,219,706 B2 | 3/2019 | Al-Ali |
| 10,219,746 B2 | 3/2019 | McHale et al. |
| 10,226,187 B2 | 3/2019 | Al-Ali et al. |
| 10,226,576 B2 | 3/2019 | Kiani |
| 10,231,657 B2 | 3/2019 | Al-Ali et al. |
| 10,231,670 B2 | 3/2019 | Blank et al. |
| 10,231,676 B2 | 3/2019 | Al-Ali et al. |
| RE47,353 E | 4/2019 | Kiani et al. |
| 10,251,585 B2 | 4/2019 | Al-Ali et al. |
| 10,251,586 B2 | 4/2019 | Lamego |
| 10,255,994 B2 | 4/2019 | Sampath et al. |
| 10,258,265 B1 | 4/2019 | Poeze et al. |
| 10,258,266 B1 | 4/2019 | Poeze et al. |
| 2003/0218386 A1 | 11/2003 | Dalke et al. |
| 2005/0234317 A1 | 10/2005 | Kiani |
| 2006/0094943 A1 | 5/2006 | Van Slyke |
| 2006/0161054 A1 | 7/2006 | Reuss et al. |
| 2007/0073121 A1 | 3/2007 | Hoarau et al. |
| 2007/0282478 A1 | 12/2007 | Al-Ali et al. |
| 2009/0247984 A1 | 10/2009 | Lamego et al. |
| 2009/0275813 A1 | 11/2009 | Davis |
| 2009/0275844 A1 | 11/2009 | Al-Ali |
| 2010/0004518 A1 | 1/2010 | Vo et al. |
| 2010/0030040 A1 | 2/2010 | Poeze et al. |
| 2011/0001605 A1 | 1/2011 | Kiani et al. |
| 2011/0082711 A1 | 4/2011 | Poeze et al. |
| 2011/0087083 A1 | 4/2011 | Poeze et al. |
| 2011/0105854 A1 | 5/2011 | Kiani et al. |
| 2011/0125060 A1 | 5/2011 | Telfort et al. |
| 2011/0208015 A1 | 8/2011 | Welch et al. |
| 2011/0213212 A1 | 9/2011 | Al-Ali |
| 2011/0230733 A1 | 9/2011 | Al-Ali |
| 2011/0237911 A1 | 9/2011 | Lamego et al. |
| 2011/0237969 A1 | 9/2011 | Eckerbom et al. |
| 2011/0288383 A1 | 11/2011 | Diab |
| 2012/0041316 A1 | 2/2012 | Al-Ali et al. |
| 2012/0046557 A1 | 2/2012 | Kiani |
| 2012/0059267 A1 | 3/2012 | Lamego et al. |
| 2012/0088984 A1 | 4/2012 | Al-Ali et al. |
| 2012/0165629 A1 | 6/2012 | Merritt et al. |
| 2012/0179006 A1 | 7/2012 | Jansen et al. |
| 2012/0209082 A1 | 8/2012 | Al-Ali |
| 2012/0209084 A1 | 8/2012 | Olsen et al. |
| 2012/0227739 A1 | 9/2012 | Kiani |
| 2012/0283524 A1 | 11/2012 | Kiani et al. |
| 2012/0296178 A1 | 11/2012 | Lamego et al. |
| 2012/0319816 A1 | 12/2012 | Al-Ali |
| 2012/0330112 A1 | 12/2012 | Lamego et al. |
| 2013/0023775 A1 | 1/2013 | Lamego et al. |
| 2013/0041591 A1 | 2/2013 | Lamego |
| 2013/0045685 A1 | 2/2013 | Kiani |
| 2013/0046204 A1 | 2/2013 | Lamego et al. |
| 2013/0060147 A1 | 3/2013 | Welch et al. |
| 2013/0096405 A1 | 4/2013 | Garfio |
| 2013/0096936 A1 | 4/2013 | Sampath et al. |
| 2013/0190581 A1 | 7/2013 | Al-Ali et al. |
| 2013/0197328 A1 | 8/2013 | Diab et al. |
| 2013/0211214 A1 | 8/2013 | Olsen |
| 2013/0243021 A1 | 9/2013 | Siskavich |
| 2013/0253334 A1 | 9/2013 | Al-Ali et al. |
| 2013/0262730 A1 | 10/2013 | Al-Ali et al. |
| 2013/0274572 A1 | 10/2013 | Al-Ali et al. |
| 2013/0296672 A1 | 11/2013 | O'Neil et al. |
| 2013/0296713 A1 | 11/2013 | Al-Ali et al. |
| 2013/0317370 A1 | 11/2013 | Dalvi et al. |
| 2013/0324808 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331660 A1 | 12/2013 | Al-Ali et al. |
| 2013/0331670 A1 | 12/2013 | Kiani |
| 2013/0338461 A1 | 12/2013 | Lamego et al. |
| 2014/0012100 A1 | 1/2014 | Al-Ali et al. |
| 2014/0034353 A1 | 2/2014 | Al-Ali et al. |
| 2014/0051953 A1 | 2/2014 | Lamego et al. |
| 2014/0058230 A1 | 2/2014 | Abdul-Hafiz et al. |
| 2014/0066783 A1 | 3/2014 | Kiani et al. |
| 2014/0077956 A1 | 3/2014 | Sampath et al. |
| 2014/0081100 A1 | 3/2014 | Muhsin et al. |
| 2014/0081175 A1 | 3/2014 | Telfort |
| 2014/0094667 A1 | 4/2014 | Schurman et al. |
| 2014/0100434 A1 | 4/2014 | Diab et al. |

6

**US 10,433,776 B2**

Page 7

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2014/0114199 A1 | 4/2014 | Lamego et al. |
| 2014/0120564 A1 | 5/2014 | Workman et al. |
| 2014/0121482 A1 | 5/2014 | Merritt et al. |
| 2014/0121483 A1 | 5/2014 | Kiani |
| 2014/0127137 A1 | 5/2014 | Bellott et al. |
| 2014/0129702 A1 | 5/2014 | Lamego et al. |
| 2014/0135588 A1 | 5/2014 | Al-Ali et al. |
| 2014/0142401 A1 | 5/2014 | Al-Ali et al. |
| 2014/0163344 A1 | 6/2014 | Al-Ali |
| 2014/0163402 A1 | 6/2014 | Lamego et al. |
| 2014/0166076 A1 | 6/2014 | Kiani et al. |
| 2014/0171763 A1 | 6/2014 | Diab |
| 2014/0180038 A1 | 6/2014 | Kiani |
| 2014/0180154 A1 | 6/2014 | Sierra et al. |
| 2014/0180160 A1 | 6/2014 | Brown et al. |
| 2014/0187973 A1 | 7/2014 | Brown et al. |
| 2014/0194709 A1 | 7/2014 | Al-Ali et al. |
| 2014/0194711 A1 | 7/2014 | Al-Ali |
| 2014/0194766 A1 | 7/2014 | Al-Ali et al. |
| 2014/0206963 A1 | 7/2014 | Al-Ali |
| 2014/0213864 A1 | 7/2014 | Abdul-Hafiz et al. |
| 2014/0243627 A1 | 8/2014 | Diab et al. |
| 2014/0266790 A1 | 9/2014 | Al-Ali et al. |
| 2014/0275808 A1 | 9/2014 | Poeze et al. |
| 2014/0275835 A1 | 9/2014 | Lamego et al. |
| 2014/0275871 A1 | 9/2014 | Lamego et al. |
| 2014/0275872 A1 | 9/2014 | Merritt et al. |
| 2014/0275881 A1 | 9/2014 | Lamego et al. |
| 2014/0276115 A1 | 9/2014 | Dalvi et al. |
| 2014/0288400 A1 | 9/2014 | Diab et al. |
| 2014/0303520 A1 | 10/2014 | Telfort et al. |
| 2014/0316217 A1 | 10/2014 | Purdon et al. |
| 2014/0316218 A1 | 10/2014 | Purdon et al. |
| 2014/0316228 A1 | 10/2014 | Blank et al. |
| 2014/0323825 A1 | 10/2014 | Al-Ali et al. |
| 2014/0323897 A1 | 10/2014 | Brown et al. |
| 2014/0323898 A1 | 10/2014 | Purdon et al. |
| 2014/0330092 A1 | 11/2014 | Al-Ali et al. |
| 2014/0330098 A1 | 11/2014 | Merritt et al. |
| 2014/0333440 A1 | 11/2014 | Kiani |
| 2014/0336481 A1 | 11/2014 | Shakespeare et al. |
| 2014/0343436 A1 | 11/2014 | Kiani |
| 2014/0357966 A1 | 12/2014 | Al-Ali et al. |
| 2014/0371548 A1 | 12/2014 | Al-Ali et al. |
| 2014/0378784 A1 | 12/2014 | Kiani et al. |
| 2015/0005600 A1 | 1/2015 | Blank et al. |
| 2015/0011907 A1 | 1/2015 | Purdon et al. |
| 2015/0012231 A1 | 1/2015 | Poeze et al. |
| 2015/0018650 A1 | 1/2015 | Al-Ali et al. |
| 2015/0025406 A1 | 1/2015 | Al-Ali |
| 2015/0032029 A1 | 1/2015 | Al-Ali et al. |
| 2015/0038859 A1 | 2/2015 | Dalvi et al. |
| 2015/0045637 A1 | 2/2015 | Dalvi |
| 2015/0051462 A1 | 2/2015 | Olsen |
| 2015/0080754 A1 | 3/2015 | Purdon et al. |
| 2015/0087936 A1 | 3/2015 | Al-Ali et al. |
| 2015/0094546 A1 | 4/2015 | Al-Ali |
| 2015/0097701 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099950 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099951 A1 | 4/2015 | Al-Ali et al. |
| 2015/0099955 A1 | 4/2015 | Al-Ali et al. |
| 2015/0101844 A1 | 4/2015 | Al-Ali et al. |
| 2015/0106121 A1 | 4/2015 | Muhsin et al. |
| 2015/0112151 A1 | 4/2015 | Muhsin et al. |
| 2015/0116076 A1 | 4/2015 | Al-Ali et al. |
| 2015/0126830 A1 | 5/2015 | Schurman et al. |
| 2015/0133755 A1 | 5/2015 | Smith et al. |
| 2015/0141781 A1 | 5/2015 | Weber et al. |
| 2015/0165312 A1 | 6/2015 | Kiani |
| 2015/0196237 A1 | 7/2015 | Lamego |
| 2015/0196249 A1 | 7/2015 | Brown et al. |
| 2015/0201874 A1 | 7/2015 | Diab |
| 2015/0208966 A1 | 7/2015 | Al-Ali |
| 2015/0216459 A1 | 8/2015 | Al-Ali et al. |
| 2015/0230755 A1 | 8/2015 | Al-Ali et al. |
| 2015/0238722 A1 | 8/2015 | Al-Ali |
| 2015/0245773 A1 | 9/2015 | Lamego et al. |
| 2015/0245794 A1 | 9/2015 | Al-Ali |
| 2015/0257689 A1 | 9/2015 | Al-Ali et al. |
| 2015/0272514 A1 | 10/2015 | Kiani et al. |
| 2015/0351697 A1 | 12/2015 | Weber et al. |
| 2015/0351704 A1 | 12/2015 | Kiani et al. |
| 2015/0359429 A1 | 12/2015 | Al-Ali et al. |
| 2015/0366472 A1 | 12/2015 | Kiani |
| 2015/0366507 A1 | 12/2015 | Blank |
| 2015/0374298 A1 | 12/2015 | Al-Ali et al. |
| 2015/0380875 A1 | 12/2015 | Coverston et al. |
| 2016/0000362 A1 | 1/2016 | Diab et al. |
| 2016/0007930 A1 | 1/2016 | Weber et al. |
| 2016/0029932 A1 | 2/2016 | Al-Ali |
| 2016/0029933 A1 | 2/2016 | Al-Ali et al. |
| 2016/0045118 A1 | 2/2016 | Kiani |
| 2016/0051205 A1 | 2/2016 | Al-Ali et al. |
| 2016/0058338 A1 | 3/2016 | Schurman et al. |
| 2016/0058347 A1 | 3/2016 | Reichgott et al. |
| 2016/0066823 A1 | 3/2016 | Kind et al. |
| 2016/0066824 A1 | 3/2016 | Al-Ali et al. |
| 2016/0066879 A1 | 3/2016 | Telfort et al. |
| 2016/0072429 A1 | 3/2016 | Kiani et al. |
| 2016/0073967 A1 | 3/2016 | Lamego et al. |
| 2016/0081552 A1 | 3/2016 | Wojtczuk et al. |
| 2016/0095543 A1 | 4/2016 | Telfort et al. |
| 2016/0095548 A1 | 4/2016 | Al-Ali et al. |
| 2016/0103598 A1 | 4/2016 | Al-Ali et al. |
| 2016/0113527 A1 | 4/2016 | Al-Ali et al. |
| 2016/0143548 A1 | 5/2016 | Al-Ali |
| 2016/0166182 A1 | 6/2016 | Al-Ali et al. |
| 2016/0166183 A1 | 6/2016 | Poeze et al. |
| 2016/0166188 A1 | 6/2016 | Bruinsma et al. |
| 2016/0166210 A1 | 6/2016 | Al-Ali |
| 2016/0192869 A1 | 7/2016 | Kiani et al. |
| 2016/0196388 A1 | 7/2016 | Lamego |
| 2016/0197436 A1 | 7/2016 | Barker et al. |
| 2016/0213281 A1 | 7/2016 | Eckerbom et al. |
| 2016/0228043 A1 | 8/2016 | O'Neil et al. |
| 2016/0233632 A1 | 8/2016 | Scruggs et al. |
| 2016/0234944 A1 | 8/2016 | Schmidt et al. |
| 2016/0270735 A1 | 9/2016 | Diab et al. |
| 2016/0283665 A1 | 9/2016 | Sampath et al. |
| 2016/0287090 A1 | 10/2016 | Al-Ali et al. |
| 2016/0287786 A1 | 10/2016 | Kiani |
| 2016/0296169 A1 | 10/2016 | McHale et al. |
| 2016/0310052 A1 | 10/2016 | Al-Ali et al. |
| 2016/0314260 A1 | 10/2016 | Kiani |
| 2016/0324486 A1 | 11/2016 | Al-Ali et al. |
| 2016/0324488 A1 | 11/2016 | Olsen |
| 2016/0327984 A1 | 11/2016 | Al-Ali et al. |
| 2016/0328528 A1 | 11/2016 | Al-Ali et al. |
| 2016/0331332 A1 | 11/2016 | Al-Ali |
| 2016/0367173 A1 | 12/2016 | Dalvi et al. |
| 2017/0000394 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007134 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007190 A1 | 1/2017 | Al-Ali et al. |
| 2017/0007198 A1 | 1/2017 | Al-Ali et al. |
| 2017/0014083 A1 | 1/2017 | Diab et al. |
| 2017/0014084 A1 | 1/2017 | Al-Ali et al. |
| 2017/0021099 A1 | 1/2017 | Al-Ali et al. |
| 2017/0024748 A1 | 1/2017 | Haider |
| 2017/0027456 A1 | 2/2017 | Kinast et al. |
| 2017/0042488 A1 | 2/2017 | Muhsin |
| 2017/0055847 A1 | 3/2017 | Kiani et al. |
| 2017/0055851 A1 | 3/2017 | Al-Ali |
| 2017/0055882 A1 | 3/2017 | Al-Ali |
| 2017/0055887 A1 | 3/2017 | Al-Ali |
| 2017/0055896 A1 | 3/2017 | Al-Ali et al. |
| 2017/0079594 A1 | 3/2017 | Telfort et al. |
| 2017/0086723 A1 | 3/2017 | Al-Ali et al. |
| 2017/0143281 A1 | 5/2017 | Olsen |
| 2017/0147774 A1 | 5/2017 | Kiani |
| 2017/0156620 A1 | 6/2017 | Al-Ali et al. |
| 2017/0173632 A1 | 6/2017 | Al-Ali |
| 2017/0187146 A1 | 6/2017 | Kiani et al. |
| 2017/0188919 A1 | 7/2017 | Al-Ali et al. |

7

**US 10,433,776 B2**

Page 8

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2017/0196464 A1 | 7/2017 | Jansen et al. |
| 2017/0196470 A1 | 7/2017 | Lamego et al. |
| 2017/0202490 A1 | 7/2017 | Al-Ali et al. |
| 2017/0224262 A1 | 8/2017 | Al-Ali |
| 2017/0228516 A1 | 8/2017 | Sampath et al. |
| 2017/0245790 A1 | 8/2017 | Al-Ali et al. |
| 2017/0251974 A1 | 9/2017 | Shreim et al. |
| 2017/0251975 A1 | 9/2017 | Shreim et al. |
| 2017/0258403 A1 | 9/2017 | Abdul-Hafiz et al. |
| 2017/0311851 A1 | 11/2017 | Schurman et al. |
| 2017/0311891 A1 | 11/2017 | Kiani et al. |
| 2017/0325728 A1 | 11/2017 | Al-Ali et al. |
| 2017/0332976 A1 | 11/2017 | Al-Ali et al. |
| 2017/0340293 A1 | 11/2017 | Al-Ali et al. |
| 2017/0360310 A1 | 12/2017 | Kiani et al. |
| 2017/0367632 A1 | 12/2017 | Al-Ali et al. |
| 2018/0008146 A1 | 1/2018 | Al-Ali et al. |
| 2018/0013562 A1 | 1/2018 | Haider et al. |
| 2018/0014752 A1 | 1/2018 | Al-Ali et al. |
| 2018/0028124 A1 | 2/2018 | Al-Ali et al. |
| 2018/0055385 A1 | 3/2018 | Al-Ali |
| 2018/0055390 A1 | 3/2018 | Kiani et al. |
| 2018/0055430 A1 | 3/2018 | Diab et al. |
| 2018/0064381 A1 | 3/2018 | Shakespeare et al. |
| 2018/0069776 A1 | 3/2018 | Lamego et al. |
| 2018/0070867 A1 | 3/2018 | Smith et al. |
| 2018/0082767 A1 | 3/2018 | Al-Ali et al. |
| 2018/0085068 A1 | 3/2018 | Telfort |
| 2018/0087937 A1 | 3/2018 | Al-Ali et al. |
| 2018/0103874 A1 | 4/2018 | Lee et al. |
| 2018/0103905 A1 | 4/2018 | Kiani |
| 2018/0110478 A1 | 4/2018 | Al-Ali |
| 2018/0116575 A1 | 5/2018 | Perea et al. |
| 2018/0125368 A1 | 5/2018 | Lamego et al. |
| 2018/0125430 A1 | 5/2018 | Al-Ali et al. |
| 2018/0125445 A1 | 5/2018 | Telfort et al. |
| 2018/0130325 A1 | 5/2018 | Kiani et al. |
| 2018/0132769 A1 | 5/2018 | Weber et al. |
| 2018/0132770 A1 | 5/2018 | Lamego |
| 2018/0146901 A1 | 5/2018 | Al-Ali et al. |
| 2018/0146902 A1 | 5/2018 | Kiani et al. |
| 2018/0153442 A1 | 6/2018 | Eckerbom et al. |
| 2018/0153446 A1 | 6/2018 | Kiani |
| 2018/0153447 A1 | 6/2018 | Al-Ali et al. |
| 2018/0153448 A1 | 6/2018 | Weber et al. |
| 2018/0161499 A1 | 6/2018 | Al-Ali et al. |
| 2018/0168491 A1 | 6/2018 | Al-Ali et al. |
| 2018/0174679 A1 | 6/2018 | Sampath et al. |
| 2018/0174680 A1 | 6/2018 | Sampath et al. |
| 2018/0182484 A1 | 6/2018 | Sampath et al. |
| 2018/0184917 A1 | 7/2018 | Kiani |
| 2018/0192924 A1 | 7/2018 | Al-Ali |
| 2018/0192953 A1 | 7/2018 | Shreim et al. |
| 2018/0192955 A1 | 7/2018 | Al-Ali et al. |
| 2018/0199871 A1 | 7/2018 | Pauley et al. |
| 2018/0206795 A1 | 7/2018 | Al-Ali |
| 2018/0206815 A1 | 7/2018 | Telfort |
| 2018/0213583 A1 | 7/2018 | Al-Ali |
| 2018/0214031 A1 | 8/2018 | Kiani et al. |
| 2018/0214090 A1 | 8/2018 | Al-Ali et al. |
| 2018/0218792 A1 | 8/2018 | Muhsin et al. |
| 2018/0225960 A1 | 8/2018 | Al-Ali et al. |
| 2018/0238718 A1 | 8/2018 | Dalvi |
| 2018/0242853 A1 | 8/2018 | Al-Ali |
| 2018/0242921 A1 | 8/2018 | Muhsin et al. |
| 2018/0242923 A1 | 8/2018 | Al-Ali et al. |
| 2018/0242924 A1 | 8/2018 | Barker et al. |
| 2018/0242926 A1 | 8/2018 | Muhsin et al. |
| 2018/0247353 A1 | 8/2018 | Al-Ali et al. |
| 2018/0247712 A1 | 8/2018 | Muhsin et al. |
| 2018/0249933 A1 | 9/2018 | Schurman et al. |
| 2018/0253947 A1 | 9/2018 | Muhsin et al. |
| 2018/0256087 A1 | 9/2018 | Al-Ali et al. |
| 2018/0256113 A1 | 9/2018 | Weber et al. |
| 2018/0285094 A1 | 10/2018 | Housel et al. |
| 2018/0289325 A1 | 10/2018 | Poeze et al. |
| 2018/0289337 A1 | 10/2018 | Al-Ali et al. |
| 2018/0296161 A1 | 10/2018 | Shreim et al. |
| 2018/0300919 A1 | 10/2018 | Muhsin et al. |
| 2018/0310822 A1 | 11/2018 | Indorf et al. |
| 2018/0310823 A1 | 11/2018 | Al-Ali et al. |
| 2018/0317826 A1 | 11/2018 | Muhsin |
| 2018/0317841 A1 | 11/2018 | Novak, Jr. |
| 2018/0333055 A1 | 11/2018 | Lamego et al. |
| 2018/0333087 A1 | 11/2018 | Al-Ali |
| 2019/0000317 A1 | 1/2019 | Muhsin et al. |
| 2019/0000362 A1 | 1/2019 | Kiani et al. |
| 2019/0015023 A1 | 1/2019 | Monfre |
| 2019/0021638 A1 | 1/2019 | Al-Ali et al. |
| 2019/0029574 A1 | 1/2019 | Schurman et al. |
| 2019/0029578 A1 | 1/2019 | Al-Ali et al. |
| 2019/0058280 A1 | 2/2019 | Al-Ali et al. |
| 2019/0058281 A1 | 2/2019 | Al-Ali et al. |
| 2019/0069813 A1 | 3/2019 | Al-Ali |
| 2019/0076028 A1 | 3/2019 | Al-Ali et al. |
| 2019/0082979 A1 | 3/2019 | Al-Ali et al. |
| 2019/0090748 A1 | 3/2019 | Al-Ali |
| 2019/0090760 A1 | 3/2019 | Kinast et al. |
| 2019/0090764 A1 | 3/2019 | Al-Ali |
| 2019/0117070 A1 | 4/2019 | Muhsin et al. |
| 2019/0117139 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117140 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117141 A1 | 4/2019 | Al-Ali et al. |
| 2019/0117930 A1 | 4/2019 | Al-Ali |

OTHER PUBLICATIONS

US 9,579,050 B2, 02/2017, Al-Ali (withdrawn)
International Search Report dated Jul. 11, 2002, International Application No. PCT/US02/20675 filed Jun. 28, 2002.
U.S. Appl. No. 15/820,082, Low Power Pulse Oximeter, filed Nov. 21, 2017.
U.S. Appl. No. 16/174,130, Low Power Pulse Oximeter, filed Oct. 29, 2018.
Nov. 8, 2018 Complaint for (1) Breach of Contract (2) Trade Secret Misappropriation (3) Breach of Fiduciary Duty and (4) Patent Infringement and Demand for Jury Trial, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *True Wearables, Inc. and Marcelo Lamego*, Case No. 8:18-cv-2001.
May 15, 2019 Defendants True Wearables, Inc.'s and Marcelo Lamego's Preliminary Invalidity Contentions, *Masimo Corporation and Cercacor Laboratories, Inc.* v. *True Wearables, Inc. and Marcelo Lamego*, Case No. 8:18-cv-2001-JVS-JDE.
New, William, Jr., "Continuous Non-Invasive Measurement of Arterial Oxygen", Journal of Japan Society for Clinical Anesthesia, vol. 6, No. 6, pp. 460-468 (Dec. 15, 1986).

* cited by examiner



FIG. 1 (Prior Art)



FIG. 2 (Prior Art)

Case: 22-1891    Document: 22    Page: 65    Filed: 02/15/2023



FIG. 3



FIG. 4



FIG. 5



FIG. 6

Appx66



FIG. 7A

FIG. 7B



FIG. 8



E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
PARTICULAR TIME PERIOD
T = TIMEOUT

FIG. 9



FIG. 10



FIG. 11

E = EVENT
Q = LOW QUALITY
P = ABOVE POWER TARGET FOR A
PARTICULAR TIME PERIOD

19

**1**

# LOW POWER PULSE OXIMETER

## REFERENCE TO RELATED APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are incorporated by reference under 37 CFR 1.57 and made a part of this specification.

## BACKGROUND OF THE INVENTION

Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of a person's arterial blood, an indicator of their oxygen supply. Oxygen saturation monitoring is crucial in critical care and surgical applications, where an insufficient blood supply can quickly lead to injury or death. FIG. **1** illustrates a conventional pulse oximetry system **100**, which has a sensor **110** and a monitor **150**. The sensor **110**, which can be attached to an adult's finger or an infant's foot, has both red and infrared LEDs **112** and a photodiode detector **114**. For a finger, the sensor is configured so that the LEDs **112** project light through the fingernail and into the blood vessels and capillaries underneath. The photodiode **114** is positioned at the finger tip opposite the fingernail so as to detect the LED emitted light as it emerges from the finger tissues. A pulse oximetry sensor is described in U.S. Pat. No. 6,088,607 entitled "Low Noise Optical Probe," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. **1**, the monitor **150** has LED drivers **152**, a signal conditioning and digitization front-end **154**, a signal processor **156**, a display driver **158** and a display **159**. The LED drivers **152** alternately activate the red and IR LEDs **112** and the front-end **154** conditions and digitizes the resulting current generated by the photodiode **114**, which is proportional to the intensity of the detected light. The signal processor **156** inputs the conditioned photodiode signal and determines oxygen saturation based on the differential absorption by arterial blood of the two wavelengths emitted by the LEDs **112**. Specifically, a ratio of detected red and infrared intensities is calculated by the signal processor **156**, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The display driver **158** and associated display **159** indicate a patient's oxygen saturation, heart rate and plethysmographic waveform.

## SUMMARY OF THE INVENTION

Increasingly, pulse oximeters are being utilized in portable, battery-operated applications. For example, a pulse oximeter may be attached to a patient during emergency transport and remain with the patient as they are moved between hospital wards. Further, pulse oximeters are often implemented as plug-in modules for multiparameter patient monitors having a restricted power budget. These applications and others create an increasing demand for lower power and higher performance pulse oximeters. A conventional approach for reducing power consumption in portable electronics, typically utilized by devices such as calculators and notebook computers, is to have a "sleep mode" where the circuitry is powered-down when the devices are idle. FIG. **2** illustrates a sleep-mode pulse oximeter **200** utilizing conventional sleep-mode power reduction. The pulse oximeter **200** has a pulse oximeter processor **210** and a power control **220**. The power control **220** monitors the

**2**

pulse oximeter output parameters **212**, such as oxygen saturation and pulse rate, and controls the processor power **214** according to measured activity. For example, if there is no significant change in the oxygen saturation value over a certain time period, the power control **220** will power down the processor **210**, except perhaps for a portion of memory. The power control **220** may have a timer that triggers the processor **210** to periodically sample the oxygen saturation value, and the power control **220** determines if any changes in this parameter are occurring. If not, the power control **220** will leave the processor **210** in sleep mode.

There are a number of disadvantages to applying consumer electronic sleep mode techniques to pulse oximetry. By definition, the pulse oximeter is not functioning during sleep mode. Unlike consumer electronics, pulse oximetry cannot afford to miss events, such as patient oxygen desaturation. Further, there is a trade-off between shorter but more frequent sleep periods to avoid a missed event and the increased processing overhead to power-up after each sleep period. Also, sleep mode techniques rely only on the output parameters to determine whether the pulse oximeter should be active or in sleep mode. Finally, the caregiver is given no indication of when the pulse oximeter outputs were last updated.

One aspect of a low power pulse oximeter is a sensor interface adapted to drive a pulse oximetry sensor and receive a corresponding input signal. A processor derives a physiological measurement corresponding to the input signal, and a display driver communicates the measurement to a display. A controller generates a sampling control output to at least one of said sensor interface and said processor so as to reduce the average power consumption of the pulse oximeter consistent with a predetermined power target.

In one embodiment, a calculator derives a signal status output responsive to the input signal. The signal status output is communicated to the controller to override the sampling control output. The signal status output may indicate the occurrence of a low signal quality or the occurrence of a physiological event. In another embodiment, the sensor interface has an emitter driver adapted to provide a current output to an emitter portion of the sensor. Here, the sampling control output determines a duty cycle of the current output. In a particular embodiment, the duty cycle may be in the range of about 3.125% to about 25%.

In another embodiment, the sensor interface has a front-end adapted to receive the input signal from a detector portion of the sensor and to provide a corresponding digitized signal. Here, the sampling control output determines a powered-down period of the front-end. A confidence indicator responsive to a duration of the powered-down period may be provided and displayed.

In yet another embodiment, the pulse oximeter comprises a plurality of data blocks responsive to the input signal, wherein the sampling control output determines a time shift of successive ones of the data blocks. The time shift may vary in the range of about 1.2 seconds to about 4.8 seconds.

An aspect of a low power pulse oximetry method comprises the steps of setting a power target and receiving an input signal from a pulse oximetry sensor. Further steps include calculating signal status related to the input signal, calculating power status related to the power target, and sampling based upon the result of the calculating signal status and the calculating power status steps.

In one embodiment, the calculating signal status step comprises the substeps of receiving a signal statistic related to the input signal, receiving a physiological measurement related to the input signal, determining a low signal quality

US 10,433,776 B2

3

condition from the signal statistic, determining an event occurrence from the physiological measurement, and indicating an override based upon the low signal quality condition or the event occurrence. The calculating power status step may comprise the substeps of estimating an average power consumption for at least a portion of the pulse oximeter, and indicating an above power target condition when the average power consumption is above the power target. The sampling step may comprise the substep of increasing sampling as the result of the override. The sampling step may also comprise the substep of decreasing sampling as the result of the above power target condition, except during the override.

Another aspect of a low power pulse oximetry method comprises the steps of detecting an override related to a measure of signal quality or a physiological measurement event, increasing the pulse oximeter power to a higher power level when the override exists, and reducing the pulse oximeter power to a lower power level when the override does not exist. The method may comprise the further steps of predetermining a target power level for a pulse oximeter and cycling between the lower power level and the higher power level so that an average pulse oximeter power is consistent with the target power level.

In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor. In another embodiment, the reducing step comprises the substep of powering-down a detector front-end. A further step may comprise displaying a confidence indicator related to the duration of the powering-down substep. In yet another embodiment, the reducing step comprises the substep of increasing the time-shift of post-processor data blocks.

Another aspect of a low power pulse oximeter comprises a sensor interface adapted to receive an input signal from a sensor, a signal processor configured to communicate with the sensor interface and to generate an internal parameter responsive to the input signal, and a sampling controller responsive to the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The internal parameter may be indicative of the quality of the input signal. The output parameter may be indicative of oxygen saturation.

In another embodiment, the sampling controller is responsive to a predetermined power target in combination with the internal parameter so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The signal processor may be configured to generate an output parameter and the sampling controller may be responsive to a combination of the internal and output parameters and the power target so as to generate a sampling control to alter the power consumption of at least one of the sensor interface and the signal processor. The sensor interface may comprise an emitter driver and the sampling control may modify a duty cycle of the emitter driver. The sensor interface may comprise a detector front-end and the sampling control may intermittently power-down the detector front-end. The processor may generate a plurality of data blocks corresponding to the input signal, where each of the data blocks have a time shift

4

from a preceding one of the data blocks, and where the sampling control may determine the amount of the time shift.

A further aspect of a low power pulse oximeter comprises an interface means for communicating with a sensor, a processor means for generating an internal parameter and an output parameter, and a controller means for selectively reducing the power consumption of at least one of the interface means and the processor means based upon the parameters. In one embodiment, the interface means comprises a driver means for determining the duty cycle of emitter current to the sensor, the driver means being responsive to the controller means. In another embodiment, the interface means comprises a detector front-end means for receiving an input signal from the sensor, the power for the detector front-end means being responsive to the controller means. In yet another embodiment, the processor means comprises a post-processor means for determining a time shift between data blocks, the post-processor means being responsive to the controller means. In a further embodiment, the controller means comprises a signal status calculator means for generating an indication of a low signal quality or a physiological event based upon at least one of an internal signal statistic and the output physiological measurement, and a control engine means in communications with the signal status calculator means for generating a sampling control responsive to the indication. In yet a further embodiment, the controller means comprises a power status calculator means for generating a power indication of power consumption relative to a power target, and a control engine means in communications with the power status calculator means for generating a sampling control responsive to the power indication.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a conventional pulse oximeter sensor and monitor;

FIG. 2 is a block diagram of a pulse oximeter having a conventional sleep mode;

FIG. 3 is a top-level block diagram of a low power pulse oximeter;

FIG. 4 is a detailed block diagram of a low power pulse oximeter illustrating a sensor interface, a signal processor and a sampling controller;

FIG. 5 is a graph of emitter drive current versus time illustrating variable duty cycle processing;

FIG. 6 is a graph of oxygen saturation versus time illustrating intermittent sample processing;

FIGS. 7A-B are graphs of data buffer content versus time illustrating variable data block overlap processing;

FIG. 8 is a graph of power versus time illustrating power dissipation conformance to an average power target using variable duty cycle and intermittent sample processing;

FIG. 9 is a state diagram of the sampling controller for variable duty cycle and intermittent sample processing;

FIG. 10 is a graph of power versus time illustrating power dissipation using variable data block overlap processing; and

FIG. 11 is a state diagram of the sampling controller for variable data block overlap processing.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 3 illustrates one embodiment of a low power pulse oximeter. The pulse oximeter 300 has a sensor interface 320, a signal processor 340, a sampling controller 360 and a

21

US 10,433,776 B2

5

display driver 380. The pulse oximeter 300 also has a sensor port 302 and a display port 304. The sensor port 302 connects to an external sensor, e.g. sensor 110 (FIG. 1). The sensor interface 320 drives the sensor port 302, receives a corresponding input signal from the sensor port 302, and provides a conditioned and digitized sensor signal 322 accordingly. Physiological measurements 342 are input to a display driver 380 that outputs to the display port 304. The display port 304 connects to a display device, such as a CRT or LCD, which a healthcare provider typically uses for monitoring a patient's oxygen saturation, pulse rate and plethysmograph.

As shown in FIG. 3, the signal processor 340 derives the physiological measurements 342, including oxygen saturation, pulse rate and plethysmograph, from the input signal 322. The signal processor 340 also derives signal statistics 344, such as signal strength, noise and motion artifact. The physiological measurements 342 and signal statistics 344 are input to the sampling controller 360, which outputs sampling controls 362, 364, 366 accordingly. The sampling controls 362, 364, 366 regulate pulse oximeter power dissipation by causing the sensor interface 320 to vary the sampling characteristics of the sensor port 302 and by causing the signal processor 340 to vary its sample processing characteristics, as described in further detail with respect to FIG. 4, below. Advantageously, power dissipation is responsive not only to output parameters, such as the physiological measurements 342, but also to internal parameters, such as the signal statistics 344.

FIG. 4 illustrates further detail regarding the sensor interface 320, the signal processor 340 and the sampling controller 360. The sensor interface 320 has emitter drivers 480 and a detector front-end 490. The emitter drivers 480 are responsive to a sampling control 362, described below, and provide emitter drive outputs 482. The emitter drive outputs 482 activate the LEDs of a sensor attached to the sensor port 302 (FIG. 3). The detector front-end 490 receives an input signal 492 from a sensor attached to the sensor port 302 (FIG. 3) and provides a corresponding conditioned and digitized input signal 322 to the signal processor 340. A sampling control 364 controls power to the detector front-end 490, as described below.

As shown in FIG. 4, the signal processor 340 has a pre-processor 410 and a post processor 430. The pre-processor 410 demodulates red and IR signals from the digitized signal 322, performs filtering, and reduces the sample rate. The pre-processor provides a demodulated output, having a red channel 412 and an IR channel 414, which is input into the post-processor 430. The post processor 430 calculates the physiological measurements 342 and the signal statistics 344, which are output to a signal status calculator 450. The physiological measurements 342 are also output to a display driver 380 (FIG. 3) as described above. A pulse oximetry signal processor is described in U.S. Pat. No. 6,081,735 entitled "Signal Processing Apparatus," which is assigned to the assignee of the present invention and incorporated by reference herein.

Also shown in FIG. 4, the sampling controller 360 has a control engine 440, a signal status calculator 450 and a power status calculator 460. The control engine 440 outputs sampling controls 362, 364, 366 to reduce the power consumption of the pulse oximeter 300. In one embodiment, the control engine 440 advantageously utilizes multiple sampling mechanisms to alter power consumption. One sampling mechanism is an emitter duty cycle control 362 that is an input to the emitter drivers 480. The emitter duty cycle control 362 determines the duty cycle of the current supplied

6

by the emitter drive outputs 482 to both red and IR sensor emitters, as described with respect to FIG. 5, below. Another sampling mechanism is a front-end control 364 that intermittently removes power to the detector front-end 490, as described with respected to FIG. 6, below. Yet another sampling mechanism is a data block overlap control 366 that varies the number of data blocks processed by the post processor 430. These various sampling mechanisms provide the flexibility to reduce power without sacrificing performance during, for example, high noise conditions or oxygen desaturation events, as described below in further detail.

The sampling controls 362, 364, 366 modify power consumption by, in effect, increasing or decreasing the number of input samples received and processed. Sampling, including acquiring input signal samples and subsequent sample processing, can be reduced during high signal quality periods and increased during low signal quality periods or when critical measurements are necessary. In this manner, the control engine 440 regulates power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption, as described with respect to FIGS. 8 and 10, below. The current state of the control engine is provided as a control state output 442 to the power status calculator 460. The control engine 440 utilizes the power status output 462 and the signal status output 452 to determine its next control state, as described with respect to FIGS. 9 and 11, below.

Further shown in FIG. 4, the signal status calculator 450 receives physiological measurements and signal statistics from the post processor 430 and determines the occurrence of an event or a low signal quality condition. An event determination is based upon the physiological measurements output 342 and may be any physiological-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as an oxygen desaturation, a fast or irregular pulse rate or an unusual plethysmograph waveform to name a few. A low signal quality condition is based upon the signal statistics output 344 and may be any signal-related indication that justifies the processing of more sensor samples and an associated higher power consumption level, such as a low signal level, a high noise level or motion artifact to name a few. The signal status calculator 450 provides the signal status output 452 that is input to the control engine 440.

In addition, FIG. 4 shows that the power status calculator 460 has a control state input 442 and a power status output 462. The control state input 442 indicates the current state of the control engine 440. The power status calculator 460 utilizes an internal time base, such as a counter, timer or real-time clock, in conjunction with the control engine state to estimate the average power consumption of at least a portion of the pulse oximeter 300. The power status calculator 460 also stores a predetermined power target and compares its power consumption estimate to this target. The power status calculator 460 generates the power status output 462 as an indication that the current average power estimate is above or below the power target and provides this output 462 to the control engine 440.

FIG. 5 illustrates emitter driver output current versus time. The graph 500 depicts the combination of a red LED drive current 510 and an IR drive current 560. The solid line graph 502 illustrates drive currents having a high duty cycle. The dashed line graph 504 illustrates drive currents having a low duty cycle. In a typical pulse oximeter, the duty cycle of the drive signals is constant and provides sufficient dark bands 508 to demodulate the detector response into red and IR channels. The emitter drivers 480 (FIG. 4), however,

22

US 10,433,776 B2

7

require a significant portion of the overall pulse oximeter power budget. Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity. As an example, a low power pulse oximeter implementation nominally consuming 500 mw may be able to reduce power consumption on the order of 70 mw by such drive current duty cycle reductions. In a preferred embodiment, the drive current duty cycle is varied within a range from about 25% to about 3.125%. In a more preferred embodiment, the drive current duty cycle is intermittently reduced from about 25% to about 3.125%. In conjunction with an intermittently reduced duty cycle or as an independent sampling mechanism, there may be a "data off" time period longer than one drive current cycle where the emitter drivers **480** (FIG. **4**) are turned off. The detector front-end **490** (FIG. **4**) may also be powered down during such a data off period, as described with respect to FIGS. **8** and **9**, below.

FIG. **6** is a graph **600** of a pre-processor output signal **610** over time depicting the result of intermittent sampling at the detector front-end **490** (FIG. **4**). The output signal **610** is a red channel **412** (FIG. **4**) or an IR channel **414** (FIG. **4**) output from the pre-processor **410** (FIG. **4**), which is input to the post processor **430** (FIG. **4**), as described above. The output signal **610** has "on" periods **612**, during which time the detector front-end **490** (FIG. **4**) is powered-up and "off" periods **614**, during which time the detector front-end **490** (FIG. **4**) is powered-down. The location and duration of the on periods **612** and off periods **614** are determined by the front-end control **364** (FIG. **4**).

Also shown in FIG. **6** is a corresponding timeline **601** of overlapping data blocks **700**, which are "snap-shots" of the pre-processor output signal **610** over specific time intervals. Specifically, the post processor **430** (FIG. **4**) processes a sliding window of samples of the pre-processor output signal **610**, as described with respect to FIGS. **7**A-B, below. Advantageously, the post processor **430** (FIG. **4**) continues to function during off portions **614**, marking as invalid those data blocks **640** that incorporate off portions **614**. A freshness counter can be used to measure the time period **660** between valid data blocks **630**, which can be displayed on a pulse oximeter monitor as an indication of confidence in the current measurements.

FIGS. **7**A-B illustrate data blocks **700**, which are processed by the post processor **430** (FIG. **4**). Each data block **700** has n samples **702** of the pre-processor output and corresponds to a time interval **704** of $n/f_s$, where $f_s$ is the sample frequency. For example, in one embodiment n=600 and $f_s$=62.5 Hz. Hence, each data block time interval **704** is nominally 9.6 sec.

As shown in FIG. **7**A, each data block **700** also has a relative time shift **706** from the preceding data block, where is an integral number of sample periods. That is, $=m/f_s$, where m is an integer representing the number of samples dropped from the preceding data block and added to the succeeding data block. In the embodiment described above, m=75 and =1.2 sec, nominally. The corresponding overlap **708** of two adjacent data blocks **710**, **720** is (n−m)/$f_s$. In the embodiment described above, the overlap **708** is nominally 9.6 sec−1.2 sec=8.4 sec. The greater the overlap **708**, i.e. the smaller the time shift **706**, the more data blocks there are to process in the post-processor **430** (FIG. **4**), with a corresponding greater power consumption. The overlap **708** between successive data blocks **710**, **720** may vary from n−1 samples to no samples, i.e. no overlap. Also, as shown in FIG. **7**B, there may be a sample gap **756** or negative overlap, i.e. samples between data blocks that are not processed by

8

the post-processor, allowing further post-processor power savings. Sample gaps **756** may correspond to detector front-end off periods **614** (FIG. **6**).

FIG. **8** illustrates an exemplar power consumption versus time profile **800** for the pulse oximeter **300** (FIG. **3**) during various control engine states. In one embodiment, the control engine **440** (FIG. **4**) has three states related to the sampling control outputs **362**, **364** that affect pulse oximeter power consumption accordingly. One of ordinary skill in the art will recognize that the control engine **440** (FIG. **4**) may have greater or fewer states and associated power consumption levels. The profile **800** shows the three control engine states **810** and the associated power consumption levels **820**. These three states are high duty cycle **812**, low duty cycle **814** and data off **818**.

In the high duty cycle state **812**, the control engine **440** (FIG. **4**) causes the emitter drivers **480** (FIG. **4**) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red **510** and IR **560** drive currents. In the low duty cycle state **814**, the control engine **440** (FIG. **4**) causes the emitter drivers **480** (FIG. **4**) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red **510** and IR **560** drive currents. In the data off state **818**, the control engine **440** (FIG. **4**) turns off the emitter drivers **480** (FIG. **4**) and powers down the detector front-end **490** (FIG. **4**). Also shown is a predetermined target power consumption level **830**. The control engine **440** (FIG. **4**) alters the sensor sampling of the pulse oximeter **300** (FIG. **3**) so that the average power consumption matches the target level **830**, as indicated by the power status output **462** (FIG. **4**), except when overridden by the signal status output **452** (FIG. **4**).

As shown in FIG. **8**, power consumption changes according to the control states **810** during each of the time intervals **850**. In a first time interval **851**, the pulse oximeter is in a low duty cycle state **814** and transitions to a high duty cycle state **812** during a second time interval **852** due to an event or low quality signal. During a third time interval **853**, the pulse oximeter is able to enter the data off state **818**, during which time no sensor samples are processed. In a forth time interval **854**, sensor samples are again taken, but at a low duty cycle **814**. During the fifth and sixth time intervals **855**, **856**, sensor samples are shut off and turned on again as the pulse oximeter **300** (FIG. **3**) alternates between the data off state **818** and the low duty cycle state **814** so as to maintain an average power consumption at the target level **830**.

FIG. **9** illustrates a state diagram **900** for one embodiment of the control engine **440** (FIG. **4**). In this embodiment, there are three control states, high duty cycle **910**, low duty cycle **940** and data off **970**, as described with respect to FIG. **8**, above. If the control state is data off **970**, an event triggers a data-off to high-duty-cycle transition **972**. If the control state is low duty cycle **940**, an event similarly triggers a low-duty-cycle to high-duty-cycle transition **942**. In this manner, the occurrence of an event initiates high duty sensor sampling, allowing high fidelity monitoring of the event. Similarly, if the control state is low duty cycle **940**, low signal quality triggers a low-duty cycle to high-duty-cycle transition **942**. In this manner, low signal quality initiates higher duty sensor sampling, providing, for example, a larger signal-to-noise ratio.

Also shown in FIG. **9**, if the control state is high duty cycle **910** and either an event is occurring or signal quality is low, then a null transition **918** maintains the high duty cycle state **910**. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition **948** maintains the low duty cycle state **940**, so that

23

US 10,433,776 B2

9                                              10

sampling is turned-off only when necessary to track the power target. Further, if the control state is data off **970** and no time-out has occurred, a null transition **978** maintains the data off state **970**, providing a minimum power consumption.

In addition, FIG. **9** shows that when the control state is in a high duty cycle state **910**, if neither an event nor low signal quality are occurring, then a high-duty-cycle to low-duty-cycle transition **912** occurs by default. Also, if the control state is low duty cycle **940**, if neither an event nor low signal quality are occurring and the power consumption is above the target level for longer than a particular time interval, a low-duty-cycle to data-off transition **944** occurs by default, allowing power consumption to come down to the target level. Further, if the control state is data off **970**, if no event occurs and a timeout does occur, a data-off to low-duty-cycle transition **974** occurs by default, preventing excessively long periods of no sensor sampling.

FIG. **10** illustrates an exemplar power consumption versus time profile **1000** for the post processor **430** (FIG. **4**) during various control engine states. In one embodiment, the control engine **440** (FIG. **4**) has three states related to the sampling control output **366** (FIG. **4**) that affect post processor power consumption accordingly. One of ordinary skill in the art will recognize that the control engine may have greater or fewer states and associated power consumption levels. The profile **1000** shows the three control engine states **1010** and the associated post processor power consumption levels **1020**. These three states are large overlap **1012**, medium overlap **1014** and small overlap **1018**.

As shown in FIG. **10**, in the large overlap state **1012**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively small time shift **706** (FIG. **7A**), and the post processor exhibits relatively high power consumption under these conditions, say 300 mw. In the medium overlap state **1014**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively larger time shift **706** (FIG. **7A**). For example, the data blocks may be time shifted twice as much as for the large overlap state **1012**, and, as such, the post processor performs only half as many computations and consumes half the nominal power, say 150 mw. In the small overlap state **1018**, the control engine **440** (FIG. **4**) causes the post processor to process data blocks that have a comparatively large time shift. For example, the data blocks may be time shifted twice as much as for the medium overlap state **1014**. As such, the post processor performs only a quarter as many computations and consumes a quarter of the nominal power, say 75 mw, as for the large overlap state **1012**. In one embodiment, the control engine **440** (FIG. **4**) alters the data block overlap of the post processor in conjunction with the duty cycle of the emitter drivers described with respect to FIG. **5**, above, and the front-end sampling described with respect to FIG. **6**, above, so that the power consumption of the pulse oximeter matches a target level indicated by the power status output **462** (FIG. **4**) or so that the power consumption is otherwise reduced or minimized.

In a preferred embodiment, data blocks are time shifted by either about 0.4 sec or about 1.2 sec, depending on the overlap state of the control engine **440** (FIG. **4**). In a more preferred embodiment, the data blocks are varied between about 1.2 sec and about 4.8 sec. In a most preferred embodiment, the data blocks are time shifted by either about 1.2 sec, about 2.4 sec or about 4.8 sec, depending on the overlap state of the control engine **440** (FIG. **4**). Although the post-processing of data blocks is described above with respect to only a few overlap states and a corresponding number of particular data block time shifts, there may be many overlap states and a corresponding range of data block time shifts.

Further shown in FIG. **10**, power consumption **1020** changes according to the control states **1010** during each of the time intervals **1050**. In a first time interval **1052**, the post processor is in a large overlap state **1012** and transitions to a medium overlap state **1014** during a second time interval **1054**, so as to meet a power target during a high signal quality period, for example. During a third time interval **1055**, the post processor enters a small overlap state **1018**, for example to meet a power target by further reducing power consumption. In a forth time interval **1056**, the post processor transitions back to a large overlap state **1012**, such as during an event or low signal quality conditions.

FIG. **11** illustrates a state diagram **1100** for one embodiment of the control engine **440** (FIG. **4**). These states may function in parallel with, or in combination with, the sampling states described with respect to FIG. **9**, above. In the illustrated embodiment, there are three control states, large overlap **1110**, medium overlap **1140** and small overlap **1170**, as described with respect to FIG. **10**, above. If the control state is small overlap **1170**, an event triggers a small overlap to large overlap transition **1172**. If the control state is medium overlap **1140**, an event similarly triggers a medium overlap to large-overlap transition **1142**. In this manner, the occurrence of an event initiates the processing of more data blocks, allowing more robust signal statistics and higher fidelity monitoring of the event. Similarly, if the control state is medium overlap **1140**, low signal quality triggers a medium overlap to large overlap transition **1142**. In this manner, low signal quality initiates the processing of more data blocks, providing more robust signal statistics during lower signal-to-noise ratio periods.

Also shown in FIG. **11**, if the control state is large overlap **1110** and either an event is occurring or signal quality is low, then a null transition **1118** maintains the large overlap state **1110**. If the pulse oximeter is not above the power target for more than a particular time interval, a null transition **1148** maintains the medium overlap state **1140**, so that reduced data processing occurs only when necessary to track the power target. Further, if the control state is small overlap **1170**, a null transition **1178** maintains this power saving state until the power target is reached or an event or low signal quality condition occurs.

In addition, FIG. **11** shows that when the control state is in a large overlap state **1110**, if neither an event nor low signal quality are occurring, then a large overlap to medium overlap transition **1112** occurs by default. Also, if the control state is medium overlap **1140**, if the power consumption is above the target level for longer than a particular time interval and no low signal quality condition or event is occurring, a medium overlap to small overlap transition **1174** occurs, allowing power consumption to come down to the target level. Further, if the control state is small overlap **1170**, if no event occurs but the power target has been met, a small overlap to medium overlap transition **1174** occurs.

A low power pulse oximeter embodiment is described above as having a power status calculator **460** (FIG. **4**) and an associated power target. Another embodiment of a low power pulse oximeter, however, functions without either a power status calculator or a power target, utilizing the sampling controls **362**, **364**, **366** (FIG. **3**) in response to internal parameters and/or output parameters, such as signal statistics **344** (FIG. **3**) and/or physiological measurements

24

Appx76

US 10,433,776 B2

11                                                                              12

**342** (FIG. **3**) to reduce power consumption except during, say, periods of low signal quality and physiological events.

One of ordinary skill in the art will recognize that various state diagrams are possible representing control of the emitter drivers, the detector front-end and the post-processor. Such state diagrams may have fewer or greater states with differing transitional characteristics and with differing relationships between sampling mechanisms than the particular embodiments described above. In relatively simple embodiments of the control engine **440** (FIG. **4**), only a single sampling mechanism is used, such as the sampling mechanism used to vary the duty cycle of the emitter drivers. The single sampling mechanism may be based only upon internal parameters, such as signal quality, only upon output parameters, such as those that indicate the occurrence of physiological events, or upon a combination of internal and output parameters, with or without a power target.

In relatively more complex embodiments of the control engine **440** (FIG. **4**), sampling mechanisms are used in combination. These sampling mechanisms may be based only upon internal parameters, only upon output parameters, or upon a combination of internal and output parameters, with or without a power target. In a particular embodiment, the emitter duty-cycle, front-end duty-cycle and data block overlap sampling mechanisms described above are combined. A "reduced overlap" state relating to the post-processing of data blocks is added to the diagram of FIG. **9** between the "low duty cycle" state and the "data off" state. That is, sampling is varied between a high duty cycle state, a low duty cycle state, a reduced overlap state and a data off state in response to signal quality and physiological events, with or without a power target.

The low power pulse oximeter has been disclosed in detail in connection with various embodiments. These embodiments are disclosed by way of examples only and are not to limit the scope of the claims that follow. One of ordinary skill in the art will appreciate many variations and modifications.

What is claimed is:

**1**. A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

  operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

  when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

  generating a trigger signal, wherein generating said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

  in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control

protocol, the second control protocol light source including one or more of the plurality of light sources; and

  when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

  wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

**2**. The method of claim **1**, wherein the first control protocol light source operates on the first duty cycle having an active time and an inactive time according to the first control protocol, wherein the second control protocol light source operates on the second duty cycle having an active time and an inactive time according to the second control protocol, the active time of the first duty cycle having a first duration and the active time of the second duty cycle having a second duration, wherein the first duration and the second duration are different.

**3**. The method of claim **2**, wherein the second duration is longer than the first duration.

**4**. The method of claim **1**, wherein power consumption during said operating at the second control protocol is greater than power consumption during said operating at the first control protocol.

**5**. The method of claim **1**, wherein said operating the patient monitor according to the first control protocol consumes a relatively small amount of power, and wherein said operating the patient monitor according to the second control protocol consumes a relatively large amount of power.

**6**. The method of claim **1**, wherein said operating the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state.

**7**. The method of claim **1**, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source.

**8**. The method of claim **7**, wherein the signal quality characteristics includes at least one of signal strength, a presence of noise, or a presence of motion induced noise.

**9**. The method of claim **1**, wherein the physiological event includes at least one of oxygen desaturation, an abnormal pulse rate, or an abnormal plethysmograph waveform.

**10**. The method of claim **9**, wherein the physiological event includes the abnormal pulse rate and wherein the abnormal pulse rate includes an elevated pulse rate.

**11**. A patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the patient monitor comprising:

  a plurality of light sources;

  at least one detector of an optical sensor configured to receive light after attenuation by body tissue of the patient using the patient monitor; and

25

**Appx77**

US 10,433,776 B2

<div style="column-count:2">

**13**

one or more processors configured to:

operate the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of said plurality of light sources;

when operating according to the first control protocol, calculate, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by said at least one detector after attenuation by the body tissue of the patient using the patient monitor;

generate a trigger signal, wherein generation of said trigger signal is responsive to at least one of: a comparison of processing characteristics to a predetermined threshold, a physiological event, or signal quality characteristics of signals received from the detector;

in response to receiving the trigger signal, operate the patient monitor according to a second control protocol different from the first control protocol, wherein said operation includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of said plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculate the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by said at least one detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operation of the patient monitor according to the second control protocol operates the first control

**14**

protocol light source according to a first duty cycle and said operation of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is different than power consumption of the second control protocol light source according to the second duty cycle.

**12**. The patient monitor of claim **11**, wherein said operation of the first control protocol light source on the first duty cycle has an active time and an inactive time according to the first control protocol, wherein said operation of the second control protocol light source on the second duty cycle has an active time and an inactive time according to the second control protocol, wherein the active time of the first duty cycle has a first duration and the active time of the second duty cycle has a second duration, wherein the first duration and the second duration are different.

**13**. The patient monitor of claim **12**, wherein the second duration is longer than the first duration.

**14**. The patient monitor of claim **11**, wherein power consumption during said operation at the second control protocol is greater than power consumption during said operation at the first control protocol.

**15**. The patient monitor of claim **11**, wherein said operation of the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state.

**16**. The patient monitor of claim **11**, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source.

* * * * *

</div>

### U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

July 20, 2022

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

### APPLE INC.,
### Petitioner

### v.

### MASIMO CORPORATION,
### Patent Owner

### Case: IPR2020-01524
### Patent 10,433,776 B2

By authority of the

### DIRECTOR OF THE UNITED STATES
### PATENT AND TRADEMARK OFFICE

/s/ Natasha M. Brotten

*Certifying Officer*



**Prosecution History IPR2020-01524**

| Date | Document |
|------|----------|
| 08/31/2020 | Petitioner's Power of Attorney |
| 08/31/2020 | Petition for Inter Partes Review |
| 09/21/2020 | Patent Owner's Mandatory Notices |
| 10/19/2020 | Notice of Accord Filing Date |
| 01/08/2021 | Petitioner's Updated Exhibit List |
| 01/19/2021 | Notice of Waiver of Patent Owner's Preliminary Response |
| 04/16/2021 | Order Granting Institution of Inter Partes Review |
| 04/16/2021 | Scheduling Order |
| 04/28/2021 | Patent Owner's Supplemental Mandatory Notice adding Joshua J. Stowell as Backup Counsel |
| 04/30/2021 | Patent Owner's Objections to Evidence |
| 05/25/2021 | Patent Owner's Notice of Deposition of Dr. Brian W. Anthony |
| 06/10/2021 | Patent Owner's Notice of Stipulation to Modify Due Dates 1-3 |
| 07/05/2021 | Patent Owner's Amended Notice of Deposition of Dr. Brian W. Anthony |
| 07/07/2021 | Patent Owner's Amended Notice of Stipulation to Modify Due Dates 1-3 |
| 08/02/2021 | Patent Owner's Response |
| 08/09/2021 | Petitioner's Objections to Evidence |
| 08/20/2021 | Petitioner's Notice of Deposition of Vijay K. Madisetti, Ph.D. |
| 10/21/2021 | Petitioner's Reply to Patent Owner's Response |
| 10/28/2021 | Patent Owner's Objections |
| 12/02/2021 | Patent Owner's Sur Reply to Reply |
| 12/03/2021 | Petitioner's Oral Hearing Request |
| 12/03/2021 | Patent Owner's Request for Oral Argument |
| 12/17/2021 | Order Setting Oral Argument |
| 12/21/2021 | Patent Owner's Updated Mandatory Notice Changing Lead Counsel |
| 01/14/2022 | Petitioner's Updated Exhibit List |
| 01/14/2022 | Patent Owner's Demonstratives for Trial Hearing |
| 01/14/2022 | Certificate of Service of Patent Owner's Demonstratives for Trial Hearing |
| 02/16/2022 | Hearing Transcript |
| 04/12/2022 | Final Written Decision |
| 06/09/2022 | Petitioner's Notice of Appeal |

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent of:      Al-Ali
U.S. Patent No.:     10,433,776          Attorney Docket No.:  50095-0003IP1
Issue Date:          October 8, 2019
Appl. Serial No.:    16/174,144
Filing Date:         October 29, 2018
Title:               LOW POWER PULSE OXIMETER

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT
NO. 10,433,776 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42**

the table shown below.  An explanation of how these claims are unpatentable under the statutory grounds identified below is provided in the form of a detailed description that follow.  Additional explanation and support for each ground is set forth in the Declaration of Brian W. Anthony, Ph.D. (APPLE-1003), referenced throughout this Petition.

| Ground | Claims | § 103 Basis |
|--------|--------|-------------|
| 1A | 1-8, 11-16 | Richardson (APPLE-1004) (first mapping) |
| 1B | 1-9, 11-16 | Richardson (second mapping) |
| 1C | 9, 10 | Richardson (either mapping) and Bindszus (APPLE-1005) |
| 2A | 1-9, 11-16 | Richardson and Turcott (APPLE-1006) (first mapping) |
| 2B | 1-9, 11-16 | Richardson and Turcott (second mapping) |
| 2C | 9, 10 | Richardson and Turcott (either mapping) and Bindszus |

Each reference pre-dates the provisional application (filed 7/2/2001) and qualifies as prior art:

| Reference | Date | Section |
|-----------|------|---------|
| Richardson | 9/17/1996 (issued) | 102(b) |
| Bindszus | 1/23/2001 (issued) | 102(a) |

### III.  UNPATENTABILITY GROUNDS

#### A.  GROUND 1A: Claims 1-8 and 11-16 are obvious[1] over Richardson (first mapping)

##### 1.  Overview of Richardson[2]

Richardson discloses a method for detecting and reducing the effects of electromagnetic noise on pulse oximeters.  APPLE-1004, 1:11-15, 2:35-37; APPLE-1003, ¶35.  In Richardson, a pulse oximeter includes light sources that emit red and infrared light alternately into a patient's tissue and a photodetector that senses the light transmitted through the tissue.  APPLE-1004, 1:37-45, 2:61-

_____

[1] "It is well settled that a disclosure that anticipates under §102 also renders the claim invalid under §103, for anticipation is the epitome of obviousness." *Realtime Data, LLC v. Iancu*, 912 F. 3d 1368, 1373 (Fed. Cir. 2019) (citing *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1278 n.3 (Fed. Cir. 2017) (noting the Board's conclusion that a prior art reference rendered certain claims obvious "by virtue of its anticipation of them").

[2] General descriptions provided for the references and combinations are incorporated into each subsection addressing/applying those references, as are the discussions of combinations.

62, 4:2-5.  Based on the changes in red and infrared light transmission, the pulse oximeter measures a physiological parameter.  APPLE-1004, 1:46-61.

Richardson's oximeter measures noise levels *in situ*, which "may conserve power by reducing LED drive current while maintaining a safe signal-to-noise ratio."  APPLE-1004, 3:3-7.  The oximeter operates in one of three states: State 0, State 1, and State 2.  APPLE-1004, 5:41-43.  In State 0, the oximeter turns off the light sources and monitors the photodetector signal at a given frequency to monitor noise in the oximeter signal.  APPLE-1004, 2:57-64, 5:17-24, 5:43-53.  The measured noise level is used to select a frequency at which the contribution of noise to the signal is relatively low.  APPLE-1004, 3:1-17, 5:53-54, 7:58-63; APPLE-1003, ¶36.

After selecting a frequency, the oximeter operates in a normal operating state, State 1, where both light sources are activated alternately at the frequency and the physiological parameter is monitored.  APPLE-1004, 5:55-57, 6:66-7:3, 7:58-63, 8:46-49.  When the oximeter is operating in State 1, the oximeter displays blood saturation values, a pulse waveform, and heart rate estimates and provides an audible pulse tone.  APPLE-1004, 9:33-38, 9:43-47; APPLE-1003, ¶37.  If the oximeter determines that the signal-to-noise ratio decreases below an acceptable level, it reverts from State 1 to State 0 to search for a new frequency.  APPLE-1004, 5:64-67, 7:3-18, 8:41-43, 8:50-64.

The oximeter frequently transitions from State 1 to State 2 to reassess the noise at the current operating frequency.  APPLE-1004, 6:1-2, 8:46, 9:39-43; APPLE-1003, ¶38.  In State 2, the red light source is turned off, and a new noise level is calculated by measuring the ambient noise in the red channel only. APPLE-1004, 6:2-4, 9:40-43, 9:52-63.  In State 2, the infrared channel is operating, and the oximeter monitors the pulse rate, displays a pulse waveform and heart rate estimates, and provides an audible pulse tone.  APPLE-1004, 6:4-7, 9:43-47.  After calculating the new noise level, the oximeter returns to State 1 and operates normally using the new noise level.  APPLE-1004, 6:7-10, 9:63-65.

## 2.  Analysis

For this first mapping of Richardson to the claim elements, claims 1-8 and 11-16 are mapped to disclosure in Richardson describing the oximeter transitioning from State 2 (as the first control protocol) to State 1 (as the second control protocol).

### (a)    Claim 1

**1[p]: "A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:"**

Richardson discloses a method of operating a patient monitor that processes signals responsive to light attenuated by body tissue.  APPLE-1003, ¶41. Richardson discloses a "method... to process photodetection signals obtained with

10

tissue." APPLE-1004, 9:43-47, 1:37-45. Richardson also discloses that "State 1 is the oximeter's normal operating state" where "[t]he LEDs are activated alternately at a frequency $f_{TMUX}$." APPLE-1004, 7:58-63, 5:55-57, 6:66-7:3. Additionally, "[a] clock controls the sequential output of light from the light emitting diodes and to a duty cycle of at least 1 in 4" (at least 25%). APPLE-1004, 4:6-10; APPLE-1003, ¶49.

As such, in State 2, the red light source is turned off and has a duty cycle of 0%, and the infrared light source is operated with a duty cycle of at least 25%. APPLE-1003, ¶50; APPLE-1004, 9:40-43, 6:2-4, 9:52-63, 4:6-10. In State 1, both the red and infrared light sources are activated with a duty cycle of at least 25%. APPLE-1003, ¶50; APPLE-1004, 7:58-63, 5:55-57, 6:66-7:3, 4:6-10. Accordingly, Richardson discloses that the first control protocol, e.g., State 2, operates the first control protocol light source according to a first duty cycle, e.g., red LED at 0% duty cycle and infrared LED at 25% duty cycle, and the second control protocol, e.g., State 1, operates the second control protocol light source according to a second duty cycle, e.g., red and infrared LEDs at 25% duty cycle. APPLE-1003, ¶50; APPLE-1004, 9:40-43, 6:2-4, 9:52-63, 7:58-63, 5:55-57, 6:66-7:3, 4:6-10. Accordingly, Richardson teaches operating the patient monitor according to different duty cycles, under the proper construction of 1[d]. *Id.*

(n)     **Claim 16**

**"16. The patient monitor of claim 11, wherein said signals received from the detector are responsive to the detected light of the first control protocol light source or the second control protocol light source."**

*Supra*, Ground 1A, Claim 7; APPLE-1003, ¶57.

B.     **GROUND 1B: Claims 1-9 and 11-16 are obvious over Richardson (second mapping)**

For this alternate mapping of Richardson to the claim elements, claims 1-9 and 11-16 are mapped to disclosure in Richardson describing the oximeter transitioning from a first operating frequency (as the first control protocol) for State 1 to a second, different operating frequency (as the second control protocol) for State 1.

(a)     **Claim 1[3]**

**Limitation 1[p]**

*Supra*, Ground 1A, 1[p]; APPLE-1003, ¶¶41-43.

**Limitation 1[a]**

Richardson discloses that "[v]arious available frequencies (discrete or continuous) are evaluated to determine their respective noise levels and one is

---

[3] For the sake of brevity, the remaining analysis will refer to the claim limitations by the identifiers listed in Ground 1A.

Doc Code: TRACK1.REQ
**Document Description**: TrackOne Request

PTO/AIA/424 (04-14)

## CERTIFICATION AND REQUEST FOR PRIORITIZED EXAMINATION
### UNDER 37 CFR 1.102(e) (Page 1 of 1)

| First Named Inventor: | Ammar Al-Ali | Nonprovisional Application Number (if known): | |
|---|---|---|---|
| Title of Invention: | LOW POWER PULSE OXIMETER | | |

**APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS PRIORITIZED EXAMINATION FOR THE ABOVE-IDENTIFIED APPLICATION.**

1. The processing fee set forth in 37 CFR 1.17(i)(1) and the prioritized examination fee set forth in 37 CFR 1.17(c) have been filed with the request. The publication fee requirement is met because that fee, set forth in 37 CFR 1.18(d), is currently $0. The basic filing fee, search fee, and examination fee are filed with the request or have been already been paid. I understand that any required excess claims fees or application size fee must be paid for the application.

2. I understand that the application may not contain, or be amended to contain, more than four independent claims, more than thirty total claims, or any multiple dependent claims, and that any request for an extension of time will cause an outstanding Track I request to be dismissed.

3. The applicable box is checked below:

   **I.** ☑ **Original Application (Track One) - Prioritized Examination under § 1.102(e)(1)**

   i. (a) The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a). This certification and request is being filed with the utility application via EFS-Web.
   ---OR---
   (b) The application is an original nonprovisional plant application filed under 35 U.S.C. 111(a). This certification and request is being filed with the plant application in paper.

   ii. An executed inventor's oath or declaration under 37 CFR 1.63 or 37 CFR 1.64 for each inventor, **or** the application data sheet meeting the conditions specified in 37 CFR 1.53(f)(3)(i) is filed with the application.

   **II.** ☐ **Request for Continued Examination - Prioritized Examination under § 1.102(e)(2)**

   i. A request for continued examination has been filed with, or prior to, this form.
   ii. If the application is a utility application, this certification and request is being filed via EFS-Web.
   iii. The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a), or is a national stage entry under 35 U.S.C. 371.
   iv. This certification and request is being filed prior to the mailing of a first Office action responsive to the request for continued examination.
   v. No prior request for continued examination has been granted prioritized examination status under 37 CFR 1.102(e)(2).

| Signature /daniel gibson/ | Date 2018-10-29 |
|---|---|
| Name (Print/Typed) Daniel V. Gibson | Practitioner Registration Number 68329 |

**Note:** *This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required.*

☐ *Total of _____ forms are submitted.

1                                                                 APPLE 1002

WHAT IS CLAIMED IS:

1.    A method of managing power consumption during continuous patient monitoring by adjusting behavior of a patient monitor, the method comprising:

continuously operating a patient monitor at a lower power consumption level to determine measurement values for one or more physiological parameters of a patient;

comparing processing characteristics to a predetermined threshold; and

when said processing characteristics pass said threshold, transitioning to continuously operating said patient monitor at a higher power consumption level.

2.    The method of Claim 1, wherein said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor.

3.    The method of Claim 2, wherein said reducing activation comprises reducing a duty cycle of said sensor.

4.    The method of Claim 2, wherein said attached sensor comprises an optical sensor configured to detect emitted light attenuated by body tissue of said patient.

5.    The method of Claim 1, wherein said continuously operating at said lower power consumption level comprises reducing an amount of processing by a signal processor.

6.    The method of Claim 5, wherein said reducing comprises processing less data.

7.    The method of Claim 6, wherein said processing less data comprises reducing an overlap in data blocks being processed.

8.    The method of Claim 1, wherein during said operating at said higher power consumption level, monitoring when said processing characteristics recedes from said threshold; and when receded, transitioning to continuously operating said patient monitor at said lower power consumption level.

9.    The method of Claim 1, wherein said processing characteristics comprise signal characteristics from one or more light sensitive detectors.

10.    The method of Claim 9, wherein said signal characteristics comprises signal strength.

11.    The method of Claim 9, wherein said signal characteristics comprises a presence of noise.

**Appx163**

12.    The method of Claim 9, wherein said signal characteristics comprises a presence of motion induced noise.

13.    The method of Claim 1, wherein said processing characteristics include determining an estimate of current power consumption and comparing said estimate with a target power consumption.

14.    The method of Claim 1, wherein said processing characteristics include an override condition.

15.    The method of Claim 14, wherein said override condition comprises measurements during a critical care environment.

16.    The method of Claim 14, wherein said override condition comprises one or more monitored parameters exhibiting predefined behavior.

-18-

Application/Control Number: 16/174,144                                        Page 2
Art Unit: 3791

### DETAILED ACTION

#### *Notice of Pre-AIA or AIA Status*

1.      The present application is being examined under the pre-AIA first to invent

provisions.

#### *Claim Rejections - 35 USC § 102*

2.      The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C.

102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country
> or in public use or on sale in this country, more than one year prior to the date of application
> for patent in the United States.
>
> (e) the invention was described in (1) an application for patent, published under section
> 122(b), by another filed in the United States before the invention by the applicant for patent or
> (2) a patent granted on an application for patent by another filed in the United States before
> the invention by the applicant for patent, except that an international application filed under
> the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an
> application filed in the United States only if the international application designated the United
> States and was published under Article 21(2) of such treaty in the English language.

3.      Claims 1-4 and 14-16 are rejected under 35 U.S.C. 102(b) as being anticipated

by Flower (USPN 5,279,298). In regard to claim 1, Flower discloses a method of

managing power consumption during continuous patient monitoring by adjusting

behavior of a patient monitor (Figs. 1-3 and associated descriptions), the method

comprising: continuously operating a patient monitor at a lower power consumption

level (first laser 26 with 35mW, Figs. 2-3 and associated descriptions; Col 8 lines 3-22)

to determine measurement values *for one or more physiological parameters of a patient*

(*intended uses without positive step(s) recited*; image data, Figs. 2-3 and associated

descriptions; image data, recordings, and map for abnormalities of the vasculature such

59

as neovascular membranes, Col 3 lines 11-39); comparing processing characteristics to a predetermined threshold (Col 8 lines 3-22); and when said processing characteristics pass said threshold (Col 8 lines 3-22), transitioning to continuously operating said patient monitor at a higher power consumption level (maximum level/ 200mW, Col 8 lines 3-22).

In regard to claim 2, Flower discloses said continuously operating at said lower power consumption level comprises reducing activation of an attached sensor (optical sensor is attached in element 20, Fig. 2; less than 50% duty cycle, Col 8 lines 3-22).

In regard to claim 3, Flower discloses said reducing activation comprises reducing a duty cycle of said sensor (less than 50% duty cycle, Col 8 lines 3-22).

In regard to claim 4, Flower discloses said attached sensor comprises an optical sensor configured to detect emitted light attenuated by body tissue of said patient (elements 56 and 58, Figs. 2-3 and associated descriptions; the detected image(s) comprises light information attenuated by body tissue).

In regard to claim 14, Flower discloses said processing characteristics include an override condition (when change in brightness detected, the computer increasing the output level, Col 8 lines 3-22).

In regard to claim 15, Flower discloses said override condition comprises measurements during a critical care environment (inject dye(s) to identify and treat neovascular membranes in the eye, abstract; Figs. 1-3 and associated descriptions).

In regard to claim 16, Flower discloses said override condition comprises one or more monitored parameters exhibiting predefined behavior (Col 8 lines 3-22).

MAS.285C6                                                                                           PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| First Inventor | : | Ammar Al-Ali |
| App. No. | : | 16/174,144 |
| Filed | : | October 29, 2018 |
| For | : | LOW POWER PULSE OXIMETER |
| Examiner | : | Chu Chuan Liu |
| Art Unit | : | 3791 |
| Conf. No. | : | 1163 |

### RESPONSE TO OFFICE ACTION DATED JANUARY 17, 2019

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Commissioner:

In response to the Office Action dated January 17, 2019, please reconsider the objections and rejections in view of the following amendments and remarks.

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

**Summary of Interview** begins on page 7 of this paper.

**Remarks** begin on page 8 of this paper.

-1-

**Application No.:**     **16/174,144**
**Filing Date:**          **October 29, 2018**

## AMENDMENTS TO THE CLAIMS

1-16.   (Canceled)

17.     (New) A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

operating the patient monitor according to a first control protocol, wherein said operating includes activating a first control protocol light source in accordance with the first control protocol, the first control protocol light source including one or more of a plurality of light sources;

when operating according to the first control protocol, calculating, by the patient monitor, measurement values of the pulse rate, the measurement values responsive to light from the first control protocol light source, detected by a detector of an optical sensor after attenuation by body tissue of the patient using the patient monitor;

generating a trigger signal;

in response to receiving the trigger signal, operating the patient monitor according to a second control protocol different from the first control protocol, wherein said operating includes activating a second control protocol light source in accordance with the second control protocol, the second control protocol light source including one or more of the plurality of light sources; and

when operating the patient monitor according to the second control protocol, calculating the measurement values of the pulse rate, the measurement values responsive to light from the second control protocol light source, detected by the detector after attenuation by the body tissue of the patient using the patient monitor,

wherein said operating of the patient monitor according to the first control protocol operates the first control protocol light source according to a first duty cycle and said operating of the patient monitor according to the second control protocol operates the second control protocol light source according to a second duty cycle, wherein power consumption of the first control protocol light source according to the first duty cycle is

-2-

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent of:      Al-Ali
U.S. Patent No.:    10,433,776          Attorney Docket No.: 50095-0003IP1
Issue Date:           October 8, 2019
Appl. Serial No.:    16/174,144
Filing Date:          October 29, 2018
Title:                    LOW POWER PULSE OXIMETER

## DECLARATION OF DR. BRIAN W. ANTHONY

I, Brian W. Anthony, of Cambridge, MA, declare that:

## I.     QUALIFICATIONS AND BACKGROUND INFORMATION

1.     My name is Dr. Brian W. Anthony.  I am an Associate Principal Research Scientist at the Institute of Medical Engineering & Science at Massachusetts Institute of Technology (MIT).  I am also a Principal Research Scientist at MIT's Mechanical Engineering department, Director of the Master of Engineering in Advanced Manufacturing and Design Program at MIT, a Co-Director of the Medical Electronic Device Realization Center of the Institute of Medical Engineering & Science, and Associate Director of MIT.nano.  My current *curriculum vitae* is attached and some highlights follow.

2.     I earned my B.S. in Engineering (1994) from Carnegie Mellon University.  I earned my M.S. (1998) and Ph.D. (2006) in Engineering from MIT.  My research focused on high-performance computation, signal processing, and electro-mechanical system design.

1

APPLE 1003

understanding of the knowledge that a person with this academic experience possesses. Furthermore, I possess those capabilities myself.

## V.    INTERPRETATIONS OF THE '776 PATENT CLAIMS AT ISSUE

34.    I understand that, for purposes of my analysis in this *inter partes* review proceeding, the terms appearing in the patent claims should generally be interpreted according to their "ordinary and customary meaning." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). I understand that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. I also understand that the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Id.* Unless otherwise noted, I have interpreted claim terms according to their plain meaning.

## VI.    RICHARDSON

### A.    Overview of Richardson

35.    Richardson discloses a method for detecting and reducing the effects of electromagnetic noise on pulse oximeters. APPLE-1004, 1:11-15, 2:35-37. Richardson discloses that a pulse oximeter includes light sources that emit light

alternately at a red wavelength and at an infrared wavelength into a patient's tissue and a photodetector that senses the light transmitted through the tissue at each wavelength. APPLE-1004, 1:37-45, 2:61-62, 4:2-5. A demultiplexer synchronized with the red and infrared light sources separates the red and infrared portions of the photodetector output for further processing. APPLE-1004, 1:48-51. Based on the changes in red and infrared light transmission, the pulse oximeter measures a physiological parameter. APPLE-1004, 1:46-61.

36.    Richardson's oximeter measures noise levels *in situ*, which "may conserve power by reducing LED drive current while maintaining a safe signal-to-noise ratio." APPLE-1004, 3:3-7. The oximeter operates in one of three states: State 0, State 1, and State 2. APPLE-1004, 5:41-43. In State 0, the oximeter turns off the light sources and monitors the photodetector signal at a given frequency to monitor noise in the oximeter signal. APPLE-1004, 2:57-64, 5:17-24, 5:43-53. The measured noise level is used to select a frequency at which the contribution of noise to the signal is relatively low. APPLE-1004, 3:1-17, 5:53-54, 7:58-63.

37.    After selecting a frequency, the oximeter operates in a normal operating state, State 1, where both light sources are activated alternately at the frequency and the physiological parameter is monitored. APPLE-1004, 5:55-57, 6:66-7:3, 7:58-63, 8:46-49. When the oximeter is operating in State 1, the oximeter displays blood saturation values, a pulse waveform, and heart rate

20

blood oxygen saturation is monitored." APPLE-1004, 7:58-63, 5:53-57. "[I]n State 1, the oximeter is functioning normally and saturation values are presented to the clinician for each detected and accepted pulse." APPLE-1004, 8:46-49, 9:33-38. The pulse oximeter also maintains a "pulse waveform display, heart rate estimates, and audible pulse tone." APPLE-1004, 9:43-47.

44.     Richardson's "system frequently moves from State 1 to State 2 (process 5) to reassess the noise." APPLE-1004, 6:1-2, 8:46, 9:39-43. "The purpose of State 2 is to detect new noise sources ... by turning off the red LED (Step J) and measuring ambient noise in the red channel only (Step K)." APPLE-1004, 9:40-43, 6:2-4, 9:52-63. In State 2, "the infrared channel is still operating," and the sensor emits "an infrared wavelength into the patient's tissue, and a single photodetector senses the light transmitted through the tissue." APPLE-1004, 9:43-47, 1:37-45. "Since the infrared channel is still operating, the pulse oximeter can maintain its pulse waveform display, heart rate estimates, and audible pulse tone." APPLE-1004, 9:43-47. "In State 2, the pulse oximeter ... can monitor pulse rate and otherwise give the appearance of operating normally." APPLE-1004, 6:4-7.

45.     Accordingly, Richardson's oximeter operates according to a first control protocol, e.g., State 2, including activating the infrared light source and operating the red light source in an off state in accordance with the first control protocol. APPLE-1004, 1:37-45, 6:2-7, 9:40-47, 9:52-63. When the oximeter is

24

operated according to the first control protocol, the oximeter processes signals responsive to light attenuated by body tissue using the infrared channel and monitors at least a pulse rate of a patient to display a pulse waveform and heart rate estimates.  APPLE-1004, 9:43-47, 1:37-45, 6:4-7.

46.    Richardson discloses that "[t]he purpose of State 2 is to detect new noise sources ... by turning off the red LED (Step J) and measuring ambient noise in the red channel only (Step K)."  APPLE-1004, 9:40-43, 6:2-4, 9:52-63.  "After the noise is assessed in State 2, the system returns to State 1 (process 7) and operates normally, employing the new noise level calculated in State 2."  APPLE-1004, 6:2-10, 9:52-65.  As such, the system does not exit State 2 and return to State 1 until the "new noise level" is calculated.  APPLE-1004, 6:2-10, 9:52-65.  Accordingly, the calculation of the "new noise level" (a signal quality characteristic of signals received from the detector) causes a trigger signal to be generated.  *Id.*

47.    In Richardson, "[a]fter the noise is assessed in State 2, the system returns to State 1 (process 7) and operates normally, employing the new noise level calculated in State 2."  APPLE-1004, 6:2-10, 9:52-65.  "State 1 is the oximeter's normal operating state" "where both LEDs are turned on and the blood oxygen saturation is monitored."  APPLE-1004, 7:58-63, 5:53-57, 6:61-7:3.  "[T]he sensor of the pulse oximeter system ... emits light alternately at a red and at an infrared

25

wavelength into the patient's tissue, and a single photodetector senses the light transmitted through the tissue at each wavelength." APPLE-1004, 1:37-45. "[I]n State 1, the oximeter is functioning normally and saturation values are presented to the clinician for each detected and accepted pulse." APPLE-1004, 8:46-49, 9:33-38. The pulse oximeter also maintains a "pulse waveform display, heart rate estimates, and audible pulse tone." APPLE-1004, 9:43-47.

48.    As such, Richardson's oximeter, in response to the trigger signal that causes the oximeter to return to State 1, returns to the normal operating state where both the red and infrared light sources are activated alternately, and the oximeter displays blood saturation values, a pulse waveform, and heart rate estimates and provides an audible pulse tone. APPLE-1004, 1:37-45, 5:53-57, 6:2-10, 6:61-7:3, 7:58-63, 8:46-49, 9:33-65. Accordingly, Richardson's oximeter, in response to receiving the trigger signal causing it to return to State 1, operates according to a second control protocol, e.g., State 1, including activating the both the red and infrared light sources in accordance with the second control protocol. APPLE-1004, 1:37-45, 5:53-57, 6:2-10, 6:61-7:3, 7:58-63, 8:46-49, 9:33-65. When the oximeter is operated according to the second control protocol, e.g., State 1, the oximeter processes signals responsive to light attenuated by body tissue and monitors at least a pulse rate of a patient to display a pulse waveform and heart rate

26

estimates.  APPLE-1004, 1:37-45, 5:53-57, 6:2-10, 6:61-7:3, 7:58-63, 8:46-49, 9:33-65.

49.    As I discussed previously, Richardson discloses that "[t]he purpose of State 2 is to detect new noise sources ... by turning off the red LED (Step J) and measuring ambient noise in the red channel only (Step K)."  APPLE-1004, 9:40-43, 6:2-4, 9:52-63.  In State 2, "the infrared channel is still operating," and the sensor emits "an infrared wavelength into the patient's tissue, and a single photodetector senses the light transmitted through the tissue."  APPLE-1004, 9:43-47, 1:37-45.  Richardson also discloses that "State 1 is the oximeter's normal operating state" where "[t]he LEDs are activated alternately at a frequency $f_{TMUX}$."  APPLE-1004, 7:58-63, 5:55-57, 6:66-7:3.  Additionally, "[a] clock controls the sequential output of light from the light emitting diodes and to a duty cycle of at least 1 in 4" (at least 25%).  APPLE-1004, 4:6-10.

50.    As such, in State 2, the red light source is turned off and has a duty cycle of 0%, and the infrared light source is operated with a duty cycle of at least 25%.  APPLE-1004, 9:40-43, 6:2-4, 9:52-63, 4:6-10.  In State 1, both the red and infrared light sources are activated with a duty cycle of at least 25%.  APPLE-1004, 7:58-63, 5:55-57, 6:66-7:3, 4:6-10.  Accordingly, Richardson discloses that the first control protocol, e.g., State 2, operates the first control protocol light source according to a first duty cycle, e.g., red LED at 0% duty cycle and infrared

27

LED at a duty cycle of at least 25%, and the second control protocol, e.g., State 1, operates the second control protocol light source according to a second duty cycle, e.g., red and infrared LEDs at a duty cycle of at least 25%. APPLE-1004, 9:40-43, 6:2-4, 9:52-63, 7:58-63, 5:55-57, 6:66-7:3, 4:6-10. Also, the power consumption of the light sources operating according to the first control protocol, e.g., State 2 where the red LED operates according to a first duty cycle of 0%, is different than the power consumption of the light sources operating according to the second control protocol, e.g., State 1 where the red LED operates according to a second duty cycle of at least 25%. *Id.* Accordingly, Richardson teaches operating the patient monitor according to different duty cycles, under the proper construction of 1[d]. *Id.*

51.     Richardson's oximeter also includes a "microprocessor" that performs functions to operate the oximeter in State 1 and State 2. APPLE-1004, 6:11-8:49, 9:52-65. Richardson's "microprocessor" teaches the claimed "one or more processors."

## 2.     Claims 2 and 12

52.     As I discussed previously, Richardson discloses that the first control protocol, e.g., State 2, operates the first control protocol light source according to a first duty cycle, e.g., red LED at 0% duty cycle and infrared LED at a duty cycle of at least 25%, and the second control protocol, e.g., State 1, operates the second

US005555882A

# United States Patent [19]

## Richardson et al.

| [11] | Patent Number: | **5,555,882** |
|---|---|---|
| [45] | Date of Patent: | **Sep. 17, 1996** |

[54] **METHOD AND APPARATUS FOR REDUCING AMBIENT NOISE EFFECTS IN ELECTRONIC MONITORING INSTRUMENTS**

[75] Inventors: **Charles A. Richardson**, San Francisco; **Michael Bernstein**, San Ramon; **Jerry K. Okikawa**, Oakland; **Terrence R. Bennett**, Richmond, all of Calif.

[73] Assignee: **Nellcor Incorporated**, Pleasanton, Calif.

[21] Appl. No.: **295,349**

[22] Filed: **Aug. 24, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 965,684, Oct. 23, 1992, Pat. No. 5,368,224.

[51] Int. Cl.[6] .......................................... **A61B 5/00**
[52] U.S. Cl. ............................... **128/633**; 356/41
[58] Field of Search ..................... 128/633, 664, 128/665, 666; 356/39, 40, 41

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| 4,086,915 | 5/1978 | Kofsky et al. . | |
| 4,819,752 | 4/1989 | Zelin ...................................... | 128/633 |
| 4,863,265 | 9/1989 | Flower et al. . | |
| 4,867,571 | 9/1989 | Frick et al. ............................. | 356/436 |
| 5,040,539 | 8/1991 | Scmitt et al. ......................... | 128/633 |
| 5,190,038 | 3/1993 | Polson et al. .......................... | 128/633 |
| 5,193,543 | 3/1993 | Yelderman ............................. | 128/633 |
| 5,203,329 | 4/1993 | Takatani et al. ...................... | 128/633 |
| 5,246,002 | 9/1993 | Prosser ................................. | 128/633 |
| 5,349,952 | 9/1994 | McCarthy et al. ...................... | 128/633 |

#### FOREIGN PATENT DOCUMENTS

| 0102816 | 8/1983 | European Pat. Off. . |
| 0261789 | 8/1987 | European Pat. Off. . |
| 0271340 | 12/1987 | European Pat. Off. . |

*Primary Examiner*—Angela D. Sykes
*Assistant Examiner*—Eric F. Winakur
*Attorney, Agent, or Firm*—Townsend and Townsend and Crew LLP

[57] **ABSTRACT**

The present invention provides a method and apparatus for adapting to noise sources affecting a pulse oximeter. Various available frequencies are evaluated to determine their respective noise levels and one is selected to act as the operating demultiplexer frequency. During normal operation of the pulse oximeter, the various available demultiplexer frequencies are periodically scanned to determine which has the lowest associated noise. The noise level associated with the operating frequency is used to determine the signal-to-noise ratio of the pulse oximeter signals and thereby qualify certain signals from the pulse oximeter. Those pulses associated with a signal-to-noise ratio below a predetermined threshold are rejected and excluded from use in calculating blood oxygen saturation.

**7 Claims, 3 Drawing Sheets**



1

APPLE 1004

**Appx488**

**U.S. Patent**          Sep. 17, 1996          Sheet 1 of 3          **5,555,882**



*FIG. 1.*



*FIG. 2.*

*FIG. 4.*



STATE 0
SELECT AND SET $f_I$ FROM AVAILABLE FREQUENCIES $f_N$
A
HIGH PASS FILTER
M
MONITOR DARK SIGNAL
C
CALCULATE HIGH FREQ RMS SIGNAL FOR SELECTED $f_N$
N
CALCULATE BROADBAND RMS SIGNAL FOR SELECTED $f_N$
D
F
SELECT NEW $f_N$
Q
CALCULATE LOW FREQ RMS SIGNAL FOR SELECTED $f_N$
IS RMS NOISE GREATER THAN THRESHOLD
E
YES
TURN OFF LEDS
B
NO
TURN ON LEDS AND MONITOR PHYSIOLOGICAL SIGNAL
G
O
OBTAIN HIFREQ NOISE VALUE
LOW PASS FILTER
R
COMPARE PHYSIOLOGICAL SIGNAL WITH $LOFREQ_0$
S
P
COMPARE $HIFREQ_I$ WITH $HIFREQ_0$
IS SIN ≥ THRESHOLD
H
NO
STATE 1
YES
I
Z
DISPLAY
CALCULATE BLOOD OXYGEN SATURATION FROM PHYSIOLOGICAL SIGNAL
STATE 2
PERIODICALLY TURN OFF RED LED
J
L
RESET STATE 0 RMS NOISE VALUES
MONITOR RMS NOISE IN RED CHANNEL & CALCULATE RMS NOISE IN IR CHANNEL
K

FIG. 3.

5,555,882

**1**

## METHOD AND APPARATUS FOR REDUCING AMBIENT NOISE EFFECTS IN ELECTRONIC MONITORING INSTRUMENTS

This is a continuation of application Ser. No. 07/965,684 filed Oct. 23, 1992, now U.S. Pat. No. 5,368,224.

### BACKGROUND

This invention relates to a method and apparatus for detecting and reducing the effects of ambient electromagnetic noise (including photic noise) on electronic instruments, particularly on electronic physiological monitoring instruments such as pulse oximeters.

The number of different kinds of electronic instruments used in hospitals, and the number of all electronic instruments of all kinds in use at any given time in each hospital, are on the rise. Besides performing its intended function, each instrument emits electromagnetic radiation at frequencies and intensities governed by the configuration of its electronic circuitry and the manner in which the instrument is used. For some instruments, such as radio telemetry monitors, the emission of electromagnetic radiation is the instruments' primary function.

In addition, superimposed on the electromagnetic radiation emitted by the instruments is the electromagnetic radiation emitted by the room lights and the A.C. power supply. In each room of the hospital, these electronic emissions combine to provide a complex background noise level whose instantaneous frequency and intensity characteristics depend on room lights, room power, and the nature of the instruments in use at any particular time. The effect of this background noise on the operation of an electronic instrument depends on the nature of the instrument. The use of a pulse oximeter in a noisy environment is a good example.

The principles of pulse oximetry and the operation of commercially available pulse oximeters are well known in the art. For example, the sensor of the pulse oximeter system described in U.S. Pat. No. 4,653,498 and U.S. Pat. No. 4,869,254 (both of which are incorporated herein by reference for all purposes) emits light alternately at a red and at an infrared wavelength into the patient's tissue, and a single photodetector senses the light transmitted through the tissue at each wavelength. The time-varying photodetector output represents the transmitted red and infrared signals separated by "dark" periods during which no light is emitted by the sensor. A demultiplexer synchronized with the sensor's red and infrared light sources separates the red and infrared portions of the photodetector output for further processing by the oximeter.

The physiological parameter measured by pulse oximeters is arterial blood oxygen saturation. The light-absorptive properties of blood at red and infrared wavelengths vary with the relative concentrations of oxyhemoglobin and deoxyhemoglobin in the blood. The portions of the photodetector output used in the oxygen saturation calculation, therefore, are the changes in red and infrared light transmission caused by the pulsatile changes in arterial blood volume at the sensor site. These pulse to pulse changes in transmitted light level are small in comparison to the overall intensity of the transmitted light, on the order of 1–3%, and are very susceptible to the influence of background noise.

The output of electric lights varies at a frequency related to the frequency of the A.C. power supply and its harmonics. If any frequency, fundamental or harmonic, of the ambient

**2**

light variations match or are close to any frequency, fundamental or harmonic, of the oximeter's multiplexed light source, and if ambient light somehow reaches the photodetector, the oximeter may not be able to distinguish between the photodetector output related to red and infrared light sources (i.e., the signal) and the photodetector output related to ambient light (i.e., the noise). The red and infrared light are therefore typically multiplexed (and the photodetector synchronously demultiplexed) at frequencies other than room light frequencies. See, e.g., U.S. Pat. No. 4,653,498.

There are, however, many other sources of electromagnetic radiation in the pulse oximeter operating environment, including ECG monitors, impedance apnea monitors, isolation power supplies in other monitoring instruments, and electrocautery tools, each with its own characteristic operating frequencies. It would be difficult, if not impossible, to select an oximeter synchronous demultiplexer frequency that would not be affected by at least one of the potential noise sources in the oximeter's operating environment.

One prior art approach to this problem is to add a low-pass filter at the photodetector output to remove portions of the photodetector output signal above a certain frequency, say 100 to 300 kHz. See, e.g., U.S. Pat. No. Re. 33,643. This filter would not remove the effects of noise at the oximeter's synchronous demultiplexer frequency, however.

What is needed, therefore, is a way to reduce the effects of ambient electromagnetic noise in electronic monitoring instruments, especially when the noise source frequency (or a harmonic of the noise source frequency) is approximately the same as the fundamental frequency or harmonics at which the instrument is operating.

### SUMMARY OF THE INVENTION

The present invention provides a method and apparatus for adapting to noise sources affecting electronic monitoring instruments. Various available frequencies (discrete or continuous) are evaluated to determine their respective noise levels and one is selected to act as the operating demultiplexer frequency. Then during normal operation of the instrument, the various available demultiplexer frequencies are periodically scanned to redetermine which has the lowest associated noise. This frequency agility allows the instrument to shift from a first multiplexing frequency to another in order to avoid noise appearing at the first multiplexing frequency. In some embodiments, as many as 1000 frequency channels are available.

These techniques allow the invention to adapt to the total noise found in a given environment, such as a hospital. Thus, the present invention can be used in different locations having different noise sources. It can also be used in a single location to adapt to noise changes occurring over time. Because the instrument can measure and report noise, it allows users to rapidly adjust sensors to obtain a good signal and detect interfering noise sources.

Preferably, the method and apparatus of the present invention are used to process photodetection signals obtained with a pulse oximeter. To monitor the noise in the oximeter signal at a given frequency, the oximeter is preferably operated in the "dark." In other words, the oximeter light sources (typically Light Emitting Diodes "LEDs") are turned off while the oximeter continues to monitor the detector signal at the selected frequency. Thus, the noise associated with ground loops, radio telemetry monitors, and all other sources in the environment is detected and quantified free of contributions from the physiological pulse information. The

5,555,882

3

noise level so obtained can be used to rate a selected frequency and to assess the signal-to-noise ratio of subsequently taken physiological signals. Because noise levels are measured in situ, the oximeter may conserve power by reducing LED drive current while maintaining a safe signal-to-noise ratio.

Thus, one aspect of the present invention is a method and apparatus for identifying a pulse oximeter demultiplexing frequency at which the contribution of noise to the signal is relatively low. To accomplish this a plurality of multiplexing frequencies are evaluated to determine which is quietest. That frequency is then adopted for use during collection of blood oxygen saturation data. If, during operation, a source of noise is introduced that interferes with the "adopted" demultiplexing frequency, the oximeter searches for a new, quieter, demultiplexing frequency. If one is located, the oximeter then shifts to that frequency.

Another aspect of the present invention involves a method and apparatus for "qualifying" optical pulses detected by a pulse oximeter. Those pulses associated with a signal-to-noise ratio below a predetermined threshold are rejected and excluded from further use by the pulse oximeter monitor, while qualified pulses are available for use in calculating blood oxygen saturation.

The noise values used to approximate the signal-to-noise ratio may be obtained from various sources. For example, the "dark" noise level used to select the demultiplexer frequency can be used. In addition (or alternatively), the physiological signal can be passed through a high pass filter to determine the power associated with the higher frequencies, which approximate the total noise in the signal.

A further understanding of the present invention may be obtained by reference to the following discussion and associated drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the instrument of this invention illustrating the instrument housing and attachment of a sensor to the finger of a patient.

FIG. 2 is a flow chart showing the processes connecting the three states of the present invention.

FIG. 3 is a flow diagram of a method employed to determine noise levels at demultiplexing frequencies.

FIG. 4 is a flow diagram of a pulse qualification procedure of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

A preferred embodiment of this invention will be described as implemented in electronic physiological monitoring instruments, in particular, a pulse oximeter. For purposes of this description, noise is defined as the measured signal variations about a mean apart from any signal due to the measured physiological parameter.

Referring to FIG. 1, a pulse oximeter instrument housing 26 suitable for use with the present invention is illustrated. Outwardly, the housing includes a digital display 1, circuitry select button array 2 through 5, alarm status lights 6 through 9, an optically coupled adjustment knob 10, sync status light 11, LED digital viewmeter 12, and power switch 13. A speaker 15 is placed under the instrument housing.

From a connector (not shown) in housing 26 there extend wires 27 to a detector probe 29. Detector 29 is placed upon the finger 14 of a patient 28. Utilizing the placement of the

4

detector 29 at the finger 14, all of the readings in this invention are made possible. In a typical pulse oximeter, a first light emitting diode in the red range (e.g. 660 nanometers) and a second light emitting diode in the infrared range (e.g. 940 nanometers) are sequentially pulsed to emit light.

A clock controls the sequential output of light from the light emitting diodes and to a duty cycle of at least 1 in 4. Reception of a red signal occurs during two of the four time periods and reception of an infrared signal occurs during the other two time periods. One time cycle for each of the two wavelengths is a "dark" cycle. In other words, the LED is turned off and only ambient light is detected. The dark signal is "subtracted" from the LED signal, thus, improving the signal-to-noise ratio of the pulse oximeter. Subtraction is performed by switching on an inverter each time the dark signal is received. This inverted signal is then combined with the preceding LED signal (uninverted) to decrease the effects of ambient light. This works fine for light of constant intensity. However, time varying light sources at harmonics of the AC mains will still contribute to baseband noise when the harmonics occur near harmonics of the synchronous demultiplexer.

In the preferred embodiment of this invention, the pulse oximeter selects its synchronous demultiplexer frequency $f_{TMUX}$ from a ranked list of possible frequencies $f_N$. The available frequencies $f_N$ are ranked empirically by (1) identifying noise sources in the range of possible $f_{TMUX}$ values; (2) determining, for each noise source, the degree of interference caused by the noise source within that range; (3) selecting N possible $f_{TMUX}$ frequencies that do not coincide or approximate the frequencies of the identified noise sources; and (4) ranking the chosen frequencies according to an increased degree of interference from the expected noise, with $f_1$ being the least likely $f_{TMUX}$ frequency to be affected by noise from the operating environment. Typically, the available frequencies $f_N$ are scanned until a downward trend in noise is detected. When the trend reverses, the frequency with the lowest noise is adopted as $f_{TMUX}$. Of course, other methods for scanning the possible frequencies can be used. For example, every available frequency can be checked, and the one having the lowest noise value is adopted as $f_{TMUX}$. In preferred embodiments, the $f_N$ values are stored in ROM (read-only memory) in the pulse oximeter. Typically, the available frequencies will be between about 200 and about 3000 Hz, and preferably between about 1500 and 2500 Hz.

In preferred embodiments, the available values of $f_{TMUX}$ are selected to minimize the problem specifically caused by A.C. mains harmonics (from e.g. 50 or 60 Hz photic sources) being "aliased" down to the analog passband. This occurs when an A.C. fundamental frequency or harmonic thereof differs from the demultiplexing frequency by an amount corresponding to a frequency in the passband. For example, if the A.C. main has a fundamental frequency at 50 Hz and the demultiplexer is operated at 2025 Hz, an aliased 25 Hz signal is produced. This falls outside the range of a 0–20 Hz passband used in a typical pulse oximeter. However, the second harmonic of the demultiplexer fundamental is 4050 Hz, which falls right on a harmonic of the A.C. main, thus producing an aliased signal in the physiological frequency range, i.e. 0–5 Hz. The oximeter has no way of gauging the contribution of this "noise" to physiological signal.

To deal with this problem, values of $f_{TMUX}$ are purposely chosen to be somewhat close to a harmonic of the A.C. mains. In many embodiments, the $f_{TMUX}$ available frequencies are separated by at about 10–15 Hz from the frequency of the A.C. power supply and harmonics thereof. Thus, the aliased signal shows up in the analog passband, but is far

5,555,882

**5**

enough from the physiological frequency range that it can easily be identified as noise. This serves two purposes. First, the noise spike at 10–15 Hz serves as a "marker" indicating the relative power of the A.C. power line noise that ultimately folds back into the physiological signal (possibly at the fifth or sixth harmonic of the demultiplexer fundamental). Second, the power of the power line noise that folds back into the physiological frequencies can be expected to be relatively weak. For example, if the fundamental of the demultiplexer is 10 Hz away from a harmonic of a power line, the second harmonic is 20 Hz away, the third is 30 Hz away, and so on until the fifth or sixth harmonic which falls on or close to a harmonic of the power line. However, if the demultiplexer fundamental is in the range of 2000 to 3000 Hz, the fifth and sixth harmonics are at 10 kHz or greater, a region in which the noise power from the A.C. mains rapidly falls off.

In preferred embodiments, the noise at the available demultiplexer frequencies is evaluated when the red and/or infrared light source of the pulse oximeter sensor is turned off. By turning the LEDs off, the oximeter becomes a passive monitor, listening to signals which come from foreign sources like body impedance monitors, AC power lines, electrocautery, etc. The signal so measured will provide a good measure of the noise level at the selected frequency.

It should be noted that a pulse oximeter in its normal operating mode is an "active" signal sensor. This means that the oximeter supplies energy to the system being studied (i.e. tissue having blood flow) and the system modulates the supplied energy to provide information. The techniques of the present invention can generally be applied to any active signal sensing monitor. Thus, for example, the present invention can be employed in tissue impedance techniques such as respiratory monitoring, cardiac output monitoring, and apnea monitoring. These techniques pass energy in the form of electrical current through the body so that the tissue impedance, modulated by mechanical events of the body (breathing lungs or beating heart) can be monitored. Other examples of active signal sensing devices include spectral gas monitors such as some carbon dioxide monitors.

Referring now to FIG. 2, the method of the preferred embodiment (as implemented in a pulse oximeter) operates in three states or modes: State 0, State 1, and State 2. When the pulse oximeter is first powered up, it is in State 0. In State 0, the oximeter does not provide power to the sensor's LEDs but collects a digitized "signal" from the sensor's photodetector in the red and infrared channels. The oximeter uses State 0 to read the ambient noise (both electrical and photic) in the absence of any physiological signal provided by illumination of the patient's tissue by the LEDs and to select an initial $f_{TMUX}$. In this state, the oximeter cannot determine saturation values, but it can determine noise as a passive monitor. The initial $f_{TMUX}$ is selected on the basis of its quietness from among a group of available frequencies.

When $f_{TMUX}$ is settled on in State 0, the system moves to State 1, (process 1) where both LEDs are turned on and the blood oxygen saturation is monitored. According to a predefined schedule, the system periodically reverts from State 1 to State 0 (process 3) to reassess the noise at $f_{TMUX}$, and, if necessary, find a new $f_{TMUX}$. While in State 1, the system continually monitors high frequency noise in the active signal and qualifies the physiological signal based on its signal-to-noise ratio. Unqualified signal pulses are not used to calculate blood oxygen saturation. Also, if the system determines that the signal-to-noise ratio at $f_{TMUX}$ decreases below an acceptable level, it moves to State 0 (process 4) to search for a new $f_{TMUX}$.

**6**

The system frequently moves from State 1 to State 2 (process 5) to reassess the noise at $f_{TMUX}$. This is accomplished by turning off one LED; typically the red LED. (In comparison, State 0 turns off both LEDs.) In State 2, the pulse oximeter cannot calculate blood oxygen saturation, but it can monitor pulse rate and otherwise give the appearance of operating normally. After the noise is assessed in State 2, the system returns to State 1 (process 7) and operates normally, employing the new noise level calculated in State 2.

The root-mean-square ("RMS") value of noise in State 0 is computed by estimating the mean signal level, subtracting the mean signal from the instantaneous signal, squaring the difference, summing the squared values over the measurement epoch, and taking the square root of the value. FIG. 4 is a flow chart that includes the State 0 broadband noise algorithm used by the pulse oximeter in State 0. It should be understood that while the flow chart shows signals read and calculations performed in only one channel, the oximeter uses this algorithm essentially simultaneously in both the red and infrared channels. As shown in FIG. 3, the synchronous frequency $f$ is set to $f_1$ when the oximeter enters State 0 (Step A). The oximeter then starts reading values (Step C). To calculate the RMS dark noise for $f_1$ (or any $f_N$ in Step D), the oximeter's microprocessor begins by reading a first detector output value $x_1$ and stores this value as SUM in the oximeter's memory. The microprocessor then reads a second value $x_2$, adds it to SUM and divides the total by 2 to compute MEAN. After computing the mean, the microprocessor determines the differences between $x_2$ and MEAN, squares the difference, and stores this value as SUMSQ in memory. The values of $x_i$ are read from both the red and infrared channels of the oximeter at the times when the red and infrared LEDs would be lit if the oximeter were in its operating state.

The microprocessor then compares SUMSQ values with threshold THRESH, which is set initially at $T_{INIT}$, an arbitrary value based on the inherent noise tolerance of the instrument. If both $SUMSQ_{RED}$ and $SUMSQ_{IR}$ are less than THRESH, then the microprocessor reads a third detector value $x_3$ (in both the red and infrared channels), adds $x_3$ to SUM, determines the difference between $x_3$ and MEAN, squares the difference and adds the squared value to SUMSQ.

The microprocessor once again compares the SUMSQ values to THRESH. If both SUMSQ values are still less than THRESH, then the microprocessor reads a fourth detector value $x_4$, adds $x_4$ to SUM, and computes a new value of MEAN. The microprocessor then determines the difference between $x_4$ and MEAN, squares the difference and adds the squared value to SUMSQ.

The process repeats for 65 values of $x_i$, as long as both $SUMSQ_{RED}$ and $SUMSQ_{IR}$ are less than THRESH. New values of MEAN are computed after gathering $x_8$, $x_{16}$, $x_{32}$ and $x_{64}$, i.e., whenever i is a power of 2. In the preferred embodiment, the time to gather and process $x_{1-65}$ takes approximately 1 second, based on an oximeter digital sampling rate of 57 Hz. $SUMSQ_{RED}$ and $SUMSQ_{IR}$ are both divided by 64 and the quotients are raised to the one-half power to give the RMS noise in Step D. If both SUMSQ values remain below THRESH for all 64 points (Step E), then the microprocessor changes the value of $THRESH_{RED}$ to $SUMSQ_{RED}$ and $THRESH_{IR}$ to $SUMSQ_{IR}$ and stores $f_1$ as the value of $f_{TMUX}$.

The oximeter then enters State 1 (Step **6**) where the LEDs begin emitting light pulses and the microprocessor monitors

**7**

the physiological signal at $f_1$. From the detected physiological signal, the microprocessor calculates the current blood oxygen saturation (Step I) using conventional methods. All the while, the signal-to-noise ratio of the physiological signal at $f_1$ is monitored, and, if the ratio falls below a predetermined threshold (Step H), the system reenters State 0 to determine whether $f_2$ yields a lower broadband noise total in both channels than $f_1$ had. If so, then the microprocessor updates the THRESH values, stores $f_2$ as $f_{TMUX}$, and reenters State 1. If not, then the microprocessor looks for another frequency $f_N$ having a lower broadband noise total. If none is found, the microprocessor uses the previously stored $f_{TMUX}$ value when it enters State 1.

In alternative embodiments, the system will determine the noise associated with multiple values of $f_N$ stored on the ROM before selecting $f_{TMUX}$ and reentering State 1 to detect the physiological signal. In such systems, the detector will remain in State 0 until the frequency with the lowest noise is identified. If none of the ranked values of possible frequencies passes this State 0 test, the instrument displays an error message and will not operate.

A parallel computation of State **0** high frequency noise is performed by the microprocessor in both the red and infrared channels. As the microprocessor reads the red and infrared $x_i$ values for use in the routine of FIG. **3**, it passes the $x_i$ values through a high pass filter (Step M) having a cutoff of 7 Hz to yield filtered values $y_i$. The sum of the squares of the $u_i$ values is computed as $SUMSQ_{HI}$.

The red and infrared values of $SUMSQ$ from the last State 0 calculation are measurements of the broadband noise in the red and infrared channels, respectively. As noted above, microprocessor computes State 0 broadband noise values $BROAD_{0,RED}$ and $BROAD_{0,IR}$ as the square root of $SUMSQ/64$ (Step D). Similarly, the microprocessor computes State 0 high frequency noise values $HIFREQ_{0,RED}$ and $HIFREQ_{0,IR}$ as the square root of $SUMSQ_{HI}/64$ (Step N). Finally, the microprocessor computes State 0 low frequency noise values $LOFREQ_{0,RED}$ and $LOFREQ_{0,IR}$ (Step Q) as follows:

$$LOFREQ_{0,RED}{}^2 = BROAD_{0,RED}{}^2 - HIFREQ_{0,RED}{}^2$$

$$LOFREQ_{0,IR}{}^2 = BROAD_{0,IR}{}^2 - HIFREQ_{0,IR}{}^2$$

The microprocessor uses these values in addition to the standard qualification tests to qualify the incoming physiological signal in State **1**, as discussed below.

Because noise sources in the oximeter environment may vary periodically, and possibly interfere with a previously quiet $f_{TMUX}$, the system should occasionally revert to State 0. Thus, it can be redetermined whether the RMS noise $f_{TMUX}$ is still within the threshold. In a preferred embodiment, the microprocessor reverts to State 0 30 seconds after the end of the initial State 0 routine, 1 minute after the end of the second State 0 routine, 5 minutes after the end of the third State 0 routine, then 15 minutes after the end of each subsequent State 0 routine.

State 1 is the oximeter's normal operating state. The LEDs are activated alternately at a frequency of $f_{TMUX}$, and the microprocessor uses the same $f_{TMUX}$ frequency to distinguish the photodetector signal corresponding to the red LED from the photodetector signal corresponding to the infrared LED. While in State 1, the noise values calculated in State 0 are compared to the pulse signals (Steps P and S). The pulse oximeter operating in the normal mode (i.e. State 1) in a relatively noise free environment has good internal estimates of the signal level in both optical channels, the

**8**

pulse amplitudes. The ratio of the signal, as measured by pulse amplitudes during normal operating mode with the LEDs turned on, to the noise, measured with the LEDs turned off and scaled appropriately for internal gains, serves as one criterion for acceptable signals. This will be an accurate estimate of the signal-to-noise ratio when the noise measurement epoch and the signal measuring epoch are close in time and an appropriate measurement when the pulse oximeter is rapidly changing $f_{TMUX}$ and estimating noise to select an optimal value for $f_{TMUX}$. Once that selection has been made, however, the oximeter must be able to monitor the signal-to-noise ratio continuously.

Thus, in addition, a continuous estimate of nonphysiologic noise is computed and compared with the pulse signals. An approximation for a continuous signal-to-noise ratio may be the ratio of power in the physiological passband [0.5, 5 Hz] to the power in the nonphysiological passband [8, 20 Hz]. In a preferred embodiment, the red and infrared analog outputs of the synchronous demultiplexer go into low pass analog filters (Step R), and the outputs of the filters are digitally sampled at 57 Hz. The digital signals then pass through a high pass filter at 7 Hz to derive State 1 high frequency noise values $HIFREQ_1$ (Step **0**) for the red and infrared channels. The squares of each value from the red and infrared high pass filters are stored in 64 point circular buffers. When a pulse is detected using a pulse detection algorithm (such as in the Nellcor Incorporated model N-200 pulse oximeter), the microprocessor sums the 64 points in the circular buffers, divides by 64 and takes the square root to derive $HIFREQ_{1,RED}$ and $HIFREQ_{1,IR}$ for the two optical channels. These noise measurements made in State 1 are less robust than those of State 0 because only high frequency noise can be estimated and detected, but the estimates are available for testing every detected pulse.

Preferred pulse oximeters employ timeout alarms to alert the user when no pulses are detected and qualified during an arbitrary time period. In the Nellcor N-200 pulse oximeter, this arbitrary period is 10 seconds. This invention adds a noise criteria failure timeout as follows. If the pulse is not sufficiently greater than the noise (Step H), it is rejected and no saturation is computed. If several pulses are rejected (e.g. after about 5 seconds), the noise state reverts to State 0 and a new estimate of the noise is computed. If, on the other hand, the pulse is sufficiently greater than the noise, a new saturation is calculated and displayed (Steps I and Z). Periodically in State 1 the state is forced to State 2. Note that in State 1, the oximeter is functioning normally and saturation values are presented to the clinician for each detected and accepted pulse.

If pulses fail to pass the noise qualification tests for five seconds (or other suitable period), the oximeter moves from State 1 to State 0.

In preferred embodiments, various additional tests are conducted on the pulse signal obtained in State 1. For example, the continuous high frequency noise measured in State 1 (State 0) is frequently compared with the State 0 high frequency noise values $HIFREQ_{0,RED}$ and $HIFREQ_{0,IR}$ (Step P) because the noise at $f_{TMUX}$ may suddenly change during normal operation. If so, the state returns to State 0 where a new $f_{TMUX}$ is determined. In addition, the physiological signal is compared with the State 0 low frequency noise values $LOFREQ_{0,RED}$ and $LOFREQ_{0,IR}$ (Step S) to provide an estimate of the relative signal and noise power in the physiological bandpass.

Prior pulse oximeters (such as the Nellcor N-200) use a set of pulse qualification tests to accept or reject detected pulses. The present invention adds four new tests to these

5,555,882

**9**

prior art qualification tests (as shown in FIG. **4** and lumped into Step H and FIG. **3**). In general, these new tests set signal-to-noise thresholds, where the pulse amplitudes are the "signals" and the noise parameters are as defined above. As shown in FIG. **4**, the pulse amplitudes **20** are compared with State 0 broadband values 21 and State 1 high frequency values 22 at **25, 29, 23** and **37**. Pulse qualification tests **27, 31, 35,** and **39** are performed to determine whether the pulse is rejected **40** or accepted **42**. In the preferred embodiment, the noise qualification tests are as follows:

$$\frac{AMPL_{RED}}{BROAD_{0,RED}} \geqq 10$$

$$\frac{AMPL_{IR}}{BROAD_{0,IR}} \geqq 10$$

$$\frac{AMPL_{RED}}{HIFREQ_{1,RED}} \geqq 1.5$$

$$\frac{AMPL_{IR}}{HIFREQ_{1,IR}} \geqq 1.5$$

If any of these criteria are not met, the detected pulse is rejected. In the preferred embodiment, the microprocessor performs these new tests only after the detected pulses have passed the prior art pulse qualification tests. It should be understood, however, that these noise threshold tests may be performed before, during, after or completely independent of any other pulse qualification tests without departing from the spirit of this invention. The oximeter treats a failure of any of these State 1 noise tests the same as failure of any of the standard pulse qualification tests, i.e., by disqualifying the pulse.

In some embodiments, the method also includes steps of displaying blood saturation values calculated from accepted values, maintaining a display of the most recent blood saturation value when a pulse is rejected, and then updating the displayed value whenever an accepted pulse is used to calculate blood saturation.

Every 30 seconds, the pulse oximeter enters state State 2. The purpose of State 2 is to detect new noise sources that may have appeared since the last State 0 noise measurements by turning off the red LED (Step J) and measuring ambient noise in the red channel only (Step K). Since the infrared channel is still operating, the pulse oximeter can maintain its pulse waveform display, heart rate estimates, and audible pulse tone, so long as the infrared pulses meet the qualification criteria. In addition, since State 2 is of relatively short duration, the pulse oximeter may continue to display the last computed oxygen saturation number throughout State 2 even though no new saturations numbers can be computed.

In State 2, the red LED is turned off for approximately 1.4 seconds. Using the State 0 noise computations for the red channel only, the microprocessor computes new noise values: $BROAD_{2,RED}$, $HIFREQ_{2,RED}$ and $LOFREQ_{2,RED}$. The microprocessor then uses these values to estimate new State 0 values (Step L). For the red channel State 0 value estimates, the microprocessor scales the measured values by a ratio of the working (i.e., State 1) gain to the gain value used in State 0. For the infrared channel State 0 value estimates, the microprocessor scales the newly estimated red channel values by the ratio of the infrared to red channel gains. The pulse oximeter then returns to State **1** and uses the newly estimated State 0 values in the pulse qualification tests.

In some preferred embodiments, the signal, noise and ratios are computed for the IR channel as well as the red

**10**

channel as an additional precaution. However, if the oximeter has insufficient idle time, these values are computed on the red channel only because the noise in the red channel is greater than or equal to the noise in the infrared channel under practical conditions.

Most of the above methods can be implemented by modifying the software controlling existing pulse oximeters such as the N-200 of Nellcor, Incorporated. In alternative embodiments, the active signal sensing monitor (e.g. a pulse oximeter) employs an additional "hardware" channel multiplexed to the monitor signal when no energy sources are on. For typical pulse oximeters, this "dark channel" exist as a third channel in addition to the red and infrared channels. Of course, other instruments such as apnea monitors having only a single signal channel will have now have two channels by the introduction of the dark channel. The dark channel allows continuous monitoring of noise for rapid response to a changing noise environment. Thus, the need to periodically revert to State 0 or State 2 as described above is minimized or eliminated. However, to provide an accurate assessment of noise, the additional channel requires an analog filter chain having the same noise characteristics as the red and IR channels.

Conclusion

As will be understood with those familiar with the art, the present invention may be embodied in other specific forms without departing from the spirit or essential characteristics thereof. For example, the signal-to-noise thresholds used in pulse qualification tests could be varied. In addition, the particular cutoff frequencies for low-pass filters could be adjusted. Accordingly, the disclosure of the preferred embodiment of the invention is intended to be illustrative, but not limiting of the scope of the invention, which will be set forth in the following claims.

What is claimed is:

1. A pulse oximeter comprising:

(a) a sensor including two light sources and a photodetector, the two light sources alternately generating light pulses which pass through a patient's skin to produce attenuated optical signals monitored by the photodetector;

(b) a demultiplexer coupled to the sensor for separating the attenuated optical signals from the two light sources, the demultiplexer and the light sources operating at an adjustable selected demultiplexing frequency;

(c) a ROM having a plurality of available frequencies recorded;

(d) a first processor coupled to the demultiplexer and the ROM for periodically determining the noise associated with the available frequencies, the first processor selecting, and adjusting if necessary, the adjustable selected demultiplexing frequency; and

(e) a second processor coupled to the sensor for periodically determining the patient's blood oxygen saturation from the optical signals monitored by the photodetector.

2. The pulse oximeter recited in claim **1** wherein the available frequencies are separated by at least 10 Hz from 50 to 60 Hz and harmonics thereof.

3. The pulse oximeter recited in claim **1** wherein the available frequencies are between about 1500 and 2500 Hz.

4. The pulse oximeter recited in claim **1** wherein the first processor includes means for periodically determining the root-mean-square noise associated with the attenuated optical signals for each available frequency and selecting the

5,555,882

**11**

available frequency for which the attenuated optical signals have the lowest root-mean-square noise as the adjustable selected demultiplexing frequency.

**5**. The pulse oximeter recited in claim **4** further comprising a third processor calculating a signal-to-noise ratio from the root-mean-square noise associated with the attenuated optical signals, the third processor preventing the second processor from determining the patient's blood oxygen saturation when the attenuated optical signals have a signal-to-noise ratio below a predetermined value.

**12**

**6**. The pulse oximeter recited in claim **1** wherein the lights sources are red and infrared LEDs.

**7**. The pulse oximeter recited in claim **1** wherein the first processor determines the noise associated with the available frequencies while at least one of the two light sources is not generating light pulses.

\* \* \* \* \*

Filed: August 2, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
    Jarom D. Kesler (Reg. No. 57,046)
    Joshua J. Stowell (Reg. No. 64,096)
    Stephen W. Larson (Reg. No. 69,133)
    Jacob L. Peterson (Reg. No. 65,096)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1524-776@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01524
U.S. Patent 10,433,776

———————————

**PATENT OWNER RESPONSE**

IPR2020-01524
Apple Inc. v. Masimo Corporation

Having stymied discovery regarding the correct construction, Petitioner should not

be permitted to supplement the record later.

## B.    The Proper Construction Of First And Second Duty Cycle

The Board should construe "duty cycle" to mean "the ratio of operating time

(or on time) of a light source to the total time period during which the light source

is intermittently operated, expressed as a percentage." (Ex. 2002, ¶36.) The Board

should also confirm that the "percentage" of the first and second duty cycles

cannot be zero and that the first duty cycle is different from the second duty cycle.

(*Id.*) These constructions are consistent with how a POSITA would have

understood "first duty cycle" and "second duty cycle" at the time of filing based on

the plain and ordinary meaning and intrinsic record. (37 C.F.R. § 42.100(b);

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); Ex. 2002,

¶36.)

### 1.    The '776 Patent Uses "Duty Cycle" Consistent With Its Plain Meaning

A POSITA would have understood the plain and ordinary meaning of "duty

cycle" to be "the ratio of operating time to total elapsed time of a device that

operates intermittently, expressed as a percentage." (Ex. 2004, 225; Ex. 2002, ¶37.)

The '776 patent uses "duty cycle" consistent with this plain and ordinary meaning.

(Ex. 2002, ¶¶37-39.) The '776 patent discloses a method of reducing the power

consumption of a patient monitor by "intermittently reducing the drive current duty

IPR2020-01524
Apple Inc. v. Masimo Corporation

cycle." (Ex. 1001, 6:59-7:11, Figs. 5, 8.) The "drive current" is the current supplied

by the red and infrared LED drivers (also called the "emitter drivers"). (*Id.*, 5:62-

7:6:2, Fig. 4.) The LEDs operate (i.e., are turned on and emit light) when the LED

drivers supply current. (*Id.*, 8:16-20; Fig. 8.)

The '776 patent consistently describes the "duty cycle" as the ratio of the

operating time (or on time) of the red and infrared LEDs to the total time period

during which the LEDs are intermittently operated, expressed as a percentage. (*Id.*,

2:43-44; Ex. 2002, ¶39.) For example, Figure 5 illustrates an "emitter driver output

current" versus time profile for a pulse oximeter:



(Ex. 1001, 6:59-60, Fig. 5.) As shown, when the LEDs operate in a high duty cycle

state 502 [red], the LEDs receive current from the emitter driver and are operating

IPR2020-01524
Apple Inc. v. Masimo Corporation

(i.e., are turned on and emit light) for 25% of the total time period during which the LEDs are intermittently operated. (*Id.*, 6:58-61, 7:4-8; *see also id.,* 8:15-20, Fig. 8 ("In the high duty cycle state 812, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively long time period, such as 25% on time for each of the red 510 and IR 560 drive currents.").) When the LEDs operate in a low duty cycle state 504 [green], the LEDs receive current and operate (i.e., are turned on and emit light) for 3.125% of the total time period during which the LEDs are intermittently operated. (*Id.*, 6:58-61, 7:4-8; *see also id.,* 8:20-24, Fig. 8 ("In the low duty cycle state 814, the control engine 440 (FIG. 4) cause the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red 510 and IR 560 drive currents.").)

Thus, the '776 patent uses "duty cycle" to mean "the ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage." (Ex. 2002, ¶¶37-39.)

### 2. <u>The First And Second Duty Cycles Cannot Be 0%</u>

The "first duty cycle" and "second duty cycle" cannot be 0% based on the claims and '776 patent specification. (Ex. 2002, ¶¶40-47); *see Phillips*, 415 F.3d at 1312, 1314.

IPR2020-01524
Apple Inc. v. Masimo Corporation

Claim 1 requires "operating the patient monitor according to a first control protocol," where the first control protocol "operates the first control protocol light source according to a first duty cycle." (Ex. 1001, 11:45-46, 12:11-13.) Claim 1 further requires that "when operating according to the first control protocol," the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the first control protocol light source." (*Id.*, 11:51-57.) Claim 11 includes the same limitations. (*Id.*, 13:2-3, 13:8-14, 13:35-14:1.)

Thus, claims 1 and 11 require the "first control protocol light source" to generate light so that the patient monitor can calculate the pulse rate based on the light. (Ex. 2002, ¶41.) However, if the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light. (*Id.*, ¶42.) Consequently, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11. (*Id.*) Thus, the "first duty cycle" must be a percentage greater than zero so that the first control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light. (*Id.*)

Claim 1 also requires "operating the patient monitor according to a second control protocol different from the first control protocol" where the second control protocol "operates the second control protocol light source according to a second duty cycle." (Ex. 1001, 11:63-65, 12:14-16.) Claim 1 further requires that "when

operating according to the second control protocol," the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the second control protocol light source." (*Id.*, 12:4-10.) Claim 11 includes the same limitations. (*Id.*, 13:20-32, 14:2-5.)

Thus, claims 1 and 11 also require the "second control protocol light source" to generate light so that the patient monitor can calculate the pulse rate based on the light. (Ex. 2002, ¶43.) However, if the second control protocol light source had a duty cycle of 0%, the light source would be inactive and would not generate light. (*Id.*, ¶44.) Consequently, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11. (*Id.*) Thus, the "second duty cycle" must be a percentage greater than zero so that the second control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light. (*Id.*)

Moreover, the specification never mentions a duty cycle of 0%. Rather, the specification consistently describes a patient monitor having high and low duty cycles greater than 0%. (*E.g.*, Ex. 1001, 2:39-44, 7:4-11, 8:14-15; Ex. 2002, ¶¶45-46.) For example, in a preferred embodiment, the duty cycle "is varied within a range from about 25% to about 3.125%." (Ex. 1001, 7:4-9.)

Rather than describe a 0% duty cycle, the '776 patent discloses a "data off state" where the LEDs are inactive for longer than one cycle. (*Id.*, 7:11-15; Ex.

IPR2020-01524
Apple Inc. v. Masimo Corporation

2002, ¶46.) The '776 patent distinguishes the data off state from the first and second duty cycles. (*E.g.*, Ex. 1001, 8:14-15, 8:16-32, 8:47-61.) The specification explains, "[i]n **conjunction with** an intermittently reduced duty cycle or as an **independent** sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers are turned off." (*Id.*, 7:11-15 (emphasis added).)

Consequently, any construction of "duty cycle" that encompasses a duty cycle of 0% would be inconsistent with the claims and specification. (Ex. 2002, ¶¶40-47.) For these reasons, the "first duty cycle" and "second duty cycle" cannot be 0%. (*Id.*)

### 3.  The "First" And "Second" Duty Cycles Are Different

The Board should also construe the "first duty cycle" to be different from the "second duty cycle." (Ex. 2002, ¶¶48-53.)

Petitioner appears to concede that the first and second duty cycles must be different. Petitioner argues that the first duty cycle is different from the second duty cycle under the "**proper**" construction. (Pet., 16, 24, 50, 54; Ex. 1003, ¶¶51, 87.) Thus, while Petitioner has failed to satisfy its burden to construe the claim terms (*supra* §VI.A), Petitioner has at least admitted that the first duty cycle should be different from the second duty cycle.

IPR2020-01524
Apple Inc. v. Masimo Corporation

Masimo agrees that the claims and specification of the '776 patent require *different* first and second duty cycles. Claims 1 and 11 use "first" and "second" to distinguish the duty cycles. This differentiation between the duty cycles strongly suggests that the duty cycles are not the same. If the duty cycles were the same, "first" and "second" would be superfluous. *See e.g.*, *Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Moreover, claims 1 and 11 require operating the patient monitor "according to a first control protocol" and, "in response to receiving the trigger signal, operating the patient monitor according to a second control protocol *different* from the first control protocol." (Ex. 1001, 11:45-46, 11:63-65 (emphasis added).) Claims 1 and 11 further clarify that one of the differences between the first and second control protocols are the duty cycles. (*Id.*, 12:11-21.) For example, claim 1 states that "the first control protocol operates the first control protocol light source according to a first duty cycle" and "the second control protocol operates the second control protocol light source according to a second duty cycle." (*Id.*) Thus, a POSITA would have understood claims 1 and 11 to require the first duty cycle to be *different* from the second duty cycle. (Ex. 2002, ¶49.)

The specification confirms that the first and second duty cycles are different. *See Phillips,* 415 F.3d at 1313, 1315-17 (terms must be construed in light of the

specification). For example, the specification distinguishes the claimed invention from conventional patient monitors that use constant duty cycles. (Ex. 1001, 6:64-7:2 ("In a typical pulse oximeter, the duty cycle of the drive signals is constant….").) The specification explains that using a constant duty cycle will result in higher power consumption because the LED drivers "require a significant portion of the overall pulse oximeter power budget." (*Id*.) Consequently, the '776 patent discloses a novel approach of reducing power consumption based on the recognition that "[i]ntermittently reducing the drive current duty cycle can advantageously reduce power dissipation without compromising signal integrity." (*Id.*, 7:2-4.) In a preferred embodiment, "the drive current duty cycle is intermittently reduced from about 25% to about 3.125%." (*Id.*, 7:9-11, Fig. 5.) Figure 5 illustrates the system's different duty cycles (high 25% duty cycle [red] and a low 3.125% duty cycle [green]):

IPR2020-01524
Apple Inc. v. Masimo Corporation



(*Id.* at Fig. 5; *see also* 8:4-24, Fig. 8.)

The specification consistently describes managing the power consumption of a patient monitor by intermittently switching between two **different** duty cycles. (*See e.g.,* Ex. 1001, 3:26-28 ("In one embodiment, the reducing step comprises the substep of decreasing the duty cycle of an emitter driver output to the sensor.").) Thus, the intrinsic evidence confirms that the "first duty cycle" must be different from the "second duty cycle." (Ex. 2002, ¶¶50-52.)

## VII.  PETITIONER FAILS TO EXPLAIN HOW RICHARDSON DISCLOSES FIRST AND SECOND CONTROL PROTOCOL LIGHT SOURCES

Independent claims 1 and 11 require first and second control protocol light sources. Yet, in **every** ground, Petitioner fails to explain how Richardson discloses

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

| | | Page 1 of 1 |
|---|---|---|
| PATENT NO. | : 10,433,776 B2 | |
| APPLICATION NO. | : 16/174144 | |
| DATED | : October 8, 2019 | |
| INVENTOR(S) | : Ammar Al-Ali | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

In Column 8 at Line 40, change "forth" to --fourth--.

In Column 10 at Line 15, change "forth" to --fourth--.

In the Claims

In Column 13 at Line 36, in Claim 11, change "second control protocol" to --first control protocol--.

Signed and Sealed this
Tenth Day of November, 2020

Andrei Iancu

Andrei Iancu
*Director of the United States Patent and Trademark Office*

**MASIMO 2001**
**Apple v. Masimo**
**IPR2020-01524**

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

————————————

Case IPR2020-01524
U.S. Patent 10,433,776

————————————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2002**
**Apple v. Masimo**
**IPR2020-01524**

regarding priority in this declaration. I have conducted my analysis herein according to the above principles.

## V.    <u>INTRODUCTION TO THE '776 PATENT</u>

### A.    <u>The '776 Patent</u>

27.    The '776 patent describes novel approaches for reducing the power consumption of patient monitors, such as pulse oximeters. The disclosed patient monitors modify power consumption by effectively increasing or decreasing the number of input samples received and processed by the monitor. Ex. 1001 ('776 patent) at 6:12-27. By adjusting the samples received and processed, the monitor can "regulate[] power consumption to satisfy a predetermined power target, to minimize power consumption, or to simply reduce power consumption." *Id.* at 6:18-22.

28.    In one embodiment, a patient monitor increases or decreases the input samples by changing the duty cycle of current supplied by the monitor's drivers to the LEDs. *Id.* at 6:59-7:18. The '776 patent explains that in a conventional patient monitor, the duty cycle used to drive the LEDs is constant during monitoring. *Id.* However, a constant duty cycle can result in significant power consumption because the LED drivers "require a significant portion of the overall pulse oximeter power budget." *Id.* at 6:67-7:4. The '776 patent states, "Intermittently reducing the drive current duty cycle can advantageously reduce power dissipation without

-13-
**Appx873**

compromising signal integrity." *Id.* at 7:2-4. Thus, in an exemplary embodiment, the '776 patent discloses intermittently reducing the duty cycle of the LED drivers from 25% to about 3.125%. *Id.* at 7:9-11, Fig. 5.

29.    In operation, a patient event, such as low oxygen saturation, may trigger the monitor to move from a low duty cycle or data off state to a high duty cycle. *Id.* at 8:47-61, Fig. 9. Conversely, if the monitor is in a high duty cycle state and neither an event nor low signal quality occurs, the monitor may transition to a low duty cycle to conserve power. *Id.* at 9:6-18. If the monitor is in the data off state and no event occurs within a prescribed time, the monitor may default to the low duty cycle. *Id.* at 9:15-18. Thus, the monitor described and claimed by the '776 patent better addresses patient events or signal quality issues than a conventional monitor that utilizes a sleep mode.

## B.    Introduction To The Independent Claims Of The '776 Patent

30.    The '776 patent has two independent claims: claims 1 (method) and 11 (apparatus). I am aware that Petitioner adopted a numbering system for the claim limitations in the Petition. *See e.g.*, Petition at 10-17. I have used the same numbering system in this declaration. Claim 1 states:

[1p] A method of operating a patient monitor configured to monitor at least a pulse rate of a patient by processing signals responsive to light attenuated by body tissue, the method comprising:

| Ground | Claims | § 103 Basis |
|--------|--------|-------------|
| 1A | 1-8, 11-16 | Richardson (APPLE-1004) (first mapping) |
| 1B | 1-9, 11-16 | Richardson (second mapping) |
| 1C | 9, 10 | Richardson (either mapping) and Bindszus (APPLE-1005) |
| 2A | 1-9, 11-16 | Richardson and Turcott (APPLE-1006) (first mapping) |
| 2B | 1-9, 11-16 | Richardson and Turcott (second mapping) |
| 2C | 9, 10 | Richardson and Turcott (either mapping) and Bindszus |

35.    As shown above, the unpatentability grounds rely on three references: Richardson (Ex. 1004), Bindszus (Ex. 1005), and Turcott (Ex. 1006).  I understand that the Examiner considered Turcott during prosecution. Ex. 1001 ('776 patent) at page 2.

### VIII.  CLAIM CONSTRUCTION OF "FIRST DUTY CYCLE" AND "SECOND DUTY CYCLE"

36.    The Board should construe "duty cycle" to mean "the ratio of operating time (or on time) of a light source to the total time period during which the light source is intermittently operated, expressed as a percentage."  The Board should also confirm that the "percentage" of the first and second duty cycles *cannot be zero* and that the first duty cycle is *different* from the second duty cycle.  These

constructions are consistent with how a person of ordinary skill in the art would have understood "first duty cycle" and "second duty cycle" at the time of filing based on the plain and ordinary meaning and intrinsic evidence (i.e., claims, specification, prosecution history).

**A.    The '776 Patent Uses "Duty Cycle" Consistent With Its Plain And Ordinary Meaning**

37.    The Modern Dictionary of Electronics defines "duty cycle" to be "[t]he ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage."  Ex. 2004 (Modern Dictionary of Electronics 7E) at 225.  This is the plain and ordinary meaning that the term would have had to a person of ordinary skill in the art in 2001.  The '776 patent uses "duty cycle" consistent with this plain and ordinary meaning.

38.    The '776 patent discloses a method of reducing the power consumption of a patient monitor by "[i]ntermittently reducing the drive current duty cycle." Ex. 1001 ('776 patent) at 6:59-7:11, Figs. 5, 8.  The "drive current" is the current supplied by the red and infrared LED drivers (also called the "emitter drivers").  *Id.* at 5:62-6:2, Fig. 4.  The LEDs operate (i.e., emit light) when the LED drivers supply current. *Id.* at 8:16-20, Fig. 8.

39.    The '776 patent consistently describes the "duty cycle" as the ratio of the operating time (or on time) of the red and infrared LEDs to the total time period during which the LEDs are intermittently operated, expressed as a percentage.  Ex.

*see also id.* at 8:20-24, Fig. 8 ("In the low duty cycle state 814, the control engine 440 (FIG. 4) causes the emitter drivers 480 (FIG. 4) to turn on sensor emitters for a relatively short time period, such as 3.125% of the time for each of the red 510 and IR 560 drive currents.").

### B.    The "First Duty Cycle" And "Second Duty Cycle" Cannot Be 0%

40.    A person of ordinary skill in the art would have understood that the "first duty cycle" and "second duty cycle" cannot be 0% based on the '776 patent's claims and specification.

41.    I will summarize the relevant portions of claims 1 and 11 relating to the "first duty cycle." Claim 1 requires "operating the patient monitor according to a first control protocol," where the first control protocol "operates the first control protocol light source according to a first duty cycle." Ex. 1001 at 11:45-46, 12:11-13. Claim 1 further requires that "when operating according to the first control protocol," the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the first control protocol light source." *Id.* at 11:51-57. Claim 11 includes similar limitations. *Id.* at 13:2-3, 13:8-14, 13:35-14:1. So to summarize, claims 1 and 11 require the "first control protocol light source" to generate light so that the patient monitor can calculate the pulse rate based on the light.

42. However, if the first control protocol light source had a duty cycle of 0%, the light source would be inactive and would ***not*** generate light. If the light source did not generate light, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11. For this reason, the "first duty cycle" must be a percentage ***greater*** than zero (i.e., it cannot be 0%) so that the first control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light.

43. I will now summarize the relevant portions of claims 1 and 11 relating to the "second duty cycle." Claim 1 requires "operating the patient monitor according to a second control protocol different from the first control protocol" where the second control protocol "operates the second control protocol light source according to a second duty cycle." Ex. 1001 at 11:63-65, 12:14-16. Claim 1 further requires that "when operating according to the second control protocol," the patient monitor calculates "measurement values of the pulse rate" that are "responsive to light from the second control protocol light source." *Id.* at 12:4-10. Claim 11 includes similar limitations. *Id.* at 13:20-22, 13:28-34, 14:2-5. Thus, claims 1 and 11 also require the "second control protocol light source" to generate light so that the patient monitor can calculate the pulse rate based on the light.

44. However, as with the first control protocol light source, if the second control protocol light source had a duty cycle of 0%, the light source would be

inactive and would **not** generate light.  If the light source did not generate light, the monitor could not calculate the "measurement values of the pulse rate" as required by claims 1 and 11.  For this reason, the "second duty cycle" must be a percentage **greater** than zero (i.e., it cannot be 0%) so that the second control protocol light source generates light, thereby permitting the monitor to calculate "measurement values of pulse rate" responsive to that light.

45.    The '776 patent's specification consistently describes a patient monitor having high and low duty cycles greater than 0%.  *E.g.*, Ex. 1001 at 2:39-44, 7:4-11, 8:14-15.  For example, in one embodiment, the duty cycle "is varied within a range from about 25% to about 3.125%."  *Id.* at 7:4-8.

46.    Rather than describe the patient monitor having a 0% duty cycle, the '776 patent's specification discloses a "data off state" where the LEDs are inactive for longer than one cycle.  *Id.* at 7:11-15 ("there may be a 'data off' time period longer than one drive current cycle").  The '776 patent distinguishes the data off state from the first and second duty cycles.  *E.g.*, *id.* at 8:14-15, 8:16-32, 8:47-61.  For example, the specification states, "[i]n **conjunction with** an intermittently reduced duty cycle or as an **independent** sampling mechanism, there may be a 'data off' time period longer than one drive current cycle where the emitter drivers 480 (FIG. 4) are turned off."  *Id.* at 7:11-15 (emphasis added).

### a)    The Red LED Does Not Operate According To A "First Duty Cycle" In State 2

66.    The red LED in Dr. Anthony's "first mapping" of Richardson does not operate according to a "first duty cycle" under the proper construction of "first duty cycle." Dr. Anthony argues that the red LED "has a duty cycle of 0%" in State 2 and a duty cycle of "at least 25%" in State 1. Ex. 1003 (Anthony Declaration) at ¶50. Dr. Anthony concedes that in State 2 "the red light source is turned off." *Id.* Yet, as explained in the section above titled "Claim Construction of 'First Duty Cycle' And 'Second Duty Cycle,'" a person of ordinary skill in the art would have understood that the "first duty cycle" cannot be 0% based on the '776 patent's claims and specification. Thus, under the proper claim construction of "first duty cycle," turning off the red LED in State 2 is not operating according to a "first duty cycle" as required by claims 1 and 11.

### b)    The Infrared LED Does Not Operate According To A "First Duty Cycle" And "Second Duty Cycle"

67.    The infrared LED in Dr. Anthony's "first mapping" of Richardson does not operate according to a "first duty cycle" and "second duty cycle" under the proper construction of those terms. Dr. Anthony concedes that the infrared LED operates at the *same* duty cycle, "at least 25%," in States 1 and 2. Ex. 1003 (Anthony Declaration) at ¶50. Yet, as explained in the section above titled "Claim Construction of 'First Duty Cycle' And 'Second Duty Cycle,'" the first and second

duty cycles are different under the proper claim construction of "first duty cycle" and "second duty cycle." Consequently, the operation of the infrared LED at a constant duty cycle in States 1 and 2 is not operating according to a "first duty cycle" and a "second duty cycle" as required by claims 1 and 11.

<p style="text-align:center;"><b>c)   <u>The Red And Infrared LEDs Do Not Operate According To A "First Duty Cycle" And "Second Duty Cycle"</u></b></p>

68. A combination of the red and infrared LEDs in Dr. Anthony's "first mapping" of Richardson would not satisfy the "first duty cycle" and a "second duty cycle." As explained in the claim construction section, a duty cycle is the "operating time (or on time) of *a light source*." Similarly, the duty cycle is "expressed as *a percentage*." While two light sources can operate at the same duty cycle, such as the red and infrared LEDs in the embodiments in the '776 patent (*see e.g.,* Ex. 1001 at 7:7-11, Fig. 5) or the infrared LED in Richardson's states 1 and 2, a person of ordinary skill in the art would not have understood a "first duty cycle" or a "second duty cycle" to encompass two distinct percentages of on time for different LEDs. Moreover, a person of ordinary skill in the would not have understood "duty cycle" to refer to the additive percentages of "on time" of two drive signals that drive different LEDs. For example, Richardson references the duty cycle of each light source in State 1 independently (at least 25%). Ex. 1004 at 4:6-7, 8:15-20. Richardson does not add the percentages for each light source together (e.g., 50%). *Id.* For this reason, the combination of Richardson's red and

infrared LEDs do not operate according to a "first duty cycle" and a "second duty cycle" as claimed.

69.     I will also note that if Dr. Anthony argues that a combination of the red and infrared LEDs somehow satisfies the "first duty cycle" and "second duty cycle," his argument would be inconsistent with other arguments in the Declaration. Dr. Anthony argues that the power consumption of the light sources operating in State 2 is different than the power consumption of the light sources operating in State 1.  Ex. 1003 (Anthony Declaration) at ¶50.    However, in making this argument, Dr. Anthony focuses exclusively on the operating state of the red LED. *Id.*  Dr. Anthony does not discuss the power consumption of the infrared LED, which one would have expected if the "first duty cycle" and "second duty cycle" are indeed a combination of the red and infrared LEDs.

70.     The '776 patent does not state that the power consumption of the patient monitor is different in State 1 and State 2.  Further, the power consumption in State 1 is not necessarily different than the power consumption in State 2.  While the red LED is turned off in State 2, a person of ordinary skill in the art would have recognized that adjustments could be made to the infrared LED operating in State 2 to increase power consumption.  For example, the intensity of the infrared LED (i.e., current supplied to the infrared LED) could be increased in State 2, which could increase power consumption enough to offset the power saved by turning off

detector are "used for both vascular plethysmography and for measuring the oxygen saturation of arterial hemoglobin." *Id.* at 9:30-32.

100.    Turcott, like Richardson, does not disclose low power patient monitors that reduce power consumption by intermittently alternating between first and second duty cycles.  Turcott simply states, "To conserve energy, the source is preferably driven with a low duty cycle pulse train." *Id.* at 11:51-52.  Thus, Turcott encourages using a single low duty cycle, but it does not disclose intermittently changing between two different duty cycles.  Turcott also states, "The optical power generated by the source is adjusted to optimize the signal to noise ratio and to minimize power consumption." *Id.* at 11:54-57.  Turcott claims this "can be done by adjusting the drive current, the frequency of the pulse train, the pulse duration, or the duty cycle of the pulse train." *Id.* at 11:57-59.  However, as discussed below, a person of ordinary skill in the art would have understood that these adjustments would happen during device design or setup.  Turcott never explains how a person of ordinary skill would make the adjustments during operation of the device and never discloses or suggests intermittently changing the duty cycle during operation.

**C.    Claims 1 And 11: Turcott Does Not Disclose Or Suggest Operating At First And Second Duty Cycles**

101.    Dr. Anthony argues that Turcott suggests reducing the duty cycle of a light source and that this suggestion would have motivated a person of ordinary skill in the art to reduce the duty cycle in one of Richardson's states to yield two

Turcott would include implementing the oximeter to reduce the duty cycle of the pulse train for operating the infrared light source in State 2 as compared to the duty cycle of the pulse train for operating the infrared or red light source in State 1." Ex. 1003 at ¶88. In his "second mapping," "a POSITA would have found it obvious that the duty cycle for these different frequencies would be adjusted differently to minimize the power consumption, and thus the duty cycle for the first selected frequency would be different from the duty cycle for the second selected frequency." *Id.* at ¶96.

112.    However, in order for Richardson's oximeter to adjust the duty cycle of Richardson's LEDs, the oximeter must send a signal to the emitter drivers and the emitter drivers must be capable of changing the duty cycle of supplied current between different non-zero duty cycles based on the signal. Yet, Richardson does not send a signal to the emitter drivers to change the duty cycle. Richardson only turns the LEDs off or operates the LEDs at a 25% duty cycle. Richardson would need, at a minimum, additional hardware and/or software to change the duty cycles and some sort of trigger to change the duty cycles. Richardson discloses neither. Moreover, Dr. Anthony does not propose any modifications to Richardson's hardware and/or software to address these deficiencies. Therefore, Dr. Anthony has not demonstrated that a person of ordinary skill in the art would have been motivated to combine Richardson and Turcott to adjust the duty cycle of

Richardson's oximeter, much less that a person of ordinary skill in the art would have had a reasonable expectation of success in so doing.

E.    **Claims 1 And 11: A Person Of Ordinary Skill In The Art Would Not Have Been Motivated To Reduce The Duty Cycle In The "First Mapping"**

113.    Dr. Anthony argues that a "POSITA would have recognized that the predictable modification of Richardson's oximeter as suggested by Turcott would include implementing the oximeter to reduce the duty cycle of the pulse train for operating the infrared light source in State 2, as compared to the duty cycle of the pulse train for operating the infrared or red light source in State 1, to minimize power consumption, as suggested by Turcott." Ex. 1003 at ¶87. As explained above, Turcott does not disclose or suggest operating according to two different duty cycles (i.e., first and second duty cycles). Moreover, a person of ordinary skill in the art would not have been motivated to reduce the duty cycle of the pulse train for operating the infrared light source in Richardson's State 2, as Dr. Anthony proposes. Rather, a person of ordinary skill in the art would have been discouraged from making such a reduction.

114.    In State 2, Richardson's oximeter reassesses the noise "by turning off one LED; typically the red LED." Ex. 1004 at 6:2-3. Richardson discloses that "[t]he red LED is turned off for approximately 1.4 seconds." *Id.* at 9:52-53. When



SEVENTH EDITION

# MODERN

# DICTIONARY

of

# ELECTRONICS

RUDOLF F. GRAF

Newnes

MASIMO 2004
Apple v. Masimo
IPR2020-01524

Newnes is an imprint of Butterworth-Heinemann.

Copyright © 1999 by Rudolf F. Graf

 A member of the Reed Elsevier Group.

All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher.

 Recognizing the importance of preserving what has been written, Butterworth-Heinemann prints its books on acid-free paper whenever possible.

 Butterworth-Heinemann supports the efforts of American Forests and the Global ReLeaf program in its campaign for the betterment of trees, forests, and our environment.

**Library of Congress Cataloging-in-Publication Data**

Graf, Rudolf F.
   Modern dictionary of electronics / Rudolf F. Graf. — 7th ed.,
 revised and updated.
     p.    cm.
   ISBN 0-7506-9866-7 (alk. paper)
   1. Electronics — Dictionaries. I. Title
TK7804.G67   1999
621.381'03 — dc21                                    99-17889
                                                      CIP

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library.

The publisher offers special discounts on bulk orders of this book.
For information, please contact:
Manager of Special Sales
Butterworth-Heinemann
225 Wildwood Avenue
Woburn, MA 01801-2041
Tel: 781-904-2500
Fax: 781-904-2620

For information on all Butterworth-Heinemann publications available, contact
our World Wide Web home page at: http://www.bh.com

10 9 8 7 6 5 4 3 2 1

Typeset by Laser Words, Madras, India
Printed in the United States of America

**Appx956**

purpose of making the receiving device unresponsive to outgoing signal currents.

**duplex cable** — A cable composed of two insulated stranded conductors twisted together. They may or may not have a common insulating covering.

**duplex channel** — A communication channel providing simultaneous transmission in both directions.

**duplexer** — 1. A radar device that, by using the transmitted pulse, automatically switches the antenna from receive to transmit at the proper time. 2. Highly selectable, tunable filters that allow a transmitter and receiver to use one common antenna.

**duplexing assembly (radar)** — *See* transmit-receive switch.

**duplex operation** — Simultaneous operation of transmitting and receiving apparatus at two locations.

**duplex system** — A system with two distinct and separate sets of facilities, each of which is capable of assuming the system function while the other assumes a standby status. Usually both sets are identical in nature.

**duplex tube** — A combination of two vacuum tubes on one envelope.

**duplicate** — To copy in such a way that the result has the same physical form as the source. For example, to make a new punched card that has the same pattern of holes as an original punched card.

**duplication check** — A computer check in which the same operation or program is checked twice to make sure the same result is obtained both times.

**Duraspark** — Conventional (Ford Motor) electronic ignition for use with high-voltage, high-energy spark timing control.

**duration control** — A control for adjusting the time duration of reduced gain in a sensitivity time control circuit.

**duress alarm device** — A device that produces either a silent alarm or local alarm under a condition of personnel stress such as holdup, fire, illness, or other panic or emergency. The device is normally manually operated and may be fixed or portable.

**duress alarm system** — An alarm system that employs a duress alarm device.

**during cycle** — The interval while a timer is operating for its preset time period.

**dust core** — A pulverized iron core consisting of extremely fine iron particles mixed with a binding material for use in radio-frequency coils.

**dust cover** — A device specifically designed to cover the mating end of a connector so as to provide mechanical and/or environmental protection.

**DUT** — Abbreviation for device under test.

**duty cycle** — 1. Ratio of working time to total time for intermittently operated devices. 2. The ratio of on-time to off-time in a periodic on-off cycle. 3. The ratio of operating time to total elapsed time of a device that operates intermittently, expressed as a percentage. 4. In percent, $100(t_o/T)$, where $T$ is the period between pulses and $t_o$ is the pulse width.

**duty cyclometer** — A test meter that gives a direct reading of duty cycle.

**duty factor** — 1. In a carrier composed of regularly recurring pulses, the product of their duration and repetition frequency. 2. Ratio of average to peak power. 3. Same as duty cycle except it is expressed as a decimal rather than a percentage. Usually calculated by multiplying pulses per second times pulse width.

**duty ratio** — In a pulsed system, such as radar, the ratio of average to peak power.

**DVD** — Abbreviation for the digital versatile disc and digital video disk. A high capacity optical storage medium

with improved capacity and bandwidth over the CD for prerecorded multimedia program material with applications in video playback and PC areas.

**dv/dt** — The rate of change of voltage with respect to time. Proportional to current in a capacitor.

**Dvorak keyboard** — A keyboard arrangement designed by August Dvorak for increased speed and comfort. It reduces the rate of errors by placing the most frequently used letters in the center of the keyboard for use by the strongest fingers.

**DX** — 1. Abbreviation for distance. 2. Reception of distant stations. 3. Distant and/or difficult to hear radio stations.

**DXer** — One who listens to distant or hard-to-hear stations as a hobby.

**DX hound** — An amateur who specializes in making distant contacts.

**DXing** — The hobby of listening to distant or otherwise hard-to-hear stations.

**dyadic Boolean operator** — A Boolean operator that has two operands. The dyadic Boolean operators are AND, exclusive OR, NAND, NOR, and OR.

**dyadic operation** — An operation on two operands.

**dye laser** — A laser using a dye solution as its active medium. Its output is a short pulse of broad spectral content, and its achievable gain is high. Dye lasers function at room temperature. Synchronous pumping can be used to produce a continuous train of tunable picosecond pulses for sustained periods.

**dynamic** — 1. Of, concerning, or dependent on conditions or parameters that change, particularly as functions of time. 2. A speaker drive principle using the interaction between the magnetic field surrounding a voice coil carrying a signal current and a fixed magnetic field to move the coil and the cone to which it is attached. 3. A headphone driver using a voice coil in a magnetic field driving a paper or plastic diaphragm, as in a speaker.

**dynamic acceleration** — Acceleration in a constantly changing magnitude and direction, either simple or complex motion, usually called vibration. Also measured in gravity units.

**dynamically balanced arm** — A type of tonearm whose masses are balanced about its pivot, with tracking force applied by a spring. This type of arm does not require that the turntable be level for proper tracking.

**dynamic analogies** — The similarities in form between the differential equations that describe electrical, acoustical, and mechanical systems that allow acoustical and mechanical systems to be reduced to equivalent electrical networks, which are conceptually simpler than the original systems.

**dynamic analysis** — Execution of an instrumented program to collect information on its behavior and correctness.

**dynamic behavior** — The way a system or individual unit functions with respect to time.

**dynamic braking** — 1. A system of braking of an electric drive in which the motor is used as a generator, and the kinetic energy of the motor and driven machinery is employed as the actuating means of exerting a retarding force. 2. A type of motor braking caused by current being applied to the windings after the power is shut off. This is accomplished either by self-excitation (dc motors) or by separate excitation (ac motors).

**dynamic burn-in** — High-temperature test with devices subject to actual or simulated operating conditions.

**dynamic cell** — A memory cell that stores data as charge (or absence of charge) on a capacitor. A typical cell isolates the capacitor from the data line (bit line) with a transistor switch. Thus, when no read or write operation is desired, there is essentially no power required

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————

Case IPR2020-01524
Patent No. 10,433,776

———————

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE**

The arguments in Masimo's POR attempt to overcome the substantial

evidence of unpatentability of the challenged claims.  These arguments fail

because, as explained in the Petition and further clarified below, the cited prior art

references render the challenged claims of the '776 patent unpatentable.

## I.    CLAIM CONSTRUCTION

### A.    "first duty cycle" and "second duty cycle"

#### 1.    The "first duty cycle" can be 0%.

Masimo alleges that the "first duty cycle" cannot be 0%.  POR, 19.

However, nothing in the claim language or specification of the '776 patent

supports such a restriction.

For support, Masimo points to the claim 1 language "when operating

according to the first control protocol, calculating... measurement values of the

pulse rate, the measurement values responsive to light from the first control

protocol light source."  POR, 20; APPLE-1001, 11:51-54, 13:8-11.  But this claim

requirement is still satisfied when the "first duty cycle" is 0%.  Specifically, claims

1 and 11 recite "the first control protocol light source including ***one or more of a***

***plurality of light sources***" and "operating of the patient monitor according to the

first control protocol operates the first control protocol light source according to a

first duty cycle."  APPLE-1001, 11:48-50, 12:11-13, 13:5-7, 13:35-14:1.  Under

the plain language of the claims, "when operating according to the first control

1

Case No. IPR2020-01524
Attorney Docket: 50095-0003IP1

protocol," "one or more of a plurality of light sources" are operated "according to a first duty cycle." *Id.* As long as one of the plurality of light sources is operated at a duty cycle greater than 0%, the patient monitor can calculate measurement values of the pulse rate from that one light source even if another of the plurality of light sources is operated at a duty cycle of 0%. *See id.* The Petition establishes this in the first mapping of Richardson, where the infrared light source is operated with a duty cycle of at least 25% to monitor at least a pulse rate of a patient, while the red light source is operated with a duty cycle of 0%. Petition, 12-13, 15-16; APPLE-1003, ¶¶44-45, 49-50.

Further, claims 6 and 15 specifically allow for the "first duty cycle" to be 0%. Specifically, these claims recite "operating the patient monitor in accordance with the first control protocol comprises operating the first control protocol light source in a data off state." APPLE-1001, 12:43-46, 14:23-26. In other words, these claims require that the "one or more of the plurality of light sources," that are included in the "first control protocol light source" and operated according to the "first duty cycle," be operated in "a data off state." *Id.*; APPLE-1001, 11:48-50, 12:11-13, 13:5-7, 13:35-14:1. To satisfy these claims, the "first duty cycle" corresponds to "a data off state." *Id.* A light source operating with a duty cycle of 0% is operating in a data off state, as established by Petitioner in the first mapping of Richardson and undisputed by Masimo. Petition, 21; APPLE-1003, ¶¶44-45,

2

56.

As Masimo acknowledges, the '776 specification explains that operating in the data off state can be "[i]n ***conjunction*** with an intermittently reduced duty cycle."  APPLE-1001, 7:11-15.  As such, the data off state and the reduced duty cycle can occur at the same time; *i.e.*, the reduced duty cycle can correspond to the data off state.  *Id.*

In alleging that the '776 patent distinguishes the data off state from the first duty cycle, Masimo mischaracterizes the '776 specification.  POR, 22.  In fact, the specification describes three control states: "high duty cycle," "low duty cycle," and "data off."  APPLE-1001, 8:14-32, 8:47-61.  The '776 specification does not indicate which control state corresponds to the claimed "first duty cycle" and "second duty cycle."  As discussed above, claims 6 and 15 specifically allow the "first duty cycle" to correspond to "a data off state."  Accordingly, any of the three controls states can correspond to the claimed "first duty cycle" or "second duty cycle."

Thus, the claims and specification specifically contemplate the "first duty cycle" being 0%.  Therefore, Masimo's construction is unjustifiably limiting and should not be adopted.

3

unclaimed and undisclosed feature... cannot be the basis for finding [a] patent to be non-obvious over the prior art.").

## III.   RICHARDSON (FIRST MAPPING) RENDERS CLAIMS 1-8 AND 11-16 OBVIOUS (GROUND 1A)

### A.   Richardson teaches "a first control protocol light source... including one or more of a plurality of light sources" operated "according to a first duty cycle" and "a second control protocol light source... including one or more of the plurality of light sources" operated "according to a second duty cycle."

The Petition establishes that Richardson's oximeter includes a red LED and an infrared LED, which are "a plurality of light sources." APPLE-1004, 1:37-45, 4:2-5; Petition, 11-13; APPLE-1003, ¶¶42-45. Because the "first control protocol light source" includes "one or more of a plurality of light sources," the "first control protocol light source" includes one or more of the red LED or the infrared LED. *Id.* In Richardson's State 2 ("first control protocol"), the red LED is turned off and has a duty cycle of 0%, and the infrared LED is operated with a duty cycle of at least 25%. *Id.*; APPLE-1003, ¶¶49-50; APPLE-1004, 9:40-43, 6:2-4, 9:52-63, 4:6-10; Petition, 16. As such, the Petition establishes that the "first control protocol light source" includes both the red LED and the infrared LED, and that Richardson teaches operating "the first control protocol light source according to a first duty cycle" because the red LED of the "first control protocol light source" is operated according to the "first duty cycle" of 0%. *Id.* As discussed in Section

9

Filed: December 2, 2021

Filed on behalf of:
  Patent Owner Masimo Corporation
By:  Joseph R. Re (Reg. No. 31,291)
  Stephen W. Larson (Reg. No. 69,133)
  Jarom D. Kesler (Reg. No. 57,046)
  Jacob L. Peterson (Reg. No. 65,096)
  Joshua J. Stowell (Reg. No. 64,096)

  KNOBBE, MARTENS, OLSON & BEAR, LLP
  2040 Main Street, Fourteenth Floor
  Irvine, CA 92614
  Tel.:  (949) 760-0404
  Fax:  (949) 760-9502
  E-mail:  AppleIPR2020-1524-776@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

————————————

Case IPR2020-01524
U.S. Patent 10,433,776

————————————

**PATENT OWNER'S SUR REPLY TO REPLY**

IPR2020-01524
Apple Inc. v. Masimo Corporation

## I.    CONSTRUCTION OF FIRST AND SECOND DUTY CYCLE

### A.    The First And Second Duty Cycles Cannot Be 0%

Independent claims 1 and 11 require the first and second control protocol light sources to generate light so that the patient monitor can calculate a pulse rate based on the light. (POR 19-22; Ex. 2002, ¶¶41-42.) Therefore, the first and second duty cycles cannot be 0% because the light sources would not generate light. (*Id.*)

Petitioner newly argues in reply that the claims can still be satisfied "when the 'first duty cycle' is 0%"[1] because claims 1 and 11 state, "the first control protocol light source including one or more of a plurality of light sources." (Reply 1.) Petitioner asserts that "[a]s long as one of the plurality of light sources is operated at a duty cycle greater than 0%, the patient monitor can calculate measurement values of the pulse rate from that one light source even if another of the plurality of light sources is operated at a duty cycle of 0%." (*Id.*, 1-2.)

Petitioner is incorrect. The claims do not state that "one or more of a plurality of light sources" operate according to a first duty cycle. Rather, the claims state, "the first control protocol operates the *first control protocol light source according to a first duty cycle*." (*See e.g.*, Ex. 1001, claim 1 (emphases added).) Thus, the claims presume that the individual light source(s) that comprise the first protocol light source operate according to the same, first duty cycle. Masimo's

---

[1] Petitioner does not address the "second duty cycle" in reply.

declarant testified that a POSITA "would not have understood a 'first duty cycle' or a 'second duty cycle' to encompass two distinct percentages of on time for different LEDs." (Ex. 2002, ¶68; *see also* POR 37.) This testimony is unrebutted.

Petitioner's argument is also inconsistent with the specification. The '776 patent consistently describes patient monitors having multiple LEDs, which operate at the same low or high duty cycle. (*See e.g.*, Ex. 1001, 6:59-7:18, Fig. 5.) The '776 patent does not disclose monitors that simultaneously drive multiple LEDs at different duty cycles. (POR 21-22; Ex. 2002, ¶¶45-46.)

The '776 patent also distinguishes between high and low duty cycles and a "data off state." (*Id.*) Petitioner recognizes that a "light source operating with a duty cycle of 0% is operating in a data off state." (Reply 2.) However, Petitioner argues, "claims 6 and 15 specifically allow for the 'first duty cycle' to be 0%" and that "[t]o satisfy [claims 6 and 15], the 'first duty cycle' corresponds to 'a data off state.'" (*Id.*) Petitioner is incorrect.

Claims 6 and 15 state:

> *wherein said [operating/operation of] the patient monitor in accordance with the first control protocol* **comprises** *operating the first control protocol light source in a data off state.*

(Ex. 1001, claims 6, 15 (emphasis added).) Notably, claims 6 and 15 do not state that the first duty cycle is a data off state, as Petitioner argues. Rather, claims 6 and

Trials@uspto.gov                                    Paper # 28
571-272-7822                          Entered: February 16, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————————

IPR2020-01524
Patent 10,433,776 B2

————————————

Record of Oral Hearing
Held:  January 19, 2022

————————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

IPR2020-01524
Patent 10,433,776 B2

APPEARANCES:

ON BEHALF OF THE PETITIONER:

    DAN SMITH, ESQUIRE
    KARL RENNER, ESQUIRE
    Fish & Richardson
    1000 Maine Avenue, S.W.
    Washington, D.C.  20024


ON BEHALF OF PATENT OWNER:

    JOSH STOWELL, ESQUIRE
    Knobbe, Martens, Olson & Bear, LLP
    2040 Main Street
    Irvine, CA  92614


    The above-entitled matter came on for hearing on Wednesday, January 19, 2022, commencing at 2:08 p.m., EDT, at the U.S. Patent and Trademark Office, by video/by telephone, before Chris Hofer, Notary Public.

IPR2020-01524
Patent 10,433,776 B2

1    If we can go to slide 6.  You'll recall that the petition grounds applied

2    two different mappings of Richardson. The first mapping assumes that the

3    claims require the first and second duty cycles to be different while the

4    second mapping assumes that the claims allow the first and second duty

5    cycles to be the same.  As shown in the excerpts from the petition in the

6    POR here on slide 6, the parties agree that the claims require the first and

7    second duty cycle to be different.  So, all of the record evidence

8    demonstrates unpatentability under either interpretation.  We're going to

9    focus our presentation today on the first mapping of Richardson.

10    If we could go to slide 8.  And as highlighted in the clips on the right

11    side of this slide, Richardson contemplates two different operating states that

12    are relevant to the first mapping and I'll briefly explain each of them, then

13    discuss the application of the claims.   Starting with the lower right clip in

14    blue that is State 1 in Richardson and that's Richardson's normal operating

15    state in which the first control protocol light source component LEDs are

16    operated according to, excuse me, the control protocol light source

17    component LEDs are operated with the infrared LED having a duty cycle

18    greater than 25 percent and the red LED having a duty cycle of 25 percent.

19    The output of State 1 is signals reflecting discernible physiological

20    characteristics based on light captured after interacting with the illuminated

21    tissue.

22    The upper right clip shown in purple is State 2 of Richardson.  State 2

23    is used to detect changes in ambient light in the red channel.  It occurs every

24    30 seconds.  Richardson describes it occurs every 30 seconds.  Effectively

25    what happens is the device turns off the red LED and continues to measure

6

IPR2020-01524
Patent 10,433,776 B2

1   we're in high duty they're operating at 25 percent and so Judge Kinder, to

2   answer one of your questions there is no disclosure in the '776 patent of

3   operating the red LED at one duty cycle and the infrared LED at a second

4   duty cycle.  That's not --

5       JUDGE KINDER:  This is Judge Kinder and I guess to follow up to

6   you though, kind of the converse of that, is there anything in the

7   specification that says you can't do that?  Any kind of indication where it

8   would discourage that?

9       MR. STOWELL:  There is no indication in the patent that would

10  discourage that although frankly the technology is not really described in the

11  patent.  That invention is not described in the level of detail you would

12  expect if that were something that were envisioned.  But there's no express

13  teaching against that.

14      JUDGE KINDER:  Okay.  Thank you.

15      MR. STOWELL:  If we go to slide 9, here we see an example of the

16  system running at a low duty cycle.  That's the green and you can see the

17  power consumption when the patient monitor is running according to a low

18  duty cycle.  We also have a high duty cycle.  That's the red.  When the

19  patient monitor is running according to the high duty cycle it consumes more

20  power and there is also a data off state.  If you look to the lower right of the

21  figure you see the data off and that is where the light source is turned off for

22  more than one period.  That's referred to as the data off state and so, Judge

23  Kinder, you had asked about the language in the patent that working in

24  conjunction with, having duty cycles a first and second duty cycle in

25  conjunction with a data off state.  This is an example of first and second duty

25

IPR2020-01524
Patent 10,433,776 B2

1    JUDGE COCKS:  This is Judge Cocks.  I actually have one question

2    going forward.  I think you said earlier that the specification of the '776

3    patent does not itself contemplate a duty cycle in which the red and the

4    infrared duty cycles are different from one another but I think you said the

5    specification does not exclude that.  Is that accurate?  So, it doesn't exclude a

6    duty cycle, say the red at being 3 percent and the infrared at being 25

7    percent?  Is that an accurate statement?

8    MR. STOWELL:  That's right.  There's no -- sorry, Your Honor --

9    there's no express statement in the patent that says, you know, you could not

10   mix and match your duty cycles.  But I will bring this back to the claims a

11   little bit because in the claims we have a first control protocol light source

12   that operates according to a first duty cycle.  So, in our claims, our first

13   control protocol light source must operate according to a first duty cycle.

14   Now, the first control protocol light source can have a first light source and a

15   second light source or one or more of a plurality of light sources but claim 1

16   does not say that one of a plurality of light sources operates according to a

17   first duty cycle, it says the first control protocol light source operates

18   according to a first control protocol.  So whatever lights are part of the first

19   control light source, those operate according to the same duty cycle.

20   So, while the patent may not, you know, exclude maybe mixing and

21   matching duty cycles somehow between light sources, the claim requires

22   that whatever your first control protocol light source is that you're using the

23   same duty cycle for both LEDs.

24   JUDGE KINDER:  This is Judge Kinder and kind of a follow-up

25   question then and I guess it goes to the heart of Richardson and your second

28

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on February 15, 2023, I electronically filed the foregoing

**JOINT APPENDIX** using the Court's CM/ECF filing system.  Counsel for

appellee were electronically served by and through the Court's CM/ECF filing

system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).


*/s/ Lauren A. Degnan*
Lauren A. Degnan